1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

Phillip Potter
2301 N. 66th Street
Scottsdale, Arizona 85257
Phone: 480.459.0310
E-Mail: phillip.t.potter@gmail.com
Plaintiff
Pro Se

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Phillip Potter,<br>                    Plaintiff,<br><br>v.<br><br>Robert Meza, ~~a married man~~ in his private capacity; Karrin Taylor Robson, ~~a married woman~~ in her private capacity; Alane Ortega, ~~a married woman~~; <u>Kris Mayes, in her official capacity as Arizona Attorney General; Joseph Welty, in his official administrative capacity as Presiding Judge of the Maricopa County Superior Court</u>; and Does 1-60, inclusive,<br>                    Defendants. | No. <u>2:25-cv-00663-PHX-DWL</u><br><br>**FIRST AMENDED COMPLAINT**<br><br>(Jury <u>Trial Demanded</u> ~~Requested~~) |

## OVERVIEW

71.    This action presents a ~~brings~~ <u>(1)</u> First Amendment facial challenge to A.R.S. § 12-3201; <u>(2)</u> a 42 U.S.C. § 1983 claim ~~for damages~~ arising from ~~intentional~~ <u>the</u> deprivation of constitutional rights under color of law<u>; and (3) related intentional torts where a state legislator caught trading his public office for private gain, and his associates,</u>

are liable for acts committed to conceal their unlawful routing of state-administered federal funds to the legislator via nonprofits., ~~and brings factually intertwined state claims for Abuse of Process, Aiding and Abetting, and Civil Conspiracy.~~

BACKGROUND

Robert Meza Traded His Public Office for Private Gain

72.     ~~Defendants engaged in concerted litigation misconduct to conceal their involvement in former~~ State Representative Robert Meza devised a fraudulent scheme (the "Scheme") where, under color of office[1], he corruptly secured public funds for six Medicaid-approved nonprofit behavioral health services organizations (collectively, the "Nonprofits"; individually, "NP1", "NP2", "NP3", "NP3", "NP4", "NP5", and "NP6"). ~~'s fraud schemes and laundering of public funds through six complicit Medicaid-approved behavioral health nonprofits (Chicanos Por La Causa, Sojourner Center, Jewish Family & Children's Services, PSA Behavioral Health Agency[2], Open Hearts Family Wellness, and the Arouet Foundation). The corruption is under state and federal investigation. Plaintiff is a witness to the type of government fraud that has become an intense focus of the Presidential administration; a circumstance which seems to have only heightened Defendants' tortious conduct.~~

73.     With intent to defraud, and through the artifice of a benevolent legislator

---

[1]     "No distinction exists between acts under color of office and those by virtue of office; both are 'official' acts". *McDonald v. Thomas,* 198 Ariz. 590, ¶¶ 24-35, 12 P.3d 1194 (App.2000) "[A]n official act is 'any act done by [an] officer in his official capacity, under color and by virtue of his office.' ... . This, of course, is broad enough to cover any action taken by the [elected official] in performing the duties of his office. ... [This broad definition] creates a record the public may inspect to determine what has been done and to be informed of the contents of the official record. ... [This] prevent[s] [government] activity from slipping below public scrutiny". *Id*.

[2]     PSA Behavioral Health Agency now does business as Resilient Health.

2

voluntarily supporting constituents,[3] Meza solicited and secured public funds from state officials with authority to allocate those funds.  Officials that Meza defrauded include the Governor, state legislators, leaders of state agencies, and A.R.S. § 36-2906.01(A) Arizona Health Care Cost Containment System ("AHCCCS") "system contractor" executives.  His willful omission of material facts regarding his private pay arrangements effectuated the Scheme, and deceived officials into authorizing funds that went to the Nonprofits.

74.    The Scheme violated state statutes, federal codes, and government contracts proscribing bribes, kickbacks, and frauds, including Medicaid fraud.[4]

75.    In return for increased organizational revenues, and in pursuit of enhanced compensation derived from those revenues, the Nonprofits' complicit executives (1) knowingly received and deposited corruptly obtained public funds into the Nonprofits' corporate bank accounts; (2) actively concealed the true nature of those funds to evade internal controls and external regulations; and (3) ensured Meza received a monthly payment for sham consulting services which had no value beyond his elected office.

76.    Meza and the Nonprofits' complicit executives knowingly and willfully participated in the Scheme and acted in concert under agreement.  The primary objects of that agreement were (1) to fraudulently obtain and distribute public funds for mutual personal benefit; and (2) to maintain secrecy and prevent investigations into the Scheme.

77.    On information and belief, and evidence obtained, each Nonprofit paid

---

[3]    Arizona legislators who actively support their constituents perform "official acts" in the form of "political acts" which enjoy no immunity or privilege.  *See Fann v. Kemp in and for the County of Maricopa*, 515 P. 3d 1275 (2022).

[4]    Pursuant to 42 CFR 455.2, Medicaid Fraud is defined as "an intentional deception or misrepresentation made by a person with the knowledge that the deception could result in some unauthorized benefit to himself or some other person.  It includes any act that constitutes fraud under applicable State or Federal law."  *See e.g.*, 18 U.S.C. § 371; 18 U.S.C. § 1347; 31 U.S.C. § 3729, *et seq.*; 42 U.S.C. § 1320a-7b(b).

Meza paid $1,000 - $3,000 per month.  Meza personally received more than $1,000,000 in total spread across 250-300 payments unlawfully sourced from public funds while the Scheme was fully operational from 2014 - 2021.

78.    To conceal the true nature of this financial activity, the complicit executives authorized and instructed Meza's payments to be made through Ameliorate, LLC.

79.    Robert Meza is, and has always been, the sole member of Ameliorate, LLC ("Ameliorate") per Arizona Corporation Commission records.

80.    From 2014 - 2021, Ameliorate possessed no external marks of a legitimate consulting business such as a website, marketing materials, social media presence, dedicated phone number, business email address, business liability insurance, or client contracts detailing statements-of-work or articulating industry accepted deliverables.

81.    During that time period, Ameliorate functioned in truth as a corporate vehicle to unlawfully process corruptly obtained public funds as part of the Scheme.

82.    As part of the Scheme's primary revenue source, Meza solicited and secured state-administered Medicaid funds from A.R.S. § 36-2906.01(A) AHCCCS "system contractors" including Mercy Care which receives more than $4B annually to administer Medicaid health insurance plans in Maricopa County, and serves as an insurance payor.

83.    Mercy Care C-suite executive "TG" knowingly and willfully participated in the Scheme, as he was fully aware that a portion of the public funds that he authorized to benefit the Nonprofits would be passed on to Meza.  Specifically, TG facilitated state-administered Medicaid funds to be selectively provided to the Nonprofits disguised as periodic corporate grants, annual corporate event sponsorships, and ongoing enhanced rate services contracts.[5]  Other nonprofits did not receive the same considerations or benefits.

---

[5]    Per A.R.S. § 13-2311 Fraudulent Schemes and Practices, "[n]otwithstanding any

4

84.    The Scheme also maintained a secondary revenue source derived from corruptly obtained private funds.  The Nonprofits held fundraising events where, again through the artifice of a benevolent legislator supporting constituents, Meza operated under color of office to solicit and secure corporate sponsorships from unwary registered lobbyists and corporate executives seeking his political favor.  Per the Scheme, Meza willfully withheld the material facts of his private pay from unwary private funders.[6, 7, 8]

provision of the law to the contrary, in any matter related to the business conducted by any department or agency of this state or any political subdivision thereof, any person who, pursuant to a scheme or artifice to defraud or deceive, knowingly falsifies, conceals or covers up a material fact by any trick, scheme or device or makes or uses any false writing or document knowing such writing or document contains any false, fictitious or fraudulent statement or entry is guilty of a class 5 felony."  "Scheme or artifice to defraud means to form a plan, device or trick to perpetrate a fraud upon another. ...  A fraudulent representation may be effected by deceitful statements, half-truths or the concealment of any material fact as well as by affirmative statement or acts."  *State v. Bridgeforth*, 156 Ariz. 60, 63, 750 P.2d 3, 6 (1988).  "[I]ntent to defraud is found where the defendant intends to cause a pecuniary loss or gain."  *State v. Thompson,* 194 Ariz. 295, ¶ 13, 981 P.2d 595, 598 (App. 1999).  "The intent to defraud can [also] be established by proving the defendant devised the fraudulent scheme or willfully participated in it with knowledge of its fraudulent nature".  *Bridgeforth*.

[6]    A.R.S. § 13-2310 Fraudulent Schemes and Artifices is violated whenever someone "knowingly, pursuant to a scheme or artifice to defraud, obtained any benefit by means of false pretenses, representations, promises or material omissions".  "The word benefit means anything of value or advantage, present or prospective."  *Bridgeforth*.

[7]    Meza routinely presented himself under color of office before and during events to further the artifice of a benevolent legislator voluntarily supporting his constituents.  For example, Meza appeared with the NP2 CEO on an April 12, 2016 podcast to promote an upcoming NP2 event that a sponsor "underwrote for $25,000".  Presenting himself as "Senator Robert Meza", but omitting the material fact of his private pay, he stated "for me politically ... it affects us at the city, state, and national level ... as a policy maker I know that I have to be strategically involved in the whole process and I'm glad I'm involved right now with this [Sojourner] team ... I will help with whatever they need".  *See* https://inspiredmedia360tv.com/ Podcast Episode 60; Exhibit B.

[8]    Meza also unlawfully routed election campaign funds to his private benefit via NP3 which received at least $9,100 originating from Meza's campaign accounts ($1,000 on May 22, 2015; $100 on January 22, 2016; $1,000 on April 22, 2016; $2,500 on December 20, 2017; $1,000 on October 28, 2018; $2,500 on February 1, 2019; and $1,000 on

1

Plaintiff Forced The Scheme To Be Revealed

2

3      85.    Despite the obstructive and malicious intent behind Defendants' criminally

and civilly actionable misconduct, (1) public records revealed Meza was under mounting

4

financial distress from 2010 through 2014[9], devised a fraudulent scheme to escape that

5

distress, solicited and secured public funds by omitting material facts of his private pay

6

from unwary state officials between 2014 and 2021, laundered a large portion of those

7

funds back to himself through complicit nonprofits, on three occasions arranged for

8

complicit nonprofits to "acquire" other complicit nonprofits to keep the scheme from

9

coming to light, and launched targeted personal and professional attacks on at least four

10

witnesses to obstruct criminal investigations via intimidation and misrepresentations; (2)

11

public records and other evidence revealed the CEO of an A.R.S. § 36-2906.01(A)

12

AHCCCS "system contractor" responsible for annually administering more than $4B in

13

state and federal funds knowingly facilitated Meza's Medicaid fraud[10] scheme since 2016,

14

15     ───────────────────

September 24, 2020).  Meza disguised the transactions as election campaign contributions
16     to a 501(c)(3) to be comingled with other corruptly obtained funds, and used to pay Meza.

17     [9]     Per Maricopa County Recorder records, Meza's house on W. Virginia Avenue
repeatedly fell into foreclosure beginning in 2010 while his partner became the subject of
18     judgments and liens for an inability to pay the couple's debts and financial obligations.
[10]    The Arizona Health Care Cost Containment System ("AHCCCS") follows the
19     federal definition of Medicaid fraud as "[a]n intentional deception or misrepresentation
made by a person with the knowledge that the deception could result in some
20     unauthorized benefit to himself or some other person.  It includes any act that constitutes
fraud under applicable State or Federal law, as defined in 42 CFR 455.2."  See
21     https://www.azahcccs.gov/Resources/Downloads/ContractAmendments/RBHAs/YH1700
01MMICAMD11.pdf.  This definition references, and is consistent with, Arizona's fraud
22     statutes where A.R.S. § 13-2310 Fraudulent Schemes and Artifices is violated whenever
someone "knowingly, pursuant to a scheme or artifice to defraud, obtained any benefit by
23     means of false pretenses, representations, promises or material omissions".  "Scheme or
artifice to defraud means to form a plan, device or trick to perpetrate a fraud upon another.
24     The word benefit means anything of value or advantage, present or prospective.  A
fraudulent representation may be effected by deceitful statements, half-truths or the
25     concealment of any material fact as well as by affirmative statement or acts."  State v.

26

and then knowingly misrepresented the terms of the contractor's AHCCCS contract to avoid public records disclosure implicating his knowing involvement in Meza's scheme; (3) non-criminal investigations conducted by the Arizona House of Representatives, the Arizona House and Arizona Senate Ethics Committees, and *The Arizona Republic* (*see* https://tinyurl.com/2s3wedcf) corroborated the public corruption; (4) complicit nonprofits abruptly ceased paying Meza for sham "consulting" services once the corruption came to light; (5) evidence extracted through public records litigation show Defendant Karrin Taylor Robson facilitated Meza's corruption to further her desire for statewide political office; and (6) Defendant Alane Ortega, who is the daughter-in-law of one of the complicit nonprofit's founders, was placed on year-long probation in April 2021 for serial professional misconduct where the State Bar of Arizona found Ortega knowingly made serial factual misrepresentations in numerous cases, and she has continued to knowingly make factual misrepresentations in violation of her probation terms and professional responsibilities.

86.    Defendants intentionally caused Plaintiff to suffer compensable and irreparable injuries when jointly abusing judicial processes, including through the unprecedented weaponization of A.R.S. § 12-3201 in public records litigation, knowing the statute was not constitutional per Ninth Circuit precedent.

87.    Defendants (1) engaged in First Amendment retaliation against Plaintiff for

*Bridgeforth*, 156 Ariz. 60, 63, 750 P.2d 3, 6 (1988); *State v. Henry,* 205 Ariz. 229 68 P.3d 455 (App. 2003).  See also A.R.S. § 13-2311 Fraudulent Schemes and Practices ("[I]n any matter related to the business conducted by any department or agency of this state or any political subdivision thereof, any person who, pursuant to a scheme or artifice to defraud or deceive, knowingly falsifies, conceals or covers up a material fact by any trick, scheme or device or makes or uses any false writing or document knowing such writing or document contains any false, fictitious or fraudulent statement or entry is guilty of a class 5 felony.").

exercising his statutory and constitutional rights including rights guaranteed under the Petition Cause and Speech Clause; (2) intimidated Plaintiff as a crime witness, including through repeated threats to have his son removed from his custody; (3) obstructed state and federal criminal investigations via misrepresentations and intimidation; (4) repeatedly fabricated allegations that Plaintiff perpetrated A.R.S. § 13-3601 domestic violence even after the Hon. Rodrick Coffey adjudicated those charges to be false and awarded Plaintiff fees and costs; and (5) generally abused judicial processes

88. Plaintiff has been forced to (1) beat back an entirely fabricated A.R.S. § 13-3602 action in January 2020 which denied him contact with his infant son for seventy (70) days; (2) endure "anonymous" defamatory letters sent to his business associates in March 2020 (*see* Exhibit A) to cause financial destruction; (3) emerge victorious as a *pro se* litigant on four appeals overturning seven Maricopa County Superior Court judges; (4) repeatedly counter fabricated A.R.S. § 13-3601 allegations made inside and outside of judicial proceedings, including as recent as February 21, 2025; and (5) run a legal gauntlet to prosecute two civil cases with trial dates set later in 2025, only to become the first Arizonan ever found vexatious under A.R.S. § 12-3201 for uncovering evidence of systematic public corruption in documents under the possession of the state House of Representatives and a candidate seeking to become Governor of Arizona.

89. Plaintiff brings this action to recover damages, including compensatory and punitive damages under federal and state claims.

## BACKGROUND

90. Former Arizona State Representative/Senator Robert Meza traded his public office for private gain from 2014 through 2021. Under the artifice of a benevolent legislator volunteering constituent support services to local Medicaid-approved behavioral

health nonprofits, Meza solicited and secured public funds from unwary Arizona Governors, fellow legislators, and leaders of state agencies. Nonprofit senior executives received and processed those monies, and covertly returned a portion back to Meza in the form of monthly "consulting" payments. Meza invariably omitted the material fact from unwary public officials that those nonprofits were paying him for "fundraising services".

91.     In return for sham consulting fees, Meza systematically used his public office to solicit and secure (1) discretionary public fund allocations in the form of government grants from state agencies, including state-administered monies originating from federal sources such as the Department of Justice, the Department of Health and Human Services, and the Department of Agriculture; (2) discretionary public fund allocations from state agencies in the form of government sponsorships for fundraising galas; (3) enhanced rate behavioral health services contracts via A.R.S. § 36-2906.01(A) AHCCCS "system contractor", Mercy Care[11]; and (4) supplemental funds from corporate

---

[11]     See article published in the May 2018 edition of Psychiatric Services at https://psychiatryonline.org/doi/10.1176/appi.ps.201700516. Mercy Care CEO Tad Gary co-authored the article describing the Institute for Mental Health Research ("IMHR") - Epicenter and specifically noting that funding for that nonprofit's clinic initiative came from various private and public sources including Mercy Care and the Arizona Attorney General's Office. Mercy Care provided "monthly block payments of more than $100,000 to reimburse services provided to individuals covered by Medicaid" and provided enhanced rate services contracts paying at "135% of standard Medicaid rate". Despite this incredible financial assistance, IMHR reported on its Form 990 that operating Epicenter for one year generated a net loss of $298,065 in 2017. Gary was publicly praising Epicenter while knowing the clinic was not financially viable. Meza brought Gary to IMHR in 2016 to serve as the IMHR Board Chair so that Meza and Gary could co-cultivate the nonprofit into becoming one of Meza's "clients", but the clinic initiative was never financially viable and could not generate revenue to be covertly passed onto Meza. On the cusp of financial collapse, Meza and Gary arranged for PSA Behavioral Health Agency to "acquire" Epicenter in March 2018 to conceal the Medicaid fraud, malfeasance, and mismanagement (see Exhibit B). To effectuate the acquisition, Gary arranged for Mercy Care to "forg[i]ve contract advances to IMHR Epicenter totaling $947,453", effectively transferring almost $1M in AHCCCS funds to PSA Behavioral

representatives and lobbyists seeking his legislative favor.

92.    Meza's consultant services were a sham with no value beyond his public office.

93.    He launched and utilized Ameliorate, LLC ("Ameliorate") to launder payments from nonprofits.  Arizona Corporation Commission records show Meza is Ameliorate's sole member.  The company never had a website, marketing materials, or a business email.  The company's client list consisted exclusively of nonprofits that Meza solicited through public office.  On information and belief, Ameliorate's client contracts contained no statements-of-work or deliverables, if those contracts existed at all.

94.    The Scheme ~~finally~~ first came to ~~light~~ limited public awareness on August 23, 2021 when ~~after the CEO of Chicanos Por La Causa ("CPLC"), who had been paying Meza between $1,000-$3,000 for monthly "consulting" services since January 2016, hastily met with a subset of Arizona House of Representatives (the "House") members to disclose those payments.  The CPLC CEO disclosed because (1) Defendant Ortega made him aware that Plaintiff was on the cusp of filing a civil suit that would make Meza's scheme public~~12~~; (2) the House had received $45M in federal "P90" covid relief funds which, if the House had dispersed to nonprofits paying Meza, would have exposed all knowledgeable persons to federal criminal charges; and (3) actual disclosure is a defense to criminal fraud.~~ NP1's CEO met with Arizona House of Representatives (the "House") members and disclosed that he had been covertly paying Meza since 2015 (*see* Exhibit A).

---

~~Health Agency under the fraudulent pretense of IMHR loan forgiveness.  See https://projects.propublica.org/nonprofits/organizations/861030444/201902409349300810/full (Schedule O, p. 26).~~

~~12    Plaintiff filed CV2021-013210 on August 23, 2021 (the same day the CPLC CEO disclosed Meza's payments to the House) shortly after notifying Ms. Ortega that he would be filing suit.  Ms. Ortega represents Plaintiff's former spouse in Arizona state actions FC2020-090224 and CV2021-005501, described later herein.~~

95.    <u>The NP1 CEO disclosed because (1) Defendant Alane Ortega, who is the daughter-in-law of NP1's founder, made him aware within the prior two weeks that Plaintiff was on the cusp of filing a civil suit that would expose the Scheme; (2) the House had received $45M in federal "P90" covid relief funds which, if the House had dispersed those funds to any of the Nonprofits, would have exposed knowledgeable persons to state and/or federal criminal charges; and (3) actual disclosure is a defense to fraud.</u>

96.    Immediately thereafter, <u>"at the advice of House counsel",</u> the House~~'s~~ Minority Leader ~~quietly initiated an internal investigation dedicating~~ <u>dedicated</u> "hundreds of staff hours" to identif<u>ying</u> ~~all nonprofits~~ <u>the Nonprofits</u> paying Meza<u>,</u> ~~The Leader did this to foreclose the distribution of discretionary House funds "at the advice of House counsel", especially funds originating from a federal source dispersed~~ <u>and prevented those organizations from receiving House-administered P90 funds to be allocated as part of that year's state "budget negotiations".</u>

97.    An honest legislative staff member ~~anonymously~~ contacted *The Arizona Republic* ~~which, in turn, initiated an~~ <u>about the NP1 CEO's disclosure.  This sparked a media</u> investigation published November 8, 2021 <u>containing the above quoted facts.  *See*</u> <u>https://tinyurl.com/2s3wedcf.</u>

98.    ~~Therein,~~ <u>That article reported (</u>1) ~~the article's author noted  CPLC~~ <u>NP1</u>"had been barred from seeking any funds from the House" ~~and "canceled" Meza's consulting contract;~~ <u>(2) NP1 "canceled" Meza's sham consulting contract; (3) Meza stated "[h]is job was to ... 'explore mergers and acquisitions'";</u> ~~(2)~~ <u>(4) Meza</u> ~~otherwise~~ <u>"declined to answer any questions about the work [he was] contracted to do";</u> ~~(3)~~ <u>(5)</u> Gov. Ducey reported that he "didn't know [NP1] had hired" Meza or that Meza had "financial connections to ~~[CPLC]~~ <u>NP1</u>" but he did have "frequent[] discussions" with Meza about funding ~~CPLC~~

NP1 as a "lawmaker[]"; ~~(4)~~ (6) three of the four legislators quoted were unaware ~~of Meza's financial arrangement with CPLC~~ that NP1 was paying Meza; and ~~(5)~~ (7) Meza stated that his conduct was lawful because he "showed it on [his] financials", meaning his annual A.R.S. § 18-444 Financial Disclosure Statements.

99.    ~~An examination of~~ Meza's 2014 - 2021 Financial Disclosure Statements show that he wrote the words "consultant" or "strategic marketing" on those forms, with no further description.

100.    A Financial Disclosure Statement is ~~an obscure~~ a public record, and no public record can ever provide constructive notice of material facts.  Actual notice is required, or ~~those~~ else material facts are ~~otherwise~~ considered omitted.[13]

101.    On information and belief, and evidence obtained, ~~despite years of making sham "consulting" payments of $1,000-$3,000 per month, each of~~ the six nonprofits the Nonprofits' complicit executives stopped paying Meza paying Meza ~~altogether after September~~ when the *Republic* article was published due to fear of criminal investigation. ~~further confirming Meza's consulting services were a sham.~~

102.    Before November 2021, the Scheme nearly came to light on three other occasions but was actively concealed pursuant to the Scheme agreement's second object.

        a.    First, in December 2016, an unwary NP2 Board member discovered that the NP2 CEO was covertly paying Meza.

        b.    NP2's Board members resigned en masse while the Board Chair initiated an internal investigation.

---

[13]    *See Field v. Mans,* 516 U.S. 59, 70, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995) (Fraud exists even if the truth could be learned from public records); *Baker ex rel. Hall Brake Supply, Inc. v. Stewart Title & Trust of Phoenix, Inc*., 197 Ariz. 535, 540, ¶ 23, 5 P.3d 249, 254 (App. 2000) ("The existence of public records is no defense to fraud.").

c.      Seeking to discredit, and attempting to intimidate and create a financial crisis for, the NP2 Chief Development Officer ("CDO") and CEO, Meza arranged for a NP2 staff Director ("TD") knowledgeable of the Scheme to anonymously email the Board Chair in January 2017, and falsely accuse them of breaching federal contract terms unrelated to the Scheme (misusing restricted funds as operating expenses).

d.      The NP2 Board Chair terminated the CDO and CEO in April 2017, in part because the paid arrangement with Meza was "not an appropriate relationship ... and [he had] asked [the CDO] to terminate" the sham contract.  In turn, the two executives filed suit for breach of employment contract on June 15, 2017 (case no. CV2017-008728).

e.      That case progressed through discovery.  The Board Chair admitted in a September 14, 2017 deposition that NP2 breached the CDO's employment contract, leading to an October 27, 2017 Motion for Summary Judgment (*see* Exhibit C).

f.      After maneuvers to cause delay, and after NP3 had "acquired" NP2 (as described below), the NP2 defendants manufactured facts to fabricate a Conversion counterclaim civilly accusing those plaintiffs of stealing donated furniture.

g.      The counterclaim was filed for the unlawful purpose of driving up plaintiffs' attorney fees and costs, and intimidating the former executives into fearing criminal prosecution.  As a result, the CDO and CEO were intimidated and eventually induced into dismissing their otherwise victorious claim on April 11, 2019.

h.      To limit public scrutiny and conceal the Scheme, Meza arranged for NP3 to "acquire" NP2 in July 2017.

i.      Meza served as a NP3 Board member at time while the NP3 CEO briefly suspended Meza's NP3 payments and spearheaded the acquisition.  Post-acquisition, the NP3 CEO selected, and still maintains, an NP2 Board of Directors

consisting of himself and three NP3 executives knowledgeable of the Scheme.  The "acquisition" was, in truth, a corruptly designed and executed "mop-up operation".

j.    Second, in mid-2015, Meza recruited and cultivated a seventh nonprofit ("NP7") to participate in the Scheme, but he first needed NP7 to generate public funds sufficient to pay him through Ameliorate on a recurring basis.

k.    Prior to 2015, NP7 functioned as a modest grant-making operation whose unpaid leaders routinely lobbied the Arizona Legislature for financial allocations and discretionary funding to support research into treatment for the mentally ill.  But NP7 never brought in more than $87,632 in revenue and distributed those funds as grants.[14]

l.    To generate sufficient annual revenue, Meza approached TG in mid-2015 seeking to have Mercy Care provide that funding.  Together, the two men developed a plan to convert NP7 from a grant-making organization to a Medicaid-funded nonprofit behavioral health services organization, and open a clinic soon known as "Epicenter".

m.    To effectuate that plan and to conceal its true purpose being to further the Scheme, TG (1) became the NP7 Board Chair; (2) authorized Mercy Care to provide enhanced rate clinical services contract for Epicenter; (3) authorized Mercy Care to provide corporate grants sufficient to launch Epicenter; and (4) helped Meza solicit and secure complementary public and private funding throughout the community.[15]

---

[14]    See NP7 IRS Form 990s at https://projects.propublica.org/nonprofits/organizations/861030444.

[15]    See article published in the May 2018 edition of *Psychiatric Services* at https://psychiatryonline.org/doi/10.1176/appi.ps.201700516.  Therein, as the only article co-author knowledgeable of the Scheme, TG noted that Epicenter funding came from various private and public sources including Mercy Care and the Arizona Attorney General's Office.  Mercy Care provided "monthly block payments of more than $100,000 to reimburse services provided to individuals covered by Medicaid" and provided enhanced rate clinical services contracts paying at "135% of standard Medicaid rate".

n.      Epicenter failed from the outset as NP7's IRS Form 990 shows the nonprofit suffered a net loss of $298,065 to operate the clinic in its first year.

o.      Yet, TG deceptively praised Epicenter in the May 2018 *Psychiatric Services* article and in other public venues knowing the clinic was not financially viable.

p.      On the cusp of NP7's collapse, and as means to conceal the Scheme, Meza again approached the other Nonprofits to "acquire" an asset that failed by his hand.

q.      In March 2018, NP4, where Meza had inserted TD into a C-suite executive position after she left NP2, agreed to acquire Epicenter upon TG's approval as NP7 Board Chair (*see* Exhibit D).  TD promoted and led the "acquisition" process.

r.      To effectuate the acquisition, in his Mercy Care role, TG had Mercy Care "forg[i]ve contract advances to Epicenter totaling $947,453"[16], effectively putting TG on both sides of the negotiating table and gifting almost $1M in Medicaid funds to corruptly complete this second "mop-up operation".

s.      Third, beginning in September 2019, an unwary NP6 Board member became concerned with the CEO's "specific and heightened focus on government and politics" involving Meza, and expressed those concerns in letters to the seven-member NP6 Board sent on January 29, 2020 and February 27, 2020 (*see* Exhibit E).

t.      With an unsatisfactory response from the Board (which included three members knowledgeable of the Scheme), the concerned Board member quit, instructed NP6 to "vacate[] Televerde's premises by end of day February 28, 2020", and permanently withdrew $125K in recurring annual corporate support.

u.      On May 20, 2020, NP6's Board Chair wrote an "official warning" to

---

[16]    See NP7 2018 IRS Form 990 Schedule O, p. 26 located online at https://projects.propublica.org/nonprofits/organizations/861030444/201902409349300810/full

the CEO noting, "[u]pon attending [NP6's] Mother's Day event, we learned that it was opened by Robert Mesa (sic). ... We have repeatedly discussed Robert's involvement in [NP6] and its events and have expressed the Board's preference not to have relationship (sic) front and center. In addition, we learned that you committed us to real estate in PHX in an office with Robert Mesa (sic). ... Finally, the Board had previously learned of a contract to pay Robert Mesa (sic) $1000 per month. Firstly, while I have not seen the contract, you have told me it is with Robert's company and that many politicians perform services for non-profits for hire including Robert. You had been paying Robert directly (not his company) for a portion of this contract. When the Board discovered this and became uncomfortable for the reasons you previously stated above of not wanting to be seen politically connected to Robert, you took it upon yourself to change the check-writing to Leslie (an employee of Robert's) and current recipient of the $1000 from [NP6's] account. Again, we only uncovered this on the Mother's Day call where Leslie stated that she was on the call 'to learn about [NP6] so when she is on the phone with constituents she can better represent us.'". The NP6 CEO was caught actively concealing Meza's payments from unwary Board members, and she was forced to release Meza.

       v.     As he admitted in the *Arizona Republic* article, Meza soon thereafter asked NP1's CEO to "acquire" NP6. He made this request so that the NP6 CEO could be in a position to reinstate Meza's pay.

       w.     NP1's CEO agreed to acquire NP6 and reached terms with the compromised NP6 Board in May 2021 (*see* Exhibit F). But NP1 did not finalize the acquisition when Ortega made the NP1 CEO aware of current litigation in CV2021-005501 and pending litigation in CV2021-013210.

       x.     Meza was unable to complete this third "mop up operation". The

NP1 CEO instead terminated Meza's sham consulting contract and disclosed Meza's paid arrangement to House members, triggering the November 2021 *Arizona Republic* article.

y.    The other Nonprofits' complicit senior executives quickly released Meza from the sham consulting contracts, further confirming the covert nature of the Scheme, and that Ameliorate and the Nonprofits did not conduct legitimate business.

103.    In ~~mid~~ April 2022, the Arizona House and Arizona Senate initiated ~~independent~~ ethics investigations into Meza's involvement with the Nonprofits.

104.    The Arizona House Ethics Committees acknowledged on May 2, 2022 that Meza was under federal investigation and therefore tabled the complaint.

105.    ~~Sine Kerr,~~ The Chair of the Arizona Senate Ethics Committee stated during a May 6, 2022 ethics committee meeting, and after reviewing evidence, that there was "good cause" to believe Meza's conduct in public office was "criminal". But the Senate likewise tabled the complaint for the same reasons as the House.

106.    Facing scandals, ethics investigations, and criminal investigations, and no longer able to supplement his legislator's $24,000 salary with income derived from the Scheme, Meza ran for Justice of the Peace but lost that August 2022 primary election.

107.    Meza registered his name with the Arizona Secretary of State as a Lobbyist in February 2023. He also registered Ameliorate as a Lobbyist firm in May 2023.[17]

---

[17]    Records on file with the Arizona Secretary of State show Meza registered as a lobbyist employee (EMP ID 703900) working for a lobbying firm (LOB ID 3614168). LOB ID 3614168 corresponds to LOB NAME "Ameliorate, LLC" which lists "Robert Meza" as the only "Active Employee" with no "Inactive Employees" listed in records. Among the companies that used Meza's/Ameliorate's lobbying services, "Deloitte Consulting, LLP" identified LOB ID 3614168 "Ameliorate, LLC" as an "LFC", meaning a Lobbyist for Compensation, with a "STARTED" date of "7/18/2023" and a "TERMINATED" DATE of "1/31/2024". Pursuant to A.R.S. § 41-1233(2), "[n]o person shall: ... Lobby the legislature for compensation within one year after the person ceases to be a member of the senate or house of representatives.". Meza "ceased to be a member of

108.    Ameliorate is, and always has been, a corporate vehicle that Meza used to generate private payment in return for influencing legislation and procuring public funds from elected officials, state agencies, and AHCCCS contractors.

TD Explained The Scheme To Plaintiff

109.    Plaintiff learned of the Scheme through TD.

110.    Between January - April 2018, TD gradually described to Plaintiff how she became involved in the Scheme, shared texts and voicemails between her and Meza referencing the Scheme, discussed the Scheme's details with her parents in Plaintiff's presence, and explained that Meza's growing pressure to maintain, grow, and secrete the Scheme had put Meza and TD in open conflict within the NP4 workplace.[18]

111.    In January 2018, TD admitted facilitating the Scheme to Plaintiff through various professional roles that Meza secured for her as a financial benefit, including as a NP2 staff Director and a NP4 C-suite executive; career advancements that required her to ensure Meza's private payments would continue and remain concealed.

112.    That same month, TD admitted to Plaintiff that she sent the anonymous email to the NP2 Board Chair in January 2017 at Meza's instruction.

113.    One February 2018 evening, Plaintiff and TD found themselves at the Arcadia OHSO Distillery and Brewery Restaurant discussing her conflict with Meza when she invited TG to join them via text and call.  TG arrived with his partner after their dinner out and the parties discussed Meza over drinks.  During that time, TG stated (1)

the" House in January 2023, six months prior to the July 18, 2023 "STARTED" date lobbying on behalf of Deloitte Consulting.

[18]    TD expressed her belief to Plaintiff in February 2018 that Meza was under a financial strain to act so aggressively.  Per Maricopa County Recorder's Office records, Meza was enduring an IRS audit or investigation related to a "Small Business" at that time.  The IRS placed four federal tax liens on his personal residence, totaling $55,923.31; the last of which was recorded April 14, 2018 (Recorder No. 20180290161).

"Meza always comes to me for money and I always find ways to get it to him", referring to Meza's solicitation of Mercy Care administered funds to benefit the Nonprofits; (2) "Meza convinces politicians to send money" to the Nonprofits "but doesn't tell them the money ends up back in his pocket", referring to how Meza effectuated the Scheme through unwary government officials while withholding the material facts of his private pay; and (3) "Meza is going to end up in prison ...  I just hope I don't end up in there with him", admitting his knowledge of the Scheme and that his participation was unlawful.

114.    The conflict between Meza and TD grew through March 2018 when the CEO of NP4 officially announced her retirement.  TD claimed Meza had arranged for her to become the CEO successor as one benefit of her Scheme participation.  Realizing their relationship had soured, Meza blocked TD's promotion and demanded NP4 open the position for national recruitment when, in truth, Meza had recruited a local nonprofit executive willing to assume the position and continue paying him.

115.    On or about April 9, 2018, TD learned journalist "DP" had published an online article connecting Meza with several nonprofits, and suggesting he was corrupt.

116.    Intending to frighten Meza and increase her chances of becoming NP4's CEO, TD purchased a Cricket burner phone on or about April 13, 2018 and used the phone to contact DP (*see* Exhibit G). She offered to share damaging information on Meza.

117.    TD stated her goal was to cause DP to further probe Meza's involvement with nonprofits and publish articles that would cause him to fear criminal investigation in the hopes Meza would disengage from NP4, allowing her to become CEO.

118.    On April 15, 2018, Plaintiff instead encouraged TD to retain an attorney for the purpose of formally contacting Meza and instructing him to cease his open conflict with TD or otherwise face a workplace harassment suit.

19

119.    TD asked Plaintiff to participate in an April 19, 2018 call with her preferred attorney (*see* Exhibit H).

120.    During and after that call, TD revealed that she launched Evidence Based Medical Consulting, LLC ("EBMC") in April 2016 as her personal corporate vehicle to receive additional financial benefits derivative of the Scheme, where each of EBMC's four clients (which included NP3 and NP7) was, in truth, an individual or entity seeking Meza's legislative favor.  Meza sourced every client.  EBMC had no website, marketing materials, social media presence, dedicated phone number, business email address, business liability insurance, or client contracts detailing statements-of-work or articulating industry accepted deliverables, yet the company generated $147,125 in its first year.

121.    Plaintiff attempted to end his relationship with TD in late April 2018, but he agreed to continue when TD promised she would remove herself from the Scheme, disengage from all Nonprofits, cease contact with Meza, and find legitimate employment.

122.    In April 2018, TD assured Plaintiff that she was withdrawing from the Scheme and secured employment in June 2018 with AHCCCS contractor Equality Health.

123.    Between 2014 and 2021, Meza is believed to have received more than $1M derived from fraudulently obtained public funds laundered through complicit nonprofits.

124.    Plaintiff and TD married in October 2018.

TD Continued To Participate In The Scheme During The Marriage

210.    Based on a societal need, significant market potential, TD's graduate training, Plaintiff's experience providing psychological assessments in volume, his background in launching technology-enabled startups, and a shared desire to run a family business, Plaintiff developed and launched a startup concept ("FountainSyde") to provide rapid and scalable Autism testing and diagnostic services.

211.    By October 2019, FountainSyde, LLC was launched and operational as a corporate entity after Plaintiff had (1) created trademarked materials and developed trade secrets; (2) established corporate branding and marketing materials; (3) met with pediatricians and licensed therapists to generate a patient referral pipeline; (4) developed, tested, and launched FountainSyde's corporate website with automated scheduling, provider referral, patient intake processes, and secure health records; (5) established pricing schedules; (6) produced corporate contracts and user agreements; (7) opened a corporate bank account; (8) secured a dedicated phone line and office space at three locations; (9) generated pitch decks; and (10) secured clients.

212.    However, TD had secretly continued to serve as an NP6 Board member, to associate with Scheme participants, and to further the Scheme.  For instance, Plaintiff learned TD facilitated a November 2019 $10,000 Equality Health sponsorship for an NP6 fundraising event.  She knew a portion of those funds would be passed on to Meza.

213.    In late November 2019, TD asked Plaintiff to meet with a capital investor ("CE") that she claimed to have met earlier that same month.

214.    Also in November 2019, a professional colleague ("GB") contacted Plaintiff and asked if he would be willing to help scale an educational technology startup built around K-12 teacher professional development.  Plaintiff agreed to consider it, conducted basic market analysis, kept the concept as a potential side project, and only made TD aware of the opportunity.

215.    Plaintiff met with CE on December 2, 2019 and pitched FountainSyde as an angel investment opportunity, but TD conveyed later that same month that CE decided to pass on the investment.

216.    On January 9, 2020, Plaintiff had become increasingly concerned with TD's

questionable behavior and deceptions.  He sought to end the brief marriage amicably.

217.    TD left Plaintiff's residence calm that evening but returned two hours later agitated and threatening to lodge false domestic violence allegations.  Plaintiff immediately called Scottsdale Police.  Officers (1) arrived within ten minutes; (2) inspected the residence; (3) interviewed Plaintiff and TD; (4) determined "no crime" occurred; and (5) encouraged TD to stay the night with her parents in Chandler, AZ.

218.    TD and her mother returned unannounced the next morning with TD declaring that she spoke with Scottsdale Police and could return because Plaintiff's residence was also her residence.  Plaintiff never told TD she could not return. Regardless, TD and her mother proceeded to harass and antagonize Plaintiff until he finally called police again for assistance in the evening of January 13, 2020.

219.    A Scottsdale Police officer arrived and agreed to speak with TD and her mother to keep the peace, but TD and her mother quickly made false allegations that Plaintiff had planted video devices and was recording for some malicious purpose.  The seasoned officer challenged TD to point out the devices causing both women to recant. The officer instructed TD and her mother to stop making false criminal accusations.

220.    TD's mother vacated the residence that night and TD followed suit the next morning.  But on January 16, 2020, TD appeared unannounced at a public plaza located at 68th Street and Thomas Road where Plaintiff already had been for an hour, and after he had already hailed a Lyft rideshare to take him to central Scottsdale.  The parties did not interact between 2:18 p.m. when TD arrived and 2:20 p.m. when Plaintiff left via Lyft.

221.    On January 24, 2020, Plaintiff reached a verbal settlement agreement with TD's first attorney to expedite the dissolution (case no. FC2020-090224), but the attorney failed to finalize the agreement with signature and stopped responding to email.

222.    On the evening of January 28, 2020, Scottsdale Police came to Plaintiff's residence, notified him that TD had secured an *ex parte* A.R.S. § 13-3602 order of protection, took Plaintiff's infant son, and explained that Plaintiff would have to challenge the order in court or else be labeled an A.R.S. § 13-3601 Domestic Violence perpetrator.

223.    Each allegation of assault and stalking described in the A.R.S. § 13-3602 petition (case no. FC2020-050752) was entirely fabricated.

224.    Plaintiff initiated his own investigation, hired counsel, and discovered:

a.    On January 9, 2020, TD's mother and father were present in front of Plaintiff's house when TD threatened to lodge false domestic violence allegations, and they called Scottsdale Police falsely accusing Plaintiff of assaulting TD in the hopes that police would arrive and arrest Plaintiff. Scottsdale Police had dispatched a unit for that purpose. But those officers had not yet arrived when Plaintiff made his call to the same department. The police dispatcher dispatched a second unit, notified both units that Plaintiff was on the phone with her, and there was no assault occurring at the residence.

b.    On January 10, 2020, TD made another call to Scottsdale Police falsely accusing Plaintiff of criminally threatening her but, upon questioning and a review of text messages, that officer explained to TD that Plaintiff's conduct was "not threatening in any way" per the resulting Field Incident Report.

c.    TD fired her first attorney and hired her second attorney ("MC") on January 27, 2020. MC instructed TD to file the A.R.S. § 13-3602 petition outside of the existing family law case, knowing TD had avowed three times in FC2020-090224 filings that no domestic violence occurred in the relationship.

d.    During FC2020-050752 discovery, MC initially conveyed that, *inter alia*, (1) TD's friend ("SN") would corroborate TD's assault allegations based on

conversations the two women had during a noon lunch meeting that took place December 11, 2020 at Ocotillo Coffee Shop; (2) SN would corroborate the stalking allegation based on being present at the public plaza on January 16, 2020; and (3) the NP6 CEO would also corroborate the same stalking allegation based on a phone conversation that same day; and (4) TD now lived temporarily with NP6's CEO.

e.      Plaintiff learned the Ocotillo Coffee Shop had gone out of business six months prior and since reopened as a speakeasy bar that did not open until 4:00pm.

f.      Plaintiff compiled emails, texts, voicemails, store receipts, Lyft field receipts and corporate records, and witness statements confirming his physical location continuously from 6:36am through 3:15pm on January 16, 2020.  The evidence proved he was at the public plaza for more than an hour prior to TD's arrival, he had hailed a Lyft prior to her unannounced arrival, and he did not interact with Plaintiff while waiting for the Lyft to pick him up less than two minutes after TD's arrival.

g.      Realizing Plaintiff intended to depose SN, TD's story changed again with MC reporting that CE was now the friend present at the public plaza on January 16, 2020, and that CE would testify as a witness to stalking, not the NP6 CEO.

h.      Finally, Plaintiff compiled texts, email messages, witness statements, and video showing he was more than twelve miles away at a practice facility with his older son's club baseball team when he allegedly assaulted his infant son.

i.      The clearly fabricated allegations, constantly changing stories, and the NP6 CEO's involvement made Plaintiff realize TD's malicious conduct and factual misrepresentations did not just serve the unlawful purposes of attempting to gain an advantage in dissolution proceedings and harass Plaintiff, but also served the unlawful purpose of attempting to intimidate him and obstruct investigations into the Scheme.

j.    From March 2 - 6, 2020, Plaintiff's attorney contacted MC via phone calls and emails conveying evidence that proved TD's allegations were entirely fabricated and explaining to MC that his professional obligations required him to ensure the order of protection was withdrawn and not presented at the upcoming hearing to quash.

k.    MC offered to dismiss the order of protection attached to the child if Plaintiff would admit to stalking TD; malicious terms intended to intimidate Plaintiff and exploit his distress at being unjustly separated from, and not allowed to see, his young son for more than two months.  Plaintiff declined.

l.    At the April 4, 2020 hearing to quash, TD reiterated the false allegations and testified to knowingly false facts on direct examination.  Plaintiff's attorney eviscerated TD on cross-examination.

m.    On April 7, 2020, that court quashed the order of protection and awarded Plaintiff his attorney's fees and costs on May 21, 2020.

n.    TD substituted counsel again and retained Ortega on April 20, 2020.

225.    Facing an otherwise expiring claim, Plaintiff filed suit (case no. CV2021-005501) on April 5, 2021 alleging Malicious Prosecution (i.e., Wrongful Institution of Civil Proceedings and associated counts) of the order of protection.  Ortega also represents TD in that civil suit which survived dismissal attempts and is set for trial.

226.    Plaintiff continued to investigate events and conduct discovery in the FC2020-090224 dissolution proceedings.  He learned:

a.    An anonymous defamatory letter was sent via U.S. mail to GB postmarked March 9, 2020 falsely accusing Plaintiff of criminal conduct, stating that he was under criminal investigation by the Arizona Attorney General and the IRS, and advising that GB should not do business with Plaintiff (*see* Exhibit I).  Plaintiff committed

no crimes, and was not under investigation.  The letter, not discovered until September 2020, was another malicious attempt to intimidate Plaintiff and to damage him personally and professionally with factual misrepresentations to further the Scheme, and using methods highly similar to those TD and Meza jointly used to damage and intimidate the terminated NP2 CDO in 2017.

        b.    During a November 5, 2020 deposition, TD provided knowingly false testimony, including factual misrepresentations that, *inter alia*, (1) she had not spoken with Meza since June 2018, although documents later obtained prove she and Meza were jointly involved in NP6 Board meetings and projects, and, on information and belief, Meza's personal phone records show TD and Meza spoke often beginning January 10th or 11th of 2020; (2) she did "not remember" purchasing or using the Cricket burner phone containing texts to DP; (3) Meza did not refer her to Ortega, although Meza inadvertently shared with a journalist in May 2022 that he "helped" TD to secure Ortega as counsel and "helped" Ortega with litigation thereafter; and (4) she had no personal or professional relationship with CE, but facts contained in the below paragraph refute that testimony.

        c.    CE was not a capital investor that TD met in November 2019.  In June 2021, Plaintiff learned CE was the former CEO of Industrial Solutions Network, a physical therapist health insurance network specializing in workers compensation practice.  And she paid Meza for sham consulting services in 2013 and 2014 as part of the Scheme while Meza served as a State Senator with the statutory ability to influence reimbursement rates for workers compensation claims.  CE sold Industrial Solutions Network for $7.6M in 2015.  Critically, in June 2021, CE publicly announced that she had launched Axis for Autism, LLC, a behavioral health startup to provide rapid and scalable Autism testing and diagnostic services – a functional copy of FountainSyde.  CE even

admitted in media interviews that she pursued the business concept after a meeting with two psychologists.  Plaintiff and TD are those psychologists.  CE had no background in behavioral health or in technology-enabled startups, and only could have progressed to that point with TD's involvement and based on Plaintiff's work.[19]

        d.   ~~In late April 2022, pursuant to Arizona's public records law A.R.S. § 39-121, *et seq.*, Plaintiff began seeking Meza's A.R.S. § 39-121.01(A)(1) public records of his interactions with the Governor and state agencies which funded the nonprofits. Governor Ducey and the Department of Corrections Director promptly complied; transparent conduct which comports with reports indicating those persons were unaware of Meza's private pay arrangements when providing financial and non-financial benefits to the forementioned nonprofits based on Meza's solicitation.~~ Per documents ~~Gov ducey disclosed in May 2022:~~ responsive to Plaintiff's May 2022 A.R.S. § 39-121, *et seq*. public records request of Governor Doug Ducey: (1) Meza corresponded with the Governor's Director of Scheduling from his rmeza@azleg.gov government email account between

---

[19]    After learning of Axis for Autism, LLC, and of CE's true relationship with Meza and TD, Plaintiff filed case no. CV2021-013210 on August 23, 2021, the same day the NP1 CEO disclosed Meza's pay to the House.  He filed suit after notifying Ortega of his desire to amend CV2021-005501, or else file a second suit and move to consolidate. Plaintiff filed CV2021-013210 as a separate suit only because Ortega objected to consolidation on the basis that the two suits presented distinct claims.  Per Restatement (Second) of Judgments § 26(1)(a), which Arizona follows, "Comment a provides: '[a] main purpose of the general rule [against splitting claims] is to protect the defendant from being harassed by repetitive actions based on the same claim.  The rule is thus not applicable where the defendant consents, in express words or otherwise, to the splitting of the claim.  [Defendant's] argument in [the first action] that the [Plaintiff's] claims were distinct from [the second action's] claims is the functional equivalent of consent to splitting the [plaintiff's] claims from the [first action's] proceedings." *Shoemake, et al. v. Estancia De Prescott*, Nos. 1 CA-CV 14-0162, 1 CA-CV 14-0527 (Consolidated), ¶47 (Ariz. Ct. App. 2016) (mem. decision).  Hence, as a matter of law, TD and Ortega forfeited any subsequent right to allege CV2021-013210 was filed for harassment purposes.  CV2021-005501 has progressed through discovery and is now set for trial.

March 6 - 15, 2018 regarding ~~Governor~~ Gov. Ducey's ~~pre-planned~~ appearance at the March 16, 2018 ~~PSA Behavioral Health Agency~~ NP4 fundraiser.  That email string ~~also~~ included correspondence sent through Meza's legislative aide at tkrepitch@azleg.gov email account, and included ~~including~~ other members of the Governor's Office.  On March 15, 2018 Meza emailed the Director of Scheduling from his government account, "I am writing to double verify the details of the luncheon tomorrow.  Please let me know if you have any questions.  We would like the governor to arrive at 11:45.  After the luncheon ends at 1:00, there will be a fifteen minute meeting with the governor and ~~Argie Gomez, the CEO of Open Hearts~~ [the CEO of NP5], a nonprofit that has been around for about 40 years.  Their demographic is foster youth in the behavioral health and medical health arenas.  They are helping children, as well as their foster parents.  They will be getting national recognition in the coming months, so we want the governor to hear about what they are doing. ... I will make sure that the meeting lasts only 15 minutes, to respect the governor's time."~~;~~ (2) Meza directed government personnel to his (602) 421-1702 personal cell phone to conduct business; and (3) Meza invited eleven sitting Arizona Senators and House members to attend the NP4 fundraising event.  See Exhibit J.

        ~~e.~~ Per ~~documents the~~ records responsive to Plaintiff's May 2022 A.R.S. § 39-121, *et seq*. request of the Department of ~~Corr.~~ Corrections, Rehabilitation, and Reentry ~~disclosed in October 2022:~~, (1) starting no later than March 2018, NP6 pursued a "Behavioral Health Program" initiative to "build [the NP6] Behavioral Center" and secure an "AHCCCS contract" as a joint initiative with NP4; and (2) NP6 internal messages from "3-11-20" listed Meza as the person already "Responsible for Outreach" to certain corporate sponsors for an NP6 fundraising event, where NP6 documents showed (a) Meza as the person responsible for contacting AHCCCS "system contractors" Mercy Care, AZ

Complete Health, United Health Care, and Blue Cross and Blue Shield of Arizona for

sponsorships; (b) Meza secured a $5,000 sponsorship from AHCCCS contractor Equality

Health; and (c) Meza was specifically assigned to approach private corporate sponsors

including the Arizona "Cardinals and Michael Bidwill", "APS/Pinnacle West", the

"National Bank of Arizona", and "HBI", International which agreed to be the event's

$15,000 "Title Sponsor" (*see* Exhibit K).  ~~(1) Meza was recorded in Arouet Foundation~~

~~meeting documents as an event fundraiser aimed at various corporate interests and known~~

~~Meza campaign supporters; (2) Arouet Board member and Televerde CEO Morag Lucey~~

~~had become increasingly frustrated with the Arouet CEO's "specific and heightened focus~~

~~on government and politics", and communicated her mounting frustrations in a series of~~

~~letters between September 2019 and February 2020.  On February 27, 2020 Ms. Lucey~~

~~quit the Board, instructed that "Arouet vacate[] Televerde's premises by end of day~~

~~February 28, 2020" and withdrew $125K in annual corporate support; (3) on May 20,~~

~~2020 Arouet Board Chair Lynne Oldham wrote an "official warning" note to the Arouet~~

~~CEO noting, "[u]pon atenidng Arouet's Mother's Day event, we learned that it was~~

~~opened by Robert Mesa (sic).  ... We have repeatedly discussed Robert's involvement in~~

~~Arouet and its events and have expressed the Board's preference not to have relationship~~

~~(sic) front and center.  In addition, we learned that you committed us to real estate in PHX~~

~~in an office with Robert Mesa (sic). ... Finally, the Board had previously learned of a~~

~~contract to pay Robert Mesa (sic) $1000 per month.  Firstly, while I have not seen the~~

~~contract, you have told me it is with Robert's company and that many politicians perform~~

~~services for non-profits for hire including Robert.  You had been paying Robert directly~~

~~(not his company) for a portion of this contract.  When the Board discovered this and~~

~~became uncomfortable for the reasons you previously stated above of not wanting to be~~

~~seen politically connected to Robert, yu took it upon yourself to change the check-writing~~
~~to Leslie (an employee of Robert's) and current recipient of the $1000 from Arouet's~~
~~account. Again, we only uncovered this on the Mother's Day call where Leslie stated that~~
~~she was on the call 'to learn about Arouet so when she is on the phone with constituents~~
~~she can better represent us.'"; and (4) CPLC stepped in shortly thereafter to "acquire"~~
~~Arouet, and finalized all aspects of the acquisition in May 2021 only to learn about~~
~~Plaintiff's pending civil litigation through Defendant Ortega in June 2021 and call off the~~
~~acquisition. These facts support the inference that Arouet Board members were kept~~
~~unaware of Meza's payments, that Meza and the Arouet CEO were working in concert to~~
~~conceal his funding, and that Meza had arranged for CPLC to "acquire" Arouet to avoid~~
~~further Board scrutiny. See Exhibit D.~~

Plaintiff Brought Public Records Case CV2022-014146

227.  ~~On September 29, 2022,~~ Pursuant to A.R.S. § 39-121, *et seq*., Plaintiff also requested the A.R.S. § 39-121.01(A) Director of AHCCCS and A.R.S. § 36-2906.01(A) system contractor Mercy Care provide documents regarding TG's ~~records from the~~ ~~AHCCCS Director and Mercy Care, documenting Mercy Care CEO Tad Gary's and~~ ~~Robert Meza's~~ involvement with the ~~nonprofits covertly paying~~ Nonprofits and Meza.[20]

228.  The AHCCCS Director pointed Plaintiff to the agencies' website which documented its contracts with Mercy Care, but provided no other records for inspection. The Director refused to direct Mercy Care turn over responsive records in its actual possession. And Mercy Care refused to provide any documents. Plaintiff filed suit (case no. CV2022-014146) seeking ~~Those defendants resisted records disclosure. Plaintiff thus~~

---

[20]    The Arizona Supreme Court confirmed that state contractors which perform government functions generate documents subject to Arizona's public records law. *See Fann v. Kemp in and for the County of Maricopa*, 515 P. 3d 1275 (2022).

initiated litigation (CV2022-014146) asking a state court to compel document production. to compel records production.

229.    On December 8, 2022, ~~Mercy Care and the AHCCCS Director~~ those defendants jointly moved for summary judgment based on ~~and submitted~~ sworn affidavits ~~swearing~~ declaring that ~~Mercy Care's CEO~~ Mercy Care and TG only allocated Mercy Care "profits", ~~rather than public funds to nonprofits paying Meza arguing the resulting documents did not constitute public records as a matter of law since those "profits"~~ to the Nonprofits, and therefore the requested documents did not constitute public records since those "profits" belonged "exclusively to Mercy Care".

230.    That court conducted a March 17, 2023 ~~hearing~~ oral argument wherein those defendants relied on the affidavit ~~held fast to their defenses.~~  The court granted dismissal. Plaintiff appealed.

231.    During appellate proceedings, Plaintiff discovered AHCCCS and Mercy Care participate in a profit-sharing agreement ~~that those defendants concealed.  State~~ among thousands of pages of documents under (1) state contract YH19-001R (pp. 234-235) which describes "MCO [Mercy Care] Share" and the "State Share" of profits; and (2) ACOM 311 which also details the profit-sharing agreement ("AHCCCS shall recoup/reimburse a percentage of the Contractor's profit or loss").[21]  Mercy Care's FY 2022 Audited Financial Statement also described the profit-sharing agreement ("Certain provisions of the AHCCCS ... contracts include a risk band whereby Mercy Care and the AHCCCS programs share in the profits and losses of the contract ... Mercy Care has recorded an estimate of the reconciliation revenue, or contra-revenue, within other

---

[21]    See p. 1 of ACOM 311 online at
https://www.azahcccs.gov/shared/Downloads/ACOM/PolicyFiles/300/311new/311.pdf.

revenue in the accompanying statements of activities and changes in net assets, based on the AHCCCS ... lines of business").[22]  The referenced *Psychiatric Services* article also confirms Mercy Care did not just allocate "profits" to Nonprofits but also provided "block grants" and "135%" enhanced rate services contracts.

232.    On October 6, 2024, Plaintiff ~~contacted AHCCCS Director Carmen Herdia's legal counsel but Ms. Herdia and her attorney refuse to display candor or in any way acknowledge the agreement.~~ notified those defendants, through their counsels, that he had discovered the factual misrepresentations and requested they acknowledge the profit-sharing agreement to the court. ~~The case still has not gone final.~~  On October 8, 2024, AHCCCS Director Carmen Heredia and Mercy Care, at TG's instruction, declined to acknowledge the profit-sharing agreement to the trial court or appellate court.

Plaintiff Brought Public Records Case CV2022-008626

~~Arizona Public Records Case CV2022-008626~~

~~233.~~    On June 29, 2022, Plaintiff requested ~~public records from~~ A.R.S. § 39-121.01(A)(1) House member Meza, the A.R.S. § 39-121.01(A)(2) House, ~~Meza in his official capacity,~~ and Robson provide documents regarding Meza's solicitation of Robson to host fundraising events for NP5 and NP6 – actions which Meza described as supporting "constituents" in a January 7, 2022 CV2021-013210 court filing – and seeking documents solely in Robson's actual possession after Meza reported that he did not actually possess documents relating to that "constituent" support. ~~Meza initially did not comply~~

234.    Faced with inadequate and delayed records production, Plaintiff brought suit to inspect records per A.R.S. § 39-121, *et seq.*.

---

[22]     See p. 8 of Mercy Care Financial Statement online at https://www.azahcccs.gov/Resources/Downloads/ContractorAudits/2022/MercyCare0622_FS_AUDIT_FINAL.pdf.

235.    The House partially complied ~~with the records request,~~ ~~producing~~ and produced records held on its government email server, ~~and~~ which largely duplicat~~ing~~ed Gov. Ducey's disclosure. ~~Per documents Gov. Ducey disclosed in May 2022:~~ Unique documents produced include (1) email Senator Lisa Otondo sent ~~email~~ from her legislator email account to "all House and Senate members" on January 11, 2018 asking legislators to "[p]lease join me and Sen. Robert Meza as we host the Board members of PSA Behavioral Health Agency for lunch on Tuesday January 16 at 11:30am – 1:00pm in Senate Dem. Caucus Rm. 2. ... Please RSVP to my assistant, Barb Wellman."; and (2) a January 10, 2017 email string Meza sent from his rmeza@azleg.gov email account to U.S. Senator Sinema's District Director requesting the Senator support NP2's $5,297,489 application for U.S. Dept. of Health and Human Services grant #HHS-2016-ACF-OHS-HP-118 (*see* Exhibit L). Those emails did not disclose that NP2 and NP4 were paying Meza.

236.    But the House argued it was under no statutory obligation to search beyond its email servers for public records involving an A.R.S. § 39-121.01(A)(1) Officer. Plaintiff could locate no other A.R.S. § 39-121.01(A)(2) Public Body that had ever taken such a position which also appeared contrary to precedent and statutory language.

237.    Meza eventually produced two documents after the Governor's and the House's production demonstrated that, in emails sent from his legislator email address, Meza ~~he~~ directed state officials to his personal cell phone to conduct business. Those two un-dated documents were official correspondence signed "Arizona State Senator Robert Meza", written on "Arizona State Senate" letterhead referencing "ROBERT MEZA, ARIZONA STATE SENATE, DISTRICT 30", and sent to U.S. Senator Sinema and U.S. Congressman Stanton to their government staff at their staff's federal government email

addresses.  Under the artifice of a benevolent legislator, and under color of office, those two letters invited ~~inviting~~ Senator Sinema and Congressman Stanton to be honored guests at a 2019 ~~PSA Behavioral Health Agency~~ NP4 event ~~fundraiser gala.~~  ~~Therien, Meza~~ The letters also pointed to ~~his legislator~~ Meza's involvement with ~~the nonprofit~~ NP4, to public policy ~~issues~~ matters ("advocating for behavioral health issues"), to Governor Ducey's 2018 NP4 event appearance, to ~~his~~ Meza's role in ~~hosting past galas~~ organizing NP4 events, and to the "400 attendees" who regularly ~~went~~ attended those events.  See Exhibit M.[23]  Meza did not disclose his private pay.

238.    On September 15, 2022, Meza signed an ~~filed a sworn~~ affidavit ~~declaring,~~ ~~inter alia,~~ that he never ~~did not ever~~ produced or maintained public records on his personal phone (602-421-1702) or via his personal email address (mezand86@gmail.com).

a.    ~~That statement was knowingly false.~~  But on information and belief, and evidence obtained, Meza routinely solicited ~~and secured~~ funds ~~out of his elected office~~ from ~~state officials,~~ registered lobbyists and corporate ~~interests under the guise of constituent services~~ executives ~~inviting funders and nonprofits to his government office~~

---

[23]    Senator Sinema and Congressman Stanton were unaware of Meza's private payments, meaning they were defrauded by omission into appearing.  Their appearance, in turn, boosted NP4 sponsorships and ticket sales.  See State v. Henry, 205 Ariz. 229, ¶17, 68 P.3d 455 (App. 2003) ("The definition of 'fraud' must be broad enough to cover all of the varieties made possible by boundless human ingenuity").  Unwary corporate sponsors were also defrauded by omission, as were persons who purchased individual even tickets.  Event tickets cost $150, and sponsorships cost between $5,000 and $25,000 (see Exhibit N).  As part of the Scheme, Meza facilitated at least ten Nonprofit fundraising events by soliciting and securing event sponsorships which benefitted (1) NP2 in October 2016; (2) NP3 in Spring 2015, 2016, and 2017; (3) NP4 in March 2016, 2017, 2018, and 2019; (4) NP5 in February 2020; and (5) NP6 in May 2021.  On the basis that each event attracted 400 guests at $150 per ticket, and presumably 10% of those guests were aware of Meza's private payments, more than 3,500 members of the local philanthropic community were defrauded out of $525,000.  Unwary corporate sponsors additionally were defrauded out of tens of thousands, if not hundreds of thousands, of dollars.

~~via text message~~ on behalf of the Nonprofits via his personal email and his personal phone's text messaging features and loaded "apps". ~~Under the guise of "constituent services",~~ For example, on or about February 5, 2020, Meza sent texts to ~~corporate representatives of the~~ Arizona Cardinals ~~football organization~~ corporate officials, under color of office, ~~seeking~~ asking to meet in his ~~legislator~~ government office for the purpose of soliciting NP5 sponsorship funds. ~~That representative went to~~ Corporate representative Michael Bankston met Meza in Meza's office, ~~agreed to sponsor the February 23, 2020 Open Hearts Family Wellness fundraising gala,~~ conveyed that the team would sponsor the February 23, 2020 NP5 event, and attended that event not knowing Meza was receiving private pay ~~because Meza omitted that material fact as part of his scheme~~ due to Meza's material omissions (*see* Exhibit O).

  b. Likewise, on or about October 1, 2016, Meza ~~text messages~~ sent texts to corporate lobbyists under color of office for the purpose of soliciting NP2 sponsorship funds. ~~A~~ As a result, State Farm lobbyist Gus Miranda went to Meza's office, ~~and~~ agreed to sponsor the ~~October 2016 Sojourner Center~~ NP2 fundraiser, and ~~provided~~ secured $2,500 ~~in corporate funds~~ for NP2 on October 4, 2016 not knowing Meza was receiving private pay ~~because Meza omitted that material fact as part of his scheme~~ due to material omissions: "Sen. Meza did not mention receiving any type of payment or compensation from [NP2] to me" (*see* Exhibit P). ~~On information and belief, Meza repeated this pattern with corporate representatives and lobbyists seeking political favor to solicit and secure sponsorship funds for all fundraising galas held between June 2015 and May 2021.~~

  239. Robson, who was brought to suit through principles of joinder, ~~initially~~ refused to turn over documents in her actual possession but ~~grudgingly~~ later produced seventeen (17) pages of records when confronted with ~~the~~ Arizona ~~Supreme Court's~~

~~Opinion in the "Election Audit"~~ cases <u>appellate rulings</u> determining private persons in

actual possession of public records must ~~disclose~~ <u>produce those documents.</u>  *Fann.*

240.    Per documents Robson produced on September 9, 2022, (1) Meza sent

Robson a <u>March 10, 2020</u> email ~~on March 3, 2020~~ noting ~~the support for the Arouet~~

~~Foundation and Open Hearts Family Wellness would be done for "branding" purposes in~~

~~her campaign to become Governor~~ <u>her involvement in NP5 and NP6 events served the</u>

<u>purposes</u> of "branding [her] name quickly in the community" to bolster her campaign to

become Governor; (2) Robson hosted a February 23, 2020 fundraiser for ~~Open Hearts~~

~~Family Wellness~~ <u>NP5</u> at her personal residence, and co-hosted a May 28, 2021 fundraiser

for NP6 <u>at another person's residence; (3)</u> sponsorships for those two ~~fundraisers~~ <u>events</u>

ranged from ~~$2,500~~ <u>$5,000</u> to $25,000; and (4) ~~Open Heart Family Wellness's~~ <u>NP5's</u>

Chief Administrative Officer sent <u>Robson</u> a $5,000 invoice ~~to Karrin Taylor Robson and~~

~~Ed Robson~~ via <u>from her NP5 corporate</u> email <u>account</u> ~~where~~ <u>with</u> "Representative Robert

Meza" ~~was~~ <u>cc'ed on that invoice,</u> ~~and the email message thanked the Robsons~~<u>, along with</u>

<u>an email thanking her for</u> ~~their~~ "support of our 2020 Tournament of Hearts"<u>; but (5)</u>

<u>Robson withheld records documenting her responses to Meza's communications.</u>[24]  *See*

Exhibit Q.

241.    Meza and Robson became aware by December <u>1,</u> 2022 that Plaintiff had

obtained public records from cooperative state agencies factually supporting the existence

of additional public records in their <u>actual</u> possessions <u>and implicating the Scheme</u>.

TORTIOUS ACTS

<u>Meza and Robson Jointly Committed Tortious Acts</u>

---

[24]    <u>A legislator's public records include "all ... documentary materials ... *made or*</u>
<u>*received*" pursuant to A.R.S. § 41-151(2).</u>

242.    Seeking to shut down further public records production and concerned over other public records and evidence being accumulated, the House, along with Meza and Robson jointly moved for the CV2022-008626 court to find Plaintiff vexatious pursuant to A.R.S. § 12-3201 on December 12, 2022.  As evidence, those defendants pointed to open litigation in FC2020-090224[25], CV2021-017889[26], CV2021-005501[27], CV2021-013210[28], and CV2022-014146[29].

243.    On January 27, 2023, ~~Meza submitted an affidavit in CV2022-008626 from the Arouet Foundation CEO swearing under oath that she paid Meza~~ NP6's CEO produced an affidavit admitting that she paid Meza "for his service as a fundraiser"~~ and provided him a "board-approved fee of just $1,000 per month".~~

244.    This ~~admission~~ affidavit directly contradicted Meza's January 7, 2022 CV2021-013210 court filing where he avowed nonprofits only paid him "for advice", and declared there is nothing "wrong with such organizations paying for advice ~~from legislators, so long as all such payments are publicly disclosed by the legislator" per A.R.S. § 18-444; an admission that his actions were criminal absent sufficient disclosure. But again, "[t]he existence of public records is no defense to fraud." *Baker*, 197 Ariz. at~~

---

[25]    ~~FC2020-090224 is an ongoing family law case through which Plaintiff has emerged victorious on two appeals, and has trial dates set on remand for later in 2025.~~
[26]    CV2021-017889 was a personal injury case at which time that defendant had admitted 100% fault and the only determination remaining was damages calculation
[27]    ~~CV2021-005501 is ongoing with an August 2025 trial date set on all claims.~~
[28]    ~~CV2021-013210 is an ongoing case for which Plaintiff sought immediate consolidation with CV2021-005501.  The 013210 judge abated certain claims now set for trial in CV2021-005501 and dismissed others, although newly uncovered evidence makes that dismissal judgment subject to being set aside.  Further, court-declared abatement proved the 013210 case contained meritorious claims.~~
[29]    ~~CV2022-014146 is a public records case that still has not reached final judgment, and seems to caught up in appellate court based on the forementioned discovery of Mercy Care's and the AHCCCS Director's factual and legal misrepresentations~~

1    540, ¶ 23.  Those Financial Disclosure Statements do not provide sufficient disclosure of

2    material facts.

3        245.    Regardless, on February 27, 2023, the CV2022-008626 court issued an

4    order (the "Order") finding found Plaintiff statutorily vexatious, enjoining and enjoined

5    him from filing court papers "in this case or any other pending civil action without prior

6    leave of the judge assigned to that case", and subjecting him .  Plaintiff is also subject to

7    an A.R.S. § 12-3201(B) blanket injunction which holds, ("[a] A pro se litigant who is

8    designated a vexatious litigant may not file a new pleading, motion or other document

9    without prior leave of the court.").

10

11        246.    Meza, Robson, and the House The CV2022-008626 defendants knew when

12   they filed the A.R.S. § 12-3201(A) motion that the Ninth Circuit's procedural and

13   substantive due process requirements rendered A.R.S. § 12-3201 was facially

14   unconstitutional in every application but used the statute for the unlawful purposes of

15   intimidating Plaintiff and retaliating against him for exercising his rights under the

16   Petition Clause and the Speech Clause violation of the First Amendment, as described

17   below and as described in federal case 2:25cv00016.

18

19        247.    Meza and Robson used A.R.S. § 12-3201 for the additional unlawful

20   purpose of concealing criminal conduct and obstructing investigations into the Scheme.

21   engaged in First Amendment retaliation and abused judicial processes through CV2022-

22   008626, and conspired to abuse judicial processes and engage in other tortious acts under

23   conspiratorial agreement and in concert with Ortega.

24        248.    Meza and Robson jointly and continuously prosecuted the A.R.S. § 12-

25   3201(A) motion over months of trial and appellate proceedings where the December 12,

26   2022 motion was initially granted, the resulting injunctive Order was then stayed on

appeal over defendants' objections, and the motion and Order were subsequently argued through appeal until defendants jointly filed their Answering Brief on October 10, 2023.

Ortega Committed Tortious Acts In Concert With Meza

249.   On August 25, 2021, and with full knowledge of the Scheme and of the NP1 CEO's disclosure to the House two days prior (which Meza attended), Ortega and Meza's counsel (and Meza himself, on information and belief) conferred via phone and email. During that communication, and in a series of communications dating back to April 2020, Ortega and Meza agreed (1) to intimidate Plaintiff, and (2) to pre-emptively discredit and damage him via factual misrepresentations presented in court filings; both in attempt to prevent criminal investigations into Meza and TD, and both serving as an extension of the Scheme agreement's second object.  These efforts included the concerted use of, and the overt acts of filing, A.R.S. § 12-3201(A) motions across suits.

250.   Ortega thereafter filed two unsuccessful A.R.S. § 12-3201(A) motions in CV2021-013210 on November 17, 2021 and June 23, 2022, while repeatedly referring to those motions in CV2021-005501 proceedings.  Meza then persuaded the CV2022-008626 defendants to jointly file their December 12, 2022 A.R.S. § 12-3201(A) motion.

251.   In parallel, upon learning on October 2, 2021 that TD was under FBI and DHS investigation, and in another attempt to intimidate Plaintiff and to unlawfully learn details about the federal investigations, Ortega demanded in an October 6, 2021 FC2020-090224 court filing that Plaintiff "disclose all communications with FBI Agent France and Homeland Security" or face a contempt petition seeking his incarceration.[30]

---

[30]    *See U.S. v. Liew,* 856 F.3d 585 (9th Cir. 2017) (Civil litigation becomes a criminal matter when defense tactics go beyond "a general, legal denial of guilt" and conceal prior criminal conduct);  *U.S. v. Volpendesto,* 746 F.3d 273, 286 (7th Cir. 2014) (Efforts to obtain investigative information from sources other than the investigative agency are "not efforts merely in service of curiosity, but out of desire to influence what evidence" might

252.    As time progressed, the Court of Appeals granted Plaintiff a new trial on remand and separately granted him special action relief assigning a new judge to the FC2020-090224 case.  Appellate instructions issued August 23, 2023 required discovery be re-opened, including for documents production and the right to depose TD on financial matters and on the "anonymous" attacks launched against Plaintiff's business interests.

253.    As she had done from the outset, Ortega continued to withhold statutorily mandated and appellate ordered financial records production.  On court order, she produced partial documents in rolling fashion between July 31, 2024 and April 10, 2025, but with blanket redactions for the unlawful purpose of concealing financial information that the Arizona Child Support Guidelines and court orders required her to provide, but that implicated TD's and Meza's Scheme participation.

254.    Producing documents behind schedule and facing an August 19, 2024 deposition, Ortega requested a protective order on August 14, 2024.  She asked that court to order "all financial information disseminated in this matter be limited to use in this family Court matter and not to be disseminated to third parties for any reason without order of the Court allowing such over threat of sanctions and finding of contempt."

255.    Government investigators were the "third parties" that concerned Ortega, and she attempted to intimidate Plaintiff with threats of sanctions and findings of contempt should Plaintiff share any "financial information" that might evidence financial crimes although that same evidence was statutorily required to calculate child support.

256.    During the August 19, 2024 FC2020-090224 deposition, (1) Ortega

---

come before a court knowing "information collected during the investigation would, in turn, be presented to the" proceeding, and thus merit obstruction charges); *General Dynamics Corp. v. Selby Mfg. Co.*, 481 F.2d 1204, 1213 (8th Cir. 1973) (There is no "legal right to the fruits of the FBI's investigative endeavors ... 'civil discovery is not intended to be a 'back door' method of accomplishing criminal discovery'").

improperly lodged 188 objections, the vast majority of which were talking objections and disguised instructions directing TD to evade response (e.g., "don't answer if you don't want to"); (2) she unlawfully instructed TD not to answer relevant questions going to financial matters, to EBMC's revenue, and to TD's professional history; and (3) when Plaintiff questioned TD regarding her knowledge of anonymously sent messages, Ortega unlawfully instructed TD to walk out of the deposition.  Those acts were all taken to obstruct investigations and conceal information implicating TD and Meza in the Scheme.

257.    But that court instructed TD to answer those questions at an April 14, 2025 evidentiary hearing, to which TD falsely stated she never bought or used the Cricket burner phone, *inter alia*.  Federal authorities took physical possession of that phone and, on information and belief, have confirmed that it belonged to, and was used by, TD.

258.    In preparation for inevitable documents production and deposition appearance, Ortega also instructed TD to present the A.R.S. § 12-3201 Order from CV2022-008626 to the Arizona Secretary of State on or about April 10, 2024 seeking to have the State identify Plaintiff as an A.R.S. § 13-3601 Domestic Violence perpetrator per A.R.S. § 41-161, *et seq.*[31]  The Secretary of State Office's personnel did just that.

259.    Ortega instructed TD to take those actions for the improper purposes of bolstering ongoing efforts to delay, block, and/or limit financial documents production which might prove financial crimes.

260.    To serve that unlawful purpose, on May 10, 2024, Ortega entered A.R.S. §

---

[31]    A.R.S. § 41-161, *et seq.* governs the Arizona Address Confidentiality Program where A.R.S. § 41-161(5) verified victims of A.R.S. § 13-3601 criminal domestic violence can keep an address confidential upon relocation.  See A.R.S. § 41-161(2); A.R.S. § 41-162.  TD declared to an A.R.S. § 41-163(B) "application assistant" and made an A.R.S. § 41-161(C)(11) sworn statement submitted "under penalty of perjury" that Plaintiff had been convicted of committing A.R.S. § 13-3601 domestic violence.

41-163(D) "address confidentiality program authorization cards" as exhibits attached to motions in the ongoing FC2020-090224 discovery dispute.

261.    TD confirmed during the forementioned August 19, 2024 deposition that she pursued the A.R.S. § 41-161, *et seq*. action based solely on a mention of "harassment" in the A.R.S. § 12-3201 Order – an order to which she was not party – and where the supposed harassment occurred only via court filings in meritorious litigation.

262.    Following his former attorney's prescient warnings, Plaintiff has only had very brief, publicly monitored physical or electronic contact with TD since January 2020, by design.  Ortega therefore had no factual or legal basis to instruct TD to accuse Plaintiff of being an A.R.S. § 13-3601 perpetrator via the A.R.S. § 41-161, *et seq*. action.

263.    The Arizona Secretary of State now holds official records identifying Plaintiff as an A.R.S. § 13-3601 Domestic Violence perpetrator, although Plaintiff has never committed an act of domestic violence.

264.    Despite the A.R.S. § 12-3201 Order, including the A.R.S. § 12-3201(B) blanket provision, Plaintiff plans to file court papers absent leave of the court in ongoing FC2020-090224 and CV2021-005501 litigation, and in this suit.  For doing so, he is being threatened with, and reasonably fears, administrative, civil, and/or criminal enforcement of A.R.S. § 12-3201, including where filing court papers in well-founded lawsuits is being unlawfully postured as violations of A.R.S. § 13-2810(A)(2) Interfering With Judicial Proceedings and/or A.R.S. § 13-2921 Harassment, which enforcement authorities in turn can then cite as predicates to prosecute A.R.S. §§ 13-3601 and 13-3602.[32]

---

[32]    Should there be a question of whether the pleading meets the Fed. R. Civ. P. Rule 9 requirement for "particularity" of facts documenting the alleged underlying criminal fraud which motivated Meza's, Robson's, and Ortega's conduct, Plaintiff asks the Court to either (1) permit Plaintiff to conduct limited discovery to extract facts under the exclusive control of corporate entities, and amend the complaint; or (2) consider the facts and

265.    ~~Ortega, in turn, continues to engage in overt acts and in tortious acts in~~

~~furtherance of Defendants' conspiratorial tortious and criminal objectives through conduct~~

~~displayed in FC2020-090224, CV2021-005501, and CV2021-013210.~~

**PARTIES, ~~STANDING~~, JURISDICTION, AND VENUE**

266.    Plaintiff Phillip Potter resides in Scottsdale, Arizona.  ~~Honorably discharged~~

~~from the U.S. Air Force as a decorated officer, Plaintiff went onto serve as a higher~~

---

"circumstances constituting fraud" sufficient to apprise defendants of the "the time, place and nature of the alleged fraudulent activities" under either one of two "relaxed" fraud standards that the Ninth Circuit recognizes.  *CMB Infrastructure Grp. IX, LP v. Cobra Energy Inv. Fin., Inc.,* 572 F. Supp. 3d 950, 969-70 (D. Nev. 2021) (citing *Wool v. Tandem Computers Inc.,* 818 F.2d 1433, 1439-40 (9th Cir. 1987)).  Rule 9(b) "may be relaxed" in one of two situations, both applicable here.  First, the Rule "may be relaxed as to matters within the opposing party's knowledge [especially in cases involving] corporate fraud, [where] plaintiffs will not have personal knowledge of all of the underlying facts [and may not be able to] attribute particular fraudulent conduct to each defendant."  *Id.*  This standard only requires plaintiffs to plead "facts on which the belief is founded and include the misrepresentations themselves with particularity and, *where possible,* the roles of the individual defendants in the misrepresentations."  *Id.*  The fraud alleged here involves corporate fraud conducted via Ameliorate and the Nonprofits, meaning the "relaxed" corporate-fraud standard applies.  Second, Rule 9(b) is "relaxed" in "fraud by omission claims, which do not require the same level of specificity required by a normal fraud by misrepresentation claim".  *See Washington v. Baenziger*, 673 F. Supp. 1478, 1482 (N.D.Cal. 1987) ("Where the fraud consists of omissions on the part of the defendants, the plaintiff may find alternative ways to plead the particular circumstances of the fraud. [F]or example, a plaintiff cannot plead either the specific time of the omission or the place, as he is not alleging an act, but a failure to act."); *see also MacDonald v. Ford Motor Co.*, 37 F. Supp. 3d 1087, 1096 (N.D. Cal. 2014) ("Because the plaintiffs are alleging a failure to act instead of an affirmative act, the Plaintiffs cannot point out the specific moment when the Defendant failed to act.").  Meza and the Nonprofits' complicit executives relied extensively on material omissions of Meza's private pay when soliciting public funds from elected officials and state agencies, and when soliciting supplemental private funds from lobbyists and corporate officials.  Accordingly, the "relaxed" fraud-by-omission standard also applies.  Should greater particularity be deemed necessary, easily discoverable facts under the control of Ameliorate, LLC include (1) corporate bank accounts through which funds were transferred and deposited; (2) exact dates and amounts of financial transactions; (3) the terms of written contracts and oral agreements which governed those transactions; and (4) communications that resulted in the transactions.

1  ~~education administrator.  From there he parlayed his research doctorate, military~~

2  ~~background, and business instincts into the field of veteran entrepreneurship, founding~~

3  ~~organizations that selected and trained high-potential veterans to launch investable~~

4  ~~startups.  Plaintiff became a nationally recognized leader on veteran entrepreneurship~~[33]

5  ~~and was twice invited to speak on the subject at the White House under Presidents Obama~~

6  ~~and Trump.  Defendants attacked his personal and professional life, targeting his child, his~~

7  ~~financial resources, his professional career, and his reputation through unlawful conduct~~

8  ~~committed both inside and outside of judicial proceedings.~~

9

10      267.    Defendant Robert Meza resides in Phoenix, Arizona.  He is a former State

11  Senator and State House member who continuously held legislative office from January

12  2003 through January 2023~~, but~~ He is sued in his private capacity.

13      268.    Defendant Karrin Taylor Robson resides in Phoenix, Arizona.  She is a

14  former Arizona Board of Regents member who held that position ~~from~~ between June 2017

15  and ~~through~~ February 2022~~, but~~ She is sued in her private capacity.

16      269.    Defendant Alane Ortega resides in Phoenix, Arizona.  She is TD's attorney

17  in FC2020-090224 and CV2021-005501, and has an extensive disciplinary record.  For

18  instance, on April 14, 2021, the Discipline Probable Cause Committee of the Supreme

19  Court of Arizona found that "in several cases and in several forums", Ms. Orega "violated

20  the following Rules of the Supreme Court of Arizona: Rule 42, Ariz. R. Sup. Ct., ERs,

21  1.2, 1.3, 3.1, 3.2, 3.4(c), and 8.4(d)", including in case cv-15-00357 before the U.S.

22  District Court for the District of Arizona where, on December 5, 2016, the Hon. John J.

23  Tuchi issued an order admonishing her for knowingly "furthering a [client's] falsehood".

24      270.    x Defendant Kris Mayes is the Arizona Attorney General.  She is sued in her

25

26  _____

[33] ~~See https://www.theatlantic.com/sponsored/jpme-2017/the-other-half-of-the-battle/1778/~~

official capacity.  As the state's chief legal officer, Attorney General Mayes ("AG Mayes") is charged by Ariz. Const. art., 5 § 9, A.R.S. § 41-192, A.R.S. § 41-193, and other authorities with guaranteeing that state laws are uniformly and adequately enforced. For instance, A.R.S. § 41-193(A)(2) provides that AG Mayes may "prosecute and defend any proceeding in a state court other than the supreme court in which this state or an officer of this state is a party or has an interest".  And A.R.S. § 41-193(A)(5) grants her the authority to "if deemed necessary, assist the county attorney of any county in the discharge of the county attorney's duties", providing AG Mayes the power to deputize herself with county prosecutor criminal enforcement authorities.  She has the authority to prosecute A.R.S. § 13-2810(A)(2) which makes it criminal to "disobey[] a lawful court order", including any A.R.S. § 12-3201 order (if "lawful"), and to prosecute A.R.S. § 13-2810(A)(2) violations as an A.R.S. § 13-3601 predicate.  Likewise, Ariz. Const. art., 2 § 2.1 and A.R.S. § 13-4433(D) provide AG Mayes with civil enforcement powers over A.R.S. § 12-3201(B) violations as A.R.S. § 13-2810(A)(2) predicates for an A.R.S. § 13-3602(A) civil protective order.  A.R.S. § 13-2810 directly connects the Attorney General's civil and criminal enforcement powers with every state court order, and with every statutory basis underlying every order, including A.R.S. § 12-3201 orders, sufficient to invoke Article III jurisdiction.  *See Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 919 (9th Cir. 2004) ("[A] mere scintilla of enforcement" connection is sufficient to invoke article III jurisdiction under *Ex parte Young*).

271.  Defendant Joseph Welty is the Presiding Judge of the Maricopa County Superior Court.  He is sued in his official *administrative* capacity only.  "Enjoining a statewide official under *Young* ... is appropriate when there is a realistic possibility the official will take legal or *administrative* actions against the plaintiff's interests."  *Doe v.*

45

*DeWine,* 910 F.3d 842, 848-49 (6th Cir. 2018) (emphasis added) citing *Ex parte Young,* 209 U.S. 123 (1908).  The Presiding Judge's connection to the administrative enforcement of A.R.S. § 12-3201 is grounded in Ariz. Const. art. 6 § 11 ("Presiding judges shall exercise administrative supervision over the superior court and judges thereof in their counties") and in A.R.S. § 12-3201(A) ("[T]he presiding judge of the superior court ... may designate a pro se litigant a vexatious litigant").  Judge Welty "may designate a pro se litigant a vexatious litigant" at any time without warning or recourse by issuing an unappealable administrative order adding Plaintiff to Arizona's "Vexatious Litigant List".[34]  *See Madison v. Groseth,* 230 Ariz. 8, 13, ¶ 16 n.8 (App. 2012) (Noting Arizona appellate courts does not have appellate jurisdiction over administrative orders).  Presiding Judge Welty has a sufficient connection to the administrative enforcement of A.R.S. § 12-3201 to invoke Article III jurisdiction.

272.    Doe Defendants 1 through 60, inclusive, are persons sued herein under fictitious names as their true names, capacities, and sources of liability are presently unknown.  Plaintiff will amend this complaint to designate the true names, capacities, and sources of liability of these parties when the same have been ascertained.  Plaintiff is informed and believes, and on that basis alleges, that Doe Defendants 1 through 60 were agents or alter egos of Defendants, or are otherwise responsible for any acts alleged.  Plaintiff is informed and believes, and on that basis alleges, that the actions of Does 1 through 60, as alleged herein, were duly ratified by named Defendants, with each Doe acting in concert per agreement or acting as the Defendant's agent, alter ego, or facilitator.

273.    The Court has ~~original~~ jurisdiction (1) under 28 U.S.C. § 1331 because the action arises under the Constitution and laws of the United States, thus raising federal

---

[34]    See https://tinyurl.com/2x4unmjx.

questions; (2) to decide declaratory and injunctive relief as authorized by 28 U.S.C. §§ 2201 and 2202; and (3) ~~The Court also has original jurisdiction~~ under 28 U.S.C. § 1343(a)(3) and 42 U.S.C. § 1983 since this action seeks to redress the deprivation, under color of the laws and statutes of the State of Arizona, of fundamental rights secured by the United States Constitution.  For the above reasons, ~~the~~ this Court has ~~original~~ jurisdiction over state claims factually intertwined with ~~the~~ federal claims.

274.    A case and a controversy exist between the parties on ~~a~~ federal claims authorized under 42 U.S.C. § 1983 (Meza and Robson), ~~and~~ on factually intertwined state law claims ~~(Meza, Robson, Ortega)~~, and on federal claims for prospective relief (Mayes, Welty) authorized under 28 U.S.C. §§ 2201 and 2202 based on a First Amendment facial challenge to A.R.S. § 12-3201[35] ~~sufficient~~ to invoke U.S. Const. art. III, § 2, cl. 1 jurisdiction.  A related case is 2:25cv00016, *Potter v. Mayes*.  He brings this suit under a separate case number out of an abundance of caution to preserve the claims described herein, hoping to consolidate the two cases and have them treated as a single judicial unit.

275.    Venue in this judicial district is proper under 28 U.S.C. § 1391(b)(2), because the events or omissions giving rise to Plaintiff's claims occurred in this district.

**STANDING**

276.    "To establish Article III standing, an injury must be 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'"  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013).

277.    AG Mayes threatens to cause Plaintiff to suffer First, Fifth, and Fourteenth

---

[35]    A "plaintiffs' facial challenge [i]s not 'inextricably intertwined' with the judicial decision of the local court [if] it [i]s a general challenge to the constitutionality of" a statute.  *Noel v. Hall*, 341 F.3d 1148, 1157 (9th Cir. 2003).  Therefore, this facial challenge to A.R.S. § 12-3201 is not subject to the *Rooker-Feldman* doctrine.  *Id*.

Amendment fundamental rights deprivations, creating "concrete, particularized, and ... imminent" injuries, by definition. *Nebraska Press Ass'n*; *Melendres*. "[T]he 'fairly traceable' and 'redressability' components for standing overlap and are 'two facets of a single causation requirement.'" *Washington Env't Council v. Bellon,* 732 F.3d 1131, 1146 (9th Cir. 2013). "Causation may be found even if there are multiple links in the chain connecting the defendant's unlawful conduct to the plaintiff's injury, and there's no requirement that the defendant's conduct comprise the last [or first] link in the chain". *Mendia v. Garcia,* 768 F.3d 1009, 1012 (9th Cir. 2014). "What matters is not the 'length of the chain of causation, but rather the plausibility of the links that comprise the chain.'" *Nat'l. Audubon Soc'y., Inc. v. Davis,* 307 F.3d 835, 849 (9th Cir.2002). As a demonstration of traceability and redressability, if the Court enjoins AG Mayes from civilly and criminally enforcing Plaintiff's non-adherence to A.R.S. § 12-3201(B) as any form of A.R.S. §§ 13-3601 or 13-3602 predicate then Plaintiff will not suffer additional irreparable injuries from indictment, prosecution, and incarceration, or separation from his son. Plaintiff has standing to bring suit for prospective relief against AG Mayes.

278.    Presiding Judge Welty threatens to cause Plaintiff to suffer additional First and Fourteenth Amendment fundamental rights deprivations under the Petition Clause – "imminent" irreparable injuries, by definition. As a demonstration of traceability and redressability, if the Court enjoins Presiding Judge Welty from administratively enforcing A.R.S. § 12-3201(A), then Plaintiff will not suffer further denial of access to the courts by being placed on the Vexatious Litigant List. Plaintiff has standing to bring suit for prospective relief against Presiding Judge Welty.

279.    Defendants Meza, Robson, and Ortega have intentionally and directly caused irreparable and compensable injuries which are "concrete, particularized, and

actual ...; fairly traceable to the challenged action[s]; and redressable by a favorable ruling."  Plaintiff has standing to bring suit for damages, including compensable and punitive damages, against Defendants Meza, Robson, and Ortega.

**COUNT ONE**
**DECLARATORY AND INJUNCTIVE RELIEF**
**FIRST AMENDMENT FACIAL CHALLENGE TO A.R.S. § 12-3201**
**VIOLATION OF U.S. CONST. AMENDS. I (PETITION CLAUSE) AND XIV**
**[Mayes and Welty]**

125.    Plaintiff incorporates the allegations in all preceding paragraphs as if fully set forth herein.

126.    The First Amendment is applicable to states via the Fourteenth Amendment.

127.    Whether due to the significant costs of litigation or other factors, pro se litigants account for a large and growing percentage of Arizona court actions where "as many as 70% or more of all litigants in the Family Court proceedings are self-represented, the highest number among all departments in the [Maricopa County Superior] Court".[36]

128.    The Arizona Legislature passed A.R.S. § 12-3201 in 2014 purportedly to provide a statutory authority that codified and complemented courts' inherent authority to manage their dockets in the government interest of judicial efficiency.

129.    A February 10, 2025 "A.R.S. § 12-3201" keyword search shows pro se litigants have challenged an A.R.S. § 12-3201 designation in thirty-three (33) appeals.

130.    There is no telling how many A.R.S. § 12-3201 injunctions were never appealed or, worse yet, how many times attorneys threatened pro se litigants with a vexatious litigant injunction to unjustly prevent the prosecution of civil actions.

131.    Appellate courts have affirmed A.R.S. § 12-3201 plain language permits

---

[36]    See https://superiorcourt.maricopa.gov/posts/press-releases/2023/informal-trial-format-assists-self-represented-litigants-in-family-cases/.

49

trial courts to permanently enjoin a pro se litigant from ever filing court papers of any type based solely on instances of sanctionable conduct within non-final lawsuits, even when the litigant presents as the *defendant* party. *See Gainey Ranch Community Assoc, v. Kraft*, No. 1 CA-CV 18-0179, ¶¶ 32, 34 (Ariz. Ct. App. 2019) (mem. decision) ("[Defendant] Kraft also challenges the superior court's ruling designating him a vexatious litigant, arguing that the court failed to specify any filing made for purposes of harassment or without substantial justification. ... [The Court of Appeals affirmed because] Kraft's filings repeatedly 'rehash[ed]' issues that had already been addressed"); *Parsons v. Harris*, No. 1 CA-CV 24-0324, ¶¶ 3, 9 (Ariz. Ct. App. Dec. 10, 2024) (mem. decision) ("Parsons sued Harris for defamation. Harris filed six motions in the ten-month period after he was served with the defamation complaint. None of these motions had merit, ... We affirm the court's designation of [Defendant] Harris as a vexatious litigant.").

132.    There is no record showing that the facial constitutionality of A.R.S. § 12-3201 (the "Statute") has ever been challenged in state court or federal court.

133.    Plaintiff presents a First Amendment facial challenge to A.R.S. § 12-3201, which went into effect January 1, 2015, and reads in full:

A. In a noncriminal case, at the request of a party or on the court's own motion, the presiding judge of the superior court or a judge designated by the presiding judge of the superior court may designate a pro se litigant a vexatious litigant.
B. A pro se litigant who is designated a vexatious litigant may not file a new pleading, motion or other document without prior leave of the court.
C. A pro se litigant is a vexatious litigant if the court finds the pro se litigant engaged in vexatious conduct.
D. The requesting party may make an amended request at any time if the court either:
1. Determined that the party is not a vexatious litigant and the requesting party has new information or evidence that is

50

relevant to the determination, even if there is not a pending case in the court.

2. Did not rule on the original request during the pendency of the action, even if there is not a pending case in the court.

E. For the purposes of this section:

1. "Vexatious conduct" includes any of the following:

(a) Repeated filing of court actions solely or primarily for the purpose of harassment.

(b) Unreasonably expanding or delaying court proceedings.

(c) Court actions brought or defended without substantial justification.

(d) Engaging in abuse of discovery or conduct in discovery that has resulted in the imposition of sanctions against the pro se litigant.

(e) A pattern of making unreasonable, repetitive and excessive requests for information.

(f) Repeated filing of documents or requests for relief that have been the subject of previous rulings by the court in the same litigation.

2. "Without substantial justification" has the same meaning prescribed in section 12-349.[37]

134.    The Statute's language is lifted almost verbatim from the state's sanctions statute, A.R.S. § 12-349, which reads in pertinent part:

> [I]n any civil action commenced or appealed in a court of record in this state, the court shall assess reasonable attorney fees, ..., if the attorney or party does any of the following:
> 1. Brings or defends a claim without substantial justification.
> 2. Brings or defends a claim solely or primarily for delay or harassment.
> 3. Unreasonably expands or delays the proceeding.
> 4. Engages in abuse of discovery.

135.    The Statute violates due process, and the vagueness and overbreadth doctrines. *Grayned v. Rockford,* 408 U.S. 104, 92 S.Ct. 2294, 2298-99, 33 L.Ed.2d 222,

---

[37]    Per "section 12-349[F]", "'without substantial justification' means that the claim or defense is groundless and is not made in good faith".

227 (1972) ("[W]e insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application. Third, but related, where a vague statute 'abut[s] upon sensitive areas of basic First Amendment freedoms,' it 'operates to inhibit the exercise of [those] freedoms.' Uncertain meanings inevitably lead citizens to 'steer far wider of the unlawful zone ... than if the boundaries of the forbidden areas were clearly marked.'"); *Moody v. NetChoice, LLC,* 144 S. Ct. 2383, 2397 (2024) (A state law is overbroad if it "lacks a plainly legitimate sweep. ... [W]hen a facial suit is based on the First Amendment, ... [the law is also void if] 'a substantial number of [its] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'").

THE STATUTE VIOLATES THE OVERBREADTH DOCTRINE

A.R.S. § 12-3201 Lacks A Plainly Legitimate Sweep Per *Noerr-Pennington*

136.   Any state statute which purports to carve out a path to enjoin litigation implicates the First Amendment right of access to courts.[38] *Ringgold-Lockhart v. County of Los Angeles,* 761 F.3d 1057, 1061-62 (9th Cir. 2014) (Vexatious litigant injunctions implicate rights protected by the Petition Clause since such injunctions' "pre-clearance requirement imposes a substantial burden on the free-access guarantee" under the First Amendment); *see Delew v. Wagner,* 143 F.3d 1219, 1222 (9th Cir. 1998) ("[T]he right of

---

[38]   Arizona courts and the Ninth Circuit treat vexatious litigant pre-filing restrictions as a species of injunction. *Moy v. United States,* 906 F.2d 467, 470 (9th Cir. 1990); *Madison,* 230 Ariz. 8, 279 P.3d at 638-39.

access to the courts is a fundamental right protected by the Constitution.").

137.     Speaking to overbreadth, the U.S. Supreme Court established the "plainly legitimate sweep" for any statute that makes litigation subject to injunction.  Specifically, the litigation in question must be *both* objectively baseless *and* motivated by an improper purpose.  *Bill Johnson's Rests., Inc. v. N.L.R.B.*, 461 U.S. 731, 743-44 (1983) ("[A]n 'improperly motivated' lawsuit may not be enjoined ... unless such litigation is '[objectively] baseless.'"); *Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60-62, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993) (The Petition Clause guarantees litigation "may not be enjoined" unless the suit is *both* "objectively baseless" *and* filed for an "improper, malicious purpose"); *BE & K Constr. Co. v. N.L.R.B.*, 536 U.S. 516, 531, 122 S.Ct. 2390, 153 L.Ed.2d 499 (2002) (Litigation may be enjoined only if "both objectively baseless *and* subjectively motivated by an unlawful purpose" (emphasis original); *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 934 (9th Cir. 2006) (To forfeit the Petition Clause's broad protections, "*both* objective baselessness and an improper motive" must be demonstrated) (emphasis original).

138.     Defining "plainly legitimate sweep" on the U.S. Supreme Court's "objective baselessness and improper motive" standard echoes in "the *Noerr-Pennington* doctrine [which] stands for a generic rule of statutory construction, applicable to *any* statutory interpretation that could implicate the rights protected by the Petition Clause. ... [W]e must give adequate 'breathing space' to the right of petition.  ... [U]nder the breathing space principle, ... [only] 'sham litigation' [characterized by *both*] objective baselessness *and* an improper motive" must be demonstrated before becoming actionable in any form, *Id* at 931-32 (emphasis added), including via statutory injunction.

139.     At minimum, this standard – the "*Noerr-Pennington* standard" – establishes

what constitutes the Statute's "plainly legitimate sweep" for enjoining a lawsuit.

140.    Pursuant to A.R.S. § 12-3201(C) and (E)(1), a "vexatious litigant" is a self-represented litigant who has engaged in "any" A.R.S. § 12-3201(E)(1)(a)-(f) "vexatious conduct". For the Statute to possess any plainly legitimate sweep, at least one of the A.R.S. § 12-3201(E)(1)(a)-(f) provisions must meet the *Noerr-Pennington* standard and only enjoin litigation that can be properly characterized as demonstrating *both* objective baselessness *and* an improper motive. None of those six provisions meet that standard.

141.    The Arizona Supreme Court dispositively made that determination when recently interpreting the common language between A.R.S. §§ 12-3201 and 12-349 through the lens of the Petition Claus. *See Ariz. Republican Party v. Richer,* 257 Ariz., 210, 222, ¶ 44 (2024) (Penalizing those who bring suits "grounded in fact and law ... inflict[s] real damage to our republic by slamming the courthouse door on citizens ... legitimately seeking to vindicate rights").[39]

142.    That court found A.R.S. § 12-3201(E)(1)(c) language referring to "without substantial justification" (i.e., "groundless and not made in good faith") does not mean "groundless and made in bad faith". *Id* at 221, ¶¶ 34-37. And "bad faith" is what characterizes litigation motivated by an "'improper purpose". *Id.* Consequently, A.R.S. § 12-3201(E)(1)(c) does not reach any improper purpose motivation as the *Noerr-Pennington* standard requires. Further, language in each A.R.S. § 12-3201(E)(1)(a), (b), and (d) "subsection provides a separate bad faith" consideration only, *Id* at ¶ 37, meaning each of those three provisions lacks an objectively baseless consideration. *Id.*

---

[39]    *See Bragdon v. Abbott,* 524 U.S. 624, 645, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998) (When "judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language" is presumed to incorporate that same interpretation).

143.    In the end, the Arizona Supreme Court determined no A.R.S. § 12-3201(E)(1)(a)-(d) "subsection" can be read to codify the federal injunctive standard for *both* objective baselessness *and* an improper motive.[40]

144.    The Statute thus "lacks a plainly legitimate sweep" pursuant to the *Noerr-Pennington* standard, meaning it is overbroad.

145.    That said, enjoining a single *lawsuit* is fundamentally different from enjoining a *litigant* from forever filing *any* lawsuit absent leave of the court.  The latter implicates far greater threats to the Petition Clause.  Thus, a heightened standard beyond *Noerr-Pennington* is required to guarantee procedural and substantive due process.  The Ninth Circuit established that heightened standard in *Ringgold,* 761 F.3d at 1061-62 ("Out of regard for the constitutional underpinnings of the right to court access ... [vexatious litigant injunctions must] comply with certain procedural and substantive requirements").

146.    Built on the same line of precedent as *Noerr-Pennington*, *Ringgold* determined that courts may find a litigant vexatious and issue a narrowly tailored injunction only if there are heightened procedural and "substantive findings as to the frivolous or harassing nature of the litigant's actions." *Ringgold,* 761 F.3d at 1064.

147.    Like *Noerr-Pennington*, the improper purpose "frivolous or harassing" consideration does not come into play unless the current litigation is first determined to be "objectively baseless", meaning the complaint does not arguably contain "any genuine issue of material fact or law".  *See Pro. Real Est. Invs.*, 113 S.Ct. at 61.

148.    If that threshold criterion is met, heightened procedural requirements

---

[40]    A.R.S. §§ 12-3201(E)(1)(e) ("A pattern of making unreasonable, repetitive and excessive requests for information") and (f) ("Repeated filing of documents or requests for relief that have been the subject of previous rulings by the court in the same litigation") include neither a "baseless litigation" nor an "improper motive" component on their face and thus fail the *Noerr-Pennington* standard.

beyond *Noerr-Pennington* trigger and court records must be reviewed for the presence of numerous objectively baseless lawsuits, all of which have reached finality through the exhaustion of appeal. *See In re Powell,* 851 F.2d 427, 432 (D.C. Cir. 1988) ("[T]he district court should be careful not to review pending cases ... complaints that predated the [motion for an] injunction were still pending at the time the injunction was imposed and, as such, could not have been reviewed" for being a past baseless suit).[41]

149.   To establish that serial objectively baseless litigation is of a "harassing nature", every suit in a long series of suits must found to be both objectively baseless and filed for an improper purpose, thus demonstrating a heightened "pattern of harassment" affecting common defendants on common claims. *Ringgold,* 761 F.3d at 1060-64.

150.   In the highly unusual alternative, serial objectively baseless litigation of a "frivolous ... nature" exists when records review demonstrates an "inordinate" number of finalized frivolous[42] suits. *Id; see Molski v. Evergreen Dynasty Corp.,* 500 F.3d 1047 (9th Cir. 2007) (Affirming a vexatious injunction when court records revealed *Molski* had filed "hundreds" of "frivolous" suits against small business owners alleging impossible facts that he suffered the same exact injuries at the same exact time but at different geographic locations, indicating an intent to coerce defendants into unjust monetary settlements).

151.   No A.R.S. § 12-3201(E)(1)(a)-(f) provision meets the Ninth Circuit's heightened standard for vexatious litigant injunctions – the "*Ringgold* Standard" – requiring *both* serial objectively baseless litigation *and* an improper purpose in the form of either an "inordinate" number of "frivolous" suits or a demonstrated "pattern of

---

[41]    The Ninth Circuit recognizes *Powell* as binding authority. See *Ringgold*.
[42]    "Baseless" litigation becomes "frivolous" litigation in the absence of a "reasonable inquiry" which includes fabricating facts to bring suit. *See Moore v. Keegan Mgmt. Co. (In re Keegan Mgmt. Co., Sec. Litig.),* 78 F.3d 431, 434 (9th Cir. 1996).

harassment" involving common defendants and claims.

Every A.R.S. § 12-3201(E)(1) Provision Lacks A Plainly Legitimate Sweep Per *Ringgold*

152.    A.R.S. § 12-3201(E)(1)(a) defines "vexatious conduct" as "[r]epeated filing of court actions solely or primarily for the purpose of harassment".

153.    This provision only considers the "separate bad faith" improper purpose motive of harassment, *see Richer* at ¶ 37, and therefore does not first detect the presence of serial objectively baseless litigation – a threshold requirement per *Ringgold*.

154.    Plain language permitting the improper purpose of "harassment" to form the entire basis for a vexatious litigant injunction also makes A.R.S. § 12-3201(E)(1)(a) overly broad since *Ringgold* requires a heightened "pattern of harassment" demonstration.

155.    Inclusion of the phrase "or primarily" confirms A.R.S. § 12-3201(E)(1)(a) is overbroad since "or" presents a disjunctive standard used to express an alternative or to give a choice, and the dictionary defines "primarily" as "for the most part".[43]   A court action filed "primarily for the purpose of harassment" concedes the complaint contains at least one claim which presents a "genuine issue of material fact or law", meaning the action is not objectively "baseless", and thus can neither be enjoined nor considered in the requisite historical review for finalized serial objectively baseless litigation.  *Id.*

156.    In sum, A.R.S. § 12-3201(E)(1)(a) overbroadly permits sanctionable conduct solely in the form of non-patterned "harassment" to serve as the entire basis for a statutory vexatious litigant injunction.

157.     A.R.S. § 12-3201(E)(1)(a) lacks a plainly legitimate sweep per the *Ringgold* Standard.

158.    If the provision has any plainly legitimate sweep, then "a substantial number

---

[43]    See https://www.merriam-webster.com/dictionary/primarily.

of [its] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep."

159.    A.R.S. § 12-3201(E)(1)(a) therefore is overbroad.

160.    A.R.S. § 12-3201(E)(1)(b) defines "vexatious conduct" as "[u]nreasonably expand[ing] or delay[ing] court proceedings".

161.    Like A.R.S. § 12-3201(E)(1)(a), A.R.S. § 12-3201(E)(1)(b) does not first determine whether the litigation in question is objectively baseless or whether there is a history of serial objectively baseless litigation, as it must per the *Ringgold* Standard.

162.    *Ringgold* also tells us that litigation "expansion" or "delay" is not a permitted improper purpose consideration for vexatious litigant injunctions; only "a pattern of harassment" or an "inordinate" number of "frivolous" lawsuits are permitted.

163.    The term "court proceedings" also solidifies that this particular provision casts an overbroad net since "court proceedings are not separate actions. ... [T]hey are distinct stages in the processing of the same 'action'". *Sw. Airlines Co. v. Ariz. Dep't of Revenue,* 197 Ariz. 475, 477, ¶ 7, 4 P.3d 1018, 1020 (App.2000).

164.    The First and Fourteenth Amendments do not permit a pro se litigant to be found vexatious for unreasonably expanding or delaying "distinct stages in the processing of" a single lawsuit if that lawsuit itself is not objectively baseless and if there is not also a history of serial objectively baseless litigation. *Ringgold*.

165.    A.R.S. § 12-3201(E)(1)(b) lacks a plainly legitimate sweep per *Ringgold*.

166.    If the provision has any plainly legitimate sweep, then "a substantial number of [its] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep."

167.    A.R.S. § 12-3201(E)(1)(b) therefore is overbroad.

168.    A.R.S. § 12-3201(E)(1)(c) defines "vexatious conduct" as "[c]ourt actions brought or defended without substantial justification" where, per A.R.S. § 12-3201(E)(2), "without substantial justification means that the claim or defense is groundless and is not made in good faith" based on cross-referencing "section 12-349".

169.    As an initial matter, A.R.S. § 12-3201(E)(1)(c) and "section 12-349" are incompatible because A.R.S. § 12-3201(E)(1)(c) applies to "court actions" (i.e., lawsuits) while "section 12-349" expressly applies to "claim[s] or defense[s]".  "Lawsuits", not any individual "claim or defense", are the only constitutional unit of analysis that can be used to evaluate for the presence of serial objectively baseless litigation.  *Ringgold*.

170.    The Arizona Legislature enacted an overbroad (and vague) statute when conflating and cross-referencing "court actions" with "claim[s] or defense[s]".

171.    Further, A.R.S. § 12-3201(E)(1)(c) "or defended" language and the section 12-349 "or defense" language both present an "or" disjunctive standard, which overbroadly allows a self-represented *defendant* to be deemed a vexatious litigant; a circumstance which common sense and the Ninth Circuit preclude given that the purpose of a vexatious litigant injunction is to protect "defendant[s] or the court" from a self-represented *plaintiff*.  *Ringgold*, 761 F.3d at 1064.

172.    Moving on, the Arizona Supreme Court dispositively opined that "without substantial justification" does *not* include any "improper purpose" consideration for the presence of "bad faith", *Richer* at ¶¶ 37-40, and therefore violates the *Ringgold* Standard.

173.    A.R.S. § 12-3201(E)(1)(c) lacks a plainly legitimate sweep per *Ringgold*.

174.    If the provision has any plainly legitimate sweep, then "a substantial number of [its] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep."

175.    A.R.S. § 12-3201(E)(1)(c) therefore is overbroad.

176.    A.R.S. § 12-3201(E)(1)(d) defines "vexatious" conduct as "[e]ngaging in abuse of discovery or conduct in discovery that has resulted in the imposition of sanctions against the pro se litigant".

177.    Whether a plaintiff is engaging in, or has ever engaged in, sanctionable discovery conduct provides no information as to the whether the underlying lawsuit is objectively baseless or whether there is a history of serial objectively baseless litigation. The provision, therefore, cannot meet the _Ringgold_ Standard.

178.    It should also be presumed that a litigant who reached the discovery phase presented a "well-founded lawsuit", and the First Amendment does not permit well-founded lawsuits to be enjoined for any reason.  _Bill Johnson's Rests.._

179.    A.R.S. § 12-3201(E)(1)(d) also cannot be interpreted to demonstrate any form of harassment since to do so would render A.R.S. § 12-3201(E)(1)(a) superfluous.

180.    A.R.S. § 12-3201(E)(1)(d) lacks a plainly legitimate sweep per _Ringgold._

181.    If the provision has any plainly legitimate sweep, then "a substantial number of [its] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep."

182.    A.R.S. § 12-3201(E)(1)(d) therefore is overbroad.

183.    A.R.S. § 12-3201(E)(1)(e) defines vexatious conduct as "[a] pattern of making unreasonable, repetitive and excessive requests for information."

184.    Whether a litigant makes "excessive requests for information" provides no information as to the whether the underlying lawsuit is objectively baseless or whether there is a history of serial objectively baseless litigation.  The provision, therefore, cannot meet basic _Ringgold_ requirements.

185. <u>A.R.S. § 12-3201(E)(1)(e) also cannot be interpreted to demonstrate any form of harassment since to do so would render A.R.S. § 12-3201(E)(1)(a) superfluous.</u>

186. <u>Further, "[r]equests for information" from government officials, especially information about "cronyism and conflicts of interest" or any form of public corruption represents the epitome of the fundamental right to petition the government, as well as the fundamental right of free speech in the form of political speech. *See Dombey v. Phx. Newspapers, Inc.,* 150 Ariz. 476, 481, 724 P.2d 562, 567 (1986) (The Arizona Supreme Court determined Arizonans' fundamental rights include the right to inquire about "the quality of the conduct of [] government, including charges of cronyism and conflicts of interest involving governmental programs [which] is at the very core of 'public concern' and is protected by the [F]irst [A]mendment."). Consequently, statutory injunctions cannot ever be applied to legitimate exercises of the First Amendment. *See LaFaro v. Cahill,* 203 Ariz. 482, 485, ¶ 16, 56 P.3d 56, 59 (App. 2002).</u>

187. <u>Also, seeking government "information" contained in public records, including for evidentiary purposes, is a legitimate and incentivized use of the Arizona public records law and therefore cannot ever be considered to have been done for any improper purpose. *Bolm v. Custodian of Records of Tucson Police Dep't.,* 193 Ariz. 35, ¶ 11, 969 P.2d 200, 204 (App.1998) ("that litigation was pending ... when [the requesting party] made his public records request does not affect the [Public Body's] obligation to comply with the Public Records Law"); *Phoenix Newspapers, Inc. v. Keegan,* 201 Ariz. 344, 351 ¶ 33, 35 P.3d 105, 112 (App. 2001) ("The core purpose of the public records law is to allow the public access to official records and other government information so that the public may monitor the performance of government officials."); A.R.S. § 39-121.02(D) (Public records are provided free of charge when the records are sought "as</u>

evidence or as research for evidence in an action in any judicial or quasi-judicial body").

188.    In that same vein, public records litigation vindicates a public right, not a private right, and therefore is not appropriate for inclusion in the requisite record review of court records to identify the presence of serially baseless litigation or for a *Ringgold* "pattern of harassment". *Powell*, 851 F.2d at 433 (public records litigation "preclude[s] consideration of the interests of the requester"); *Bolm,* 193 Ariz. 35 at ¶ 10 ("A person's right to public records ... is not conditioned on his or her showing, or a court finding, that the documents are relevant to anything").

189.    The First and Fourteenth Amendments do not permit a pro se litigant to be found vexatious for "requesting information".

190.    A.R.S. § 12-3201(E)(1)(e) lacks a plainly legitimate sweep per *Ringgold*.

191.    If the provision has any plainly legitimate sweep, then "a substantial number of [its] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep."

192.    A.R.S. § 12-3201(E)(1)(e) therefore is overbroad.

193.    A.R.S. § 12-3201(E)(1)(f) defines "vexatious conduct" as "[r]epeated filing of documents or requests for relief that have been the subject of previous rulings by the court in the same litigation".

194.    The "same litigation" language expressly, and overbroadly, permits courts to find litigants vexatious based on sanctionable conduct that occurs within a single suit; a circumstance which *Ringgold* prohibits.

195.    The provision does not require, as it must, that the underlying lawsuit be objectively baseless, or there to be a history of serial objectively baseless litigation, before the litigant is found vexatious and all litigation is forever enjoined.

196.    A.R.S. § 12-3201(E)(1)(f) also cannot be interpreted to demonstrate any form of harassment since to do so would render A.R.S. § 12-3201(E)(1)(a) superfluous.

197.    A.R.S. § 12-3201(E)(1)(f) lacks a plainly legitimate sweep per *Ringgold*.

198.    If the provision has any plainly legitimate sweep, then "a substantial number of [its] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep."

199.    A.R.S. § 12-3201(E)(1)(f) therefore is overbroad.

A.R.S. § 12-3201(B) Is Overly Broad Per *Ringgold*

200.    Per A.R.S. § 12-3201(B), "[a] pro se litigant who is designated a vexatious litigant may not file a new pleading, motion or other document without prior leave of the court"; the epitome of an overbroad injunction designed to prevent a pro se litigant from ever filing any motion paper or complaint in any case without leave of the court.

201.    The Ninth Circuit established long ago that a vexations litigant injunction is unconstitutionally "overbroad [if] it is designed to prevent [a plaintiff] from filing any complaint in any case without leave of court".  *Moy,* 906 F.2d at 471.

202.    An A.R.S. § 12-3201(B) injunction also serves as an unconstitutional complaint "screening" in every instance and thus sweeps overbroadly per the Ninth Circuit.  *See Ringgold*, 761 F.3d at 1066 (An injunctive "order is too broad [if] it provides that the court 'will approve all filings'. ... [T]he district court added a screening criteria that is not narrowly tailored to the problem before it, and is in fact unworkable. ... [C]ourts cannot properly say whether a suit is 'meritorious' from pleadings alone.").

203.    A.R.S. § 12-3201(B) also unconstitutionally enjoins all future litigation in permanent, blanket fashion.  *See Id* at 1067 ("In light of the constitutional concerns such pre-filing orders implicate, ... there [must be a] []sufficiently close fit between the terms of

the injunction and the problem it purports to address”).

204.    A.R.S. § 12-3201(B) therefore is overly broad.

A.R.S. § 12-3201 VIOLATES PROCEDURAL DUE PROCESS

205.    As a matter of U.S. Const. amend. XIV procedural due process, a pro se litigant facing a possible vexatious injunction must be afforded a fair opportunity to be heard during an evidentiary hearing in opposition to any vexatious litigant motion. *Ringgold,* 761 F.3d at 1062-63.  But the Statute contains no hearing provision on a matter affecting First Amendment rights, and thus is unconstitutional in every application

206.    Procedural due process requires fair notice and “the opportunity to be heard at a meaningful time and in a meaningful manner.”  *Matthews v. Eldridge*, 424 U.S. 319, 339-343 (1976).  When “the private interest that will be affected by the official action” arises from the First Amendment and there is “the risk of an erroneous [permanent] deprivation of such interest”, *Id*, due process demands a hearing.  But the Statute has no provision requiring a hearing be conducted in opposition to an A.R.S. § 12-3201(A) motion, as it must per logic and the Ninth Circuit.  *See Ringgold,* 761 F.3d at 1062-63.  Accordingly, the Statute violates procedural due process in every application.

THE STATUTE VIOLATES THE VAGUENESS DOCTRINE

207.    A.R.S. § 12-3201 is overly vague as it does not sufficiently “provide explicit standards for those who apply them ..., abut[s] upon sensitive areas of basic First Amendment freedoms,’ [and] ‘operates to inhibit the exercise of [those] freedoms.’”

208.    The Statute relies on imprecise language which does not provide “explicit standards” and invites “arbitrary and discriminatory enforcement”.

209.    A.R.S. §§ 12-3201(E)(1)(a), (e), and (f) reference terms “repeated”[44] and

---

[44]    “Repeated” means “renewed or recurring again and again”.  See

"repetitive" but do not define "explicit standards" with objective precision to determine how many times specific conduct must recur before conduct becomes prohibited as "repeated" or "repetitive", and thus subject to enforcement.

210.    A.R.S. § 12-3201(E)(1)(e) also relies on the subjective term, "excessive", which means "exceeding what is usual, proper, necessary or normal".[45]  This term does not provide "explicit standards" with objective precision and no self-represented litigant can be expected to discern at what point his conduct would be considered "excessive" and subject to penalty, especially the drastic penalty of the loss of access to the courts.

211.    A.R.S. §§ 12-3201(E)(1)(a) and (c) reference "court actions" (in the plural), but do not provide "explicit standards" with objective precision as to how many "court actions" are required before a litigant's conduct is prohibited and subject to enforcement.

212.    A.R.S. § 12-3201(E)(1)(c) relies on the term "without substantial justification" which "is judged on an objective standard of what a professional, competent attorney would do in similar circumstances." *Richer*, 547 P.3d 356, ¶ 40.  That standard does not to "give the [self-represented] person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly" since "ordinary" persons do not possess the "intelligence" of, or the acquired knowledge gained by, the average attorney to let them know "what a professional, competent attorney would do".

213.    A.R.S. § 12-3201(E)(1)(a), (c), (e), and (f) do not provide "explicit standards for those who enforce them" and do not "give the [self-represented] person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly".  Therefore, each of those provisions is overly vague.

---

https://www.merriam-webster.com/dictionary/repeated.
[45]    See https://www.merriam-webster.com/dictionary/excessive.

214.    This case also illuminates a fatal vagueness flaw across several Arizona statutes.  Specifically, "harassment" is not clearly defined, and often not defined at all.

215.    Neither A.R.S. § 12-3201(E)(1)(a) nor the provision that inspired it, A.R.S. § 12-349(A)(2), defines "harassment" which, in a legal context, should mean "[w]ords, conduct, or action . . . that, being directed at a specific person, annoys, alarms, or causes substantial emotional distress to that person and serves no legitimate purpose."  Black's Law Dictionary (12th ed. 2024).  The phrase, "and serves no legitimate purpose", functions as a crucial saving clause that prohibits litigants from strategically professing "alarm[]" or "distress" to avoid being held culpable or liable in court for their misconduct, because holding people legally accountable serves a "legitimate purpose" (vindicating legal rights) regardless of how a person emotionally responds to being brought to suit.

216.    But in everyday context, "harass" means "to annoy persistently"[46] regardless of whether that serves a "legitimate purpose" such as vindicating one's legal rights.

217.    For comparison purposes, Arizona's other statute which addresses injunctions proscribing harassment defines A.R.S. § 12-1809(T)(1)(a) "harassment" as a "[a] series of acts over any period of time that is directed at a specific person and that would cause a reasonable person to be seriously alarmed, annoyed or harassed and the conduct in fact seriously alarms, annoys or harasses the person and serves no legitimate purpose."  The "and serves no legitimate purpose" saving clause is present.  *See LaFaro*.

218.    But because A.R.S. § 12-3201(E)(1)(a) does not define harassment, persons of ordinary intelligence do not have a reasonable opportunity to know what is prohibited in judicial proceedings.  The provision invites arbitrary and discriminatory enforcement, and abuts against First Amendment freedoms implicating the Petition Clause, thus forcing

---

[46]    See https://www.merriam-webster.com/dictionary/harass.

Arizonans to "steer far wider of the unlawful zone" out of fear of rights deprivations.

219.    A.R.S. §§ 12-3201(E)(1)(a), (c), (e), and (f) are overly vague.

**COUNT TWO**
**DECLARATORY AND INJUNCTIVE RELIEF**
**FIRST AMENDMENT FACIAL CHALLENGE TO A.R.S. § 13-2921**
**VIOLATION OF U.S. CONST. AMENDS. I (PETITION CLAUSE) AND XIV**
**[Mayes]**

220.    Plaintiff incorporates the allegations in all preceding paragraphs as if fully set forth herein.

221.    Pursuant to A.R.S. § 13-2921(A)(1), "[a] person commits harassment if the person knowingly and repeatedly commits an act or acts that harass another person or the person knowingly commits any one of the following acts in a manner that harasses: ... Contacts or causes a communication with another person by verbal, electronic, mechanical, telegraphic, telephonic or written means."

222.    Per A.R.S. § 13-2921(E), "'harass' means conduct that is directed at a specific person and that would cause a reasonable person to be seriously alarmed, annoyed, humiliated or mentally distressed and the conduct in fact seriously alarms, annoys, humiliates or mentally distresses the person." The provision, however, does not contain an "and serves no legitimate purpose" saving clause. Accordingly, any repeating conduct that results in a reasonable person's "distress[]", regardless of whether that conduct serves a legitimate purpose, is a criminal violation under Arizona statute.

223.    The Arizona Secretary of State has accepted that a pro se litigant who files court papers that result in the opposing party experiencing (or at least expressing) emotional distress, has violated A.R.S. §§ 13-2921 and 13-3601. The breadth of A.R.S. § 13-2921 Harassment is staggering both in sheer numbers and in societal consequences.

224.    Reasonable persons experience distress when brought to suit. In Arizona,

tens of thousands of new suits are filed each year, and it is reasonable to believe

defendants experience distress as a result. Thus, the "number" of A.R.S. § 13-2921

violations committed when a plaintiff exercises his right to petition Arizona courts for

redress of grievances and the opposing party experiences distress is "substantial".

225.    The *Noerr-Pennington* doctrine requires government to give adequate

"breathing space" to the right of petition. Under the breathing space principle, only "sham

litigation" characterized by both objective baselessness and an improper motive is subject

to penalty, especially a criminal penalty. But Arizona officials read A.R.S. § 13-2921 to

invoke criminal penalties for petitioning the judicial branch on the basis that the opposing

party voices distress, regardless of whether the petitioning serves a "legitimate purpose".

226.    Accordingly, A.R.S. § 13-2921 is an overbroad statute in violation of the

First Amendment where "a substantial number of its applications are unconstitutional,

judged in relation to its plainly legitimate sweep."

**COUNT THREE**
**DEPRIVATION OF CONSTITUTIONAL RIGHTS UNDER COLOR OF LAW**
**FIRST AMENDMENT RETALIATION**
**42 U.S.C. § 1983**
**VIOLATION OF U.S. CONST. AMENDS. I AND XIV**
**[Meza and Robson]**

227.    Plaintiff incorporates the allegations in all preceding paragraphs as if fully

set forth herein.

228.    "Every person who, under color of any statute, ordinance, regulation,

custom, or usage, of any State ..., subjects, or causes to be subjected, any citizen of the

United States or other person within the jurisdiction thereof to the deprivation of any

rights, ... secured by the Constitution and laws, shall be liable to the party injured in an

action at law, suit in equity, or other proper proceeding for redress". 42 U.S. Code §

1983.  "A plaintiff may bring a Section 1983 claim alleging that public officials, acting in their official capacity, took action with the intent to retaliate against, obstruct, or chill the plaintiff's First Amendment rights."  *Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 867 (9th Cir. 2016).

229.    Meza operated under color of law as an Ariz. Const. art. 4 House member and an A.R.S. § 39-121.01(A)(1) Officer when filing and prosecuting the A.R.S. § 12-3201(A) motion through appeal, knowing the Statute was patently unconstitutional, causing Plaintiff to be subjected to the deprivation of his First Amendment right of access to the courts.  Meza's intentional acts caused irreparable and compensable injuries, making him liable for compensable and punitive damages for acting with malicious intent to retaliate, against, obstruct, and chill Plaintiff's rights under the Petition Clause.

230.    With the same intent and result, Robson also operated under color of law as a willful participant in joint activity with Meza and the House when filing and prosecuting the A.R.S. § 12-3201(A) motion through appeal.  "Private persons, jointly engaged with state officials in the prohibited action, are acting 'under color of law' for purposes of the statute.  To act 'under color' of law does not require that the accused be an officer of the State.  It is enough that he is a willful participant in joint activity with the State or its agents,".  *United States* v. *Price,* 383 U. S. 787, 794 (1966); *United Steelworkers of America v. Phelps Dodge Corp.,* 865 F.2d 1539, 1540 (9th Cir.1989) ("Private parties act under color of state law if they willfully participate in joint action with state officials to deprive others of constitutional rights").  For the same reasons as Meza, Robson is liable for compensable and punitive damages.

231.    "Under the First Amendment to the United States Constitution, a citizen has the right to be free from governmental action taken to retaliate against the citizen's

exercise of First Amendment rights or to deter the citizen from exercising those rights in the future." *Sloman v. Tadlock,* 21 F.3d 1462, 1469-70 (9th Cir. 1994); *Hartman v. Moore*, 547 U.S. 250, 256 (2006) ("[T]he First Amendment prohibits government officials from subjecting an individual to retaliatory actions").

232.    "To bring a First Amendment retaliation claim, the plaintiff must allege that (1) it engaged in constitutionally protected activity; (2) the defendant's actions would 'chill a person of ordinary firmness' from continuing to engage in the protected activity; and (3) the protected activity was a substantial motivating factor in the defendant's conduct – i.e., that there was a nexus between the defendant's actions and an intent to chill [First Amendment rights]." *Ariz. Students' Ass'n.*, 824 F.3d at 867.

233.    Pursuant to *Noerr-Pennington* and the *Ringgold* Standard, Plaintiff engaged in constitutionally protected activity under the Petition Clause when he petitioned the government for redress of grievances, including when he sought to inspect public records containing government information of public concern.

234.    Meza's and Robson's actions would chill a person of ordinary firmness from continuing to engage in such First Amendment protected activity.  To be sure, facing a chamber of the State Legislature, a sitting House member, and a viable candidate for Governor acting in concert to jointly launch targeted attacks on one's right to petition – and then seeing those government officials coordinate with their associates to threaten incarceration and separation from one's child based on those attacks – would chill a person of ordinary firmness from continuing to engage in that protected activity.

235.    Plaintiff's exercise of his First Amendment petition rights, and his associated speech rights, were substantial motivating factors in the defendants' conduct, which was intended to chill Plaintiff's rights.  There was a clear nexus between Meza's

and Robson's actions in filing and prosecuting the A.R.S. § 12-3201(A) motion, and in their intent to chill Plaintiff's First Amendment rights. Indeed, Plaintiff's exercise of his fundamental rights uncovered evidence of Meza's pervasive misconduct and brought Plaintiff to the cusp of additional documents production demonstrating Meza's and Robson's concerted involvement with the Scheme. To avoid that outcome, and to thwart efforts to collect evidence in any other action, Meza and Robson jointly moved to deny Plaintiff access to the courts. Meza and Robson had no reason to file and prosecute the A.R.S. § 12-3201(A) motion other than to chill Plaintiff's First Amendment rights given that Meza's factual misrepresentations on affidavit had already induced the trial court to grant summary judgment in defendants' favor.

236.    Plaintiff became subject to adverse action when Meza and Robson jointly filed and prosecuted an A.R.S. § 12-3201(A) motion for the improper purposes of unlawfully shutting down public records production to which Plaintiff had a statutory right to inspect, intimidating Plaintiff as a crime witness, obstructing state and federal criminal investigations into the Scheme, and falsely labeling Plaintiff vexatious in attempt to chill his First Amendment rights and deny him access to courts. Defendants' acts had the intended effects, subjected Plaintiff to a blanket injunction, and threatened him with civil and criminal penalties, including incarceration and loss of access to his son, should he not submit to the retaliation and abandon his fundamental right to petition.

237.    The adverse action against Plaintiff would not have been taken absent the retaliatory motive.

238.    Meza's and Robson's conduct violated clearly established statutory and constitutional rights of which a reasonable person would have known. Plaintiff's statutory right to inspect public records was clearly established at the time of the conduct at issue,

as were his constitutional rights under the First Amendment's Petition Clause and Speech Clause, including that the fundamental right to petition was procedurally and substantively protected in the face of vexatious accusations far beyond the Statute's woefully overbroad provisions pursuant to well-established U.S. Supreme Court and Ninth Circuit precedent.

239.    Meza's actions and Robson's actions "exceeded the bounds of reasonable governmental action and violated [Plaintiff's] First Amendment rights." *White v. Lee*, 227 F.3d 1214, 1231 (9th Cir. 2000).

240.    Every reasonable official, and their agents or joint operators, would have understood that what he or she was doing to violate Plaintiff's constitutional rights.

241.    First Amendment retaliation, especially on matters of considerable public concern, are prohibited under the utmost of circumstances.

242.    Meza's and Robson's joint A.R.S. § 12-3201(A) motion and prosecution, including their efforts to uphold the resulting Order on appeal, were not legitimate petitioning activity immunized by the Petition Clause or the *Noerr-Pennington* doctrine. Those concerted actions constitute "sham litigation" predicated on a litigant's "fraud ... misrepresentation, or other misconduct", including criminal misconduct.[47]  *See Pro. Real Est. Invs.*, 113 S.Ct. at 1928 n. 6 (quotation marks omitted).  "The line is crossed when

---

[47]    The Ninth Circuit has adopted this consideration as stand-alone evidence of "sham litigation". *See Relevant Grp., LLC v. Nourmand,* 116 F.4th 917, 928 (9th Cir. 2024) ("Our court has identified three circumstances in which the sham litigation exception might apply: first, where the lawsuit is objectively baseless and the defendant's motive in bringing it was unlawful; second, where the conduct involves a series of lawsuits 'brought pursuant to a policy of starting legal proceedings without regard to the merits' and for an unlawful purpose; and third, if the allegedly unlawful conduct 'consists of making intentional misrepresentations to the court, litigation can be deemed a sham if 'a party's knowing fraud upon, or its intentional misrepresentations to, the court deprive the litigation of its legitimacy.'") (Internal citations omitted).  This "second" consideration tracks with the *Ringgold* "inordinate" number of "frivolous" lawsuits consideration.

[the litigant's] purpose is not to win a favorable judgment ... but to harass him, and deter others, by the process itself – regardless of outcome – of litigating". *Id* at 1935-36. Again, there was no "favorable judgment" to win in a public records lawsuit after the trial court denied additional records production, but Meza and Robson proceeded with efforts to forever deny and deprive Plaintiff of his fundamental right of access to courts.

243.    Meza's misconduct and malicious intent is further evident in other court filings where he provided knowing misrepresentations for the unlawful purpose of attempting to conceal the Scheme.  Again, he falsely avowed to one court that Nonprofits' executives only paid him for his "advice", although Plaintiff secured an affidavit from NP6's CEO in another court that she paid him for his "services as a fundraiser".  Meza also submitted an affidavit swearing he did not produce or maintain public records on his personal cell phone or personal email account, but evidence demonstrated that he did.

244.    "In the adjudicatory sphere, ..., information supplied by the parties is relied on as accurate for decision making and dispute resolving.  The supplying of fraudulent information thus threatens the fair and impartial functioning of these agencies and does not deserve [*Noerr-Pennington*] immunity".  *Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.,* 690 F.2d 1240, 1260-61 (9th Cir. 1982). "There is no first amendment protection for furnishing with predatory intent false information to an ... adjudicatory body." *Id.*

245.    Meza's improper and malicious litigation tactics included numerous "intentional misrepresentations to, the court[s] and deprive[d] the litigation of its legitimacy.'" *Relevant Grp.,* 116 F.4th at 928.

246.    Plaintiff seeks compensatory damages due to fundamental rights deprivations, reputational harm, loss of income and wages, loss of business assets,

emotional distress and fear, and pecuniary losses with damages to be jointly and severally assessed against Meza and Robson for their concerted actions.

247.  "A jury [is] permitted to assess punitive damages in an action under Section 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others."  *Smith v. Wade*, 461 U.S. 30 (1983).  "Punitive damages by definition are not intended to compensate the injured party, but rather to punish the tortfeasor whose wrongful action was intentional or malicious, and to deter him and others from similar extreme conduct."  *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 266–67 (1981).

248.  Meza and Robson were motivated by evil motives and evil intent, and demonstrated reckless or callous indifference to Plaintiff's federally protected First Amendment rights under the Petition Clause and the Speech Clause.  Those defendants should be punished for their intentional and malicious actions, and to deter them and others from similar extreme conduct.

249.  Plaintiff seeks punitive damages jointly and severally assessed against Meza and Robson.

**COUNT FOUR**
**ABUSE OF PROCESS**
**[Meza, Robson, and Ortega]**

250.  Plaintiff incorporates the allegations in all preceding paragraphs as if fully set forth herein.

251.  Arizona recognizes a common law claim for Abuse of Process.  *Goldman v. Sahl,* 248 Ariz. 512 (App. 2020).  "[T]he elements of abuse of process are (1) a willful act in the use of [a] judicial process; (2) for an ulterior purpose not proper in the regular conduct of the proceedings."  *Id at* ¶ 58.  "One who uses a legal process, whether criminal

74

or civil, against another primarily to accomplish a purpose for which it is not designed, is subject to liability to the other for harm caused by the abuse of process." *Id* at ¶ 59.

MEZA AND ROBSON

252.    The proper purpose of a vexatious litigant injunction is to protect courts and defendants from enduring a series of "objectively baseless lawsuits" which also demonstrate "a pattern of harassment" on common claims and defendants. *Ringgold.*

253.    Robert Meza, in his official capacity, and Karrin Taylor Robson were not party to any other lawsuit involving Plaintiff beyond CV2022-008626. Therefore, by definition, they could not have endured any effects of a series of baseless lawsuits. And neither Meza nor Robson could have suffered directly from a "pattern of harassment" since one lawsuit cannot establish a pattern.

254.    Further, Plaintiff never filed an objectively baseless lawsuit per *Pro. Real Est. Invs.*. Several CV2021-013210 claims were "returned to" or abated for litigation in CV2021-005501 which is now set for trial. Therefore, the CV2021-013210 complaint was not "objectively baseless" as it contained "genuine issues of material fact and law". *Id*. Further, previously concealed, but now discovered, facts show no CV2021-013210 claim, much less the entire suit, was objectively baseless. Further still, in non-final parallel litigation, Mercy Care and the AHCCCS Director knowingly misrepresented and actively concealed facts of their profit-sharing agreement to evade public records disclosure in CV2022-014146, so that suit was not "objectively baseless" and could not contribute to any calculation of an "inordinate" number of frivolous lawsuits. *Ringgold.*

255.    Meza and Robson each engaged in a willful act in the use of a judicial process when jointly bringing the A.R.S. § 12-3201(A) motion in CV2022-008626 and prosecuting the motion and resulting Order through appeal.

75

256.    Meza and Robson acted in concert, and jointly filed and prosecuted the A.R.S. § 12-3201(A) motion for the "ulterior purposes" of (1) retaliating against Plaintiff for exercising his First Amendment rights under the Petition Clause; (2) intimidating Plaintiff as a crime witness; and (3) obstructing criminal investigations into the Scheme. None of those purposes are proper in the regular conduct of judicial proceedings.  But those ulterior purposes were Meza's and Robson's primary motive.

257.    Plaintiff seeks compensatory damages due to fundamental rights deprivations, reputational harm, loss of income and wages, loss of business assets, emotional distress and fear, and pecuniary losses with those damages jointly and severally assessed against Robson and Meza.  Meza is liable in his private capacity for acts taken in his official capacity but which served his private interest.  *See Goldman,* 248 Ariz. at 519, ¶ 58 ("There is no requirement that [a defendant] be a party to the proceedings.").

258.    Meza and Robson both acted out of malice. Their concerted conduct was guided by evil minds.

259.    Meza's and Robson's wrongful conduct was motivated by ill will with intentions to serve their own interests.

260.    Meza and Robson acted in concert with evil minds to commit intentional acts that injured Plaintiff and, thus, are jointly and severally liable for punitive damages.

ORTEGA

261.    Again, "[t]here is no requirement that [a defendant] be a party to the proceedings." *Goldman*.  Ortega can be held liable for her actions and for working in concert with Meza to further the Scheme.

262.    Ortega engaged in "(1) a willful act in the use of [a] judicial process; (2) for an ulterior purpose not proper in the regular conduct of the proceedings." *Id*.

263.     The proper purpose of "discovery is to assist the search for truth by providing the parties with all the evidence possible so that the crucial facts may be presented at trial and a just decision made.'"  *Wells v. Fell,* 231 Ariz. 525, 528 ¶ 13 (2013).  "[D]iscovery, is not a game."  *Id.*

264.     The only proper purpose of A.R.S. § 41-161, *et seq.* is to keep addresses confidential when genuine A.R.S. § 13-3601 victims move from one location to another.

265.     Polluting proceedings with false information, evading discovery via unlawful and improper means, and intimidating crime victims with threats of incarceration are never proper purposes for judicial proceedings, including discovery proceedings.

266.     Ortega engaged in willful acts in the use of judicial processes when (1) filing A.R.S. § 12-3201(A) motions in CV2021-005501 and CV2021-013210 per agreement with Meza; (2) remaining silent during a FC2020-090224 November 2020 deposition knowing her client was presenting false testimony while having a duty, but refusing, to display candor[48] in an ongoing case; (3) demanding Plaintiff turn over communications he made to federal investigators and threatening him with incarceration in motion papers if he did not comply; (4) entering A.R.S. § 41-163(D) "address confidentiality program authorization cards" as exhibits in motion papers seeking to evade ordered and relevant discovery; (5) instructing TD not to answer deposition questions

---

[48]     Ortega willfully remained silent in FC2020-090224, and therefore actively concealed the Scheme, knowing TD was presenting false testimony at a November 2020 deposition, and she willfully failed to correct the record despite maintaining an ongoing professional duty to do so.  *See* Ariz. R. Sup. Ct. 42 ER 3.3; *see also U.S. v. LaPage*, 231 F3d 488, 492 (9th Cir. 2000) ("[N]o lawyer, whether prosecutor or defense counsel, civil or criminal, may knowingly present lies to a [court] and then sit idly by while opposing counsel [or party] struggles to contain this pollution"); *Wells Fargo Bank v. Arizona Laborers, Teamsters*, 201 Ariz. 474, 485, 38, ¶¶ 87-98, P.3d (2002) (Silence and other forms of material omissions constitute "active concealment", and therefore constitute fraud, when there is a duty to speak the truth).

required on appellate remand, special action instructions, and court order; (6) instructing TD to walk out when asked relevant questions later permitted at trial; and (7) moving the FC2020-090224 court to issue a blanket order prohibiting Plaintiff from exercising his First Amendment rights under the Speech Clause and Petition Clause to speak with government officials.

267.    Ortega engaged in those willful acts for the ulterior purposes of (1) threatening Plaintiff's First Amendment rights under the Petition Clause; (2) intimidating Plaintiff as a crime witness; and (3) obstructing criminal investigations into the Scheme. None of those purposes were proper in the regular conduct of those judicial proceedings. But those ulterior purposes were Ortega's primary motive.

268.    Plaintiff seeks compensatory damages due to reputational harm, loss of income and wages, loss of business assets, emotional distress and fear, and pecuniary losses.

269.    Ortega acted out of malice.  Her conduct was guided by an evil mind.

270.    Ortega's wrongful conduct was motivated by ill will with intentions to serve her own interests and interests of other persons, including Meza.

271.    Ortega committed intentional and malicious acts that injured Plaintiff and, therefore, is liable for punitive damages.

**COUNT FIVE**
**AIDING AND ABETTING ABUSE OF PROCESS**
**[Meza, Robson, and Ortega]**

272.    Plaintiff incorporates the allegations in all preceding paragraphs as if fully set forth herein.

273.    The elements of Aiding and Abetting are (1) a primary tort or violation; (2) knowledge or general awareness of the primary tort or violation; and (3) substantial

assistance or encouragement of the primary tort. *Wells Fargo*, 201 Ariz. 474 at ¶ 51.

274.    Meza, Robson, and Ortega each committed the primary tort of Abuse of Process.

275.    Meza, Robson, and Ortega each had knowledge and general awareness of the other's tortious acts as they jointly engaged in that tortious activity in planned and coordinated fashion.

276.    Meza and Robson each substantially assisted and encouraged each other to commit their primary torts, as evidenced by their joint conduct in CV2022-008626.

277.    Meza and Ortega each substantially assisted and encouraged one another to commit their primary torts as evidenced by (1) Meza's and Ortega's August 2021 communications on the specific topic of filing A.R.S. § 12-3201(A) motions; (2) Ortega's two unsuccessful A.R.S. § 12-3201(A) motions filed in CV2021-013210; and (3) Meza's May 2022 inadvertent public admission that he was "helping" Ortega in litigation, including assisting her in her attempts to commit the torts and further the Scheme.

278.    Meza, Robson, and Ortega are liable for compensatory damages for causing Plaintiff's fundamental rights deprivations, reputational harm, loss of income and wages, loss of business assets, emotional distress and fear, and pecuniary losses.

279.    Meza, Robson, and Ortega each acted out of malice. Their conduct was guided by evil minds.

280.    Meza's, Robson's, and Ortega's wrongful actions were motivated by ill will with intentions to serve their own interests.

281.    Meza, Robson, and Ortega acted in concert to commit intentional acts that injured Plaintiff and, therefore, are jointly and severally liable for punitive damages.

**COUNT ONE**

**42 U.S.C. § 1983**
**DEPRIVATION OF CONSTITUTIONAL RIGHTS UNDER COLOR OF LAW**
**FIRST AMENDMENT RETALIATION**
**VIOLATION OF U.S. CONST. AMENDS. I AND XIV**
**(Meza and Robson)**

280.    Plaintiff incorporates the allegations in all preceding paragraphs as if fully set forth herein.

281.    The First Amendment is applicable to states via the Fourteenth Amendment.

282.    Meza operated under color of law as an Ariz. Const. art. 4 Arizona House of Representatives member and A.R.S. § 39-121.01(A)(1) Officer in pursuit of an A.R.S. § 12-3201 injunction.

283.    Robson operated under color of law as a willful participant in joint activity with Meza.  "Private persons, jointly engaged with state officials in the prohibited action, are acting 'under color of law' for purposes of the statute.  To act 'under color' of law does not require that the accused be an officer of the State.  It is enough that he is a willful participant in joint activity with the State or its agents,".  *United States* v. *Price,* 383 U. S. 787, 794 (1966).

284.    "Under the First Amendment to the United States Constitution, a citizen has the right to be free from governmental action taken to retaliate against the citizen's exercise of First Amendment rights or to deter the citizen from exercising those rights in the future." *Sloman v. Tadlock,* 21 F.3d 1462, 1469-70 (9th Cir. 1994); *Hartman v. Moore*, 547 U.S. 250, 256 (2006) ("[T]he First Amendment prohibits government officials from subjecting an individual to retaliatory actions").

285.    "A plaintiff may bring a Section 1983 claim alleging that public officials, acting in their official capacity, took action with the intent to retaliate against, obstruct, or chill the plaintiff's First Amendment rights." *Ariz. Students' Ass'n v. Ariz. Bd. of Regents*,

824 F.3d 858, 867 (9th Cir. 2016).

286.   Plaintiff engaged in a constitutionally protected activity under the Petition Clause and the Speech Clause when, pursuant to A.R.S. § 39-121, *et seq*., he petitioned the government for redress of grievances and sought to inspect government information of great public concern.

287.   In turn, and with the intent to retaliate against, obstruct, and chill Plaintiff's First Amendment rights for exercising those First Amendment rights under the Petition Clause and Speech Clause, Plaintiff was subjected to adverse action when Defendants jointly filed an A.R.S. § 12-3201(A) motion seeking to shut down public records production to which Plaintiff had a statutory right to inspect, falsely label Plaintiff vexatious, intimidate Plaintiff as a crime witness, and obstruct state and federal criminal investigations into a Medicaid fraud scheme.  Defendants' conduct had the intended effects and deprived Plaintiff of the benefit of the right to petition in the form of free access to the courts.

288.   Plaintiff's petition rights and speech rights were substantial and motivating factors in the adverse action.  Indeed, Plaintiff's exercise of his First Amendment rights brought him to the cusp of documents production which would demonstrate their concerted involvement in Medicaid fraud and other criminal conduct, as well as in

289.   Defendants' actions would chill a person of ordinary firmness from continuing to engage in the protected activity.

290.   The protected activity was a substantial or motivating factor in Defendants' conduct.

291.   The adverse action against Plaintiff would not have been taken absent the retaliatory motive.

292. Meza's and Robson's conduct violated clearly established statutory and constitutional rights of which a reasonable person would have known.

293. The statutory right to inspect public records was clearly established at the time of the conduct at issue, as were constitutional rights under the First Amendment's Petition Clause and Speech Clause, including that the right to petition was protected in the face of alleged vexatious litigation pursuant to Ninth Circuit precedent. *Bill Johnson's Restaurants*; *De Long*; *Ringgold*.

294. Every reasonable official, and their agents or joint operators, would have understood that what he was doing violated Plaintiff's constitutional rights.

295. The Ninth Circuit made it clear and gave Defendants fair warning that their pursuit of an A.R.S. § 12-3201 vexatious litigant injunction was unconstitutional.

296. Speech retaliation and petition retaliation on matters of considerable public concern are prohibited under the utmost of circumstances.

297. Paragraphs 66-266 herein contain allegations taken from 2:25cv00016, and demonstrate the First Amendment facial unconstitutionality of A.R.S. § 12-3201.

CV-25-00016-PHX-KML

298. Plaintiff filed federal case 2:25cv00016 in the District of Arizona on January 3, 2025, therein bringing a facial challenge to the constitutionality of Arizona Revised Statutes ("A.R.S.") § 12-3201 (the "Statute"), titled "Vexatious litigants", pursuant to the vagueness and overbreadth doctrines.

299. Unconstitutionally restricting Arizonans' First Amendment right to petition, the Statute conflates A.R.S. § 12-3201(E) "vexatious conduct" with A.R.S. § 12-349(A) sanctionable conduct, and requires an A.R.S. § 12-3201(B) permanent blanket injunction limiting pro se litigants' First Amendment right to petition the Government for a redress

of grievances based on the occurrence of as little as one sanctionable act.

300.    Vexatious litigant injunctions[49], whether issued pursuant to a court's inherent authority or pursuant to any statutory authority, must provide procedural and substantive due process, and cannot unduly limit the fundamental right to petition in the form of free access to the courts.  *De Long v. Hennessey,* 912 F.2d 1144 (9th Cir.1990); *Ringgold-Lockhart v. County of Los Angeles,* 761 F.3d 1057 (9th Cir. 2014).

301.    While courts may statutorily sanction conduct at any stage of judicial proceedings, the Arizona Legislature violated U.S. Const. Amends. I and XIV when it passed A.R.S. § 12-3201 permitting, and even requiring, Arizona courts to enjoin[50] well-founded lawsuits.  *Bill Johnson's Restaurants., Inc. v. NLRB,* 461 U.S. 731, 743 (1983) ("[T]he First Amendment right to petition [guarantees] ... well-founded lawsuits ... *may not be enjoined*") (emphasis added); *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.,* 508 U.S. 49, 59-60 (1993) ("[E]ven an 'improperly motivated' lawsuit *may not be enjoined* … unless such litigation is '*baseless*' ... [which requires a threshold consideration that] must be resolved using objective criteria") (emphasis added).

302.    In addition to unconstitutionally requiring courts to enjoin well-founded lawsuits in general, the Statute unconstitutionally permits Arizona courts to enjoin pro se litigants who (1) present as defendants, not plaintiffs; (2) have filed as little as one civil action; (3) have seen no action reach judgment finality; (4) seek to compel public records production; and (5) have not been provided a meaningful opportunity to be heard in

---

[49]    See *Madison v. Groseth,* 230 Ariz. 8, 279 P.3d 633, 638-39 (App. 2012) establishing that Arizona courts consider vexatious litigant pre-filing restrictions to serve as a species of injunction.  The Ninth Circuit also counts vexatious litigant pre-filing restrictions as an injunction.  See *Moy v. United States,* 906 F.2d 467, 470 (9th Cir. 1990).
[50]    See *Hajro v. U.S. Citizenship & Immigration Servs.*, 811 F.3d 1086, 1101 (9th Cir. 2016) ("'to enjoin' is defined as '[t]o legally prohibit or restrain by injunction'").

opposition to a request to have the litigant designated vexatious.

303.    Plaintiff is now subject to an A.R.S. § 12-3201 injunction secured by the Arizona House of Representatives in a single public records suit, prohibiting Plaintiff from submitting court filings "in this case or any other pending civil action without prior leave of the judge assigned to that case" where the "other pending civil action[s]" involve unique defendants and claims, had already been deemed "well-founded", led journalists to research and publish articles on legislators' covert pursuit of private gain under color of office, and sparked criminal investigations that reshaped Arizona's legislative body, while "this case" resulted in recalcitrant A.R.S. § 39-121 public records production.[51]

304.    As an A.R.S. § 12-3201(C) "vexatious litigant", Plaintiff is also subject to an A.R.S. § 12-3201(B) blanket injunction permanently prohibiting him from "fil[ing] a new pleading, motion or other document without prior leave of the court".

305.    Further, Plaintiff is subject administrative enforcement of A.R.S. § 12-3201(A) to enter Plaintiff's name onto a "Vexatious Litigant List" and to enter separate administrative orders against Plaintiff; unappealable actions that would enlarge fundamental right deprivations.

306.    Further still, the Arizona Secretary of State has entered official documents identifying Plaintiff as an A.R.S. § 13-3601 domestic violence perpetrator traced back to supposed A.R.S. § 12-3201 "harassment".  As such, Plaintiff is subject to Defendant Mayes' criminal enforcement of A.R.S. §§ 13-2921 Harassment and 13-3601 Domestic Violence that would deprive him of his fundamental liberty and due process rights.  He is also subject to Mayes' civil enforcement of an A.R.S. § 13-3602 Domestic Violence

---

[51]    Per A.R.S. § 39-121, "[p]ublic records and other matters in the custody of any officer shall be open to inspection by any person at all times during office hours".

Order of Protection Procedure traced back to A.R.S. § 12-3201 that would deprive him of his fundamental rights of family association and to raise his child without interference.

307.    Plaintiff seeks declaratory and injunctive relief to prevent the Statute from being used to punish, threaten, restrict, or violate pro se litigants' fundamental rights.

308.    Kris Mayes serves as the Arizona Attorney General.  As the state's chief legal officer, she is charged by Ariz. Const. art., 5 § 9, A.R.S. § 41-192, A.R.S. § 41-193, and other authorities with guaranteeing that Arizona laws are uniformly and adequately enforced.  For instance, A.R.S. § 41-193(A)(5) grants the Attorney General the authority to "if deemed necessary, assist the county attorney of any county in the discharge of the county attorney's duties", providing Ms. Mayes the power to deputize herself with county prosecutor criminal enforcement authorities.  Ariz. Const. art., 2 § 2.1 and A.R.S. § 13-4433(D) also provide her the power to civilly enforce A.R.S. § 12-3201 via an A.R.S. § 13-3602 injunction.  She also has authority to prosecute A.R.S. § 13-2810(A)(2) which makes it criminal to "disobey[] a *lawful* court order", and is an offense that AG Mayes can prosecute for disobeying an A.R.S. § 12-3201 order.  A.R.S. § 13-2810 inherently connects AG Mayes' enforcement powers with every state court order, and with every underlying statutory basis for every court order, sufficient to invoke jurisdiction.

309.    Plaintiff brings claims in 2:25cv00016 for declaratory and injunctive relief authorized by 28 U.S.C. §§ 2201 and 2202.

### CV-25-00016-PHX-KML Factual Allegations

310.    Whether due to the significant costs of litigation or other factors, pro se litigants account for a large and growing percentage of Arizona court actions where "as many as 70% or more of all litigants in the Family Court proceedings are self-represented,

the highest number among all departments in the [Maricopa County Superior] Court".[52]

311.    The Arizona Legislature passed A.R.S. § 12-3201 in 2014 purportedly to provide a statutory authority that codified and complemented courts' inherent authority to manage their dockets in the government interest of judicial efficiency.  *Contreras v. Bourke*, No. 2 CA-CV 2023-0146-FC (Ariz. Ct. App. Aug. 9, 2024) (Sklar, J. dissenting).

312.    An "A.R.S. § 12-3201" keyword search conducted December 23, 2024 shows pro se litigants challenged an A.R.S. § 12-3201 vexatious designation in thirty-three (33) Arizona appeals.

313.    There is no telling how many A.R.S. § 12-3201 injunctions were never appealed or, worse yet, how many times opposing counsels threatened pro se litigants with an injunction to unjustly prevent the prosecution of civil actions.

314.    State appellate courts have affirmed the Statute's plain language permits trial courts to permanently enjoin a pro se litigant from ever filing court papers of any type based solely on instances of sanctionable conduct within non-final lawsuits, even when the pro se litigant presents as the *__defendant__* party.  *See Gainey Ranch Community Association v. Kraft*, No. 1 CA-CV 18-0179, ¶¶ 32, 34 (Ariz. Ct. App. 2019) (mem. decision) ("[Defendant] Kraft also challenges the superior court's ruling designating him a vexatious litigant, arguing that the court failed to specify any filing made for purposes of harassment or without substantial justification. ... [The Court of Appeals affirmed because] Kraft's filings repeatedly 'rehash[ed]' issues that had already been addressed"); *Parsons v. Harris*, No. 1 CA-CV 24-0324, ¶¶ 3, 9 (Ariz. Ct. App. Dec. 10, 2024) (mem. decision) ("Parsons sued Harris for defamation.  Harris filed six motions in the ten-month

---

[52]    See https://superiorcourt.maricopa.gov/posts/press-releases/2023/informal-trial-format-assists-self-represented-litigants-in-family-cases/.

1  period after he was served with the defamation complaint.  None of these motions had

2  merit, ... We affirm the court's designation of [Defendant] Harris as a vexatious litigant.").

3      315.    On information and belief, the Statute's facial constitutionality has never

4  been challenged in state court or federal court.

5      316.    Plaintiff brings 2:25cv00016 to defend his, and all Arizonans', fundamental

6  rights.[53]

7

8      317.    Per a February 27, 2023 order (the "Order") entered at the joint request of

9  the Arizona House of Representatives and State Representative Robert Meza, Plaintiff

10  was deemed a "vexatious litigant" within the context of a public records lawsuit.[54]

11      318.    The Order also enjoined Plaintiff from filing court papers "in this case or

12  any other pending civil action without prior leave of the judge assigned to that case".

13      319.    That A.R.S. § 39-121, *et seq*. public records suit ("this case" per the Order)

14  resulted in the production of documents showing Rep. Meza used legislative resources

15  (legislative staff, government email, etc.) to covertly generate personal financial gain

16  while operating under color of office from 2014 through 2021.

17      320.    "[O]ther pending civil action[s]" were deemed "well-founded" following

18  appeal in a family law case (FC2020-090224) where Plaintiff won a new trial on remand

19  and was granted special action relief[55], and following dismissal challenges in a second

20  case (CV2021-005501) that has since gone to discovery while a third case (CV2021-

21

22  _____

23  [53]    See *Noel v. Hall*, 341 F.3d 1148, 1157 (9th Cir. 2003) explaining that a "plaintiff's
   facial challenge[] [i]s not 'inextricably intertwined' with the judicial decision of the local

24  court [if] it [i]s a general challenge to the constitutionality of" a statute, meaning facial
   challenges are not subject to the *Rooker-Feldman* doctrine.

25  [54]    Neither Rep. Meza in his official capacity as an A.R.S. § 39-121.01(A)(1) Officer
   nor the Arizona House of Representatives as an A.R.S. § 39-121.01(A)(2) Public Body

26  stood as defendants in any prior or "pending civil action" involving Plaintiff.
   [55]    See *Potter v. Cohen*, No. 1 CA-SA 23-0144 (August 31, 2023).

013210)⁵⁶ and a fourth case (CV2022-014146) had not reached a final judgment at the time the Order was issued, and a fifth case (CV2021-017889) involved a motor vehicle accident where that case's defendant had already admitted 100% fault and the only undecided issue was the damages amount.

321. One panel of the Arizona Court of Appeals initially stayed the A.R.S. § 12-3201 injunction due to likely success on the merits, only to see another panel later affirm.

322. As it stands, Plaintiff faces a statutory injunction prohibiting him from filing court papers in ongoing "well-founded lawsuits" without judicial pre-approval, including in the FC2020-090224 dissolution which subjects Plaintiff to the state court's continuing jurisdiction for another twelve years as his youngest child will soon turn six years old.

323. Submitting any court papers absent pre-filing judicial approval serves as a basis for financial sanctions, contempt of court proceedings, and criminal indictment thus restricting Plaintiff's fundamental rights and placing him at risk of incarceration.

324. Plaintiff is subject to, but plans to defy, the Order including the A.R.S. § 12-3201(B) permanent blanket injunction prohibiting him from filing court papers absent leave of the court.

Constitutional Requirements Recognized in the Ninth Circuit

325. The U.S. Supreme Court has held that "baseless litigation is not immunized by the First Amendment right to petition" but a "well-founded lawsuit", defined as a civil *case* with a complaint presenting any objective or subjective "genuine issue of material fact ... or law[,] ... may not be enjoined".⁵⁷ *Bill Johnson's Restaurants,* 461 U.S. at 743;

---

⁵⁶ Plaintiff requested CV2021-005501 and CV2021-013210 be consolidated immediately upon filing 013210 but the CV2021-005501 trial court denied that motion based on defendants' objections and requests to proceed on split claims.

⁵⁷ The Ninth Circuit has established that the "lawsuit", i.e., the "case", is the constitutional unit of analysis when conducting a vexatious litigant substantive due

~~*Professional Real Estate Investors*, 508 U.S. at 61 (The phrase "genuine issue of material fact or law" does not have the same meaning as that found in Rule 56 but in the context of enjoining litigation, "a 'genuine issue' is one 'that properly can be resolved only by a finder of fact because [it] may reasonably be resolved in favor of either party.' ... On the other hand, 'genuine' also means 'sincerely and honestly felt or experienced.' ... Therefore, litigation must fail to be 'genuine' in *both* [the objective and subjective] senses of the word" before it can be enjoined) (emphasis added).~~

~~326. To guarantee procedural and substantive due process, the Ninth Circuit has established threshold conditions and clear guidelines that must be followed before a pro se litigant can be deemed vexatious and an associated injunction issued.~~

~~327. As an initial threshold, the Ninth Circuit holds that litigation which is not~~

---

process review. *De Long*; *Ringgold*. The term "case" is synonymous with "lawsuit", "court action", "suit", "litigation", and "action". See Black's Law Dictionary (6th Ed., 1990) (The word "*case*" is defined as "the general term for an *action*, [or], *suit*" while "*lawsuit*" is a "vernacular term for a *suit*, [or] *action*", and "*litigation*" is defined as "a *lawsuit* [or] *suit*"). While the U.S. Supreme Court provided that a "well-founded lawsuit [i.e., case, action, court action, suit, or litigation] ... may not be enjoined", that court has permitted meritless aspects of a "case" or "lawsuit" to be sanctioned pursuant to inherent authority, rules of procedure, or statutes. For instance, if a case's complaint includes five claims but only two raise a "genuine issue of material fact", the "lawsuit" cannot be enjoined but the plaintiff can be sanctioned for filing three non-meritorious claims. *Fox v. Vice,* 563 U.S. 826 (2011). The injunction-sanction and case-claim distinctions are crucial. Addressing sanctions, the U.S. Supreme Court has established that meritorious claims, as well as non-meritorious claims intertwined with meritorious claims, cannot serve as the basis for sanctions. *Id*. Instead, the purely non-meritorious claims must be examined and isolated so that any appropriate sanctions are issued proportionally. *Id*. So, while a pro se litigant's right to petition prohibits a well-founded *lawsuit* from being enjoined, factually distinct non-meritorious *claims* brought within that lawsuit can serve as the basis for proportional sanctions without threatening that fundamental right. But to reiterate, the occurrence of sanctionable conduct, such as filing a non-meritorious claim or improper motion papers, is immaterial to the overall question of whether the "case" presents as a "well-founded lawsuit' containing at least one meritorious claim.

objectively "baseless" may not be enjoined for any reason, including due to an improper purpose. *Ringgold*, 761 F.3d at 1064; s*ee also Greenberg v. Sala,* 822 F.2d 882, 885-86 (9th Cir. 1987) ("[W]here the Court finds a complaint is [not objectively 'baseless'], the Court need not reach the 'improper purpose' analysis because 'a[n] [objectively] non-frivolous complaint cannot be said to be filed for an improper purpose.'").

328. Beyond the initial threshold condition of objectively "baseless" active litigation, substantive due process also requires a second threshold condition in the form of a demonstrated history of objectively "baseless" lawsuits. *Ringgold,* 761 F.3d at 1064.

329. That historical review may only include cases which have reached finality through the exhaustion of appeals. *See In re Powell,* 851 F.2d 427, 432 (D.C. Cir. 1988) ("[T]he district court should be careful not to review pending cases … complaints that predated the [motion for an] injunction were still pending at the time the injunction was imposed and, as such, could not have been reviewed" for being a past baseless suit).[58]

330. Only under threshold conditions of a current objectively "baseless" case, as well as a documented history of objectively "baseless" cases, does the First Amendment allow an injunction to be issued for the limited purpose of protecting "defendant[s] or the court" from having to repeatedly endure subjective bad faith. *Ringgold,* 761 F.3d at 1064.

331. Once both objective threshold conditions are met, substantive due process permits courts to then move onto determining whether the suits (past and present) served an improper purpose for being of a subjectively bad faith "frivolous or harassing nature". *De Long,* 912 F.2d at 1148 ("[B]efore a district court issues a pre-filing [vexatious litigant] injunction ... it is incumbent on the court to make 'substantive findings as to the [subjective] *frivolous or harassing* nature of the litigant's actions'") (emphasis added).

---

[58]    The Ninth Circuit recognizes *Powell* as binding authority.  See *De Long*; *Ringgold*.

332.    Regarding a "frivolous ... nature" finding, "[t]o determine whether the [history of] litigation is [subjectively] frivolous, district courts must 'look at *both* the number and content of the filings as indicia of the frivolousness of the litigant's claims.' ... While we have not established a numerical definition for frivolousness, we have said that 'even if [a litigant's] petition is frivolous, the court [must] make a finding that *the number of complaints was inordinate*.' ... *Litigiousness alone is not enough*, either: 'The plaintiff's claims *must not only be numerous, but also be patently without merit*.'"  *Ringgold,* 761 F.3d at 1064 *citing Moy* (emphasis added).

333.    Accordingly, to reach the constitutional end of a *De Long* "frivolous" finding, substantive due process requires there to be (1) a current objectively "baseless" lawsuit as well as a history of (2) finalized (3) objectively "baseless" lawsuits which (4) are also subjectively "inordinate" in number.  Each condition must be met.

334.    As an "alternative" to a subjectively "frivolous" determination, *De Long* allows vexatious litigant injunctions to be issued where there is evidence of a subjective improper purpose in the form of a "harassing nature", so long as a "pattern of harassment" on common defendants or claims is demonstrated, not just single or unrelated instances. *See Ringgold,* 761 F.3d at 1064 ("[T]he district court may make an alternative finding that the litigant's filings 'show *a pattern of harassment.*' ...  However, courts must 'be careful not to conclude that particular types of actions filed repetitiously are harassing,' and must '[i]nstead ... 'discern whether the filing of several similar types of actions constitutes an intent to harass the defendant or the court.'") (Emphasis added).

335.    Accordingly, to reach the constitutional end of a *De Long* "harassment" finding, substantive due process requires there to be (1) a current objectively "baseless" lawsuit as well as a history of (2) finalized (3) objectively "baseless" lawsuits which (4)

also demonstrate a subjective "pattern of harassment" involving common parties or claims.  Each condition must be met.[59]

336.    The Ninth Circuit also established that procedural due process requires a self-represented plaintiff be provided a meaningful opportunity to be heard in opposition before a vexatious litigation injunction can be issued.  *De Long,* 912 F.2d at 1147-48.

337.    A.R.S. § 12-3201 guarantees none of these procedural due process or substantive due process protections and, fatally, requires Arizona courts to enjoin current and future "well-founded lawsuits" in patently overbroad fashion.

338.    Effective January 1, 2015, the Arizona Legislature adopted A.R.S. § 12-3201 which reads in full:

A. In a noncriminal case, at the request of a party or on the court's own motion, the presiding judge of the superior court or a judge designated by the presiding judge of the superior court may designate a pro se litigant a vexatious litigant.
B. A pro se litigant who is designated a vexatious litigant may not file a new pleading, motion or other document without prior leave of the court.
C. A pro se litigant is a vexatious litigant if the court finds the pro se litigant engaged in vexatious conduct.
D. The requesting party may make an amended request at any time if the court either:
    1. Determined that the party is not a vexatious litigant and the requesting party has new information or evidence that is relevant to the determination, even if there is not a pending case in the court.

---

[59]    The Ninth Circuit has determined that the federal pleading standards permit a federal court to enjoin a plaintiff from filing specific types of actions in the future when a review of court records showed the plaintiff had filed "hundreds" of lawsuits against different defendants alleging that he suffered the same injuries at the same exact time at different geographic locations.  In that instance, the district court determined the record showed that plaintiff filed past and present objectively baseless lawsuits based on impossible "contrived" facts, and demonstrated subjective frivolousness based on an inordinate number of suits as well as a subjective pattern of harassment limited to the unique circumstances which indicated an intent to harass small business owners into settlements.  See *Molski v. Evergreen Dynasty Corp.,* 500 F.3d 1047 (9th Cir. 2007).

2. Did not rule on the original request during the pendency of the action, even if there is not a pending case in the court.

E. For the purposes of this section:

1. "Vexatious conduct" includes any of the following:

(a) Repeated filing of court actions solely or primarily for the purpose of harassment.

(b) Unreasonably expanding or delaying court proceedings.

(c) Court actions brought or defended without substantial justification.

(d) Engaging in abuse of discovery or conduct in discovery that has resulted in the imposition of sanctions against the pro se litigant.

(e) A pattern of making unreasonable, repetitive and excessive requests for information.

(f) Repeated filing of documents or requests for relief that have been the subject of previous rulings by the court in the same litigation.

2. "Without substantial justification" has the same meaning prescribed in section 12-349.[60]

The Arizona Supreme Court Weighed In

339.   On May 2, 2024, the Arizona Supreme Court confirmed what the Arizona House of Representatives and Rep. Meza knew all along; A.R.S. § 12-3201 created a patently unconstitutional statute which violates Ninth Circuit procedural and substantive due process protections, and unlawfully restricts First Amendment rights.

340.   A.R.S. § 12-3201(E)(1)(a)-(d) language is copied almost verbatim from A.R.S. § 12-349(A)(1)-(4) language.  A.R.S. § 12-349(A)(1)-(4) reads in pertinent part:

A. Except as otherwise provided by and not inconsistent with another statute, in any civil action commenced or appealed in a court of record in this state, the court shall assess reasonable attorney fees, expenses and, at the court's discretion, double damages of not to exceed five thousand dollars against an attorney or party, including this state and political subdivisions of this state, if the attorney or party does any of the following:

1. Brings or defends a claim without substantial justification.

2. Brings or defends a claim solely or primarily for delay or harassment.

---

[60]    Per "section 12-349[F]", "'without substantial justification' means that the claim or defense is groundless and is not made in good faith".

93

3. Unreasonably expands or delays the proceeding.
4. Engages in abuse of discovery.

341.    The similarities between A.R.S. § 12-3201(E)(1)(a)-(d) language and A.R.S. § 12-349(A)(1)-(4) language are unmistakable.

342.    The Arizona Supreme Court declared the A.R.S. § 12-3201(E)(2) term "without substantial justification" has been misconstrued since "section 12-349" was amended in 2012.  *See Ariz. Republican Party v. Richer,* 547 P.3d 356, ¶ 35 (2024). Specifically, the state's highest court noted the "phrase 'not made in good faith' *lack*[*ed*] *clarity and engender*[*ed*] *confusion*".  *Id* at ¶ 34 (emphasis added).

343.    Arizona courts wrongly "conflate[d] the absence of good faith with the presence of bad faith".  *Id* at ¶ 35.

344.    "[U]nder § 12-349(F)" the term "absence of good faith" does not include any form of subjective "bad faith" "improper purpose" consideration.  *Id* at ¶ 36.

345.    "Sections 12-349(A)(2)-(4), respectively, [and A.R.S. § 12-3201(E)(1)(a), (b), and (d), respectively] ..., each [] provides a separate bad faith basis" demonstrative of an improper purpose.  *Id* at ¶ 37.  Critically, none of these three provisions include an "objective" "groundless" (i.e., baseless)[61] consideration which only exists in A.R.S. § 12-349(A)(1), *Id* at ¶ 40, and likewise only in A.R.S. § 12-3201(E)(1)(c).

346.    In sum, "[s]ections 12-349(A)(2)-(4)" – and therefore A.R.S. § 12-3201(E)(1)(a), (b), and (d) – incorporate "improper purpose" considerations, but *not* "baseless" considerations.  On the other hand, A.R.S. § 12-349(A)(1) – and therefore A.R.S. § 12-3201(E)(1)(c) – incorporates "baseless" considerations but *not* "improper

---

[61]    The A.R.S. § 12-3201(E)(1)(c) term "groundless" means "the proponent can present no rational argument based upon the evidence or law".  *Takieh v. O'Meara*, 252 Ariz. 51, 61, ¶ 37 (App. 2021).

purpose" considerations.  To conclude otherwise would unlawfully render the language of those provisions "superfluous".  *Id* at ¶ 37.

347.   But to reiterate for emphasis, the Ninth Circuit holds that substantive due process in the face of a vexatious litigant injunction requires (1) a threshold consideration for the presence of current and past finalized objectively "baseless" litigation, *and* (2) as a secondary consideration, the demonstration of a subjective "improper purpose" involving common defendants on common claims.  *See De Long*; *Ringgold*.  Neither consideration alone suffices to protect the First Amendment right to petition.

### A.R.S. § 12-3201 Lacks Procedural Due Process

348.   "The right of access to the courts is indeed but one aspect of the right of petition".  *California Motor Transport v. Trucking Unlimited*, 404 U.S. 508, 510 (1972).

349.   The First Amendment applies to the states through the Fourteenth Amendment, while the right to freely access the courts is found in the First Amendment petition clause, the Fifth Amendment due process clause, and the Fourteenth Amendment equal protection clause.  *Christopher v. Harbury,* 536 U.S. 403, 415 n. 12, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002).

350.   U.S. Const. Amends. I and XIV provide pro se litigants a procedural due process right to a hearing whenever a vexatious litigant injunction is being considered.

351.   That hearing must give self-represented litigants a meaningful opportunity to be heard in opposition to a vexatious litigant motion.

352.   A.R.S. § 12-3201 contains no hearing provision.[62]

353.   Accordingly, the Statute does not require trial courts to conduct a hearing.

---

[62]     For comparison, vexatious litigant statutes enacted in other Ninth Circuit states provide robust procedural due process including the guarantee of an adversarial hearing. See Cal. Code Civ. Proc. §§ 391.1 - 391.3; Hawaii Revised Statutes §§ 634J1 - J3.

354.    A.R.S. § 12-3201 therefore violates procedural due process for lacking statutory language requiring trial courts to conduct an evidentiary hearing according to consistent standards and objectives.

A.R.S. §§ 12-3201(B) and 12-3201(E)(1) Are Overbroad

355.    The overbreadth doctrine provides that a law is unconstitutional if it "lacks a plainly legitimate sweep". *Moody v. NetChoice, LLC,* 144 S. Ct. 2383, 2397 (2024). "[W]hen a facial suit is based on the First Amendment, ... [the law is alternatively unconstitutional if] 'a substantial number of [the law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *Id.*

356.    Because the Statute is constitutionally deficient as to procedural due process in every instance as described above, the Statute "lacks a plainly legitimate sweep".

357.    Also, as described below, because cursory reading of A.R.S. §§ 12-3201(B) and 12-3201(E)(1)(a)-(f) shows each referenced provision to be constitutionally deficient as to substantive due process, the Statute "lacks a plainly legitimate sweep".

358.    Any incidentally legitimate sweep that might be found within the Statute is slight compared to the "substantial number of [] applications [that] are unconstitutional".

A.R.S. § 12-3201(B) Is Overbroad

359.    Per A.R.S. § 12-3201(B), "[a] pro se litigant who is designated a vexatious litigant may not file a new pleading, motion or other document without prior leave of the court"; the epitome of an overbroad injunction designed to prevent a pro se litigant from filing any complaint in any case without leave of the court.

360.    But the Ninth Circuit unambiguously established that a vexations litigant injunction is unconstitutionally "overbroad [if] it is designed to prevent [a plaintiff] from filing any complaint in any case without leave of court". *Moy,* 906 F.2d at 471.

361.    An A.R.S. § 12-3201(B) injunction also serves as an unconstitutional complaint "screening" in every instance and thus sweeps overbroadly per the Ninth Circuit. *See Ringgold*, 761 F.3d at 1066 (An injunctive "order is too broad [if] it provides that the court 'will approve all filings'. ... [T]he district court added a screening criteria that is not narrowly tailored to the problem before it, and is in fact unworkable. ... [C]ourts cannot properly say whether a suit is 'meritorious' from pleadings alone.").

362.    A.R.S. § 12-3201(B) also unconstitutionally enjoins all future litigation in permanent, blanket fashion. *See Ringgold*, 761 F.3d at 1067 ("In light of the constitutional concerns such pre-filing orders implicate, ... there [must be a] []sufficiently close fit between the terms of the injunction and the problem it purports to address").

363.    A.R.S. § 12-3201(B) therefore is overly broad for the above reasons.

A.R.S. § 12-3201(E)(1) Is Overbroad

364.    Per A.R.S. § 12-3201(C) and (E)(1), a "vexatious litigant" is a pro se litigant who has engaged in "any" A.R.S. § 12-3201(E)(1)(a)-(f) "vexatious conduct".

365.    One of the Statute's many insurmountable defects is that each A.R.S. § 12-3201(E)(1)(a)-(f) criterion burdens and punishes activities which are within the Statute's purported scope, but which are protected by the First Amendment—those protected activities being the filing, prosecution, and defense of "well-founded lawsuits".

366.    In other words, the Statute does not only burden or punish constitutionally unprotected "baseless litigation" with the threat and consequences of an injunction, but the Statute sweeps far too broadly by enjoining constitutionally protected litigation.

367.    This fatal flaw is omnipresent because the Arizona Legislature disregarded *Ringgold* and other states' model vexatious litigant statutes, and instead copied A.R.S. § 12-3201(E)(1)(a)-(d) language almost verbatim from A.R.S. § 12-349(A)(1)-(4); a fee

shifting statute[63] which triggers even on single instances of sanctionable conduct, including sanctionable conduct that occurs within "well-founded lawsuits".

368.    Beyond A.R.S. § 12-3201(E)(1)(a)-(d), A.R.S. § 12-3201(E)(1)(e) ("A pattern of making unreasonable, repetitive and excessive requests for information") and A.R.S. § 12-3201(E)(1)(f) ("Repeated filing of documents or requests for relief that have been the subject of previous rulings by the court in the same litigation") both contain unique language appearing nowhere in A.R.S. § 12-349; however, A.R.S. § 12-3201(E)(1)(e) and (f) only provide broad descriptions of conduct that would not normally even rise to the level of sanction, much less a vexatious litigant designation, meaning A.R.S. § 12-3201(E)(1)(e) and (f) also sweep far too broadly.

    Every A.R.S. § 12-3201(E)(1)(a)-(f) Provision Is Overly Broad

369.    A.R.S. § 12-3201(E)(1) does not provide substantive due process that the Ninth Circuit has determined U.S. Const. Amends. I and XIV require.

370.    Critically, A.R.S. § 12-3201(E)(1) violates the bright-line constitutional prohibition against enjoining "well-founded lawsuits" where the plain language of every provision therein permits, and Arizona trial and appellate courts have affirmed permits, "well-founded lawsuits" to be enjoined.

371.    A.R.S. § 12-3201(E)(1) is overbroad in its entirety for that reason alone, as well as for additional reasons described below.

372.    Again, for a vexatious litigant statute to pass constitutional muster, it must guarantee substantive due process which requires current and finalized litigation to be objectively "baseless" as a threshold condition *and* requires that litigation to be brought

---

[63]    See *In re Larry's Apartment, L.L.C.*, 249 F.3d 832, 837-840 (9th Cir. 2001) where the Ninth Circuit has recognized A.R.S. § 12-349 is a "sanctions statute".

for a subjective "improper purpose" against common defendants on common claims as a secondary condition. *See De Long*; *Ringgold*.

373. The Arizona Supreme Court has determined that no A.R.S. § 12-3201(E)(1) provision includes both an objectively baseless litigation threshold consideration *and* a subjective improper purpose consideration. Thus, the Statute is overbroad in its entirety for that reason alone, as well as for additional reasons described below.

A.R.S. § 12-3201(E)(1)(a) Is Overly Broad

374. A.R.S. § 12-3201(E)(1)(a) defines "vexatious conduct" as "[r]epeated filing of court actions solely or primarily for the purpose of harassment".

375. Plain language permitting subjective "harassment" to form the exclusive basis for a vexatious litigant injunction also makes A.R.S. § 12-3201(E)(1)(a) overly broad; a "pattern of harassment" must be demonstrated. *See Ringgold*.

376. Inclusion of the phrase "or primarily" also makes A.R.S. § 12-3201(E)(1)(a) overbroad since "or" presents a disjunctive standard used to express an alternative or to give a choice, and the dictionary defines "primarily" as "for the most part".[64]

377. "Primarily" does not mean "solely"; i.e., the "exclusion of all else".[65]

378. So, while "court actions [filed] solely ... for the purpose of harassment" might imprecisely describe more than one objectively "baseless" lawsuit possibly brought as part of a *Ringgold* "pattern of harassment", no such A.R.S. § 12-3201(E)(1)(a) statutory construal can be made since the provision includes the phrase "or primarily".

379. A court action filed "primarily for the purpose of harassment" concedes that the suit's complaint contains at least one claim which objectively presents a "genuine

---

[64] See https://www.merriam-webster.com/dictionary/primarily.
[65] See https://www.merriam-webster.com/dictionary/solely.

issue of material fact or law", meaning the action is "well-founded" and not objectively "baseless", and thus can neither be enjoined nor considered in the requisite historical review for finalized objectively "baseless" litigation.[66]

380.   In sum, A.R.S. § 12-3201(E)(1)(a) unconstitutionally permits sanctionable conduct in the form of non-patterned "harassment" within "well-founded lawsuits", including non-final lawsuits, to serve as the entire basis for a vexatious injunction.

381.   A.R.S. § 12-3201(E)(1)(a) is unconstitutionally overbroad.

A.R.S. § 12-3201(E)(1)(b) Is Overly Broad

382.   A.R.S. § 12-3201(E)(1)(b) defines "vexatious conduct" as "[u]nreasonably expand[ing] or delay[ing] court proceedings".

383.   Whether a pro se litigant "expanded ... or delayed court proceedings" is immaterial to the first threshold consideration of whether the current suit is objectively "baseless", and is immaterial to the second threshold consideration of whether there exists a history of finalized objectively "baseless litigation". *See De Long.*

384.   In other words, A.R.S. § 12-3201(E)(1)(b) permits a "well-founded lawsuit" to be enjoined based solely on sanctionable conduct, and therefore is overly broad.

385.   The term "court proceedings" solidifies Plaintiff's position that this particular provision casts an overbroad net since "court proceedings are not separate actions. ... [T]hey are distinct stages in the processing of the same 'action'". *Sw. Airlines Co. v. Ariz. Dep't of Revenue,* 197 Ariz. 475, 477, ¶ 7, 4 P.3d 1018, 1020 (App.2000).

386.   The First and Fourteenth Amendments do not permit a pro se litigant to be

---

[66]     The Ninth Circuit found California's vexatious litigant statute is not overbroad because prohibited conduct is limited to litigation "*solely* intended to harass". *Wolfe v. George,* 486 F.3d 1120, 1125 (9th Cir.2007).  California's statute does not sweep beyond "baseless litigation" while Arizona's statute sweeps far beyond.

found vexatious for unreasonably expanding or delaying "distinct stages in the processing of" a single civil action if the entire action itself is not objectively "baseless" and if there is not also a history of other baseless actions.

387.    While statutory sanctions may be issued during any stage of "court proceedings" due to expansion or delay, a vexatious litigant injunction can only be issued upon the repeated occurrence of objectively "baseless" lawsuits; a substantive due process threshold consideration which A.R.S. § 12-3201(E)(1)(b) lacks.

388.    A.R.S. § 12-3201(E)(1)(b) is overbroad for the above reasons.

A.R.S. § 12-3201(E)(1)(c) Is Overly Broad

389.    A.R.S. § 12-3201(E)(1)(c) defines "vexatious conduct" as "[c]ourt actions brought or defended without substantial justification" where, per A.R.S. § 12-3201(E)(2), "without substantial justification means that the claim or defense is groundless and is not made in good faith" based on cross-referencing "section 12-349".

390.    As an initial matter, A.R.S. § 12-3201(E)(1)(c) and "section 12-349" are incompatible because A.R.S. § 12-3201(E)(1)(c) applies to "court actions" (i.e., lawsuits) while "section 12-349" expressly applies to "claim[s] or defense[s]", and "lawsuits", not individual "claim[s] or defense[s]", are the only constitutional unit of analysis that can be used to evaluate the threshold considerations of "baseless litigation".

391.    The Arizona Legislature enacted an overbroad statute when conflating "court actions" with "claim[s] or defense[s]".

392.    Further, the A.R.S. § 12-3201(E)(1)(c) "or defended" language and the section 12-349 "or defense" language both present an "or" disjunctive standard, which unconstitutionally allows a self-represented *defendant* to be deemed a vexatious litigant; a circumstance which common sense and the Ninth Circuit preclude since the purpose of

vexatious litigant injunctions is to protect "defendant[s] or the court" from a self-represented *plaintiff*. *Ringgold,* 761 F.3d at 1064.

393.    A.R.S. § 12-3201(E)(1)(c) is overbroad on the simple and logical basis that substantive due process does not permit self-represented *defendants* to be deprived of their fundamental rights under any circumstance.[67]

394.    Moving on, the Arizona Supreme Court very recently opined that a claim is "without substantial justification" "if (1) it is groundless *and* (2) the party or attorney knows or should know that it is groundless, or is indifferent to its groundlessness, but pursues it anyway." *Ariz. Republican Party,* 547 P.3d at ¶ 38 (emphasis added).

395.    The Arizona Supreme Court went on to explain that the "not made in good faith" component of the phrase "without substantial justification" must be evaluated against the "objective standard" of "what a professional, competent attorney would do in similar circumstances." *Id* at ¶ 40.

396.    "[W]ithout substantial justification" thus is now a phrase considered to be the statutory equivalent to "Rule 11[(b)(2)]", which inherently does *not* include consideration of any "improper purpose", including subjective bad faith. *Id* at ¶¶ 37-40.

397.    The Arizona Supreme Court emphasized that A.R.S. § 12-349(A)(1) language (and therefore A.R.S. § 12-3201(E)(1)(c) language)[68] does not reach any type of

---

[67]    Likewise, none of the non-specific language contained in A.R.S. § 12-3201(E)(1)(b)-(f) is restricted to a *plaintiff's* conduct, and thus allows a self-represented *defendant* to be deemed a vexatious litigant, making each of those provisions overbroad.

[68]    When "judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language" is presumed to incorporate that same interpretation. *Bragdon v. Abbott,* 524 U.S. 624, 645, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998). And here, the exact same "without substantial justification" language is used where A.R.S. § 12-3201(E)(2) expressly tells us that "'Without substantial justification' has the same meaning prescribed in section 12-349".

"bad faith" consideration, and pointed to the A.R.S. §§ 12-349(A)(2)/12-3201(E)(1)(a) "solely or primarily for purposes of harassment" language to emphasize the critical point that "improper purpose" considerations are *separately* reached elsewhere in A.R.S. §§ 12-349(A)/12-3201(E)(1). *Id* at ¶ 37.

398.    *Ariz. Republican Party* thus confirms A.R.S. § 12-3201(E)(1)(c), like A.R.S. § 12-349(A)(1), includes no subjective "frivolous" or "harassment" improper purpose consideration which substantive due process requires as a secondary condition when determining whether litigation may be enjoined.

399.    A.R.S. § 12-3201(E)(1)(c) thus unconstitutionally permits vexatious litigant injunctions to be issued solely on the threshold condition of objectively "groundless" (i.e., "baseless") litigation without consideration for an "inordinate" number of "frivolous" cases or for a "pattern or harassment" involving common defendants[69] and claims.

400.    A.R.S. § 12-3201(E)(1)(c) thus is overbroad for the above reasons.

A.R.S. § 12-3201(E)(1)(d) Is Overly Broad

---

[69]    Plaintiff again notes that defendants in cases CV2021-005501 and CV2021-013210 objected to case consolidation and requested claims be adjudicated in "split" fashion. See Complaint ¶ 30, footnote 9.  Restatement (Second) of Judgments § 26(1)(a) "Comment a provides: '[a] main purpose of the general rule [against splitting claims] is to protect the defendant from being harassed by repetitive actions based on the same claim.  The rule is thus not applicable where the defendant consents, in express words or otherwise, to the splitting of the claim."  [Defendants'] argument in [the first action] that the [Plaintiff's] claims were distinct from [the second action's] claims is the functional equivalent of consent to splitting the [plaintiff's] claims from the [first action's] proceedings." *Shoemake, et al. v. Estancia De Prescott*, Nos. 1 CA-CV 14-0162, 1 CA-CV 14-0527 (Consolidated), ¶47 (Ariz. Ct. App. 2016) (mem. decision).  Per the Restatement, which Arizona follows, the CV2021-005501 and CV2021-013210 defendants could not claim they were, and the trial court could not determine those defendants were, subject to a "harassment" since defendants invited the outcome.  Again, A.R.S. § 12-3201(E)(1)(c) is overbroad because, as a matter of law, it does not require Arizona courts to evaluate "harassment".  Rather, the state's highest court determined the pertinent provision only contemplates objective baselessness, thus making the provision overly broad.

401.    A.R.S. § 12-3201(E)(1)(d) defines "vexatious" conduct as "[e]ngaging in abuse of discovery or conduct in discovery that has resulted in the imposition of sanctions against the pro se litigant".

402.    Whether a plaintiff is engaging in sanctionable conduct as part of discovery or was previously sanctioned in any discovery process provides no relevant information as to the threshold condition of whether the underlying lawsuit is objectively "baseless" or whether there is a history of objectively "baseless" litigation.

403.    It should also be presumed that a litigant who reached the discovery phase presented a "well-founded lawsuit", and the First and Fourteenth Amendments do not permit well-founded lawsuits to be enjoined for any reason including discovery abuses.

404.    Further, A.R.S. § 12-3201(E)(1)(d) does not limit statutorily prohibited conduct to plaintiffs, meaning the provision's standard can be applied to enjoin self-represented defendants in overbroad fashion.

405.    A.R.S. § 12-3201(E)(1)(d) therefore is overbroad.

A.R.S. § 12-3201(E)(1)(e) Is Overly Broad

406.    A.R.S. § 12-3201(E)(1)(e) defines vexatious conduct as "[a] pattern of making unreasonable, repetitive and excessive requests for information."

407.    Whether a litigant makes "requests for information" provides no constitutional insight into the threshold condition of whether the underlying lawsuit is objectively "baseless" or whether there is a history of objectively "baseless" litigation.

408.    Further, "[r]equests for information" from government officials, especially information about "cronyism and conflicts of interest" or any form of public corruption represents the epitome of the fundamental right to petition the government as well as the fundamental right of free speech in the form of political speech.  *See Dombey v. Phx.*

*Newspapers, Inc.,* 150 Ariz. 476, 481, 724 P.2d 562, 567 (1986) (The Arizona Supreme Court determined Arizonans' fundamental rights include the right to inquire about "the quality of the conduct of [] government, including charges of cronyism and conflicts of interest involving governmental programs [which] is at the very core of 'public concern' and is protected by the [F]irst [A]mendment.").

409.     Statutory injunctions such as the Statute "cannot be used to restrict protected political speech … [because] political speech [is] entitled to First Amendment protection 'at its zenith'." *See LaFaro v. Cahill,* 203 Ariz. 482, 485, ¶ 16, 56 P.3d 56, 59 (App. 2002) *quoting Buckley v. Am. Constitutional Law Found.,* 525 U.S. 182, 186-87, 119 S.Ct. 636, 142 L.Ed.2d 599 (1999).

410.     In this instance, the Arizona House of Representatives and former State Representative Robert Meza were fully aware of Rep. Meza's questionable conduct and, out of unlawful self-preservation, sought to weaponize and did weaponize, the Statute's overbroad and vague language to shut down document production, to usurp Arizona's public records law, to avoid public scrutiny, and to convert the Statute's litigation "shield" into a litigation "sword" as means to strip Plaintiff of his fundamental rights.

411.     A.R.S. § 12-3201(E)(1)(e) is overbroad because it can be, has been, and will be used by elected officials to curtail the First Amendment right to engage in free speech.

412.     Further, seeking public records for civil litigation evidentiary purposes is a legitimate and incentivized use of the Arizona public records law, and therefore cannot ever be considered to have been done for a "frivolous" or "harassment" improper purpose. *Bolm v. Custodian of Records of Tucson Police Dep't.,* 193 Ariz. 35, ¶ 11, 969 P.2d 200, 204 (App.1998) ("that litigation was pending ... when [the requesting party] made his public records request does not affect the [Public Body's] obligation to comply with the

Public Records Law"); *Phoenix Newspapers, Inc. v. Keegan,* 201 Ariz. 344, 351 ¶ 33, 35 P.3d 105, 112 (App. 2001) ("The core purpose of the public records law is to allow the public access to official records and other government information so that the public may monitor the performance of government officials."); A.R.S. § 39-121.02(D) ("Commercial purpose does not mean the use of a public record as evidence or as research for evidence in an action in any judicial or quasi-judicial body").

413.   In that vein, public records litigation vindicates a public right, not a private right, and therefore is not appropriate for inclusion in the requisite threshold review for "baseless litigation" or a subjective "pattern of harassment" review.  *Powell*, 851 F.2d at 433 (public records litigation "preclude[s] consideration of the interests of the requester"); *Bolm,* 193 Ariz. 35 at ¶ 10 ("A person's right to public records … is not conditioned on his or her showing, or a court finding, that the documents are relevant to anything").

414.   Finally, A.R.S. § 12-3201(E)(1)(e) does not limit statutorily prohibited conduct to plaintiffs, meaning the provision's standard can be applied to self-represented defendants in unconstitutional fashion.

415.   A.R.S. § 12-3201(E)(1)(e) therefore is overbroad for all above reasons.

A.R.S. § 12-3201(E)(1)(f) Is Overly Broad

416.   A.R.S. § 12-3201(E)(1)(f) defines "vexatious conduct" as "[r]epeated filing of documents or requests for relief that have been the subject of previous rulings by the court in the same litigation".

417.   Whether a plaintiff files documents or makes requests for relief provides no material information regarding the threshold conditions of whether an associated lawsuit is objectively "baseless" and whether there is a history of "baseless litigation".

418.   The "same litigation" language illuminates another fatal constitutional flaw

106

in that the phrase expressly permits courts to find self-represented litigants vexatious based on sanctionable conduct that occurs within a single action; a circumstance which substantive due process does not tolerate.

419.    Finally, A.R.S. § 12-3201(E)(1)(f) does not limit statutorily prohibited conduct to plaintiffs, meaning the provision's standard can be applied to enjoin self-represented defendants in overbroad fashion.

420.    A.R.S. § 12-3201(E)(1)(f) therefore is overbroad.

A.R.S. §§ 12-3201(B) and 12-3201(E)(1) Are Unconstitutionally Overbroad

421.    The Statute, including provisions A.R.S. §§ 12-3201(B) and 12-3201(E)(1), lacks a plainly legitimate sweep.

422.    A.R.S. § 12-3201(E)(1)(a), (b), (c), (d), (e), and (f) are each purportedly designed to burden or punish activities which are not constitutionally protected, but which include within their scope activities which are protected by the First Amendment.

423.    A substantial number of A.R.S. § 12-3201(E)(1)(a), (b), (c), (d), (e), and (f) applications are unconstitutional and go far beyond any incidentally legitimate sweep.

424.    A.R.S. § 12-3201(E)(1)(a), (b), (c), (d), (e), and (f) are each overbroad.

425.    A.R.S. § 12-3201 is subject to the strict scrutiny standard as state legislation that limits the fundamental right of free access to the courts.

426.    Defendants cannot demonstrate that A.R.S. § 12-3201 serves a compelling government interest because the state has no interest in enjoining "well-founded lawsuits".

427.    The State of Arizona, in truth, has an interest in allowing "well-founded lawsuits" to be filed and prosecuted, not enjoined.

428.    Defendants cannot demonstrate that A.R.S. § 12-3201 is narrowly tailored

because the Statute requires "well-founded lawsuits" to be enjoined.

429.    Defendants cannot demonstrate that A.R.S. § 12-3201 is narrowly tailored because the Statute violates procedural and substantive due process.

430.    Defendants cannot demonstrate that A.R.S. § 12-3201 is narrowly tailored to serve any actual or potential compelling government interest because the Statute requires an A.R.S. § 12-3201(B) blanket injunction.

431.    A.R.S. § 12-3201 violates U.S. Const. Amends. I and XIV pursuant to the overbreadth doctrine.

A.R.S. § 12-3201(E)(1) Is Unconstitutionally Vague

432.    "[W]e insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly.  Vague laws may trap the innocent by not providing fair warning.  Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them.  A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application.  Third, but related, where a vague statute 'abut[s] upon sensitive areas of basic First Amendment freedoms,' it 'operates to inhibit the exercise of [those] freedoms.'  Uncertain meanings inevitably lead citizens to 'steer far wider of the unlawful zone ... than if the boundaries of the forbidden areas were clearly marked'".  *Grayned v. Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 2298-99, 33 L.Ed.2d 222, 227 (1972).

433.    The vagueness doctrine implicates substantive due process and derives from the U.S. Const. Amends. V and XIV, § 1.  *Kolender v. Lawson*, 461 U.S. 352, 353 (1983); *Johnson v. United States*, 576 U.S. 591, 595 (2015) (A statute is overly vague if "it fails to

give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement."); *Sessions v. Dimaya*, 138 S.Ct. 1204, 1225 (2018) (The "most basic of due process's customary protections is the demand of fair notice [and warning]").

434.   It does not matter that a statute imposes civil penalties rather than criminal since the U.S. Supreme Court has applied exacting vagueness review to civil laws.  *See Dimaya*, 138 S.Ct. at 1229 ("[T]he happenstance that a law is found in the civil or criminal part of the statute books cannot be dispositive").

Every A.R.S. § 12-3201(E)(1)(a)-(f) Provision Is Overly Vague

435.   As described above, no A.R.S. § 12-3201(E)(1)(a)-(f) provision meets the Ninth Circuit's procedural or substantive due process requirements.  Specifically, none of these provisions includes both an objectively baseless litigation threshold consideration *and* a subjective improper purpose consideration.

436.   Accordingly, every A.R.S. § 12-3201(E)(1)(a)-(f) provision abuts upon sensitive areas of basic First Amendment freedoms and unlawfully operates to inhibit the exercise of those freedoms.

437.   A.R.S. § 12-3201(E)(1) is overly vague for that reason, and for reasons described below.

A.R.S. § 12-3201(E)(1)(a) Is Overly Vague

438.   A.R.S. § 12-3201(E)(1)(a) defines "vexatious conduct" as "[r]epeated filing of court actions solely or primarily for the purpose of harassment."

439.   Dictionaries define "repeated" as "renewed or occurring again and again".[70]

440.   The phrase "repeated filing of court actions" is neither clearly defined nor

---

[70]    See https://www.merriam-webster.com/dictionary/repeated.

specifically quantified, therefore revealing a fatal vagueness defect for failing to provide explicit standards from which to determine how many "filings of court actions" are considered "repeated" enough under the circumstances to warrant injunction.

441.    While such an unclear dividing line may be permissible when a vexatious litigant injunction is issued pursuant to a court's inherent authority, *De Long*, the U.S. Constitution does not tolerate such vagueness under statutory authority.  *Knox v. Brnovich*, 907 F.3d 1167, 1182 (9th Cir. 2018) ("[O]rdinary notions of fair play and the settled rules of law are violated if ... judges are essentially ... fixing penalties by filling statutory gaps so large that doing so becomes essentially legislative").

442.    Absent objective specificity regarding the number and circumstances behind what is meant by "repeated filing of court actions", A.R.S. § 12-3201(E)(1)(a) fails to give ordinary self-represented litigants fair notice of the conduct that it punishes, and is so standardless that it invites arbitrary enforcement.

443.    Hence, A.R.S. § 12-3201(E)(1)(a) violates the vagueness doctrine.

444.    A.R.S. § 12-3201(E)(1)(a) also does not define the term "harassment".

445.    Making this defect more problematic, "harassment" is inconsistently defined across Arizona statutes, and thus the term has no set statutory meaning under state law.

446.    For instance, A.R.S. § 13-2916(E)(3) tells us "'[h]arassment' means a knowing and willful course of conduct that is directed at a specific person, that a reasonable person would consider as seriously alarming, seriously disruptive, seriously tormenting or seriously terrorizing the person *and that serves no legitimate purpose*."

447.    This definition expressly excludes "[c]onstitutionally protected speech or activity or to any other activity authorized by law" per A.R.S. § 13-2916(C)(1).

448.    A.R.S. § 13-2916(C)(1) comports with the U.S. Supreme Court's holding

that a "well-founded lawsuit" maintains an inherent "legitimate purpose", thus making such suit's prosecution an "activity authorized by [constitutional] law", not "harassment".

449.   In similar fashion, A.R.S. § 12-1809(T)(1)(a) defines "harassment" as "[a] series of acts over any period of time that is directed at a specific person and that would cause a reasonable person to be seriously alarmed, annoyed or harassed and the conduct in fact seriously alarms, annoys or harasses the person *and serves no legitimate purpose*."

450.   An Arizona appellate court wisely construed that statute's "no legitimate purpose" language to be critical to First Amendment protections and found the term "harassment" did not include the exercise of one's fundamental rights.  *See LaFaro.*

451.   The A.R.S. § 13-2916(E)(3) and A.R.S. § 12-1809(T)(1)(a) "legitimate purpose" language is consistent with the 18 USC § 1514(d)(1)(B) federal definition of "the term 'harassment' [which] means a serious act or course of conduct directed at a specific person that   (i) causes substantial emotional distress in such person; and (ii) serves no legitimate purpose".

452.   Unfortunately, the "no legitimate purpose" language does not appear in every Arizona statute referencing "harassment".

453.   For instance, A.R.S. § 13-2921(E) says "'harass' means conduct that is directed at a specific person and that would cause a reasonable person to be seriously alarmed, annoyed, humiliated or mentally distressed and the conduct in fact seriously alarms, annoys, humiliates or mentally distresses the person."

454.   But whether a lawsuit is objectively "baseless", not whether a particular defendant experiences any negative emotion for being brought to suit, is the only constitutional threshold consideration that can be used to enjoin litigation.

455.   Accordingly, the A.R.S. § 13-2921(E) definition of "harassment" cannot be

111

adopted as the A.R.S. § 12-3201(E)(1)(a) definition of "harassment".

456.    As written, every Arizonan is left to speculate how to accurately define A.R.S. § 12-3201(E)(1)(a) "harassment", and to guess whether that definition includes a "legitimate purpose" exception as it constitutionally must.  A.R.S. § 12-3201(E)(1)(a) is overly vague on the meaning of "harassment" with no room to interpret or to construe the Statute in a constitutional manner.[71]

457.    A.R.S. § 12-3201(E)(1)(a) does not give a person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly.

458.    A.R.S. § 12-3201(E)(1)(a) does not provide explicit standards for those who apply them, and therefore invites arbitrary and discriminatory enforcement.

459.    A.R.S. § 13-3201(E)(1)(a) abuts upon sensitive areas of basic First Amendment freedoms and unlawfully operates to inhibit the exercise of those freedoms.

460.    A.R.S. § 12-3201(E)(1)(a) therefore is overly vague.

A.R.S. § 12-3201(E)(1)(b) Is Overly Vague

461.    A.R.S. § 12-3201(E)(1)(b) defines "vexatious conduct" as "[u]nreasonably expanding or delaying court proceedings".

462.    A.R.S. § 12-3201(E)(1)(b) does not include the objectively baseless litigation threshold condition *and* the subjective improper purpose condition that the Ninth

---

[71]    A.R.S. § 12-3201(E)(1)(a) was a statute "vaguely drafted by the legislature to cover a wide and potentially chilling range of activity.  Undoubtedly, had the legislature intended to circumscribe its coverage, it could have easily installed words to [bring the statutes in line with constitutional protections].  For the court to now limit the statute[s'] reach by introducing words of limitation would be to encroach upon the legislature's sole power" to author legislation.  *State v. Steiger,* 162 Ariz. 138, 146, 781 P.2d 616, 619 (1989).  "Therefore, [the court should find the statute unconstitutional and] leave to the legislature the task of narrowing [A.R.S. § [12-3201(E)(1)(a)] with such specificity that it will cover conduct which is within the legislature's power to prohibit."  *Id.*

1    Circuit requires to meet substantive due process.

2        463.    A.R.S. § 12-3201(E)(1)(b) abuts upon sensitive areas of basic First

3    Amendment freedoms and unlawfully operates to inhibit the exercise of those freedoms.

4        464.    A.R.S. § 12-3201(E)(1)(b) is overly vague.

5    A.R.S. § 12-3201(E)(1)(c) Is Overly Vague

6        465.    A.R.S. § 12-3201(E)(1)(c) defines "vexatious conduct" as "[c]ourt actions

7    brought or defended without substantial justification" where "section 12-349" declares

8    "'without substantial justification means that the claim or defense is groundless and is not

9    made in good faith". *See* A.R.S. § 12-3201(E)(2).

10        466.    The vagueness on display reached indisputable status on May 2, 2024 when

11    the Arizona Supreme Court issued its *Ariz. Republican Party* Opinion declaring that the

12    term "without substantial justification" had been misconstrued since "section 12-349" was

13    amended in 2012. *Ariz. Republican Party*, 547 P.3d 356 at ¶ 35.

14        467.    Arizona judges and attorneys are persons beyond ordinary intelligence, and

15    it turns out that A.R.S. § 12-3201(E)(1)(c) language did not even give those persons a

16    reasonable opportunity to know what conduct was prohibited.

17        468.    A.R.S. § 12-3201(E)(1)(c) thus, prior to *Ariz. Republican Party*, caused

18    "confusion" and failed to give a person of ordinary intelligence a reasonable opportunity

19    to know what was statutorily prohibited, so that he could act accordingly.

20        469.    A.R.S. § 12-3201(E)(1)(c) thus, prior to *Ariz. Republican Party*, also

21    allowed for arbitrary and discriminatory enforcement by failing to provide explicit

22    standards for those who are charged with enforcing or applying the law.

23        470.    A.R.S. § 12-3201(E)(1)(c) violated the vagueness doctrine prior to the *Ariz.*

24    *Republican Party* Opinion issued May 2, 2024.

471.    In addition, A.R.S. § 12-3201(E)(1)(c) does not include the objectively baseless litigation threshold consideration *and* the subjective improper purpose consideration that the Ninth Circuit requires to meet substantive due process.

472.    A.R.S. § 12-3201(E)(1)(c) abuts upon sensitive areas of basic First Amendment freedoms and unlawfully operates to inhibit the exercise of those freedoms.

473.    A.R.S. § 12-3201(E)(1)(c) is overly vague.

A.R.S. § 12-3201(E)(1)(d) Is Overly Vague

474.    A.R.S. § 12-3201(E)(1)(d) defines "vexatious conduct" as "[e]ngaging in abuse of discovery or conduct in discovery that has resulted in the imposition of sanctions against the pro se litigant".

475.    A.R.S. § 12-3201(E)(1)(d) does not include the objectively baseless litigation threshold consideration *and* the subjective improper purpose consideration that the Ninth Circuit requires to meet substantive due process.

476.    A.R.S. § 12-3201(E)(1)(d) abuts upon sensitive areas of basic First Amendment freedoms and unlawfully operates to inhibit the exercise of those freedoms.

477.    A.R.S. § 12-3201(E)(1)(d) is overly vague.

A.R.S. § 12-3201(E)(1)(e) Is Overly Vague

478.    A.R.S. § 12-3201(E)(1)(e) defines vexatious conduct as "[a] pattern of making unreasonable, repetitive and excessive requests for information" but does not sufficiently define those terms.

479.    The phrase "unreasonable, repetitive, and excessive" is written in the conjunctive, so each word must apply to operate as a single, collective condition.

480.    A.R.S. § 12-3201(E)(1)(e) does not define "repetitive" or "excessive".

481.    The dictionary defines "repetitive" as "involving or doing the same thing

114

several times"[72] while the dictionary defines "excessive" as "exceeding what is usual, proper, necessary or normal".[73]

482.    The words "repetitive" and "excessive" are neither clearly defined nor specifically quantified, therefore revealing a fatal vagueness defect for failing to provide explicit standards from which to determine how many "requests for information" form a "pattern", or how many "requests for information" are considered "repetitive and excessive" enough under the circumstances to warrant injunction.

483.    While such an unclear dividing line may be permissible when a vexatious litigant injunction is issued pursuant to a court's inherent authority, *De Long*, the U.S Constitution does not tolerate such vagueness when legislators establish a statutory authority. *See Knox*, 907 F.3d at 1182.

484.    Absent objective specificity regarding the number and circumstances behind what is meant by "repetitive and excessive", A.R.S. § 12-3201(E)(1)(e) fails to give ordinary self-represented litigants fair notice of the conduct that it punishes, and is so standardless that it invites arbitrary judicial enforcement.

485.    A.R.S. § 12-3201(E)(1)(e) also does not include the objectively baseless litigation threshold consideration *and* the subjective improper purpose consideration that the Ninth Circuit requires to meet substantive due process.

486.    A.R.S. § 13-3201(E)(1)(e) abuts upon sensitive areas of basic First Amendment freedoms and unlawfully operates to inhibit the exercise of those freedoms.

487.    A.R.S. § 12-3201(E)(1)(e) is overly vague.

A.R.S. § 12-3201(E)(1)(f) Is Overly Vague

---

[72]    See https://dictionary.cambridge.org/us/dictionary/english/repetitive.
[73]    See https://www.merriam-webster.com/dictionary/excessive.

488.   A.R.S. § 12-3201(E)(1)(f) defines "vexatious conduct" as "[r]epeated filing of documents or requests for relief that have been the subject of previous rulings by the court in the same litigation".  Like A.R.S. § 12-3201(E)(1)(a), A.R.S. § 12-3201(E)(1)(f) relies on the word "repeated".

489.   Once more, the dictionary definition of "repeated" is "renewed or occurring again and again".

490.   The phrase "repeated filing of documents or requests for relief" is neither clearly defined nor specifically quantified, therefore revealing a fatal vagueness defect for failing to provide explicit standards from which to determine how many "filings of documents or requests for relief" are considered "repeated" enough under the circumstances to warrant injunction.

491.   Again, while such an unclear dividing line may be permissible when a vexatious litigant injunction is issued pursuant to a court's inherent authority, *De Long*, the U.S. Constitution does not tolerate such vagueness when legislators establish a statutory authority.  *See Knox*, 907 F.3d at 1182.

492.   Absent objective specificity regarding the number and circumstances behind what is meant by "repeated filings", A.R.S. § 12-3201(E)(1)(f) fails to give ordinary self-represented litigants fair notice of the conduct that it punishes, and is so standardless that it invites arbitrary enforcement.

493.   Further, A.R.S. § 12-3201(E)(1)(f) is unclear as to the definition of the term, "same litigation" (i.e., the "same action").

494.   "Arizona uses the '*same evidence*' test for determining whether an earlier action is the ***same*** as the current ***action***. ... Under this test, '[i]f no additional evidence is needed to prevail in the second action than that needed in the first, then the second action

is barred.; ... The 'same evidence' test is quite liberal, and permits a plaintiff to avoid preclusion 'merely by posturing the same claim as a new legal theory,' even if both theories rely on the same underlying occurrence. ... [T]he same evidence test allows litigants to 'implicat[e] somewhat different facts' and 'recast their claims under new theories.'" *Power Road-Williams Field LLC v. Gilbert,* 14 F.Supp.3d 1304 (D. Ariz. 2014) (emphasis added).

495.    Persons of ordinary intelligence would have no reason to know that Arizona law permits them to present "a new legal theory" on "somewhat different facts", even facts implicating the "same occurrence", to differentiate civil litigation, meaning more sophisticated adversaries and their attorneys could, and do, exploit the vague language of A.R.S. § 12-3201(E)(1)(f) to threaten pro se litigants and chill their fundamental rights.

496.    A.R.S. § 12-3201(E)(1)(f) also does not include the objectively baseless litigation threshold consideration *and* the subjective improper purpose consideration that the Ninth Circuit requires to meet substantive due process.

497.    A.R.S. § 12-3201(E)(1)(f) abuts upon sensitive areas of basic First Amendment freedoms and unlawfully operates to inhibit the exercise of those freedoms.

498.    A.R.S. § 12-3201(E)(1)(f) is overly vague.

499.    At bottom, A.R.S. § 12-3201 is facially unconstitutional under the First Amendment pursuant to the vagueness and overbreadth doctrines.

This Lawsuit

500.    On information and belief, Meza and Robson had planned for months, in conjunction with Ortega, to bring an A.R.S. § 12-3201(A) motion if circumstances indicated Plaintiff was close to securing incriminating documents production.

501.    On information and belief, and evidence obtained, Ortega and Meza,

through and with Meza' counsel, began discussing the deployment of A.R.S. § 12-3201 as a tool for reputation destruction, witness intimidation, and investigation obstruction in August 2021; specifically, Ortega and Meza discussed that possibility on or about August 26, 2021 in the aftermath of CPLC's disclosure to the House and the accompanying realization that Plaintiff's former spouse had provided him enough information and evidence for authorities to initiate state and federal criminal investigations.

502.    There was nothing spontaneous about Meza's and Robson's A.R.S. § 12-3201(A) motion.  That filing was part of an established plan and conspiratorial agreement, evidenced by Ortega twice filing unsuccessful A.R.S. § 12-3201(A) motions in CV2021-005501 and CV2021-013210 as part of the agreement to intimidate Plaintiff, damage his reputation, and cause his financial destruction through the abuse of judicial proceedings.

503.    The U.S. Supreme Court held that Section 1983 authorizes the award of punitive damages against state or local officials in their individual capacity.  Specifically, a "[a] jury [is] permitted to assess punitive damages in an action under Section 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others."  *Smith v. Wade*, 461 U.S. 30 (1983).  The U.S. Supreme Court also held that "[p]unitive damages by definition are not intended to compensate the injured party, but rather to punish the tortfeasor whose wrongful action was intentional or malicious, and to deter him and others from similar extreme conduct."  *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 266–67 (1981).

504.    Meza and Robson were motivated by evil motives and intent, and demonstrated reckless or callous indifference to Plaintiff's federally protected First Amendment rights under the Petition Clause and Speech clause.  Those defendants should

be punished for their intentional and malicious actions, and to deter them and others from similar extreme conduct.

505.    Plaintiff seeks punitive damages to be jointly and severally assessed against Meza and Robson.

506.    Plaintiff also seeks compensatory damages due to reputational harm, loss of income and wages, loss of business assets, emotional distress and fear, and pecuniary losses with damages to be assessed against Meza and Robson jointly and severally for acting in concert.

### COUNT TWO
### ABUSE OF PROCESS
### (Meza, Robson, and Ortega)

507.    Plaintiff incorporates the allegations in all preceding paragraphs as if fully set forth herein.

508.    "[T]he elements of abuse of process are (1) a willful act in the use of [a] judicial process; (2) for an ulterior purpose not proper in the regular conduct of the proceedings." *Goldman v. Sahl,* 248 Ariz. 512, 519, ¶ 58 (App. 2020). "One who uses a legal process, whether criminal or civil, against another primarily to accomplish a purpose for which it is not designed, is subject to liability to the other for harm caused by the abuse of process." *Id* at ¶ 59.

CV2022-008626

509.    The only proper purpose of vexatious litigant injunctions is to protect courts or defendants from enduring repetitive "objectively baseless lawsuits" which demonstrate "a pattern of harassment". *De Long*; *Ringgold*.

510.    State government officials, and their agents or joint operators, may not punish, threaten, or chill First Amendment freedoms, including the right to petition and

119

enjoy free access to the courts

511.   Robert Meza, in his official capacity, and Karrin Taylor Robson were not party to any other lawsuit involving Plaintiff beyond CV2022-008626.  Therefore, by definition, they could not have endured any effects of repetitive lawsuits, much less repetitive baseless lawsuits.  And they could not have suffered from a "pattern of harassment" when, by definition, one lawsuit cannot establish a pattern.

512.   Further, Plaintiff never filed an objectively baseless *lawsuit*.  Several CV2021-013210 claims were abated for litigation in CV2021-005501 where the latter suit is now set for trial.  Therefore, the entire CV2021-013210 lawsuit was not baseless per Ninth Circuit and U.S. Supreme Court precedent.  *See Bill Johnson's Restaurants*.  And previously concealed, but now newly discovered, evidence shows no CV2021-013210 claim, much less the entire lawsuit, was objectively baseless.

513.   Meza and Robson each engaged in a willful act in the use of a judicial process when jointly bringing the A.R.S. § 12-3201(A) motion.

514.   Meza and Robson jointly filed the A.R.S. § 12-3201(A) motion for the ulterior purposes of (1) retaliating against Plaintiff for exercising his First Amendment rights under the Petition Clause and Speech Clause; (2) intimidating Plaintiff as a crime witness; and (3) obstructing criminal investigations.  None of these purposes are proper in the regular conduct of the proceedings.

515.   Plaintiff seeks compensatory damages due to reputational harm, loss of income and wages, loss of business assets, emotional distress and fear, and pecuniary losses with damages to be assessed against Meza and Robson jointly and severally for acting in concert.

516.   Meza and Robson both acted out of malice. Their conduct was guided by

evil minds.

517.   Meza's and Robson's wrongful conduct was motivated by ill will with intentions to serve their own interests.

518.   Meza and Robson acted in concert to commit intentional acts that injured Plaintiff and, therefore, are jointly and severally liable for punitive damages.

FC2020-090224

519.   Under Abuse of Process, "[t]here is no requirement that [a defendant] be a party to the proceedings." *Goldman,* 248 Ariz. at 519, ¶ 58.  Ortega can be held liable.

520.   To support her position in a May 2024 FC2020-090224 discovery dispute, on or about April 10, 2024, Plaintiff's former spouse presented the forementioned A.R.S. § 12-3201 Order to the Arizona Secretary of State seeking to have the state label Plaintiff an A.R.S. § 13-3601 Domestic Violence perpetrator pursuant to A.R.S. § 41-161, *et seq.*[74]

521.   On May 10, 2024, Ortega then introduced A.R.S. § 41-163(D) "address confidentiality program authorization cards" as exhibits into a FC2020-090224 discovery dispute seeking to influence the court.

522.   The former spouse pursued A.R.S. § 41-161, *et seq.* address protection on Ortega's express instruction in response to Plaintiff seeking production of financial documents which, in addition to being required per appellate instructions and being statutorily required per the Arizona Child Support Guidelines, would provide evidence of

---

[74]    A.R.S. § 41-161, *et seq.* governs the Arizona Address Confidentiality Program where A.R.S. § 41-161(5) verified victims of A.R.S. § 13-3601 criminal domestic can keep an address confidential.  See A.R.S. § 41-161(2); A.R.S. § 41-162.  Plaintiff's former spouse declared to an A.R.S. § 41-163(B) "application assistant" and swore in an A.R.S. § 41-161(C)(11) sworn statement submitted "under penalty of perjury" that Plaintiff had been civilly convicted of committing A.R.S. § 13-3601 criminal domestic violence.  The former spouse produced A.R.S. § 41-163(D) "address confidentiality program authorization cards" identifying her as an A.R.S. § 13-3601 domestic violence victim.

the former spouse's involvement with Meza's fraud scheme. Documents production also risked revealing concerted efforts between Meza and the spouse to obstruct investigations and intimidate Plaintiff as a witness to Meza's scheme.[75]

523. During an August 19, 2024 deposition, the former spouse confirmed that she pursued A.R.S. § 41-161, *et seq*. action based solely on an A.R.S. § 12-3201 "harassment" mention, and where the supposed harassment only occurred via court proceedings.

524. Based on his former family law attorney's prescient warnings, Plaintiff has had no prolonged or unmonitored physical or electronic contact with his former spouse since January 2020. Ortega had no factual or legal basis to instruct her client to accuse Plaintiff of being an A.R.S. § 13-3601 perpetrator via A.R.S. § 41-161, *et seq*. action.

525. The only proper purpose of A.R.S. § 41-161, *et seq*. is to keep addresses confidential when genuine A.R.S. § 13-3601 victims move from one location to another. The resulting documents are not meant to be used as a litigation sword.

526. Fabricating allegations of A.R.S. § 13-3601 domestic violence to conceal evidence of criminal activity is never a proper purpose for any administrative of judicial proceedings, and here was done for the ulterior purposes of avoiding disclosure and discovery ordered by appellate courts, intimidating Plaintiff as a crime witness, and

---

[75]     For even greater factual context, Plaintiff's former spouse, at Rep. Meza's instruction, fabricated criminal domestic violence allegations in January 2020 to secure an A.R.S. § 13-3602 protective order. In an ex parte hearing, the spouse accused Plaintiff of engaging in A.R.S. § 13-2921 Harassment for calling police to his residence, and accused Plaintiff of assaulting their infant son. At an April 2020 hearing to vacate the protective order, Plaintiff provided (1) police reports and video proving he called police immediately in response to the spouse threatening to fabricate domestic violence allegations; (2) geolocation data, time-stamped electronic communications, phone records, and witness testimony proving he was more than twelve miles away when the assault of his child supposedly occurred; and (3) proof that the spouse was stalking him in an attempt to provoke confrontations. The Hon. Rodrick Coffey of the Maricopa County Superior Court vacated the protective order and awarded Plaintiff attorney fees and costs.

obstructing criminal investigations.  This conduct was not proper in the regular conduct of the proceedings.

527.  Ortega engaged in a willful act in the use of a judicial process when introducing A.R.S. § 41-163(D) "address confidentiality program authorization cards" as exhibits into FC2020-090224 judicial proceedings.

528.  This was not Ortega's only instance of Abuse of Process.

529.  On August 2 and 6, 2021, with knowledge of the pending CV2021-013210 litigation and seeking to pre-emptively discredit and intimidate Plaintiff, Ortega knowingly misrepresented to the FC2020-090224 family law court that Plaintiff was suffering from psychosis to believe his former spouse or her parents were Dawoodi Bohra: "[Plaintiff] operates under a delusional state of belief … that Mother's family (Maternal Grandfather in particular) are members of the religious cult 'Bohra' … Mother has reiterated numerous times that neither her (sic) nor her parents are members of the Bohra religion".  She requested Plaintiff be ordered to undergo a psychiatric examination on the good cause basis that Father had suffered a psychotic break to believe his former in-laws were Dawoodi Bohra members.

530.  Ten days later, on August 16, 2021, Plaintiff revealed he had been cooperating with criminal investigators since December 2020 and that the FBI and DHS had placed the former spouse and her parents on an international travel watch due to their well-established Dawoodi Bohra affiliation.

531.  Ortega did not withdraw the request for a psychiatric evaluation which was granted September 8, 2021 before that court could learn the truth.

532.  On October 26, 2021, recognizing they were under criminal investigation and subject to perjury charges, the spouse's parents admitted their Dawoodi Bohra

affiliation under oath, disproving Ortega's knowingly false statements. Per certified transcript, "Q: So [], you were raised as a Dawoodi Bohra, correct? A: (Spouse's Father): Yes, I was. … Q: So then you admit to the Court that you are Dawoodi Bohra? A: Yes. … Q: Okay. Great. So this -- now, your daughter's attorney has been filing all kinds of motions and court documents saying that this is a [] cult and your daughter has no association with it. Is the Bohra a cult? A: No."

533.   Plaintiff was never scheduled for the psychiatric evaluation as the case became tangled in two trips to the Court of Appeals, and as it was factually apparent that there never was any good cause basis for the evaluation request.

534.   Yet Ortega recently filed a contempt petition against Plaintiff for failing to attend the evaluation, and pressed the issue during a February 21, 2025 preliminary evidentiary hearing. Therein, she referenced the original order to which Plaintiff again brought to her attention that the former spouse's family admitted under oath that they were Dawoodi Bohra members. Undeterred, Ortega continues to press her demands that Plaintiff comply with an order fraudulently obtained through her and her client's knowing misrepresentations of fact, or face contempt proceedings and loss of access to his child.

535.   The proper purpose of psychiatric evaluations in family law cases is to evaluate what course of action is in the best interests of children on parenting time and legal decision-making matters.

536.   Fabricating allegations of psychosis to discredit crime witnesses and to conceal evidence of criminal activity are never proper purposes for any judicial proceedings, but here was done for the ulterior purpose of avoiding disclosure and discovery ordered by appellate courts, intimidating Plaintiff as a crime witness, and obstructing criminal investigations. This conduct was not proper in the regular conduct of

the proceedings.

537.    Ortega engaged in a willful act in the use of a judicial process when introducing fabricated allegations of psychosis, and again when maintaining those fabricated allegations despite knowledge that no good cause basis ever existed to suspect psychosis, in the course of FC2020-090224 judicial proceedings.

538.    Plaintiff seeks compensatory damages due to reputational harm, loss of income and wages, loss of business assets, emotional distress and fear, and pecuniary losses.

539.    Ortega acted out of malice. Her conduct was guided by an evil mind.

540.    Ortega's wrongful conduct was motivated by ill will with intentions to serve her own interests and the interests of persons not party to FC2020-090224.

541.    Ortega committed intentional acts that injured Plaintiff and, therefore, is liable for punitive damages.

## COUNT THREE
## AIDING AND ABETTING ABUSE OF PROCESS
### (Meza, Robson, and Ortega)

542.    Plaintiff incorporates the allegations in all preceding paragraphs as if fully set forth herein.

543.    The elements of Aiding and Abetting are (1) a primary tort or violation; (2) knowledge or general awareness of the primary tort or violation; and (3) substantial assistance or encouragement of the primary tort. *Wells Fargo Bank v. Arizona Laborers, Teamsters*, 201 Ariz. 474, 485, 38, ¶ 51, P.3d (2002)),

544.    Meza and Robson each committed the primary tort of Abuse of Process in CV2022-008626.

545.    Meza and Robson each had knowledge or general awareness of the other's

tort as they jointly engaged in that tortious activity in planned and coordinated fashion.

546. Meza and Robson each substantially assisted and encouraged each other to commit the primary tort, as evidenced by their joint conduct.

547. Ortega also had knowledge or general awareness of Meza's and Robson's primary tort.

548. Ortega substantially assisted and encouraged Meza to commit his primary tort, as evidenced by Meza's and Ortega's meetings on the topic, and by Ortega's prior unsuccessful attempts to commit the tort when her A.R.S. § 12-3201(A) motions failed.

549. Ortega also committed the primary torts of Abuse of Process, but in FC2020-090224

550. Meza had knowledge or general awareness of Ortega's primary torts.

551. Meza substantially assisted and encouraged Ortega to commit the primary tort, as evidenced by their meetings on the subject beginning in August 2021, and which continue to the present day. Indeed, Meza inadvertently admitted to the press on May 8, 2022 that he referred the former spouse to Ortega and was "helping" Ortega in the FC2020-090224 case. The former spouse had previously denied Meza referred her during a November 10, 2020 oral deposition. Ortega attended that deposition but did not correct the record despite knowing Meza was the actual source of the referral.

552. Plaintiff seeks compensatory damages due to reputational harm, loss of income and wages, loss of business assets, emotional distress and fear, and pecuniary losses.

553. Meza, Robson, and Ortega each acted out of malice. Their conduct was guided by evil minds.

554. Meza's, Robson's, and Ortega's wrongful conduct was motivated by ill will

126

with intentions to serve their own interests.

555. Meza, Robson, and Ortega acted in concert to commit intentional acts that injured Plaintiff and, therefore, are jointly and severally liable for punitive damages.

**COUNT FOUR**
**CIVIL CONSPIRACY**
**(Meza, Robson, and Ortega)**

556. Plaintiff incorporates the allegations in all preceding paragraphs as if fully set forth herein.

557. "For a civil conspiracy to occur two or more people must agree to accomplish an unlawful purpose or to accomplish a lawful object by unlawful means, causing damages." *Rowland v. Union Hills Country Club,* 157 Ariz. 301, 757 P.2d 105 (1988).

558. Abuse of Process is an "unlawful purpose" common law tort where concerted action between "two or more people" to commit that tort is sufficient to plead conspiracy. *Darragh v. Superior Court,* 183 Ariz. 79, 900 P.2d 1215 (App.1995); *see also State v. Willoughby,* 181 Ariz. 530 (1995) ("[O]vert acts jointly performed by [two or more people] confirm there was an agreement between them").

CV2022-008626

559. Meza and Robson entered into an agreement to accomplish an unlawful purpose or to accomplish a lawful object by unlawful means. The primary objects of the conspiracy were (1) to facilitate Meza's fraud scheme and covertly provide him private pay for mutual benefits; and (2) to maintain secrecy around their involvement in the scheme, including by concealing evidence and obstructing investigations.

560. Meza and Robson evidenced this conspiratorial agreement when jointly filing the A.R.S. § 12-3201(A) motion to accomplish the unlawful purposes of (1)

127

retaliating against Plaintiff for exercising his First Amendment rights under the Petition Clause and Speech Clause; (2) intimidating Plaintiff as a crime witness; and (3) obstructing criminal investigations.

561.   Meza and Robson committed overt acts when jointly filing the A.R.S. § 12-3201(A) motion, causing Plaintiff damages.

FC2020-090224

562.   Meza and Ortega entered into the same agreement as Meza and Ortega; an agreement to accomplish an unlawful purpose or to accomplish a lawful object by unlawful means.  Again, the primary objects of the conspiracy were (1) to facilitate Meza's fraud scheme and covertly provide him private pay for mutual benefits; and (2) to maintain secrecy around their involvement in the scheme, including by concealing evidence and obstructing investigations.

563.   Meza and Ortega evidenced this conspiratorial agreement when serially filing A.R.S. § 12-3201(A) motions to accomplish the unlawful purposes of (1) retaliating against Plaintiff for exercising his First Amendment rights under the Petition Clause and Speech Clause; (2) intimidating Plaintiff as a crime witness; and (3) obstructing criminal investigations.

564.   Meza and Ortega committed overt acts when serially filing the A.R.S. § 12-3201(A) motions, causing Plaintiff damages.

565.   Plaintiff seeks compensatory damages due to reputational harm, loss of income and wages, loss of business assets, emotional distress and fear, and pecuniary losses.

566.   Meza, Robson, and Ortega each acted out of malice. Their conduct was guided by evil minds.

567. ~~Meza's, Robson's, and Ortega's wrongful conduct was motivated by ill will with intentions to serve their own interests.~~

568. ~~Meza, Robson, and Ortega acted in concert to commit intentional acts that injured Plaintiff and, therefore, are jointly and severally liable for punitive damages~~

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court provide the following relief:

A. A judgment for declaratory relief that:

1. A.R.S. § 12-3201 is unconstitutional pursuant to the overbreadth and vagueness doctrines, and void *en toto*; and

2. A.R.S. § 13-2921 is unconstitutional pursuant to the vagueness doctrine; and

3. A.R.S. § 39-121, *et seq.* public records requests vindicate public rights, not private rights, implicating First Amendment protections to such an extent that the U.S. Constitution prohibits such public records litigation from being included in any consideration, or in any court records review process, for the purposes of determining a vexatious litigant injunction.

B. A judgment for preliminary and permanent injunctive relief:

1. Enjoining Defendant Mayes from enforcing A.R.S. § 12-3201 injunctive orders, including as any type of A.R.S. §§ 13-2810, 13-2921, 13-3601, and/or 13-3602 predicate.

C. A judgment for preliminary and permanent injunctive relief:

1. Permanently enjoining Defendant Welty from enforcing A.R.S. § 12-3201, which also precludes issuing any administrative entering Plaintiff's name onto any vexatious litigant list or register.

D. A judgment for compensatory damages against Defendants Meza, Robson, and Ortega.

E. A judgment for punitive damages against Defendants Meza, Robson, and Ortega.

F. A judgment for taxable costs and expenses to the extent permitted by law.

F. Such other relief as may appear just and appropriate.

~~WHEREFORE, Plaintiff respectfully requests that this Court provide the following relief:~~

~~A. A judgment for compensatory damages.~~

~~B. A judgment for punitive damages.~~

~~C. An order awarding Plaintiff his costs under the private attorney general doctrine.~~

~~D. Any other relief as may be appropriate.~~

DATED this 12th day of May 2025.

By: _____
     Phillip Potter
     Plaintiff
     Pro Se

130