Phillip Potter
2301 N. 66th Street
Scottsdale, Arizona 85257
Phone: 480.459.0310
E-Mail: phillip.t.potter@gmail.com
Plaintiff
Pro Se

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

Phillip Potter,

     Plaintiff,

v.

Robert Meza, et al.,

     Defendants.

No. 2:25-cv-00663-PHX-DWL

**MOTION TO TAKE
JUDICIAL NOTICE
RELEVANT TO
ATTORNEY GENERAL MAYES'
MOTION TO DISMISS**

## INTRODUCTION

  Pursuant to Fed. R. Evid. ("Rule") 201, Plaintiff asks the Court take judicial notice of the undisputed facts and court opinions described below and attached as Exhibits 1-5.

I. Legal Standard

  "The court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *Lee v. City of L.A.,* 250 F.3d 668, 689 (9th Cir. 2001); Rule 201(b).  A court

may judicially notice another court's opinion but "when a court takes judicial notice of another court's opinion, it may do so not for the truth of the facts recited therein, but for the existence of the opinion." *Lee,* 250 F.3d at 690*; United States. ex rel. Robinson Rancheria Citizens Council v. Borneo,* 971 F.2d 244, 248 (9th Cir. 1992) (holding that federal courts "may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue"). When notice is requested and the Court receives sufficient information, judicial notice is mandatory. Rule 201(c)(2).

## II. The Court Should Take Judicial Notice to Evaluate the First Amended Complaint and Help Decide Attorney General Kris Mayes' Motion to Dismiss

Courts may use judicial notice to help evaluate the sufficiency of a complaint challenged under Fed. R. Civ. P. 12(b)(1) and (6). *See In re NVIDIA Corp. Sec. Litig.,* 768 F.3d 1046, 1051 (9th Cir. 2014) (courts look to "the complaint itself and its attached exhibits, documents incorporated by reference, and matters properly subject to judicial notice"). Attorney General Mayes filed a motion to dismiss (Doc. 38) in large part on grounds that (1) she plays "no role" in the A.R.S. § 12-3201 "enforcement scheme" (Doc. 38, p. 10) because "prosecution would be more likely to come from a county attorney than from AG Mayes" (Doc, 38, p. 9); and (2) Plaintiff does not face a "credible fear of prosecution" because he has not "demonstrated any instance where a person was prosecuted" for conduct proscribed under § 12-3201(B) (Doc. 38, p. 7).

### A. Judicial Notice Refutes AG Mayes' "No Role in Enforcement Scheme" Defense

#### 1. Pertinent Statutes Confirm AG Mayes' Role in Enforcing § 12-3201(B)

Courts may take "judicial notice of ... statutes, ... not included in the plaintiff's complaint." *Navajo Nation v. Dep't of the Interior,* 876 F.3d 1144, 1153 n.3 (9th Cir.

2

2017).

<u>a. Exhibits 1, 2, and 3: A.R.S. §§ 12-861, 12-862, and 12-863</u>

Plaintiff asks the Court to take judicial notice that, per (1) A.R.S. § 12-861, "[a] person who willfully disobeys a lawful writ, process, order or judgment of a superior court by doing an act or thing therein or thereby forbidden, if the act or thing done also constitutes a criminal offense, shall be proceeded against for contempt as provided in sections 12-862 and 12-863"; (2) A.R.S. § 12-862(A), "[w]hen it appears to the superior court by the return of a proper officer on lawful process, or upon affidavit of some credible person, or by information filed by the county attorney, that there is reasonable ground to believe that a person is guilty of the disobedience described in section 12-861, the court may order the person so charged to show cause at the time and place the court directs why he should not be punished for such disobedience"; and (3) A.R.S. § 12-863(A), "[t]he trial as provided in section 12-862 may be by the court, or, upon demand of the person allegedly in contempt, shall be by a jury as upon a trial for a misdemeanor."

A.R.S. §§ 12-861, 12-862, and 12-863 are state statutes generally known in the Court's territorial jurisdiction, and can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned; specifically, a website maintained by the Arizona Legislature.  *See* Exhibits 1, 2, and 3 attached, and available online at *i*https://www.azleg.gov/viewdocument/?docName=https://www.azleg.gov/ars/12/00861.htm; https://www.azleg.gov/viewdocument/?docName=https://www.azleg.gov/ars/12/00862.htm; https://www.azleg.gov/viewdocument/?docName=https://www.azleg.gov/ars/12/00863.htm (last visited July 20, 2025).

The Court should judicially notice that § 12-861 recognizes that the violation of any civil "writ, process, order or judgment" can "constitute[] a criminal offense". This provision is relevant because it demonstrates that (1) a civil violation can also constitute "a criminal offense" which the Attorney General may prosecute; and (2) there exists another specific statutory avenue other than that which Plaintiff described in the First Amended Complaint (Doc. 14) through which the Attorney General plays an "role" in the § 12-3201 "enforcement scheme" and may criminally prosecute Plaintiff for § 12-3201(B) violations as a matter of statute (Doc. 14 at 98, 103).

The Court should judicially notice that § 12-862(A) permits state courts to initiate criminal contempt proceedings when a private "person, or by information filed by the county attorney, [submits] that there is reasonable ground to believe that a person is guilty of the disobedience described in section 12-861". This provision is relevant because it demonstrates that private persons are also part of the "enforcement scheme" with the Attorney General who plays a "role".

The Court should judicially notice that § 12-863(B) permits a state court to conduct a criminal trial for § 12-3201(B) violations which would be prosecuted by a "county attorney" and/or the Attorney General. This provision is relevant because it gives the Attorney General a statutory "role" in the § 12-3201 "enforcement scheme".

b. Exhibit 4: A.R.S. § 41-101(A)(8)

Plaintiff asks the Court to take judicial notice that, pursuant to (1) A.R.S. § 41-101(A)(8), "[t]he governor: ... [m]ay require the attorney general to aid a county attorney in the discharge of his duties.".

A.R.S. § 41-101(A)(8) is a statutory provision generally known in the Court's territorial jurisdiction, and can be accurately and readily determined from sources whose

accuracy cannot reasonably be questioned; specifically, a website maintained by the Arizona Legislature.  *See* Exhibit 4 attached, and available online at https://www.azleg.gov/viewdocument/?docName=https://www.azleg.gov/ars/41/00101.htm (last visited July 20, 2025).

The Court should judicially notice that § 41-101(A)(8) recognizes the "governor" can order (i.e., "require") the Attorney General to "aid" a "county attorney" in their "duties", including to civilly or criminally prosecute Plaintiff for an § 12-3201 violation. This provision is relevant because (1) such "aid" given to a "county attorney" goes beyond a "supervisory power" (Doc. 38, p. 8); and (1) it demonstrates that there exists a specific statutory avenue in addition to those statutes Plaintiff described in the First Amended Complaint (Doc. 14) through which the Attorney General plays a "role" in the § 12-3201 "enforcement scheme" (Doc. 14 at 103).

B. Judicial Notice Refutes AG Mayes' "No Credible Fear" Defense

The Attorney General contends that Plaintiff lacks standing due to no "credible fear", claiming he has not demonstrated a "history of past prosecution or enforcement under the challenged statute" (Doc. 38, pp. 6-7).  This defense is refuted by the below judicially noticeable Ninth Circuit case which opines that such "history" is only pertinent to the determination of standing when the state demonstrates "the challenged statute" (1) has been "commonly and notoriously violated"; and (2) has fallen into "desuetude".

1. Pertinent Court Opinions Confirm Plaintiff Has a Credible Fear, and Standing

The Court may "take[] judicial notice of another court's opinion".  *Lee,* 250 F.3d at 690.

a. Exhibit 5: *S.F. Cnty. Democratic Cent. Comm. v. Eu* (9th Cir.1987)

Plaintiff asks the Court to take judicial notice that, in *S.F. Cnty. Democratic Cent.*

*Comm. v. Eu,* 826 F.2d 814, 822 & n. 15 (9th Cir.1987), the Ninth Circuit established that when a state official raises a jurisdictional defense calling to a challenged statute's history of enforcement or prosecution, the state official must produce a "record of nonenforcement" which shows the challenged statue has been "commonly and notoriously violated" and "has fallen into desuetude" (quoting *Poe v. Ullman,* 367 U.S. 497, 502, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961)).

The *S.F. Cnty. Democratic Cent. Comm*. opinion is generally known in the Court's territorial jurisdiction, and can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned; specifically, in Ninth Circuit records. *See* Exhibits 5 attached, and available online at https://scholar.google.com/scholar_case?case=503498784588123492&q=S.F.+Cnty.+Democratic+Cent.+Comm.+v.+E&hl=en&as_sdt=803 (last visited July 20, 2025).

The Court should judicially notice that, in *S.F. Cnty. Democratic Cent. Comm. v. Eu*, the Ninth Circuit opined that to successfully assert a "no history of enforcement or prosecution" defense, state officials must overcome the presumption of enforcement by factually demonstrating the challenged state (1) has been "commonly and notoriously violated"; and (2) has fallen into "desuetude".  The Court should judicially notice this opinion because it is relevant to the proper legal standard and evidentiary requirements needed to decide a state official's "no history of enforcement and prosecution" defense. That standard has a "direct relation to matters at issue" in this case. *Robinson Rancheria,* 971 F.2d at 248.

DATED this 25th day of July 2025.

By: //s//
      Phillip Potter
      Plaintiff, Pro Se

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

# Exhibit 1

## 12-861. Criminal contempt defined

A person who wilfully disobeys a lawful writ, process, order or judgment of a superior court by doing an act or thing therein or thereby forbidden, if the act or thing done also constitutes a criminal offense, shall be proceeded against for contempt as provided in sections 12-862 and 12-863.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

# Exhibit 2

## 12-862. Order to show cause; service; return; attachment of person or sequestration of property

A. When it appears to the superior court by the return of a proper officer on lawful process, or upon affidavit of some credible person, or by information filed by the county attorney, that there is reasonable ground to believe that a person is guilty of the disobedience described in section 12-861, the court may order the person so charged to show cause at the time and place the court directs why he should not be punished for such disobedience.

B. The order, with a copy of the affidavit or information, shall be served upon the person charged within sufficient time to enable him to prepare and make return to the order, and if by the return the alleged contempt is not purged, a trial shall be directed at a time fixed by the court.

C. If the person allegedly in contempt fails or refuses to make return to the order, a warrant of arrest may issue directing the sheriff or any constable of the county where the person charged resides or may be found, to arrest him and bring him before the court at a time and place directed by the court, and such person may be required to give bail for his attendance at the trial and his submission to final judgment of the court.

D. If accused is a corporation, an attachment for sequestration of its property may be issued upon refusal or failure to answer.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

# Exhibit 3

**12-863. Trial; classification; appeal**

A. The trial as provided in section 12-862 may be by the court, or, upon demand of the person allegedly in contempt, shall be by a jury as upon a trial for a misdemeanor.

B. Any person found in contempt is guilty of a class 2 misdemeanor.

C. The fine shall be paid to the clerk of the court, or to the party injured by the act constituting the contempt, or may be apportioned where more than one party is damaged.

D. An appeal may be taken as in criminal cases and the appeal shall stay execution of the sentence and the person found guilty of contempt, if sentenced to imprisonment, shall be admitted to bail.

# Exhibit 4

## 41-101. Powers and duties; attestation of acts of governor; salary

A. The governor has the powers and shall perform the duties as prescribed in this article. The governor:

1. Shall supervise the official conduct of all executive and ministerial officers.

2. Shall see that all offices are filled and the duties performed or, in default, invoke such remedy as the law allows.

3. Shall appoint a private secretary to the governor and shall appoint all officers of this state not made elective, unless otherwise provided.

4. Notwithstanding section 38-211, shall appoint the lieutenant governor to serve as the governor's chief of staff or the director of the Arizona department of administration or to fill any position for which the governor is otherwise authorized by law to make an appointment.

5. Shall be the sole official means of communication between this state and the government of any other state or the United States.

6. May direct the attorney general to appear on behalf of this state when any action or legal proceeding is pending that affects the title of this state to any property or that may result in a claim against this state.

7. May require the attorney general, or any county attorney, to inquire into the affairs or management of any corporation doing business in this state.

8. May require the attorney general to aid a county attorney in the discharge of his duties.

9. May offer rewards for escaped insane persons, not exceeding five hundred dollars.

10. May require any officer or board to make special reports to him on demand in writing.

11. May convene the legislature at some other place when the seat of government becomes dangerous from disease or a common enemy.

12. May enter into intergovernmental agreements with officers, agencies or departments of the United States to provide funding or other resources available from any related state agency, board or commission for the purpose of operating federal parks located in this state during any period when such parks would otherwise be subject to shutdown due to a lack of federal appropriation and as deemed necessary to promote tourism, this state's economic well-being, or the health, safety or welfare of the state's citizens. The governor shall not provide general fund appropriations from any related state agency, board or commission to operate a federal park pursuant to this paragraph for more than twenty-one days without the approval of the legislature. The joint legislative budget committee shall review any expenditure of funds or other resources pursuant to this paragraph.

13. Has such powers and shall perform such other duties as devolve on him by law.

B. All official acts of the governor, except approval of the laws, shall be attested by the secretary of state.

C. The governor is eligible to receive an annual salary pursuant to section 41-1904.

D. Before an individual is hired as an employee of the office of the governor, that individual shall submit a full set of fingerprints to the governor for the purpose of obtaining a state and federal criminal records check pursuant to section 41-1750 and Public Law 92-544. The department of public safety may exchange this fingerprint data with the federal bureau of investigation.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

# Exhibit 5

Case 2:25-cv-00663-DWL - Document 57 - Filed 07/25/25 - Page 17 of 36

**826 F.2d 814 (1987)**

**SAN FRANCISCO COUNTY DEMOCRATIC CENTRAL COMMITTEE; San Francisco County Republican Central Committee; Los Angeles County Democratic Central Committee; Alameda County Democratic Central Committee; Santa Clara County Democratic Central Committee; Solano County Democratic Central Committee; Placer County Democratic Central Committee; State Central Committee of the Libertarian Party of California; Bert Coffey; Nancy Walker; Linda Post; Dolph Andrews; Carolyn Wallace; Mary King; Thomas Romero; Mary Gingell; David E. Sturrock; Walter Layson; Mary Vail; Roy Christman; James Fay; Northern California Committee for Party Renewal; Southern California Committee for Party Renewal; and National Committee for Party Renewal, Plaintiffs-Appellees,**

v.

**March Fong EU, Secretary of the State of California, John Van De Kamp, Attorney General of the State of California; Arlo Smith, District Attorney of San Francisco County, et al., Defendants-Appellants.**

No. 84-1851.

**United States Court of Appeals, Ninth Circuit.**

August 18, 1987.

As Amended on Denial of Rehearing and Rehearing October 29, 1987.

Geoffrey L. Graybill, Sacramento, Cal., for defendants-appellants.

James J. Brosnahan, Cedric C. Chao, Paul R. Dieseth, Paul Flum, Morrison & Foerster, San Francisco, Cal., for plaintiffs-appellees.

Before WRIGHT, SKOPIL and NORRIS, Circuit Judges.

As Amended on Denial of Rehearing and Rehearing En Banc October 29, 1987.

NORRIS, Circuit Judge:

This case involves a First Amendment challenge to various sections of the California Elections Code. The challenged sections specify the membership of the state central committees of ballot-qualified political parties and the term of office of committee chairs, and prohibit both state and county central committees from endorsing candidates in party primaries.

Plaintiffs are various county central committees of the Democratic and Republican parties, the state central committee of the Libertarian party, members of these and other party central committees, and various other groups and individuals active in partisan politics in California. They sued the Secretary of State and Attorney General of California and the district attorneys of various counties (hereinafter "the State") for declaratory and injunctive relief under 42 U.S.C. § 1983 seeking to vindicate their asserted First Amendment right to endorse candidates running in California's direct primary elections and to structure and conduct the internal affairs of their respective political parties free of unjustified interference by the state.[1]

In the first count of their first amended complaint, plaintiffs challenge the constitutionality of Cal.Elec.Code § 11702, which prohibits state and county central committees from endorsing, supporting, or opposing candidates for partisan office in direct primary elections. Plaintiffs' second count challenges sections of the Elections Code and the state constitution that prohibit central committees from endorsing candidates in nonpartisan county, city and school elections. Plaintiffs' third count challenges Code sections that prescribe the membership of state central committees, the term of office of state committee chairpersons, the time and place of state and county central committee meetings, and the dues to be paid by county committee members.

Plaintiffs moved for summary judgment on all three counts. In response, the State moved to dismiss the amended complaint under Fed.R.Civ.P. 12(b)(1) and (6) and crossmoved for summary judgment. The district court granted summary judgment on plaintiffs' first count, ruling that section 11702's ban on preprimary endorsements violated the First Amendment. The court stayed all proceedings on plaintiffs' second count under the abstention doctrine of _Railroad Commission of Texas v. Pullman Co._, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). The court granted partial summary judgment on plaintiffs' third count, ruling that the sections prescribing the membership of state central committees and the term of their chairs violated the First Amendment.[2] The court, however, denied plaintiffs' motion for summary judgment with respect to those Code sections regulating the time and place of committee meetings and county committee dues. The court also denied in all respects the State's motion to dismiss and crossmotion for summary judgment. Although the district court did not finally dispose of all    issues with respect to all parties, it directed the entry of final judgment for plaintiffs under Fed.R.Civ.P. 54(b) on the first count and as to those claims in the third count decided in plaintiffs' favor. Accordingly, we have appellate jurisdiction under 28 U.S.C. § 1291 (1982).[3]

In _San Francisco County Democratic Central Committee v. Eu_, 792 F.2d 802, 820 (9th Cir.1986), we affirmed the district court's judgment granting summary judgment to plaintiffs. Our judgment was, however, vacated by the United States Supreme Court, which remanded the case to this court "for further consideration in light of _Tashjian v. Republican Party of Connecticut_, 479 U.S. ___, 107 S.Ct. 544, 93 L.Ed.2d [514] (1986). _Eu v. San Francisco County Democratic Committee_, ___ U.S. ___, 107 S.Ct. 864, 93 L.Ed.2d 820 (1987). Having considered the matter further after supplemental briefing by the parties, we conclude that _Tashjian_ supports our previous decision and accordingly reinstate our judgment affirming the district court for the reasons set forth in this modified opinion.

# I

Plaintiffs contend that California's political parties and their governing bodies — the state and county central committees — are voluntary associations entitled to the full protection of the First Amendment. They argue that California's prohibition of preprimary endorsements and the state's regulation of party structure and internal affairs abridge their freedom of political expression and association.[4] In response, the State argues that the state and county central committees of ballot-qualified political parties in California do not enjoy First Amendment status because they are public entities, not private associations. In the alternative, the State argues that the challenged provisions of the Election Code pass First Amendment muster because they are narrowly drawn statutes that serve compelling state interests.

"Our form of government is built on the premise that every citizen shall have the right to engage in political expression and association." _Sweezy v. New Hampshire_, 354 U.S. 234, 250, 77 S.Ct. 1203, 1212, 1 L.Ed.2d 1311 (1957). Because "[e]xercise of these basic freedoms ... has traditionally been through the media of political associations," _id._, political parties as well as individual party adherents enjoy First Amendment rights. _See Tashjian v. Republican Party of Connecticut_, ___ U.S. ___, 107 S.Ct. 544, 548-49, 93 L.Ed.2d 514 (1986); _Democratic Party v. Wisconsin ex rel. La Follette_, 450 U.S. 107, 101 S.Ct. 1010, 67 L.Ed.2d 82 (1981); _Cousins v. Wigoda_, 419 U.S. 477, 95 S.Ct. 541, 42 L.Ed.2d 595 (1975).[5] Moreover, "'[a]ny interference with the freedom of a party is simultaneously an interference with the freedom of its adherents.'" _Tashjian_, 107 S.Ct. at 549 (quoting _Sweezy_, 354 U.S. at 250, 77 S.Ct. at 1212). Thus,

courts have "placed the internal workings of a political party squarely within the protection of the First Amendment." _Ripon Society Inc. v. National Republican Party,_ 525 F.2d 567, 586 (D.C.Cir.1975), _cert. denied,_ 424 U.S. 933, 96 S.Ct. 1147, 47 L.Ed.2d 341 (1976).

In this case we must apply these settled First Amendment principles to the restrictions imposed on California political parties by various provisions of the California Elections Code. To place the important        constitutional questions presented by this appeal into perspective, we will first provide an overview of state regulation of political parties in California.

Like our national political parties,[6] California's political parties were originally unregulated voluntary associations of individuals "governed largely by custom and usage." _Unger v. Superior Court,_ 37 Cal.3d 612, 615, 692 P.2d 238, 209 Cal.Rptr. 474 (1984) (_Unger II_); _see also_ 59 Ops.Cal.Atty.Gen. 60 (1976); 23 Ops.Cal.Atty.Gen. 119, 120 (1954) (citing _Spelling v. Brown,_ 122 Cal. 277, 279, 55 P. 126 (1898)). These voluntary associations "fix[ed] membership criteria, nominat[ed] candidates for public office, conduct[ed] their campaigns, and shap[ed] their platforms" with neither recognition nor interference from the state. Friedman, _Reflections Upon the Law of Political Parties,_ 44 Cal.L.Rev. 65, 66 (1956); _see also Spier v. Baker,_ 120 Cal. 370, 380, 52 P. 659 (1898). Internal party decisions were generally made at party conventions where choices as important as "who shall represent [the] party on the election day ballot [were] left exclusively to a select group of its leaders." J. Owens, E. Costantini & L. Weschler, _California Politics and Parties_ 78 (1970) [hereinafter, "_California Politics_"]. At the turn of the century, Progressive Republicans, led by Hiram Johnson, set out to replace this prevailing laissez-faire regime with one ostensibly designed to democratize and purify the parties by rescuing them from the stranglehold of wealthy special interests.[7] _See Assembly Interim Committee on Elections and Reapportionment,_ Report on Political Party Organization 7, _reprinted in_ 1 Appendix to Journal of the Assembly (1963).

Spurred on by the Progressive reformers, the state legislature took the first — and most fundamental — step toward democratizing political parties by enacting a direct primary law, which transferred the power to nominate candidates from party organizations to the voters themselves. _See Hart v. Jordan,_ 168 Cal. 321, 143 P. 537 (1914); _Katz v. Fitzgerald,_ 152 Cal. 433, 93 P. 112 (1907); _see also California Politics, supra_ at 35. As part of the same reform movement (_see_ Opinion, Legislative Counsel of California, February 23, 1978, Excerpt of Record 465), the California legislature required political parties to form state and county central committees and adopted rules for party governance. [8]

The Elections Code provisions regulating party governance are byzantine in their complexity[9] and vary in extent and detail from party to party. _See, e.g.,_ Cal.Elec.Code §§ 8500-8945 (Democratic Party), 9000-9510 (Republican Party), 9600-9745 (American Independent Party), 9750-9855 (Peace and Freedom Party). To take the Democratic Party as an illustration, the Code establishes party central committees at the county, _id._ § 8820, and state-wide levels, _id._ § 8660; it dictates the size, membership, and apportionment of these committees,        _id._ §§ 8660-8672 (state committee), 8820-8834 (county committees); it mandates the place and time of committee meetings, _id._ §§ 8710-8711, 8920-8922; it enjoins the state central committee to observe standard parliamentary procedure, _id._ § 8778; and it provides for the election of a state chair and vice-chair and requires that they be selected alternately from the northern and southern sections of the state. _Id._ § 8774.

Most importantly, the Elections Code assigns to each party's state central committee the "statutory function of party leadership" by placing it "at the very helm of the party's general election campaign." 23 Ops Cal.Atty.Gen. 119, 123 (1954); _see_ Cal.Elec.Code §§ 8776, 8940.[10] Similarly, the Code provides that the county committees "shall have charge of the party campaign under general direction of the state central committee." _Id._ §§ 8940 (Democratic Party), 9440 (Republican Party), 9740 (American Independent Party), 9850 (Peace and Freedom Party). Hence, at least in theory, the central committees constitute the governing bodies of the parties.

In practice, commentators have noted that the statutory organization of the central committees is so cumbersome as to make only titular leadership realistically possible.[11] *See California Politics, supra* at 190-91. For example, the Democratic state central committee is composed of over 1,000 members — more than five times the size of the State Convention. *Id.* at 191. The membership includes all Democratic officeholders from Governor to members of the Congress and the state legislature. Cal.Elec.Code § 8660(a). Each statewide officeholder,[12] United States Senator and state senator appoints three other state committee members, "at least two of whom shall be of the opposite sex"; and each member of Congress and the State Assembly appoints two other members, "at least one of whom shall be of the opposite sex." *Id.* § 8663. Defeated party nominees for these offices also serve on the committee and appoint their share of additional members. *Id.* § 8661. Rounding out the membership are members elected by the county committees on a basis proportionate to registered party strength in each county, *id.* §§ 8660(b), 8667; five members elected by a caucus convened in each assembly district, *id.* §§ 8660(g) & 8669; and miscellaneous others.[13]

Thus, the legislative design favors elected officials over party members who do not hold elective office. The design particularly favors incumbent state legislators, who enact and amend the legislation regulating party affairs. Members of the California State Assembly and Senate can control as many as 400 positions; in comparison, the California delegation to the United States Congress and Senate controls only 143 positions. *See* Cal.Elec.Code § 8660.

Finally, all party central committees have been prohibited from endorsing or opposing candidates in party primaries. Commentators have claimed that, like the        cumbersome provisions dictating party governance, the ban on preprimary endorsements has weakened political parties, especially their ability to recruit and elect candidates who will further the party's goals.[14] *See* Friedman, *supra* at 70; *California Politics, supra* at 4; *see also* 23 Ops.Cal.Atty.Gen. 119, 122 (1954). Plaintiffs' uncontroverted affidavits show that by excluding the committees from the process of choosing party nominees, "a basic function of a political party [in our system]," *Kusper v. Pontikes,* 414 U.S. 51, 58, 94 S.Ct. 303, 308, 38 L.Ed.2d 260 (1973), the state has effectively drained party central committees of political power. Although the legislature has charged the committees with the responsibility of running the general election campaigns of party nominees, in reality nominees run their own campaigns through ad hoc campaign committees. Supplemental Declaration of Austin Ranney; *see also California Politics, supra* at 199-200. Indeed, the California Attorney General has opined that the ban on preprimary endorsements reflects the Progressives' "intent to minimize the role of the established party agencies." 23 Ops.Cal.Atty.Gen. at 122. Overall, it has been observed that California's regulation of political parties has pushed them "out of much of their original domain." Friedman, *supra* at 69.

## II

At the outset, we consider various threshold issues raised by the State in its motion to dismiss below and renewed on appeal. The State presents four reasons for reversing the district court without reaching the merits: (1) plaintiffs' complaint fails to raise a justiciable controversy; (2) plaintiffs lack standing to bring the action; (3) the action is barred by the Eleventh Amendment; and (4) the district court should have abstained under the *Pullman* doctrine from adjudicating the first and third causes of action. We find none of these arguments persuasive.

## A

Article III limits the exercise of federal judicial power to actual cases and controversies. *NAACP v. City of Richmond,* 743 F.2d 1346, 1350 (9th Cir.1984). A plaintiff who challenges a statute must demonstrate "a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *Babbitt v. United Farm Workers National Union,* 442 U.S. 289, 298, 99 S.Ct. 2301, 2309, 60 L.Ed.2d 895 (1979); *see also O'Shea v. Littleton,* 414 U.S. 488, 494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974). But "[o]ne does not have to await the consummation of the threatened injury [to seek

San Francisco County Democratic Cent. Comm. v. Eu, 826 F.2d 814 - Court of Appeals, 9th Circuit 1987 - Google Scholar

Case 2:25-cv-00663-DWL - Document 57 - Filed 07/25/25 - Page 21 of 36

7/25/25, 12:04 PM

relief]. If the injury is certainly impending that is enough." _Babbitt,_ 442 U.S. at 298, 99 S.Ct. at 2308 (quoting _Pennsylvania v. West Virginia,_ 262 U.S. 553, 593, 43 S.Ct. 658, 663, 67 L.Ed. 1117 (1923)). When a plaintiff seeks to engage in conduct proscribed by statute and a credible threat of prosecution exists, he need not "expose himself to actual arrest and prosecution to be entitled to challenge [the] statute...." _Id._ (quoting _Steffel v. Thompson,_ 415 U.S. 452, 459, 94 S.Ct. 1209, 1216, 39 L.Ed.2d 505 (1974)); _see also Doe v. Bolton,_ 410 U.S. 179, 188, 93 S.Ct. 739, 746, 35 L.Ed.2d 201 (1973). This is especially true in a First Amendment case because of "the sensitive nature of constitutionally protected expression." _Dombrowski v. Pfister,_ 380 U.S. 479, 486, 85 S.Ct. 1116, 1121, 14 L.Ed.2d 22 (1965).

Relying on _Poe v. Ullman,_ 367 U.S. 497, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961), the State claims that the action is not justiciable because the Elections Code provisions that plaintiffs challenge have never been enforced. In _Poe,_ the Supreme Court held that a constitutional challenge to a Connecticut      ban on contraceptives was not justiciable because the ban had never been enforced during its seventy-five year history, _id._ at 501, 81 S.Ct. at 1754, even though "contraceptives [were] commonly and notoriously sold in Connecticut drug stores." _Id._ at 502, 81 S.Ct. at 1755. This case, however, is distinguishable from _Poe_ in that here we have no record that the relevant provisions have been "commonly and notoriously" violated. Indeed plaintiffs' uncontroverted affidavits show that they have consistently, if reluctantly, obeyed the statutes in conducting party affairs.

Rather than _Poe,_ we believe resolution of the justiciability issue is controlled by _Babbitt,_ 442 U.S. at 302-03, 99 S.Ct. at 2310-11, and _Epperson v. Arkansas,_ 393 U.S. 97, 101-02, 89 S.Ct. 266, 268-69, 21 L.Ed.2d 228 (1968). In both cases, the Court found justiciability notwithstanding a record of non-enforcement because, as distinguished from _Poe,_ the record did not show that the statutes had been "commonly and notoriously" violated.[15]

The State further contends that, under _Pennhurst State School and Hospital v. Halderman,_ 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984), federal courts lack the authority to determine that a violation of a challenged state statute is a criminal offense unless the statute has already been enforced through a criminal prosecution.[16] The State asserts that because federal courts cannot "instruct[ ] state officials on how to conform their conduct to state law," _id._ at 106, 104 S.Ct. at 911, they are necessarily disabled from finding that a state statute requires criminal prosecution. We cannot accept this reading of _Pennhurst._ There the Supreme Court merely held that federal courts had no jurisdiction over an action to compel state officials to adhere to state law. _Pennhurst_ does not undermine either explicitly or implicitly the settled rule that when a plaintiff is "one against whom the[ ] criminal statutes directly operate ... a sufficiently direct threat of personal detriment" is alleged. _Bolton,_ 410 U.S. at 188, 93 S.Ct. at 745.

## B

Closely related to the case or controversy requirement is the requirement that plaintiffs have standing to bring the action.[17] _See Simon v. Eastern Kentucky Welfare Rights Organization,_ 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976). The State argues that plaintiffs lack standing because they have not shown that any party's state central committee has adopted bylaws that conflict with the statutory restrictions on preprimary endorsements and internal governance. Thus, the State argues, plaintiffs would not obtain effective relief from a judicial declaration that the statutes were unconstitutional. Moreover, the State argues, plaintiffs fail to state a claim for the infringement of _their_ First Amendment rights because the First Amendment rights at stake belong to the party state central committees and those committees have voluntarily complied with the statutes. These arguments fail on two scores: (1) they are based on the erroneous premise that conformity with obligations imposed by law proves that those laws do not restrict constitutional freedoms; and (2) they erroneously assume that the only bodies capable of challenging the statutes are the party state central committees.

The fact that no state central committee currently has bylaws that conflict with the challenged statutes hardly indicates that those statutes do not restrict the parties' First Amendment rights. Parties cannot qualify for the ballot unless they conform their operations to the statutory blueprint prescribed for one of the existing ballot-qualified parties. *See* Cal.Elec.Code § 9955. The State nonetheless argues that a party's decision to become ballot-qualified makes its conformance with those statutes voluntary and thus removes any constitutional difficulty. *See* Appellant's Supplemental Brief on Remand at 4. A state cannot, however, constitutionally condition a party's access to the ballot — the lifeblood of any party — upon that party's forgoing its First Amendment freedoms. The First Amendment bars the government from attaching unconstitutional conditions even to benefits the government has no obligation to bestow. *See, e.g., Regan v. Taxation With Representation*, 461 U.S. 540, 545, 103 S.Ct. 1997, 2001, 76 L.Ed.2d 129 (1983) ("the government may not deny a benefit to a person because he exercises a constitutional right"); *Perry v. Sinderman*, 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972); *Speiser v. Randall*, 357 U.S. 513, 526, 78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460 (1958). The bar applies even more forcefully when the government attempts to attach unconstitutional conditions to a party's right of access to the ballot.

We also reject the State's suggestion that if political parties are reluctant to violate the statutes they must obtain standing by adopting bylaws that conflict with the statutes and then disregarding those bylaws in actual practice. Institutions are not required to make the empty gesture of passing rules that are void as a matter of law and ignored as a matter of institutional practice in order to satisfy standing requirements. Certainly a failure to make such a futile gesture gives us no grounds for inferring that the parties' bylaws merely reflect a neat coincidence of what the parties want and what the statutes require. The State correctly points out that in *Tashjian* the Republican Party of the State of Connecticut had adopted a party rule that conflicted with state election law. *See* 107 S.Ct. at 546-47. But the Supreme Court nowhere suggested in *Tashjian* that the adoption of a conflicting bylaw was necessary to confer standing or to show infringement of a First Amendment right.

Finally, the State makes the rather astonishing argument that the legislative action in this case can be equated with voluntary action by the political parties. The State asserts that:

> when the nominees of a party who are actually elected to the Legislature enact legislation affecting the organization and procedures of the party institutions the legislation is an act of self-governance by the party itself. Appellants presented evidence in the district court to support their motion for summary judgment and to oppose appellee's (sic) motion demonstrating that by custom and practice the political parties represented in the legislature accept each other's party legislation. Obviously, the legislators, who are inherently their party, are also exercising the legislative power of the state.

Appellants' Supplemental Brief Pursuant to Court Order Dated August 5, 1985, at 3.

The State's argument collapses on its own terms. State legislators are not "inherently their party." Nor do legislative enactments that bind the parties and carry criminal penalties represent the parties' own voluntary action. The exercise of the coercive power of the state is the antithesis of voluntary action by political associations. Regardless of the motives of individual legislators        or the quid pro quo arrangements that led to passage of the challenged statutes, the result remains the same: state regulation of political parties. To hold otherwise would be to allow the state legislature to endow the committees with "the statutory function of party leadership," 23 Ops.Cal.Atty.Gen. 119, 123 (1954), and place this leadership in the effective control of state legislators, *see California Politics* at 191, without fear that their exercise of legislative power will be reviewed under the First Amendment.[18]

The State has simply failed to make any showing that the political parties have voluntarily adopted the statutory restrictions. Indeed, the uncontroverted affidavits of party representatives indicate the contrary: they would reform the composition of their parties' central committees if the statutes were invalidated. Moreover, all committee plaintiffs say they would make preprimary endorsements if the practice were not prohibited. The obvious fact that the State Central

San Francisco County Democratic Cent. Comm. v. Eu, 826 F.2d 814 - Court of Appeals, 9th Circuit 1987 - Google Scholar    7/25/25, 12:04 PM

Case 2:25-cv-00663-DWL - Document 57 - Filed 07/25/25 - Page 23 of 36

Committee of the Libertarian Party of California is a named plaintiff would seem to satisfy even the State's assertion that plaintiffs cannot state a cause of action unless they show that "the statutes conflict with the policies and will of" the state central committees. *See* Appellants' Supplemental Brief on Remand From the United States Supreme Court at 6-8.

Even if the State were correct in asserting that the state central committees have no standing to challenge the statutes until they adopt conflicting bylaws, the State has still failed to show that plaintiffs do not have standing to bring suit for the infringement of *their* First Amendment rights as party officials, county committees, and party members. Indeed, the State's argument that the only bodies capable of challenging the statutes prescribing the membership and terms of the state central committees are the state central committees themselves turns the associational interest at stake on its head. The associational rights of political parties and their members to choose their own governing body would be of little avail if a statute imposing a state-created and selected governing body could only be challenged by the governing body the state imposed. We thus reject the State's apparent assertion that political parties and their members must endure leadership chosen by the State until that leadership votes itself out. Nor do we accept the State's assertion that only the state central committees can challenge the statutes forbidding preprimary endorsements. The State never offers any satisfactory explanation as to why the county committees cannot challenge the statutes prohibiting preprimary endorsements as an infringement of *their* rights to speak freely. Nor has the State explained why the individual party members cannot challenge these statutes as an infringement of *their* First Amendment right to *listen*. *See, e.g., First Nat'l Bank of Boston v. Bellotti,* 435 U.S. 765, 783, 98 S.Ct. 1407, 1419, 55 L.Ed.2d 707 (1978) ("the First Amendment goes beyond protection of the press and the self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw."); *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 757, 96 S.Ct. 1817, 1823, 48 L.Ed.2d 346 (1976) (acknowledging "a First Amendment right to `receive information and ideas,' and that freedom of speech `"necessarily protects the right to receive."'" (quoting *Kleindienst v. Mandel,* 408 U.S. 753, 762-63, 92 S.Ct. 2576, 2581, 33 L.Ed.2d 683 (1972)).

## C

The State next argues that plaintiffs' action is barred by the Eleventh Amendment. It is settled law, however,       that the Eleventh Amendment does not bar an action seeking prospective relief from enforcement of an unconstitutional statute. *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 174 (1908). Because plaintiffs do not seek damages, but only declaratory and injunctive relief, *Ex parte Young* is directly controlling. *See also Edelman v. Jordan,* 415 U.S. 651, 664, 94 S.Ct. 1347, 1356, 39 L.Ed.2d 662 (1974).

## D

Finally, relying on *Railroad Commission of Texas v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), the State contends that the district court should have abstained from adjudicating plaintiffs' first and third counts pending the resolution of litigation in state court raising similar challenges to the Elections Code. In *Pullman,* the Supreme Court held that abstention may be appropriate "when difficult and unsettled questions of state law must be resolved before a substantial federal constitutional question can be decided." *Hawaii Housing Authority v. Midkiff,* 467 U.S. 229, 236, 104 S.Ct. 2321, 2327, 81 L.Ed.2d 186 (1984). *Pullman* abstention is inappropriate, however, "when a state statute is not `fairly subject to an interpretation which will render unnecessary' adjudication of the federal constitutional question." *Id.* (citation omitted); *see also Canton v. Spokane School District No. 81,* 498 F.2d 840, 845 (9th Cir.1974).

Here, the State does not advance an interpretation of the Elections Code that would moot the constitutional questions raised by plaintiffs. Nor could the State do so. Section 11702 is clear on its face that central committees may not make preprimary endorsements, and other provisions prescribe in minute detail committee membership and limit the terms of committee chairs. Thus the district court's refusal to invoke *Pullman* abstention was not an abuse of discretion.[19] *See*

San Francisco County Democratic Cent. Comm. v. Eu, 826 F.2d 814 - Court of Appeals, 9th Circuit 1987 - Google Scholar

Case 2:25-cv-00663-DWL - Document 57 - Filed 07/25/25 - Page 24 of 36

7/25/25, 12:04 PM

_C-Y Development Co. v. City of Redlands_, 703 F.2d 375, 377 (9th Cir.1983).

## III

Before considering plaintiffs' claims that the Elections Code unjustifiably burdens their First Amendment rights, we address the State's contention that the state and county central committees of California's ballot-qualified political parties have no First Amendment rights because they are public entities, not private associations. The State asserts that the legislature transformed the committees from voluntary political associations into public entities "integral [to] the state's election system," Appellants' Supplemental Brief, p. 15, when it dictated the committees' organization and powers and charged them with the responsibility of conducting the general election campaigns of party nominees. _Id.,_ p. 13.

In essence, the State argues that by regulating the committees, the legislature may deprive them of First Amendment rights. The State's argument is flawed by "bootstrap reasoning." _Abrams v. Reno,_ 452 F.Supp. 1166, 1170 (S.D.Fla.1978) ("[w]ithout begging the question of the right of a political executive committee to exist and function without the breath of life provided by the election code, it seems to be bootstrap reasoning to suggest that election code regulation permits the denial of substantial constitutional rights"), _aff'd,_ 649 F.2d 342 (5th Cir.1981), _cert. denied,_ 455 U.S. 1016, 102 S.Ct. 1710, 72 L.Ed.2d 133 (1982). Even if the California Elections Code had expressly characterized the committees as public agencies,[20] we would reject the State's premise that a state can strip a voluntary political association of First Amendment rights by legislating it into an arm of the state. In _Consolidated Edison Co. v. Public Service Commission,_ 447 U.S. 530, 100 S.Ct. 2326, 65 L.Ed.2d 319 (1980), for instance, the Supreme Court held that extensive regulation, however beneficial to the public, cannot deprive a utility of its status as a private entity entitled to constitutional rights. _Id._ at 533-34 & n. 1, 100 S.Ct. at 2331 & n. 1. Likewise, in _First National Bank of Boston v. Bellotti,_ 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978), the Court repudiated the notion that the status of corporations as "creatures of the state" permits the state to prohibit corporate speech. _Id._ at 778 n. 14, 98 S.Ct. at 1416 n. 14. It follows _a fortiori_ that the state cannot abridge the First Amendment rights of political associations by arguing that regulatory legislation makes them "creatures of the state."[21] _Cf. Tashjian,_ 107 S.Ct. at 550 (state's power to regulate elections does not justify, without more, the abridgement of the associational rights of political parties and their members).

We recognize that California has extensively regulated political parties. The State, however, turns constitutional analysis upside down when it argues that its Elections Code provisions are immune from constitutional attack because they deprive the party committees of First Amendment status. The question is not whether the committees lack First Amendment rights because of state regulation. Rather, the question is whether the challenged statutory provisions must fall because they violate the committees' First Amendment rights. Turning to this question, we address in Part IV the constitutionality of the provisions that regulate the structure and internal affairs of the parties. In Part V, we consider the constitutionality of the ban on preprimary endorsements.

## IV

Our analysis of plaintiffs' constitutional claims begins with the fundamental premise that "a significant impairment of First Amendment rights must survive exacting scrutiny." _Elrod v. Burns,_ 427 U.S. 347, 362, 96 S.Ct. 2673, 2684, 49 L.Ed.2d 547 (1976) (plurality); _see also Citizens Against Rent Control v. City of Berkeley,_ 454 U.S. 290, 294, 102 S.Ct. 434, 436, 70 L.Ed.2d 492 (1981). If, as plaintiffs allege, the state statutes interfere with their rights to free association and free expression, the statutes can survive First Amendment scrutiny only if the State shows that they are "necessary to serve a compelling interest." _Illinois State Bd. of Elections v. Socialist Workers Party,_ 440 U.S. 173, 184, 99 S.Ct. 983, 990, 59

San Francisco County Democratic Cent. Comm. v. Eu, 826 F.2d 814 - Court of Appeals, 9th Circuit 1987 - Google Schola...

Case 2:25-cv-00663-DWL - Document 57 - Filed 07/25/25 - Page 25 of 36

7/25/25, 12:04 PM

L.Ed.2d 230 (1979); *see also Kusper v. Pontikes*, 414 U.S. 51, 58-59, 94 S.Ct. 303, 308, 38 L.Ed.2d   260 (1973) ("even when pursuing a legitimate interest, a State may not choose means that unnecessarily restrict constitutionally protected liberty").[22]

We first consider whether the statutes' regulation of the selection of state committee members and the term of office of committee chairs burdens plaintiffs' First Amendment rights. We then consider whether this regulation serves compelling state interests. *See Anderson v. Celebrezze*, 460 U.S. 780, 789, 103 S.Ct. 1564, 1570, 75 L.Ed.2d 547 (1983).

# A

"[T]he right of individuals to associate for the advancement of political beliefs" is fundamental, *Williams v. Rhodes*, 393 U.S. 23, 30, 89 S.Ct. 5, 10, 21 L.Ed.2d 24 (1968), and includes the "freedom to identify the people who constitute the association, and to limit the association to those people only." *Wisconsin ex rel. La Follette*, 450 U.S. at 122, 101 S.Ct. at 1019; *see also Tashjian*, 107 S.Ct. at 549. Because the right of association would be hollow without a corollary right of self-governance, "there must be a right not only to form political associations but to organize and direct them in the way that will make them most effective." *Ripon Society Inc. v. National Republican Party*, 525 F.2d 567, 585 (D.C.Cir.1975), *cert. denied,* 424 U.S. 933, 96 S.Ct. 1147, 47 L.Ed.2d 341 (1976). "The Party's determination ... of the structure which best allows it to pursue its political goals is protected by the Constitution." *Tashjian*, 107 S.Ct. at 554; *see also Ripon Society Inc.*, 525 F.2d at 585 ("a party's choice, as among various ways of governing itself, of the one which seems best calculated to strengthen the party and advance its interests, deserves the *protection* of the Constitution....") (emphasis in original).

It is readily apparent that the California statutes burden the parties' right to govern themselves as they think best. By legislative fiat, the State vests party leadership in the central committees, determines the size of the committees, and apportions their membership according to a statutory formula. Whether this formula is or is not "best calculated to strengthen the party and advance its interests," *Ripon Society Inc.*, 525 F.2d at 585, is irrelevant to First Amendment analysis. *See Tashjian*, 107 S.Ct. at 554. It is the right of the party, not the State, to decide how the party shall be governed. *See id.*

In stacking the deck heavily in favor of elected officials and party nominees, the legislature has dictated to each ballot-qualified party an organizational structure that may not be the party's choice. For example, a party trying to adapt to changing conditions may have interests that differ from the interests of entrenched incumbents. Commentators have noted that the pro-incumbent composition and unwieldy size of California's state central committees have made them "fairly rigid organization[s] incapable of adjusting and responding to changing conditions." *California Politics, supra* at 186.

The experience of the Libertarian party exemplifies the plight of a political party forced to operate under state-mandated rules of governance. When the Libertarian party qualified for the ballot, it was forced to jettison its "preferred and natural" party organization and replace it with one already mandated for one of the existing qualified parties.[23] *See* Declaration of Mary Gingell. After adopting the rules of the Peace and Freedom Party as the least objectionable interim model, the Libertarians drafted a body of rules specifically tailored to their party's distinctive needs. When presented to the legislature, the proposed rules languished and died in committee. *See id.* Thus, the Libertarian party has been compelled by the state to organize itself in a way considered inimical to its political interests.

Moreover, we believe that the challenged statutes directly interfere with the parties' free expression by inevitably coloring the message that the parties communicate to the electorate. *See Tashjian*, 770 F.2d 265, 282 (2d Cir.1985) ("in light of the intimate relationship between the structure of a political association and the message ultimately transmitted by that group, ... the inexorable effect of [regulating the structure of political parties] is to alter the Party's message"),

*aff'd*, ___ U.S. ___, 107 S.Ct. 544, 93 L.Ed.2d 514 (1986). By favoring incumbents, the California legislature may give ballot-qualified parties a pro-incumbent image that impedes their associational goals.[24] For instance, a party's efforts to change political course may be frustrated by the incumbent bias inherent in its organizational structure. We do not intend to say that elected officials and party nominees are incapable of providing strong and effective leadership. What we do intend to say is that when the state restricts a party's freedom to choose its leadership, the state burdens the party's First Amendment rights.

The parties' associational right to choose their own leadership is also burdened by the single-term limit on committee chairs. In limiting committee chairpersons to one two-year term — regardless of their popularity and effectiveness — the legislature has impaired the parties' ability to commit their fortunes to experienced and successful leadership. As Judge Patel recognized below, parties are "gravely weakened if the members are not permitted to make use of an able leader for a long enough period of time to ensure effective administration." *San Francisco County Central Committee v. Eu,* No. C-83-5599 at 20 (Order filed May 3, 1984).

In short it seems clear to us that if "the freedom to join together in furtherance of common political beliefs `necessarily presupposes the freedom to identify the people who constitute the association,'" *Tashjian,* 107 S.Ct. at 549 (quoting *Wisconsin ex rel. La Follette,* 450 U.S. at 122, 101 S.Ct. at 1019), then *a fortiori* that same political freedom necessarily presupposes the freedom to identify the people who *run* the association. Thus, in holding that the First Amendment rights of the Republican Party and its members to reach out to non-members were infringed by a law preventing independents from voting in Republican primaries, the Court in *Tashjian* provided fresh authority for our holding that the First Amendment rights of political parties and their members to choose their own leaders are infringed by laws prescribing the membership and terms of parties' governing bodies. We note in particular that the Court found the associational interests         at stake in *Tashjian* substantial even though the only obstacle facing independent voters who wanted to vote in Republican primaries was the requirement that they register Republican on the day of the primary. 107 S.Ct. at 550 n. 7. In this case, by contrast, the associational interests at stake seem even more substantial because a political party cannot freely choose its own leaders without losing its place on the ballot.

## B

Having concluded that the challenged statutes burden appellees' First Amendment rights, we turn to "the precise interests put forward by the State as justifications for the burden imposed by its rule." *Anderson,* 460 U.S. at 789, 103 S.Ct. at 1570.

The State claims that it has a compelling interest in sheltering the parties from factional strife so that the governing committees will be in a strong position to carry out their statutory responsibility of running the general election campaigns of party nominees. This interest in avoiding factionalism, the argument goes, justifies state interference with the associational rights of political parties and their adherents. The State further claims that unless statutes determine the composition of the parties' governing bodies for the parties, those parties will be so divided by internal political battles for control of the governing bodies that the parties will be unable to run effective campaigns in the general election. The State argues that vesting control of the state committees in elected officials and party nominees assures that the committees will be broadly representative and resistant to factionalism.

The State also cites its professed interest in restraining factions as a justification for limiting the terms of party chairs. The State maintains that when the term limitation is combined with the statutory requirement that chairs rotate between northern and southern California, friction between these distinct regional interests is minimized.

In sum, the State argues that the Elections Code provisions regulating the membership of party governing committees and limiting the terms of committee chairs serve the state's assertedly compelling interest in avoiding "splintered parties

and unrestrained factionalism." *Storer v. Brown*, 415 U.S. 724, 736, 94 S.Ct. 1274, 1282, 39 L.Ed.2d 714 (1974); *see also Tashjian*, 107 S.Ct. at 553. In advancing this argument, the State misperceives the nature of the state interest recognized as compelling in *Tashjian* and *Storer*. To be sure, in *Storer* the Court recognized that a state has a compelling interest in "the stability of its political system." 415 U.S. at 736, 94 S.Ct. at 1282. But, as the Supreme Court pointed out in *Tashjian*, "[t]he statute in *Storer* was designed to .... prevent the disruption of political parties from without, and not, as in this case, to prevent the parties from taking internal steps affecting their own process for the selection of candidates." *Tashjian*, 107 S.Ct. at 553-54.

This distinction between disruption from within and disruption from without, which the Court so clearly delineated in *Tashjian* as a basis for distinguishing *Storer*, is the distinction that the State fails to come to grips with in this case. The California statutes under attack make no effort to prevent the disruption of political parties from forces *outside* the party; rather they intrude directly on *internal* party affairs by dictating who can serve on the various state central committees. Indeed, it would seem that if *any* issue involves the internal workings of a political party, it is the process of selecting the party's leadership.

Rather than explaining how the statutes serve a compelling interest by actually preventing disruption from an outside force, the State seems content to argue mainly that its regulation of internal party affairs is not illegitimate because the bylaws of all the parties' state central committees in fact conform with the statutory requirements.[25]   This argument rehashes the standing argument discussed above, *see supra* at 823-824, and we again reject the State's assertion that political parties have no standing to challenge statutes restricting their First Amendment rights unless they first adopt bylaws that conflict with the statutes. Moreover, this argument also fails to recognize that once an infringement of First Amendment rights is demonstrated, the government has the burden of showing a compelling state interest. *See* 107 S.Ct. at 550. Even if the State could prove that the parties would have voluntarily adopted the same rules of governance in the absence of the statutes, the State's burden to show a compelling interest would hardly be met. Indeed, it would seem perverse to hold that a compelling state interest is advanced by regulations that have no effect on those regulated. At any rate, it is hard to see what state interest is served by statutes that require parties to organize themselves in a prescribed way unless those statutes prevent the parties from organizing themselves differently. Even if no party at the present time wished to adopt rules in conflict with the statutes, the State's interest in preventing any party from doing so in the future would hardly be considered either compelling or even legitimate under *Tashjian*.

In short, the State's defense of its statutes forces it to take a paradoxical position. To show that the statutes advance a compelling interest, the State must show that the statutes actually accomplish something by forcing the parties to adopt rules they otherwise would not adopt. But in its attempt to show that the statutes do not illegitimately intrude on internal party decision-making, the State must argue that the parties would have adopted the same rules in the absence of the statutes. In making these arguments, the State never attempts to explain why, even if it were correct in its judgment that the rules of governance prescribed by the statutes best served the interests of the various parties, the parties could not adopt those rules voluntarily.[26] Underlying the State's paradoxical position seems to be a paternalistic assumption that, left to their own devices, parties will act in a manner adverse to their own interests. We have no trouble concluding that the First Amendment forecloses paternalistic state action designed to protect parties from choosing rules of governance that may prove to be harmful to party interests. Freedom to choose includes the right to choose unwisely. That was made resoundingly clear by the Supreme Court in *Tashjian*:

> The State argues that its statute is well designed to save the Republican Party from undertaking a course of conduct destructive of its own interests. But on this point "even if the State were correct, a State, or a court, may not constitutionally substitute its own judgment for that of the Party." *Democratic Party of United States v. Wisconsin*, 450 U.S., at    123-24, 101 S.Ct., at 1019-1020 (footnote omitted). The Party's determination of the boundaries of its own association, and of the structure which best allows it to pursue its political goals, is protected by the Constitution.

Case 2:25-cv-00663-DWL - Document 57 - Filed 07/25/25 - Page 28 of 36

San Francisco County Democratic Cent. Comm. v. Eu, 826 F.2d 814 - Court of Appeals, 9th Circuit 1987 - Google Scholar                    7/25/25, 12:04 PM

*107 S.Ct. at 554*.

Moreover, any state regulation of political parties beyond that necessary to further orderly elections must be viewed with great skepticism. To be sure, some state regulation that affects political parties serves a compelling interest in protecting "the integrity of the electoral process." *Rosario v. Rockefeller*, 410 U.S. 752, 761, 93 S.Ct. 1245, 1251, 36 L.Ed.2d 1 (1973). As the Supreme Court said in *Storer*, "as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." 415 U.S. at 730, 94 S.Ct. at 1279. Thus, a state may restrict access to the ballot. *See Bullock v. Carter*, 405 U.S. 134, 145, 92 S.Ct. 849, 857, 31 L.Ed.2d 92 (1972) (a state "has a legitimate interest in regulating the number of candidates on the ballot"). Toward this end, a state may require that candidates meet minimum standards to qualify for the ballot in order to keep "its ballots within manageable, understandable limits." *Lubin v. Panish*, 415 U.S. 709, 715, 94 S.Ct. 1315, 1319, 39 L.Ed.2d 702 (1974). For example, independent candidates may be required to present nominating petitions that demonstrate "a significant modicum of [electoral] support." *Jenness v. Fortson*, 403 U.S. 431, 442, 91 S.Ct. 1970, 1976, 29 L.Ed.2d 554 (1971); *see also American Party of Texas v. White*, 415 U.S. 767, 782, 94 S.Ct. 1296, 1306, 39 L.Ed.2d 744 (1974). A state may also require the payment of filing fees to weed out spurious candidacies, *see Bullock*, 405 U.S. at 145, 92 S.Ct. at 856, so long as the fees are not excessive or a bar to indigent candidates. *Lubin*, 415 U.S. at 717-18, 94 S.Ct. at 1320. Further, a state may protect the integrity of its primary elections by imposing a waiting period before voters can switch their registered party affiliation, *Rosario*, 410 U.S. 752, 93 S.Ct. 1245, 36 L.Ed.2d 1 (1973), and before candidates registered with one party can renounce their affiliation to run as independent candidates. *Storer*, 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974).

It is equally clear, however, that our deference to a state's interest in orderly elections must be tempered by the risk that state regulation will favor some parties and some party factions over others. For example, a state's interest in "the stability of its political system", *Storer*, 415 U.S. at 736, 94 S.Ct. at 1282, does not extend to state regulation that effectively restricts the ballot to the major parties or that ensures that the major parties remain ballot-qualified. *Williams*, 393 U.S. at 32, 89 S.Ct. at 11; *see also Illinois State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 185-86, 99 S.Ct. 983, 990-91, 59 L.Ed.2d 230 (1979). As the Supreme Court noted in a related context, "care must be taken not to confuse the interest of partisan organizations with governmental interests." *Elrod*, 427 U.S. at 362, 96 S.Ct. at 2684. Thus, although a state's interest in orderly elections allows it to impose reasonable, non-discriminatory restrictions on ballot access, a state may not go to bat for political parties to assure that they remain ballot-qualified. In other words, a state has no interest in regulating political parties for the purpose of helping them win or retain voter support. Political parties are nothing more than voluntary associations of individuals who band together in pursuit of shared political goals. A party's survival depends upon its ability to compete in the free marketplace of political ideas and ideals. The First Amendment limits states to a neutral role in that competitive process. A state may not interfere with the associational rights of political parties beyond what is necessary to assure honest and orderly elections.

In short, a state's interest is in orderly elections, not orderly parties, and it may regulate political parties only as an incident to regulating elections. Moreover, although under *Tashjian* a state's interest in orderly elections can sometimes justify laws that protect parties from disruption, it        can do so *only* if that disruption comes from outside the party. *See supra* at 832. Thus, the State's arguments in this case fail on two counts. Not only does the State fail to show that the statutes at issue prevent outside disruption, the State fails to show that the promotion of party harmony assertedly advanced by the statutes has anything to do with the State's interest in orderly elections. Any state involvement in promoting party harmony inevitably poses the risk that a state will favor one party or one faction within a party over another. After all, "the views of the State ... to some extent represent the views of the one political party transiently enjoying majority power." *Tashjian*, 107 S.Ct. at 554. The risk that a state will favor some factions over others is at its highest, and a state's interest in orderly elections is at its lowest, when a state tries to dictate who will govern each party.

Thus, the State's reliance on *Storer v. Brown* is misplaced. In *Storer*, the Court upheld a California "sore loser" statute

San Francisco County Democratic Cent. Comm. v. Eu, 826 F.2d 814 - Court of Appeals, 9th Circuit 1987 - Google Scholar

Case 2:25-cv-00663-DWL - Document 57 - Filed 07/25/25 - Page 29 of 36

7/25/25, 12:04 PM

that required independent candidates for political office to disaffiliate from their former political party at least one year prior to the party primary. *Storer* recognized that a state's legitimate interest in limiting access to the general election ballot entitles it to reserve that ballot for "major struggles," free of the destabilizing effect of "continuing intraparty feuds." *Storer*, 415 U.S. at 735, 94 S.Ct. at 1281; *see also American Party of Texas*, 415 U.S. at 781, 94 S.Ct. at 1306 (a state "may insist that intraparty competition be settled before the general election...."). But critical to the *Storer* holding was that California's disaffiliation provision did not attempt to control intraparty feuding during the primary campaigns. To the contrary, the primary was recognized as the forum in which "contending forces within the party finally settle their differences." *Storer*, 415 U.S. at 735, 94 S.Ct. at 1281; *see also Anderson*, 460 U.S. at 803, 103 S.Ct. at 1577 (the *Storer* Court did not "suggest that a political party could invoke the powers of the State to assure monolithic control over its own members and supporters."). Nothing in *Storer* suggests that a state may preempt intraparty feuding to help the parties win elections.

Some intraparty feuding is as inevitable in the process of choosing party officials as it is in the process of choosing candidates to carry a party's banner in the general elections. The State's argument here, that it can prescribe party rules of governance in order to preempt intraparty struggles over questions of party governance, is certainly a far cry from *Storer*, which merely held that a state can regulate the timing of otherwise unregulated intraparty struggles over choosing candidates. In other words, *Storer* recognized that a state's compelling interest in orderly general elections justified requiring that party adherents finally settle their differences over the selection of party candidates a reasonable time before election day. However, government's power to regulate the timing of some intraparty feuds in order to protect general elections from disruption hardly gives government the power to preempt party decision-making in order to protect political parties from the disruption inherent in deciding matters for themselves. Such governmental preemption of party decision-making goes well beyond the government's legitimate interest in orderly elections. Intraparty feuding may indeed weaken and divide a party and result in defeat at the polls, but the government's concern is in an orderly election process, not in helping parties maintain their strength and win elections. The State confuses campaigns with elections, partisan interests with state interests. We hold, therefore, that no compelling state interest is served by the California Elections Code provisions regulating the membership of party governing committees and limiting the terms of committee chairs.

## C

Moreover, even should we assume that the State has a compelling interest in minimizing party factionalism, it has failed to carry its burden of showing "a substantially relevant correlation between the governmental interest asserted," *Pacific Gas & Electric Co. v. Public Utilities Commission of California*, 475 U.S. 1, 106 S.Ct. 903, 913, 89 L.Ed.2d 1 (1986), and the Elections Code sections regulating the selection of state committee members and the term of office of their chairs. We agree with Judge Patel that the State failed to submit "a shred of evidence", *San Francisco County Central Committee v. Eu*, No. C-83-5599, at 22 (Order filed May 3, 1984), in support of its claim that unregulated parties would be more vulnerable to "the predations of faction." Appellants' Supplemental Brief at 44. In opposing plaintiffs' summary judgment motion on the merits, the State relied exclusively on the affidavit of retired Democratic state senator Albert S. Rodda, Jr., a long-time member of the Democratic state central committee. As Judge Patel observed, this affidavit consists of "opinions ... not based on facts, but on speculations." *San Francisco County Central Committee v. Eu*, at 16. With respect to the provisions that regulate committee governance, Senator Rodda makes the single conclusory statement that they "provide some protection against devices used by factions to exclude others from participation in party affairs." Affidavit of Albert S. Rodda, Jr.

The Rodda affidavit fails to controvert plaintiffs' declarations concerning the impact that the challenged Elections Code provisions have on political parties. Plaintiffs' declarations demonstrate that these provisions weaken rather than strengthen the leadership of ballot-qualified parties. For example, the provisions regulating state committee membership

San Francisco County Democratic Cent. Comm. v. Eu, 826 F.2d 814 - Court of Appeals, 9th Circuit 1987 - Google Scholar

Case 2:25-cv-00663-DWL - Document 57 - Filed 07/25/25 - Page 30 of 36

7/25/25, 12:04 PM

stifle party debate by overrepresenting elected officials. *See* Declarations of David E. Sturrock and Bert Coffey. Plaintiffs have also shown the difficulty of effecting a change in party leadership because party initiatives are left to the mercy of a slow-moving, possibly recalcitrant legislature. *See* Declaration of Hugh Bone.

Finally, plaintiffs' declarations show that the state's extensive regulation of party leadership discourages able people from taking an active role in party organization and hinders a party's recruitment of new leaders. *See* Declarations of Bert Coffey and Austin Ranney. Although the State claims that the challenged statutes invigorate and democratize the parties, as the Progressives ostensibly set out to do, *see supra* at 8-13, the record demonstrates the opposite: in fact, the parties have become weak and fossilized. Thus, we conclude that the State has failed to demonstrate that the statutes advance its professed interest in strong party leadership.[27]

# V

Finally, we consider the constitutionality of California's outright ban on partisan preprimary endorsements, Cal.Elec.Code § 11702.[28] Because section 11702 prohibits political speech, the inviolability of which rests at the core of the First Amendment, *see, e.g., Buckley v. Valeo*, 424 U.S. 1, 14, 96 S.Ct. 612, 632, 46 L.Ed.2d 659 (1976); *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272, 91 S.Ct. 621, 625, 28 L.Ed.2d 35 (1971), we must subject the section to strict scrutiny. "[W]here ... a prohibition is directed at speech itself, and the speech is intimately related to the process of governing, `the State may prevail only upon showing a subordinating interest which is compelling.'" *Bellotti*, 435 U.S. at 786, 98 S.Ct. at 1421 (quoting *Bates v. Little Rock*, 361 U.S. 516, 524, 80 S.Ct. 412, 417, 4 L.Ed.2d 480 (1960)). Moreover, "`the burden is on the government to show the existence of such an interest.'" *Bellotti*, 435 U.S. at 786, 98 S.Ct. at 1421 (quoting *Elrod*, 427 U.S. at 362, 96 S.Ct. at 2684). Finally, "the state action may be sustained only if the government can show that the regulation is a precisely drawn means of serving" its interests. *Consolidated Edison Co. v. Public Service Commission*, 447 U.S. 530, 540, 100 S.Ct. 2326, 2334, 65 L.Ed.2d 319 (1980).

The State argues that the ban on preprimary endorsements serves two governmental interests that it claims are compelling: (1) protecting the party from factionalism; and (2) protecting primary voters from confusion and undue influence. We will address each interest in turn.

# A

The State asserts that the ban on preprimary endorsements serves the governmental interest in averting internal party dissension and factionalism. The State again cites *Tashjian* for the proposition that the state has a compelling interest in preventing party committees from disintegrating into hostile factions because such factionalism would weaken the parties' ability to run the general election campaigns of party nominees. According to the State, section 11702 advances this interest by disengaging the committees from the primary contest. Thus, the argument goes, opportunistic primary candidates have no reason to seize control of the party leadership. Likewise, the leadership's enforced neutrality among primary rivals encourages the preservation of party resources for the eventual party nominee.

The State's reliance on *Tashjian* is misplaced. As we discussed above, a state has a compelling interest in protecting political parties from disruption only when that disruption comes from outside the party. We thus held that the government has no legitimate interest in preventing political parties from adopting rules of governance that the government deems divisive. We now hold similarly that the government has no legitimate interest in protecting parties from the disruption that the State argues will result if parties are free to make preprimary endorsements. Political parties are entitled to decide for themselves whether making preprimary endorsements creates disruption that hurts the parties' chances in the general election. If a party makes a judgment that the costs of making preprimary endorsements outweigh the benefits, presumably that party will simply abstain. But the power to decide whether a party should

exercise its First Amendment right to free speech belongs to the party and its adherents, not the government. *See, e.g., Tashjian*, 107 S.Ct. at 554. The government simply has no legitimate interest in protecting political parties from disruptions of their own making.

Moreover, even if protecting parties from disruptive party endorsements were a compelling or legitimate state interest, the State has made no showing that banning preprimary endorsements sufficiently advances the interest in party cohesion to justify an outright prohibition on political speech.[29] Again, the only affidavit the State has submitted is the declaration of former state senator Rodda, and this affidavit consists of unsupported conjecture. *See supra* at 44-45.

Plaintiffs' uncontroverted affidavits, on the other hand, bear out the following: First, section 11702 has eroded the parties' ability to identify, recruit, and promote "strong opposition candidates." Declaration of David E. Sturrock. In the void caused by silencing the committees' power of endorsement, each candidate forms an ad hoc committee to run his primary campaign and, if he is successful, that committee goes on to run the general election campaign independently of the party organization. The result of banning preprimary endorsements, according to the affidavit of Williams College political scientist James MacGregor Burns, is that party control degenerates into a "personalistic system that caters to irresponsible political campaigning and public service." Thus, as Burns concludes, "taking away the endorsement power strikes at the very core of the party." *See also* Declaration of Eugene Lee ("[a] political party unable to endorse candidates is, by definition, a weak party"); *California Politics, supra* at 5 ("[C]alifornia campaigns are highly personalized extravaganzas").

Second, plaintiffs showed that in states that permit partisan primary endorsements, the practice is generally used in a selective, circumspect fashion so as not to endanger party unity. Several affiants experienced in the politics of other states testified that when no candidate has been the clear favorite of the party leadership, the leadership has either refrained from issuing controversial endorsements or endorsed several candidates in the same race. *See, e.g.,* Declarations of Eugene Lee and James MacGregor Burns. Moreover, the ability to issue endorsements has helped party leadership distinguish candidates genuinely allied with the party from candidates who are essentially masquerading as party adherents. In California, conversely, the ban on preprimary endorsements has on occasion allowed hostile candidates to win the party nomination. For instance, in a much-publicized episode discussed in plaintiffs' affidavits, a grand dragon of the Ku Klux Klan campaigned for and won the 1980 Democratic party nomination for Congress in the San Diego area while the Democratic county central committee remained powerless to oppose him. *See* Declaration of Edmond Constantini.

In sum, the State has failed to show that section 11702 serves party cohesion. Thus, even if we considered the State's interest in preventing parties from undermining party cohesion to be compelling or legitimate, we would conclude that the State has failed to show that the interest is furthered by banning preprimary endorsements.

## B

The State further claims that the ban on preprimary endorsements is justified by the governmental interests in protecting party adherents from confusion and undue influence when they vote in primaries. The State asserts that voters might be confused if they are not sheltered from the views of party leadership.[30] The State's apparent concern is that voters will be discouraged from participating in the primary election because they will view the party-endorsed candidate as the party's foreordained choice. The State also argues that preprimary endorsements from the party leadership will exert undue influence on party members when they vote in primaries.

With the exception of cases upholding laws carefully tailored to proscribe fraud and corruption, *see, e.g., Buckley*, 424 U.S. at 26-27, 96 S.Ct. at 638, the State cites no authority for the proposition that the government can regulate the flow of information between political associations and their members. Prohibiting the governing body of a political party from

San Francisco County Democratic Cent. Comm. v. Eu, 826 F.2d 814 - Court of Appeals, 9th Circuit 1987 - Google Schola... 7/25/25, 12:04 PM

Case 2:25-cv-00663-DWL - Document 57 - Filed 07/25/25 - Page 32 of 36

supporting some candidates and opposing others patently infringes both the right of the party to express itself freely and the right of party members to an unrestricted flow of political information. *See Pacific Gas & Electric,* 106 S.Ct. at 907 ("The First Amendment protects the public's interest in receiving information"); *cf. Brown v. Hartlage,* 456 U.S. 45, 60, 102 S.Ct. 1523, 1532, 71 L.Ed.2d 732 (1982) ("[by] *the free exchange of ideas* ... the people are to choose ... between candidates for political office") (emphasis added). We cannot accept the State's claim that denying voters access to the views of party leadership somehow enhances their First Amendment rights.

In any case, we would reject the "highly paternalistic approach' of statutes like [section 11702] which restrict what the people may hear." *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 770, 96 S.Ct. 1817, 1829, 48 L.Ed.2d 346 (1976). The State's argument that preprimary endorsements confuse and unduly influence voters rests upon a lack of trust in the ability of voters to think and act for themselves. "But `[o]ur cases reflect a greater faith in the ability of individual voters to inform themselves about campaign issues.'" *Tashjian,* 107 S.Ct. at 552 (quoting *Anderson,* 460 U.S. at 797, 103 S.Ct. at 1574). "[T]he people in our democracy are entrusted with the responsibility for ... evaluating the relative merits of conflicting arguments.... [and] the source and credibility of the advocate." *Bellotti* 435 U.S. at 791-92, 98 S.Ct. at 1423-24; *cf. Police Department v. Mosley,* 408 U.S. 92, 95, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 (1972) ("government has no power to restrict expression because of its message, its ideas, its subject matter, or its content"). "`A State's claim that it is enhancing the ability of its citizenry to make wise decisions by restricting the flow of information to them must be viewed with some skepticism.'" *Tashjian,* 107 S.Ct. at 552 (quoting *Anderson,* 460 U.S. at 798, 103 S.Ct. at 1575).

Simply put, the State has given voters too little credit. It has made no showing in support of its charge that voters will be confused and overly influenced by party endorsements. In contrast, plaintiffs' affidavits confirm what is implicit in the First Amendment: when the people are exposed to a public debate that is "uninhibited, robust, and wide-open," *New York Times Co. v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L.Ed.2d 686 (1964), they are fully capable of thinking for themselves. Plaintiffs have made a showing that voters understand that endorsements are intended to counsel, not preempt their votes, and that the primary victor alone constitutes the general election candidate of the party. Party endorsements are unrestricted in all other states, *see supra* at n. 28; and plaintiffs' affidavits show that the electorate of these states typically considers the party's imprimatur as simply one relevant datum in the pool of information on rival candidates for the party nomination. *See* Declarations of Donald Fraser, Malcolm Jewell, and Bert Coffey. Thus, the State's fear that party members will blindly rubber-stamp the party's endorsement is speculation not borne out by either experience or common sense. Moreover, we agree with the Second Circuit that "a state certainly does not have a compelling interest in shielding from confusion those voters who engage in unthinking and Pavlovian reliance on party labels." *Tashjian,* 770 F.2d at 284, *aff'd,* ___ U.S. ___, 107 S.Ct. 544, 93 L.Ed.2d 514. To the extent that the risk of confusion arises because the central committees carry the official imprimatur of the State, the State's own statutes — not the inherent coerciveness of party endorsements — are the root of the problem. California's ban on preprimary endorsements is a form of paternalism that is inconsistent with the First Amendment.

In sum, California's asserted interests — protecting the parties from factionalism and protecting the voters from confusion and undue influence — are insufficient to justify its ban on preprimary endorsements. Accordingly, we hold that section 11702 violates the First Amendment.

# CONCLUSION

The judgment of the district court invalidating the provisions of the California Elections Code that regulate the selection of state central committee members, limit the term of office of committee chairs, and prohibit state and county central committees from endorsing, supporting, or opposing candidates in party primary elections is AFFIRMED.

[1] The First Amendment is made applicable to the states through the Fourteenth Amendment. *See, e.g., Edwards v. South*

_Carolina_, 372 U.S. 229, 235, 83 S.Ct. 680, 683, 9 L.Ed.2d 697 (1963); _Schneider v. State_, 308 U.S. 147, 160, 60 S.Ct. 146, 150, 84 L.Ed. 155 (1939).

[2] The district court invalidated the following sections: Cal.Elec.Code §§ 8660, 8661, 8663 — 67, 8669 (Democratic State Central Committee); §§ 9160, 9160.5, 9161, 9161.5, 9162 — 64 (Republican State Central Committee) (West Supp.1984); § 9274 (Republican State Central Committee Chairman); and § 9816 (Peace & Freedom State Central Committee Chairperson) (West 1977).

[3] We review a summary judgment _de novo_. _Lojek v. Thomas_, 716 F.2d 675, 677 (9th Cir.1983). Summary judgment is appropriate if "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(b). We also review _de novo_ the district court's denial of the State's motion to dismiss under Fed.R.Civ.P. 12(b)(1) & (6) for want of subject matter jurisdiction and for failure to state a claim upon which relief may be granted. _See, e.g., Trerice v. Pedersen_, 769 F.2d 1398, 1400 (9th Cir.1985).

[4] Plaintiffs also claim that the State's regulation of ballot-qualified parties violates their rights to equal protection of the laws under the Fourteenth Amendment. It is unnecessary to reach this claim.

[5] _See also_ Weisburd, _Candidate-Making and the Constitution: Constitutional Restraints on and Protections of Party Nominating Methods_, 57 S.Cal.L.Rev. 213, 265 (1984) [hereinafter Weisburd, _Candidate-Making and the Constitution_] ("parties as parties have associational rights").

[6] _See, e.g., O'Brien v. Brown_, 409 U.S. 1, 4, 92 S.Ct. 2718, 2720, 34 L.Ed.2d 1 (1972) (per curiam) ("our national political parties first came into being as voluntary associations of individuals"); _see also_ A. De Tocqueville, 2 _Democracy in America_ 129 (Bradley, ed. 1954); D. Broder, _The Party's Over: The Failure of Politics in America_ 172 (1971).

[7] The most notorious special interest and the chief impetus to reform was the Southern Pacific Railroad Company, nicknamed "the Octopus" because of its allegedly ubiquitous corrupting influence on state government. _California Politics, supra_ at 32. According to one commentator, the Southern Pacific "literally ran the state's politics." _Id._ at 31.

[8] The political reforms that the Progressives wrote into California law during the first two decades of this century parallel laws adopted in other states. Between 1890 and 1920, most states adopted "elaborate legal codes closely regulating the state parties' internal affairs: the codes generally stipulated what committees and conventions the parties must have, the procedures by which their members are selected, who may participate in making the parties' decisions, and what powers, if any, each party organ has over the others." A. Ranney, _Curing the Mischief of Faction: Party Reform in America_ 18 (1975). For a thorough catalogue of the reform measures implemented in the other states, see J. Starr, _The Legal Status of American Political Parties I_, 34 Amer.Pol Sci.Rev. 439 (1940).

[9] _See_ Friedman, _supra_ at 71 (describing the laws governing the parties as "an illogical, disordered pattern").

[10] _See_ Friedman, _supra_ at 69 ("[i]n statutory contemplation California party organs have been left with one major role — to campaign for the general election success of the party nominees selected by the voters at the primary"); _see also_ 23 Ops.Cal.Atty.Gen. 119, 121-23 (1954).

[11] The separate Elections Code provisions prescribing the membership of the Republican, American Independent, and Peace and Freedom central committees differ in some respects from the Democratic Party provisions. _See, e.g.,_ Cal.Elec.Code §§ 9000 — 9510 (Republican Party). For instance, Elections Code § 8774 requires that the chairperson of the Democratic Party state central committee serve a single term to be fixed by party bylaws and that the chair alternate between residents of northern and southern California. Section 9274 duplicates the north-south rotation requirement of section 8774 but specifies a fixed term of two years for the Republican Party chair.

[12] The state-wide officeholders are the Governor, the Lieutenant Governor, the Treasurer, the Controller, the Attorney General, the Secretary of State, and members of the State Board of Equalization. Cal.Elec.Code § 8660(a)(1)-(7).

[13] The miscellaneous state committee members include the following: (1) the national committeemen and national committeewomen of the party; (2) such immediate past party officers as are provided by party by-laws; (3) the President of the California Democratic Council and the President of the Federation of Young Democrats; and (4) former elected, nonjudicial officeholders. Cal.Elec.Code § 8660 _passim_.

San Francisco County Democratic Cent. Comm. v. Eu, 826 F.2d 814 - Court of Appeals, 9th Circuit 1987 - Google Scholar

Case 2:25-cv-00663-DWL - Document 57 - Filed 07/25/25 - Page 34 of 36

7/25/25, 12:04 PM

[14] Partisan politics in California has been further inhibited by other provisions of the Elections Code. California has adopted non-partisan municipal elections, the initiative and referendum, and at one time allowed cross-filing, which permitted candidates with declared allegiance to one party to run simultaneously for the nomination of another party. Each of these Progressive-era innovations has curbed the ability of the party organization to shape the party's political agenda and support sympathetic candidates. *See California Politics* at 4 & 294-95; *cf.* Ranney, *Curing the Mischief of Faction, supra* at 17-19.

[15] The State argues without authority that no case or controversy is raised by a challenge to an unenforced criminal statute unless that statute was recently enacted. This argument is refuted by *Epperson,* where the Court held the statute justiciable despite its unenforced presence on the books for forty years. *See* 393 U.S. at 109, 89 S.Ct. at 273 (Black, J., concurring). Indeed, the aftermath of *Poe* teaches that federal courts should not lightly determine that a statute has fallen into desuetude. The very statute the Court characterized as a dead letter in *Poe* was struck down in *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), after the state prosecuted two persons, including a doctor, for openly counseling married persons on the use of contraceptives. We note that the Supreme Court did not cite *Poe* in either *Babbitt* or *Epperson.*

[16] The State also asserts that criminal penalties are not associated with the violation of the challenged statutes. We agree with Judge Patel, however, that, in light of the plain statutory language of Cal.Elec.Code §§ 29102 & 29430, the apparent disavowal of any intention to enforce these laws is "anomalous." *San Francisco County Democratic Central Committee v. Eu,* No. C-83-5599, at 6 (Order filed May 3, 1984).

[17] On appeal, the state has also raised the question whether the various appellee central committees have actually authorized participation in this litigation. The district court ruled that the state waived the issue of capacity to sue by failing to comply with Rule 9(a), Fed.R.Civ.P., and by failing to raise the question on summary judgment. Order Following Remand, June 1, 1984. The district court also ruled that the state had failed to challenge declarations establishing authorization to bring suit. *Id. See, e.g.,* Declaration of Mary Gingell, member of the Executive Committee of the State Central Committee of the Libertarian Party of California. VII Appendix to Appellants' Emergency Motion for Stay on appeal, at 934. We see no reason to disturb these rulings on appeal.

[18] The State also relies on *Marchioro v. Chaney,* 442 U.S. 191, 99 S.Ct. 2243, 60 L.Ed.2d 816 (1979). In *Marchioro,* the plaintiffs contended that the policymaking body of a political party enjoys an absolute First Amendment exemption from state regulation. The Supreme Court rejected the claim without reaching the First Amendment issue by pointing out that state law did not require the central committee to perform any policymaking functions; those functions had been freely delegated to the central committee by the party itself. *Id.* at 198 & n. 13, 99 S.Ct. at 2247 & n. 13; *see also* Weisburd, *Candidate-Making and the Constitution, supra* at 270 n. 336. In this case, by contrast, state law compels ballot-qualified parties to adopt the statutory restrictions.

[19] This court has a "virtually unflagging obligation" to exercise jurisdiction and may abstain only in exceptional circumstances. *Colorado River Water Conservation District v. United States,* 424 U.S. 800, 817, 96 S.Ct. 1236, 1246, 47 L.Ed.2d 483 (1976). This unflagging "'obligation is particularly weighty when those seeking a hearing in federal court are asserting ... their right to relief under 42 U.S.C. § 1983.'" *Miofsky v. Superior Court of California,* 703 F.2d 332, 338 (9th Cir.1983) (quoting *Tovar v. Billmeyer,* 609 F.2d 1291, 1293 (9th Cir.1980)).

[20] The status of these committees under the Elections Code is less clear than the State would have us believe. The State contends that under *Katz v. Fitzgerald,* 152 Cal. 433, 93 P. 112 (1907), "political parties shall be ... regarded as public bodies whose methods are to be controlled by the state." *Id.* at 435. While a state's characterization of state political parties does not bind this court's determination of plaintiffs' First Amendment status, we note that the State's characterization of the committees as public entities is belied by the refusal of both the California Supreme Court and the California Attorney General to so characterize them. *See Unger II,* 37 Cal.3d at 615, 692 P.2d 238, 209 Cal.Rptr. 474 (committees "are not agencies of the state for all purposes"); 59 Ops.Cal.Atty.Gen. 60, 61 (1976) (committees "are not public agencies"); 23 Ops.Cal.Atty.Gen. 119, 120 (1954) (committees "are no more public agencies than were their counterparts in the pre-primary era"). Moreover, the contention that the committees are state agencies is somewhat incongruous because unlike the sovereign, party central committees are expected to serve party interests, not the interests of the public at large; specifically, they are charged by statute with the responsibility of running the general election campaigns of party nominees. *See, e.g.,* Cal.Elec.Code §§ 8776 & 8940.

[21] The so-called "white primary" cases are not to the contrary. While the State cites *Smith v. Allwright,* 321 U.S. 649, 664-65, 64 S.Ct. 757, 765, 88 L.Ed. 987 (1944), for the proposition that political parties are "public bodies" because they are part of the state's machinery for choosing officials, that case held only that a state party's disenfranchisement of black party members in its primary election amounted to state action for purposes of the Fifteenth Amendment. In later cases, the Court has limited *Smith* to its

San Francisco County Democratic Cent. Comm. v. Eu, 826 F.2d 814 - Court of Appeals, 9th Circuit 1987 - Google Scholar

Case 2:25-cv-00663-DWL - Document 57 - Filed 07/25/25 - Page 35 of 36

7/25/25, 12:04 PM

unusual context: a state-mandated racially discriminatory primary scheme in a one-party state where nomination is tantamount to election. In both _Cousins v. Wigoda_, 419 U.S. 477, 95 S.Ct. 541, 42 L.Ed.2d 595 (1975), and _Democratic Party v. Wisconsin ex rel. La Follette_, 450 U.S. 107, 101 S.Ct. 1010, 67 L.Ed.2d 82 (1981), the Court "appears to reject the argument that an activity is state action solely because it is integral to a state-created election process." Weisburd, _Candidate-Making and the Constitution, supra_ at 239 (1984).

[22] The Supreme Court has developed the following detailed methodology for deciding whether laws that impinge on associational freedoms violate the First Amendment,

[A] court ... must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights.

_Tashjian_, 107 S.Ct. at 548 (quoting _Anderson v. Celebrezze_, 460 U.S. 780, 789, 103 S.Ct. 1564, 1570, 75 L.Ed.2d 597 (1983)); _see also Socialist Workers Party v. Secretary of State_, 765 F.2d 1417, 1418 (9th Cir.1985). We do not, however, construe _Tashjian_ and _Anderson_ as disturbing the settled rule that laws that restrict First Amendment freedoms must "be demonstrably supported by not only a legitimate state interest, but a compelling one." _Brown v. Hartlage_, 456 U.S. 45, 53-54, 102 S.Ct. 1523, 1529, 71 L.Ed.2d 732 (1982). Indeed, in a later passage in _Tashjian_ the Supreme Court makes clear that the inquiry is whether an election code that infringes first amendment rights "is a narrowly tailored regulation which advances the State's compelling interests." _Tashjian_, 107 S.Ct. at 550.

[23] Parties that newly qualify for the ballot by demonstrating adequate electoral strength under Cal.Elec.Code § 6430 are required to conform their operations to the statutory blueprint prescribed for one of the existing ballot-qualified parties. _Id._ § 9955. The Libertarian party qualified in 1980. Declaration of Mary Gingell.

[24] Commentators have noted that mandatory organizational provisions damage a party's freedom to determine its own message. See Weisburd, _Candidate-Making and the Constitution, supra_ at 260-61 ("requiring a particular form of party organization can prevent party adherents from attaining objectives inconsistent with that required form of organization"); _cf._ Note, _Primary Elections and the Collective Right of Freedom of Association_, 94 Yale.L.J. 117, 126 (1984) ("a political party's ability to define its boundaries cannot be separated from the party's ability to determine its political ideology").

[25] The State's use of _Marchioro v. Chaney_, 442 U.S. 191, 99 S.Ct. 2243, 60 L.Ed.2d 816 (1979), to support the challenged governance provisions outstrips the limited rationale of that case. In _Marchioro_, the State of Washington attempted to require that the state central committee be composed in a representative fashion. The authorizing statute empowered the central committee to perform certain limited duties, such as calling party conventions and filling vacancies on the party ticket. In addition, the charter of the Democratic Party delegated to the committee considerable responsibility in raising funds, recruiting candidates, and setting general policy. The plaintiffs, would-be committee members who were elected pursuant to a charter amendment that sought to supplement the membership stipulated by state law, sued to enjoin their exclusion based on the statute on the ground that a party policymaking body enjoyed a First Amendment exemption from state regulation. The Supreme Court dismissed the plaintiffs' claim without resolving the constitutionality of the Washington regulations. The Court noted that the party freely delegated the committee powers upon which the plaintiffs predicated their challenge; and plaintiffs did not oppose the committee's performance of its state-imposed duties. _Id._ at 197-98, 99 S.Ct. at 2247. Thus, the Court held that the source of the plaintiffs' grievance was the party's exercise of its right of self-governance, not state interference with that right. _Id._ at 199, 99 S.Ct. at 2248.

[26] The State does assert that the statutes are necessary to allow political parties to enforce their organizational rules in court but does not explain why judicial enforcement is necessary to advance any state interest. Nor does the State explain why a statute providing for judicial enforcement of parties' rules, which left the content of those rules up to the parties, would not be a less restrictive alternative.

[27] Although the State claims that the Progressives' reform of political parties strengthened party leadership, the Attorney General of California once rendered a formal opinion that the reforms reflect the Progressives' intent "to minimize the role of the established party agencies." 23 Ops.Cal.Atty.Gen. at 122.

[28] Until recently, Florida was the only state other than California that forbade partisan preprimary endorsements. _See_ Weisburd,

*Candidate-Making and the Constitution, supra* at 271 n. 343. The Florida statute was held to violate the First Amendment in *Abrams v. Reno*, 452 F.Supp. 1166, 1170 (S.D.Fla.1978), *aff'd,* 649 F.2d 342 (5th Cir.1981), *cert. denied,* 455 U.S. 1016, 102 S.Ct. 1710, 72 L.Ed.2d 133 (1982).

[29] Thus, in our view, the only conceivable basis for justifying the ban on preprimary endorsements would be that the central committees possess no First Amendment rights because they are public entities. We have already rejected the State's argument to that effect. *See* Part III, *supra.*

[30] Legislative findings preceding § 11702 report "considerable public doubt and confusion" arising from the promulgation of deceptive endorsements. Cal.Elec.Code § 11701(3). The California courts that have enforced § 11702 have stated that minimizing voter confusion was the principal motive behind the enactment. *See People v. Crutcher*, 262 Cal.App.2d 750, 752-53, 68 Cal.Rptr. 904 (1968); *California Democratic Council v. Arnebergh*, 233 Cal.App.2d 425, 430, 43 Cal.Rptr. 531 (1965), *appeal dismissed*, 382 U.S. 202, 86 S.Ct. 395, 15 L.Ed.2d 269 (1965).

Save trees - read court opinions online on Google Scholar.