**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

Phillip Potter,

          Plaintiff,

v.

Robert Meza, et al.,

          Defendants.

No. CV-25-00663-PHX-DWL

**ORDER**

In February 2023, an Arizona trial court issued an order declaring Phillip Potter ("Plaintiff") a vexatious litigant. (Doc. 51 at 249-52.) In February 2024, the Arizona Court of Appeals unanimously affirmed. (*Id.* at 264-80.) In June 2024, the Arizona Supreme Court denied review. (*Id.* at 285.)

In February 2025, Plaintiff, who is proceeding pro se, initiated this action. (Doc. 1.) In Count One of his operative pleading, the First Amended Complaint ("FAC"), Plaintiff raises a "First Amendment Facial Challenge to A.R.S. § 12-3201," Arizona's vexatious litigant statute, and seeks declaratory and injunctive relief. (Doc. 14 ¶¶ 113-207.) The two defendants named in Count One are Arizona Attorney General Kris Mayes ("AG Mayes"), in her official capacity, and Joseph Welty, the then-Presiding Judge of the Maricopa County Superior Court, in his "official administrative capacity." (*Id.* ¶¶ 103-04.) Judge Welty was later terminated as a defendant and substituted by now-Presiding Judge Pamela Gates. (Doc. 77.)[1]

---

[1]     Given this substitution, certain documents relevant to the pending motions were filed by Judge Welty while others were filed by Judge Gates. The Court uses the term

In Count Two, Plaintiff raises a "First Amendment Facial Challenge to A.R.S. § 13-2921," Arizona's harassment statute, and seeks declaratory and injunctive relief. (Doc. 14 ¶¶ 208-14). The sole defendant named in Count Two is AG Mayes. (*Id.*)

In Count Three, Plaintiff asserts a claim under 42 U.S.C. § 1983 against former Arizona State Senator and State House Member Robert Meza ("Meza") and against former Arizona Board of Regents member and gubernatorial candidate Karrin Taylor Robson ("Robson"), both of whom are sued in their personal capacities. (*Id.* ¶¶ 215-37.) In Count Four, Plaintiff asserts a state-law claim for abuse of process against Meza and Robson, as well as against Alane Ortega ("Ortega"), the attorney of Plaintiff's ex-wife. (*Id.* ¶¶ 238-59.) And in Count Five, Plaintiff asserts a state-law claim for aiding and abetting abuse of process against Meza, Robson, and Ortega. (*Id.* ¶¶ 260-269.)

Now pending before the Court are Defendants' motions to dismiss (Docs. 38, 51, 52, 67), Plaintiff's motion to strike one of the motions to dismiss (Doc. 64), Plaintiff's motions for judicial notice (Docs. 57, 85, 90),[2] and Plaintiff's motions for jurisdictional discovery (Docs. 58, 84).[3] The motions are now fully briefed or otherwise ripe for resolution, and Plaintiff's various requests for oral argument are denied because argument would not assist the decisional process.

## BACKGROUND

I.   <u>Relevant Factual Allegations</u>

The following relevant factual allegations are taken from the FAC. (Doc. 14.) In a nutshell, the FAC describes a series of lawsuits by Plaintiff that appear to relate, at least in some way, to Plaintiff's contentious divorce from his now ex-wife.

Much of the FAC details an alleged scheme ("the Scheme") "devised" by Meza in

---

"Presiding Judge" to refer to these Judges collectively. Because Plaintiff's allegations against the Presiding Judge largely center around an order issued by Judge Welty, the Court uses masculine pronouns for consistency purposes when referring to the Presiding Judge.

[2]   The parties' filings also included various additional requests for judicial notice. (Docs. 49 at 16; Doc. 51 at 3-7; Doc. 52 at 2; Doc. 67 at 9 n.1.)

[3]   Plaintiff also filed a "notice" (Doc. 93) that is not a motion, does not seek any form of relief from the Court, and simply rehashes arguments Plaintiff made in prior briefing.

which Plaintiff alleges that Meza "corruptly secured public funds for six Medicaid-approved nonprofit behavioral health services organizations" and was "covertly paid" by the nonprofits' "complicit executives." (*Id.* ¶ 1.) The FAC alleges that "Meza solicited and secured public funds from state officials with authority to allocate these funds" to the nonprofits and, in return, "Meza received a monthly payment" from those nonprofits "for sham consulting services." (*Id.* ¶¶ 2-4.) The FAC further alleges that "[t]he Scheme also maintained a secondary revenue source derived from corruptly obtained private funds" in which the nonprofits working with Meza "held fundraising events" that Meza used to "solicit and secure corporate sponsorships from unwary registered lobbyists and corporate executives seeking his political favor." (*Id.* ¶ 13.)

The Scheme purportedly "first came to limited public awareness on August 23, 2021" when one nonprofit's CEO met with the Arizona House of Representatives "and disclosed that he had been covertly paying Meza since 2015." (*Id.* ¶ 14.) The FAC alleges that this disclosure occurred because the nonprofit founder's daughter-in-law, Ortega (who is also the attorney of Plaintiff's ex-wife), made the CEO "aware within the prior two weeks that Plaintiff was on the cusp of filing a civil suit that would expose the Scheme." (*Id.* ¶ 15.) The FAC alleges various other purportedly fraudulent and/or improper actions taken by Meza and these nonprofits in furtherance of the Scheme, and to cover up the Scheme, as well as investigations into the Scheme. (*Id.* ¶¶ 22-26.)

Plaintiff alleges that he learned of the Scheme from his now-ex-wife "TD," who was also "involved in the Scheme." (*Id.* ¶¶ 29-30, 43.) Ultimately, the FAC alleges that "Plaintiff attempted to end his relationship with TD" but then "agreed to continue" with the relationship "when TD promised she would," among other things, "remove herself from the Scheme" and "cease contact with Meza." (*Id.* ¶ 41.) During the marriage, "[h]owever, TD had secretly continued to . . . associate with Scheme participants, and to further the Scheme." (*Id.* ¶ 46.) The FAC alleges that Plaintiff, "increasingly concerned with TD's questionable behavior and deceptions," "sought to end the brief marriage amicably." (*Id.* ¶ 50.) However, the relationship quickly soured, and Plaintiff alleges that TD and/or her

parents engaged in various improper actions, including "threatening to lodge false domestic violence allegations" against Plaintiff and "ma[king] false allegations that Plaintiff had planted video devices and was recording for some malicious purpose." (*Id.* ¶¶ 51, 53.) While a verbal settlement agreement in the couple's dissolution case (FC2020-090224) was pending (*id.* ¶ 55), "Scottsdale Police came to Plaintiff's residence, notified him that TD had secured an *ex parte* A.R.S. § 13-3602 order of protection, took Plaintiff's infant son, and explained that Plaintiff would have to challenge the order in court or else be labeled an A.R.S. § 13-3601 Domestic Violence perpetrator" (*id.* ¶ 56). Plaintiff alleges that "[e]ach allegation of assault and stalking described in the A.R.S. § 13-3602 petition (case no. FC2020-050752) was entirely fabricated." (*Id.* ¶ 57.) The FAC proceeds to outline a series of events related to this contentious divorce and the related domestic violence case.

Separately, the FAC alleges that Plaintiff, with TD, "developed and launched a startup concept ('FountainSyde') to provide rapid and scalable Autism testing and diagnostic services." (*Id.* ¶¶ 44-45.) After FountainSyde launched, "TD asked Plaintiff to meet with a capital investor ('CE')" regarding FountainSyde. (*Id.* ¶ 47.) "Plaintiff met with CE on December 2, 2019 and pitched FountainSyde as an angel investment opportunity, but TD conveyed later that same month that CE decided to pass on the investment." (*Id.* ¶ 49.) As it turns out, "CE was not a capital investor" but was "the former CEO" of "a physical therapist health insurance network" who had "paid Meza for sham consulting services in 2013 and 2014 as part of the Scheme." (*Id.* ¶ 60(c).) Ultimately, "CE publicly announced that she had launched Axis for Autism, LLC, a behavioral health startup to provide rapid and scalable Autism testing and diagnostic services—a functional copy of FountainSyde." (*Id.*) "After learning of Axis for Autism, LLC, and of CE's true relationship with Meza and TD, Plaintiff filed case no. CV2021-013210." (*Id.* at 21 n.14.)

After an Arizona court quashed the order of protection involving Plaintiff and TD, TD hired Ortega as her lawyer. (*Id.* ¶ 58(m)-(n).) Just before that order of protection was quashed, Plaintiff sued TD in Maricopa County Superior Court in CV2021-005501

"alleging Malicious Prosecution (i.e., Wrongful Institution of Civil Proceedings and associated counts) of the order of protection." (*Id.* ¶ 59.) TD is also represented by Ortega in that malicious prosecution suit. (*Id.*) The FAC alleges that Meza disclosed that "he 'helped' TD to secure Ortega as counsel and 'helped' Ortega with litigation thereafter." (*Id.* ¶ 60(b).)

Plaintiff has filed several state-court lawsuits seeking documents relevant to the Scheme. In 2022, Plaintiff filed CV2022-014146 "seeking to compel records production" of records allegedly related to Meza's participation in the Scheme. (*Id.* ¶¶ 61-62.) Plaintiff also brought another public records case, CV2022-008626, seeking documents from Meza and Robson related to the Scheme. (*Id.* ¶ 67.)

Ultimately, the FAC alleges that "[s]eeking to shut down further records production out of concern that Plaintiff would obtain other incriminating documents, the [Arizona House of Representatives], along with Meza and Robson jointly moved for [the CV2022-008626] court to find Plaintiff vexatious pursuant to A.R.S. § 12-3201(A)," citing Plaintiff's litigation activities in FC2020-090224 (divorce dissolution), CV2021-017889 (a personal injury case filed by Plaintiff), CV2021-005501 (malicious prosecution of order of protection), CV2021-013210 (suit regarding Axis for Autism, LLC, which allegedly produced a "functional copy" of Plaintiff's startup FountainSyde), and CV2022-014146 (Plaintiff's initial public records case). (*Id.* ¶ 76 & 28 n.20.)

"[O]n February 27, 2023, the CV2022-008626 court issued an order . . . finding Plaintiff statutorily vexatious per A.R.S. § 12-3201, enjoining him from filing court papers 'in this case or any other pending civil action without prior leave of the judge assigned to that case,' and subjecting him to an A.R.S. § 12-3201(B) blanket injunction." (*Id.* ¶ 79.) The FAC alleges that "Meza, Robson, and the House knew when they filed the A.R.S. § 12-3201(A) motion that A.R.S. § 12-3201 was patently unconstitutional in every application but used the statute for the unlawful purposes of intimidating Plaintiff and retaliating against him for exercising his rights under the Petition Clause and Speech Clause" and that "Meza and Robson used A.R.S. § 12-3201 for the additional unlawful

purpose of concealing criminal conduct and obstructing investigations into the Scheme." (*Id.* ¶¶ 80-81.)

As for Ortega, the FAC alleges that Ortega, Meza, and Meza's counsel—"with full knowledge of the Scheme"—conspired together, including "the concerted use of, and the overt acts of filing, A.R.S. § 12-3201(A) motions across suits." (*Id.* ¶ 83.) Ortega had previously filed two unsuccessful A.R.S. § 12-3201 motions against Plaintiff in CV2021-013210 and had referred to those motions in CV2021-005501—all before Meza and Robson ultimately obtained the order in CV2022-008626 declaring Plaintiff vexatious. (*Id.* ¶ 84.) The FAC proceeds to outline various purported instances of improper litigation tactics by Ortega, all of which Plaintiff alleges "were . . . taken to obstruct investigations and conceal information implicating TD and Meza in the Scheme." (*Id.* ¶¶ 85-91.)

The FAC further alleges that "Ortega also instructed TD to present the A.R.S. § 12-3201 Order from CV2022-008626 to the Arizona Secretary of State on or about April 10, 2024 seeking to have the State identify Plaintiff as an A.R.S. § 13-3601 Domestic Violence perpetrator per A.R.S. § 41-161, *et seq.*" which "governs the Arizona Address Confidentiality Program where A.R.S. § 41-161(5) verified victims of A.R.S. § 13-3601 criminal domestic violence can keep an address confidential upon relocation." (*Id.* ¶ 92 & 32 n.23.) "The Secretary of State Office's personnel did just that." (*Id.* ¶ 92.) Ortega allegedly "instructed TD to take those actions for the improper purposes of bolstering ongoing efforts to delay, block, and/or limit financial documents production which might prove financial crimes." (*Id.* ¶ 93.) Ortega also "entered A.R.S. § 41-163(D) 'address confidentiality program authorization cards' as exhibits attached to motions in the ongoing FC2020-090224 discovery dispute." (*Id.* ¶ 94.) And "TD confirmed during [a deposition] that she pursued the A.R.S. § 41-161, *et seq.* action based solely on a mention of 'harassment' in the A.R.S. § 12-3201 Order." (*Id.* ¶ 95.) The FAC alleges that Ortega "had no factual or legal basis to instruct TD to accuse Plaintiff of being an A.R.S. § 13-3601 Domestic Violence perpetrator" and that the "Arizona Secretary of State now holds official records identifying Plaintiff as an A.R.S. § 13-3601 Domestic Violence

perpetrator, although Plaintiff has never committed an act of domestic violence." (*Id.* ¶¶ 96-97.)

"Despite the A.R.S. § 12-3201 Order, including the A.R.S. § 12-3201(B) blanket provision, Plaintiff plans to file court papers absent leave of the court in ongoing FC2020-090224 and CV2021-005501 litigation, and in this suit. For doing so, he is being threatened with, and reasonably fears, administrative, civil, and/or criminal enforcement of A.R.S. § 12-3201, including where filing court papers in well-founded lawsuits is being unlawfully postured as violations of A.R.S. § 13-2810(A)(2) Interfering With Judicial Proceedings and/or A.R.S. § 13-2921 Harassment, which enforcement authorities in turn can then cite as predicates to prosecute A.R.S. §§ 13-3601 and 13-3602." (*Id.* ¶ 98.)

II.    <u>Procedural History</u>

On February 27, 2025, Plaintiff initiated this action. (Doc. 1.)

On May 12, 2025, Plaintiff filed the FAC. (Doc. 14.)

On May 14, 2025, Plaintiff filed a motion for a temporary restraining order and preliminary injunction ("the first TRO motion"), which sought to enjoin AG Mayes from enforcing the vexatious litigant statute against him. (Doc. 23.)

On June 20, 2025, after full briefing, the Court denied the first TRO motion, concluding that it was "unclear whether Plaintiff has standing to pursue the claim giving rise to his request for injunctive relief" and, at any rate, that Plaintiff "has not shown a likelihood of success on the merits of his claim or even serious questions going to the merits of that claim." (Doc. 47 at 18.)

On June 3, 2025, AG Mayes filed a motion to dismiss. (Doc. 38.) That motion is now fully briefed. (Docs. 49, 53.)

On July 11, 2025, Robson and Meza filed a joint motion to dismiss. (Doc. 51.) That motion is now fully briefed. (Docs. 55, 59.)

Also on July 11, 2025, Ortega filed a motion to dismiss. (Doc. 52.) That motion is now fully briefed. (Docs. 54, 56.)

On July 25, 2025, Plaintiff filed a motion to take judicial notice relevant to AG

1    Mayes's motion to dismiss.  (Doc. 57.)  That motion is now fully briefed.  (Doc. 60.)

2        On July 28, 2025, Plaintiff filed a motion to take limited jurisdictional discovery.

3    (Doc. 58.)  That motion is now fully briefed.  (Docs. 66, 69, 72.)

4        On August 8, 2025, Plaintiff filed a motion to strike Robson's and Meza's motion

5    papers.  (Doc. 64.)  That motion is now fully briefed.  (Docs. 68, 71.)

6        On August 11, 2025, the Presiding Judge filed a motion to dismiss.  (Doc. 67.)  That

7    motion is now fully briefed.  (Docs. 79, 81.)

8        On October 9, 2025, Plaintiff filed another motion to take limited jurisdictional

9    discovery.  (Doc. 84.)  That motion is now fully briefed.  (Docs. 86, 88.)

10        On October 16, 2025, Plaintiff filed a second motion to take judicial notice.  (Doc.

11    85.)  That motion is now fully briefed.  (Docs. 87, 89.)

12        On November 9, 2025, Plaintiff filed a motion to take judicial notice regarding the

13    Presiding Judge's motion to dismiss.  (Doc. 90.)  That motion is now fully briefed.  (Docs.

14    91, 92.)

15        On December 12, 2025, Plaintiff filed a second motion for a temporary restraining

16    order and preliminary injunction ("the second TRO motion"), which sought "to enjoin

17    [AG] Mayes and [the Presiding Judge] from civilly, criminally or administratively

18    enforcing A.R.S. § 12-3201 until the [present] case is complete."  (Doc. 94 at 3-4.)

19        On December 16, 2025, the Court denied the second TRO motion.  (Doc. 96.)

20        On December 19, 2025, Plaintiff filed a notice of interlocutory appeal from the

21    denial of the second TRO motion.  (Doc. 97.)

22                                    **DISCUSSION**

23    I.    <u>Judicial Notice</u>

24        A.    **Legal Standard**

25        Federal Rule of Evidence 201(a) "governs judicial notice of an adjudicative fact

26    only, not a legislative fact."  Under Rule 201(b), a court "may judicially notice a fact that

27    is not subject to reasonable dispute" if it "is generally known within the trial court's

28    territorial jurisdiction" or "can be accurately and readily determined from sources whose

accuracy cannot reasonably be questioned."  Under Rule 201(c), a court "may take judicial notice on its own," and it "must take judicial notice if a party requests it and the court is supplied with the necessary information."  A court may, however, decline to take judicial notice of facts that are irrelevant.  *See, e.g.*, *Pearson v. Arizona*, 2020 WL 5544373, *2 (D. Ariz. 2020) ("Although relevance is not explicitly required to satisfy Rule 201, the Ninth Circuit has declined to take judicial notice of facts that are irrelevant.") (citations omitted); *Hargis v. Access Cap. Funding, LLC*, 674 F.3d 783, 793 (8th Cir. 2012) ("Courts are not required to take judicial notice of irrelevant materials.").

"When ruling on a Rule 12(b)(6) motion to dismiss, if a district court considers evidence outside the pleadings, it must normally convert the 12(b)(6) motion into a Rule 56 motion for summary judgment, and it must give the nonmoving party an opportunity to respond."  *United States v. Ritchie*, 342 F. 3d 903, 907 (9th Cir. 2003).  "A court may, however, consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or *matters of judicial notice*—without converting the motion to dismiss into a motion for summary judgment."  *Id.* at 908 (emphasis added).

"[M]aterials of which a district court may take judicial notice are not considered extrinsic evidence for purposes of Rules 12(b)(1) and 12(b)(6) . . . ."  *DeFiore v. SOC LLC*, 85 F.4th 546, 553 n.2 (9th Cir. 2023).  Even where a district court resolves a Rule 12(b)(1) facial attack and accepts the plaintiff's allegations as true, a court may still take judicial notice of matters of public record in deciding the motion.  *Hyatt v. Yee*, 871 F.3d 1067, 1071 n.15 (9th Cir. 2017).

### B.    Requests Pertaining To AG Mayes

In his response to AG Mayes's motion to dismiss, Plaintiff asks the Court to take judicial notice that "(1) the Arizona Legislature revised [A.R.S. § 13-2921] during the 2022 legislative session, eliminated intent as an element while maintaining the A.R.S. § 13-2921(E) 'harassment' definition which has no 'saving clause' (FAC at 202-214), and on the day Democrat Senator Martin Quezada voted against the 2022 revision, he explained

on the chamber floor that § 13-2921 'violates the first amendment'; and (2) Republican Senator Alexander Kolodin sponsored significant revisions in the 2025 session because the statute 'violates the First Amendment.'"  (Doc. 49 at 16, footnotes omitted).  In support, Plaintiff directs the Court to two webpages: (1) Ariz. State Legislature, *Bill History for SB1633*, https://apps.azleg.gov/BillStatus/BillOverview/77621 (last visited Dec 18, 2025) [https://perma.cc/L8EE-AEYW]; (2) Ariz. State Legislature, *Bill History for HB2043*, https://apps.azleg.gov/BillStatus/BillOverview/81701?Sessionid=129 (last visited Dec. 18, 2025) [https://perma.cc/7TJT-SM93].  (*Id.* at 16 n. 8 & 9.)  Although AG Mayes does not expressly object to Plaintiff's request to take judicial notice of these facts, she does argue in reply that "Plaintiff's reliance on floor statements by two Arizona legislators to show that the statute was 'controversial'" is insufficient to show that the harassment statute is vague.  (Doc. 53 at 11, citation omitted.)

The Court could take judicial notice of the fact that A.R.S. § 13-2921 previously contained an "intent" requirement that no longer appears in the current version of the statute.  This fact "can be accurately and readily determined" by a review of prior versions of § 13-2921.  Fed. R. Evid. 201(b)(2).  Nonetheless, this request is denied as unnecessary. *Price v. Clifton*, 2024 WL 4720888, *5 (C.D. Cal. 2024), *report and recommendation adopted*, 2024 WL 4828700 (C.D. Cal. 2024) ("As to the other two exhibits, the Court need not take judicial notice of state statutes or state bills, because these are matters that are 'legislative facts,' rather than 'adjudicative facts,' and are outside the scope of Rule 201. It is unnecessary to ask a court to take judicial notice of these types of matters, which can be reviewed by the Court conducting its own research into the relevant issues.").

The Court also declines to take judicial notice of the alleged statements by Senators Quezada and Kolodin regarding the purported unconstitutionality of A.R.S. § 13-2921. Plaintiff, as the party seeking judicial notice, bears the burden of showing that the fact sought to be noticed "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned," and the Court need only take judicial notice of facts for which "the [C]ourt is supplied with the necessary information."  Fed. R. Evid.

201(b)(2), (c)(2).  Although Plaintiff cites Arizona legislature ".gov" webpages, the Court cannot locate where on these webpages Senator Quezada stated that A.R.S. § 13-2921 "violates the First Amendment," nor can it locate where on these webpages Senator Kolodin stated the statute "violates the First Amendment."  (Doc. 49 at 16.)  The Court is unwilling to take judicial notice of a fact for which it was not supplied with the necessary information.[4]  In any event, the dismissal analysis is unaffected by whether the Senators made these statements.

Plaintiff also seeks judicial notice of five exhibits that are purportedly relevant to AG Mayes's motion to dismiss.  (Doc. 57.)  AG Mayes declined to file a response.  (Doc. 60.)

Plaintiff first seeks judicial notice of three Arizona statutes: A.R.S. § 12-861; A.R.S. § 12-862; and A.R.S. § 12-863.  (Doc. 57 at 3.)  These requests are denied for two independent reasons.

First, Plaintiff seeks judicial notice under Rule 201.  (*Id.* at 1 ["Pursuant to Fed. R. Evid. ('Rule') 201, Plaintiff asks the Court to take judicial notice of the undisputed facts and court opinions described below and attached as Exhibits 1-5."].)  But Rule 201 does not provide a basis for taking judicial notice of these statutes, which are legislative rather than adjudicative facts.  *See, e.g.*, *Lemieux v. Cwalt, Inc.*, 2017 WL 365481, *1 (D. Mont. 2017) ("Plaintiffs ask the Court to take judicial notice of several federal and Montana statutes, regulations, and published court decisions.  But because these statutes, cases, and regulations are 'legislative facts' rather than 'adjudicative facts,' they are not appropriate for judicial notice.") (citation omitted).  *See also Getty Petroleum Mktg., Inc. v. Cap. Terminal Co.*, 391 F.3d 312, 322 (1st Cir. 2004) (Lipez, J., concurring) ("Although judicial notice of fact and judicial notice of law share the phrase 'judicial notice,' they draw on different rules of practice.  Rule 201 'governs only judicial notice of adjudicative facts.'  Judicial notice of law is outside the scope of Rule 201, and derives from practical

---

[4]    To the extent these statements are buried somewhere in embedded hyperlinks derivative of the webpages supplied by Plaintiff, the Court declines to embark on a quest to find them.

considerations and case law that do not rely on Rule 201 or principles of evidence.") (citation omitted).

Second, the statutes are not relevant, and Plaintiff effectively seeks judicial notice of his own misinterpretation of them.  Plaintiff seeks judicial notice of these statutes because, in his view, they "recognize that the violation of any civil writ, process, order or judgment can constitute a criminal offense."  (Doc. 57 at 4, cleaned up.)  In his view, that reading of the statutes advances his position that he has standing to sue AG Mayes "because it demonstrates that there exists another specific statutory avenue other than that which Plaintiff described in the FAC through which AG Mayes plays a 'role' in the § 12-3201(B) 'enforcement scheme' and may criminally prosecute Plaintiff for § 12-3201(B) violations as a matter of statute."  (*Id.*, cleaned up.)  But § 12-861 simply provides that "[a] person who wilfully disobeys a lawful writ, process, order or judgment of a superior court by doing an action or thing therein or thereby forbidden, *if the act or thing done also constitutes a criminal offense*, shall be proceeded against for contempt as provided in §§ 12-862 and 12-863."  A.R.S. § 12-861 (emphasis added).  In other words, the act taken in violation of the court order must also independently constitute a criminal offense.  And a violation of § 12-3201 itself does not constitute a criminal offense.

Plaintiff next seeks judicial notice of A.R.S. § 41-101.  (Doc. 57 at 4.)  The relevance of this statute is admittedly a closer call; however, the statute itself is still a legislative fact. Because Plaintiff's request was brought under Rule 201, it lacks merit.[5]

Plaintiff also seeks judicial notice of *S.F. Cnty. Democratic Cent. Comm. v. Eu*, 826 F.2d 814 (9th Cir. 1987).  (Doc. 57 at 5-6.)  But Plaintiff does not seek judicial notice of this case in the traditional sense of Rule 201.  Rather, Plaintiff asks the Court to take "judicial notice" of this case as a means of arguing—as he could have done in his response brief (Doc. 49)—that the case supports his position that his claims against AG Mayes should not be dismissed.  Plaintiff cannot use a motion for judicial notice in this fashion.

---

[5]     Moreover, even if § 41-101 provides that AG Mayes can assist a county attorney's prosecutorial duties, such a prosecution would still take place under statutes other than § 12-3201.

*Fox v. Velocity Solar Power, Inc.*, 2024 WL 457195, *4 (E.D. Cal. 2024) (denying "plaintiff's request for judicial notice of California statutes, case law, and portions of the contracts in the exhibits . . . as irrelevant and otherwise an improper attempt to submit a disfavored surreply"); *United States v. Molen*, 2011 WL 1810449, *6-7 (E.D. Cal. 2011) ("[T]he Molens have filed at least six motions for 'judicial notice' that, in substance, actually request dismissal of the complaint for failure to state a claim.  The motions reference statutes and regulations that the Molens believe support dismissal of the complaint, and the Molens appear simply to seek to have the undersigned review—or, in their words, 'notice'—the statutes and regulations.  When a motion actually seeks to attack the pleadings and seeks dismissal of the action, labeling that motion as a 'request for judicial notice' is misleading.  Future filings labeled as requests for judicial notice that actually seek other relief or dismissal of the case may be summarily denied.") (cleaned up). At any rate, Plaintiff misunderstands *S.F. Cnty. Democratic Cent. Comm.*, which does not "establish[]," as Plaintiff contends, "that when a state official raises a jurisdictional defense calling to a challenged statute's history of enforcement or prosecution, the state official must produce a 'record of nonenforcement' which shows the challenged statute has been 'commonly and notoriously violated' and 'has fallen into desuetude.'" (Doc. 57 at 6.)

Finally, in his second request for judicial notice relevant to AG Mayes's motion to dismiss, Plaintiff seeks judicial notice of (1) California's vexatious litigant statute; and (2) the Arizona vexatious litigant list and several records from that list.  (Doc. 85.)  In response, AG Mayes states that to the extent Plaintiff is "asking the Court to take judicial notice of the existence and contents of two California statutes and a number of orders designating litigants vexatious from Arizona," she "finds the request unobjectionable."  (Doc. 87 at 1.) However, "[t]o the extent Plaintiff asks the Court to judicially notice any factual contents of the documents or disputed legal conclusions, AG Mayes opposes that request."  (*Id.*) AG Mayes also asks the Court to disregard the sections of Plaintiff's motion that "appear[] to be an effort to offer additional argument in opposition to AG Mayes's motion to dismiss the case, in effect an unauthorized sur-reply."  (*Id.* at 2.)  In reply, Plaintiff confusingly

1    argues that "Presiding Judge Gates entered no objection to the motion."  (Doc. 89 at 2.)

2    Plaintiff also argues, for the first time, that the records at issue should be deemed

3    incorporated by reference into the FAC.  (*Id.* at 3, 5-6.)[6]

4        As an initial matter, AG Mayes is correct that large sections of Plaintiff's second

5    motion to take judicial notice—much like his first motion to take judicial notice—operate,

6    in effect, as an unauthorized and improper surreply.  Plaintiff uses the first 10 pages of his

7    motion to argue that the Court should adopt a conjunctive, rather than disjunctive, standard

8    when evaluating his claim that A.R.S. § 12-3201 is unconstitutional.  (Doc. 85 at 1-10.)

9    Plaintiff does so even though that argument is one the Court rejected four months earlier

10   in its order denying Plaintiff's first TRO motion.  (Doc. 47 at 16.)  Thus, the Court will

11   disregard the portions of Plaintiff's second motion for judicial notice that operate, in effect,

12   as an unauthorized surreply.

13       Turning to Plaintiff's judicial notice requests, Plaintiff first seeks judicial notice of

14   §§ 391-391.8 of the California Code of Civil Procedure.  (Doc. 85 at 10-12.)  But as

15   explained above, Rule 201 does not contemplate judicial notice of such legislative facts.

16   Furthermore, Plaintiff once again misrepresents what the statute provides.  Section

17   391.3(b) does not say, as Plaintiff argues, that "California courts may find a pro se litigant

18   vexatious only '[i]f, after hearing evidence on the motion, the court determines that the

19   litigation has no merit *and* has been filed for the purposes of harassment or delay.'"  (Doc.

20   85 at 11-12.)  Rather, it provides: "If, after hearing evidence on the motion, the court

21   determines that the litigation has no merit and has been filed for the purposes of harassment

22   or delay, the court shall order the litigation dismissed.  *This subdivision shall only apply to*

23   *litigation filed in a court of this state by a vexatious litigant subject to a prefiling order*

24   *pursuant to Section 391.7 . . . .*"  Cal. Code Civ. P. § 391.3(b) (emphasis added).  In other

25   words, the cited provision addresses the standard for dismissing a case filed by a pro se

26   litigant who has already been deemed vexatious and is already subject to a prefiling

---

[6]        These vexatious litigant records are not cited or referenced anywhere in the FAC
(Doc. 14), so the Court fails to see how they could possibly be incorporated by reference
into the FAC.

requirement, not the standard for deeming a pro se litigant vexatious in the first place. In fact, § 391 defines a vexatious litigant as one who, *inter alia*, "repeatedly files unmeritorious motions, pleadings, or other papers, conducts unnecessary discovery, *or* engages in other tactics that are frivolous *or* solely intended to cause unnecessary delay." Cal. Code Civ. P. § 391(b)(3) (emphasis added). That is a disjunctive standard. Plaintiff's misquotation and mischaracterization of these California statutes does not warrant the Court taking judicial notice of them.

Plaintiff also seeks judicial notice of over 250 pages of Arizona records, which are largely composed of state-court orders finding other plaintiffs to be vexatious litigants and administrative orders from the presiding judge designating other plaintiffs as vexatious litigants. On the one hand, these records may have some relevance to the extent Plaintiff seeks to use them to show that a "substantial number of applications" of A.R.S. § 12-3201 are unconstitutional. On the other hand, "judicial notice under Federal Rule of Evidence 201 is for cold, hard, undisputable facts—not law." *CTC Glob. Corp. v. Huang*, 2018 WL 4849715, *3 (C.D. Cal 2018). And Plaintiff seeks judicial notice of these records to show that "85% of vexatious litigant injunctions issued per A.R.S. § 12-3201 violate the Petition Clause, meaning 'a substantial number of applications . . . are unconstitutional' in relation to any legitimate sweep." (Doc. 85 at 17.) Given the lack of objection from AG Mayes, the Court will take judicial notice of the existence and contents of the orders designating other plaintiffs vexatious; however, the Court will not take judicial notice of any disputed facts therein. Nor will the Court take judicial notice of any legal claims. The Court also declines to take judicial notice of whether these other vexatious litigant orders are constitutional. That is not a proper subject of judicial notice.

C.    **Certain Defendants' Requests For Judicial Notice**

In their motion to dismiss, Robson and Meza seek judicial notice of several facts related to Plaintiff's prior litigation history against Robson and Meza. (Doc. 51 at 3-7.) In response, Plaintiff does not appear to respond specifically to the judicial notice request. (Doc. 55.)    Plaintiff does, however, cite one of the objects of the request—the

1    Administrative Order from the Presiding Judge designating Plaintiff a vexatious litigant—

2    without disputing it.  (*Id.* at 4 n.1.)

3        The Court will take judicial notice of the following undisputed facts:[7]

4        1.    On August 23, 2021, Plaintiff filed a 136-page, 772 paragraph[8] complaint

5    against multiple defendants, including Meza and Ortega, in the Superior Court of Arizona

6    in *Potter v. Doctor, et al.*, No. CV2021-013210 (Ariz. Super. Ct. Aug. 23, 2021).  (Doc.

7    51 at 29-164.)  The complaint contained 13 counts.  (*Id.*)  Among things, Plaintiff alleged

8    that "MEZA is an elected official who has engaged in ongoing fraud and public corruption

9    schemes since at least 2012."  (*Id.* at 33 ¶ 13.)  The complaint also included allegations that

10   Meza "exploit[ed] his public office for private gain" through, *inter alia*, "fundraising

11   events" and "sham 'consulting.'"  (*Id.* at 57-58 ¶ 139.)

12       2.    On January 19, 2022, the Arizona Superior Court in *Potter v. Doctor, et al.*,

13   No. CV2021-013210, "granted Defendant Robert Meza's Motion to Dismiss in its

14   entirety."  (*Id.* at 174 [cleaned up].)

15       3.    On May 16, 2022, the Arizona Superior Court in *Potter v. Doctor, et al.*, No.

16   CV2021-013210 granted a motion for entry of Rule 54(b) judgment "with respect to those

17   Defendants who have been entirely dismissed from these proceedings."  (*Id.* at 183.)  The

18   court "order[ed] Plaintiff to pay attorney's fees in the amount of $10,000.00 and taxable

19   costs in the amount of $262.92" to Meza.  (*Id.* at 185.)  The court further stated in its order:

20   "As the Court acknowledged in its ruling filed on January 19, 2022, Plaintiff has litigated

21   this matter in bad faith.  It is apparent from both the Complaint as well as the First Amended

22   Complaint that Plaintiff—clearly dissatisfied with the circumstances in the family court

---

[7]    Several of Robson's and Meza's requests for judicial notice contain proposed spins on the facts.  For example, Robson and Meza ask the Court to take judicial notice that the Arizona Superior Court "*reluctantly* denied" initial motions to designate Plaintiff as vexatious.  (Doc. 51 at 4, emphasis added.)  As another example, Robson and Meza ask the Court to take judicial notice that "Plaintiff filed a variety of groundless motions" in public records litigation.  (*Id.* at 5.)  Certainly, Plaintiff would dispute these characterizations of the underlying facts.  Accordingly, the Court takes judicial notice only of the facts as stated in this order, mindful that it cannot take judicial notice of Robson's and Meza's characterization of those facts.

[8]    Robson and Meza state that the complaint was 776 paragraphs.  (Doc. 51 at 3.)

1    proceedings—chose to initiate this litigation in an effort to harass numerous entities and

2    persons only vaguely associated with his ex-wife and her family."  (*Id.* at 184.)[9]

3         4.    On July 7, 2022, the Arizona Superior Court in *Potter v. Doctor, et al.*, No.

4    CV2021-013210 "considered Defendant [TD's] Renewed Motion to Designate the

5    Plaintiff as a Vexatious Litigant" and "f[ound] that it is still improper to designate him as

6    a vexatious litigant."  (*Id.* at 187-88.)  In that order, the court stated that it "is aware that

7    any remaining Defendants might be required to incur unnecessary attorney's fees in the

8    event Plaintiff continues to file additional groundless or unjustified requests in this action"

9    and thus held that "all remaining Defendants will be relieved of their traditional obligation

10   to respond to Plaintiff's motion unless specifically directed to do so by this Court."  (*Id.* at

11   188.)[10]

12        5.    On July 8, 2022—the day after the issuance of the Arizona Superior Court's

13   order in *Potter v. Doctor, et al.*, No. CV2021-013210 denying TD's motion to designate

14   Plaintiff as a vexatious litigant—Plaintiff filed a complaint in *Potter v. Arizona House of*

15   *Reps., et al.*, No. CV2022-008626 and named Meza and Robson as defendants.  (Doc. 51

16   at 190-204.)  The complaint was brought under Arizona's Public Records Law, A.R.S.

17   § 39-121 *et seq.*  (*Id.* at 190.)  Plaintiff alleged in the complaint that "[t]he records sought

18   will shed light on Representative Meza's involvement with nonprofit organizations he

19   engaged under his elected title using monies from the state."  (*Id.* at 190-91.)

20        6.    On November 16, 2022, the Arizona Superior Court granted the motions to

21   dismiss of each defendant in *Potter v. Arizona House of Reps., et al.*, No. CV2022-008626,

22   including the motions to dismiss of Robson and Meza.  (*Id.* at 246-47.)

23        7.    On February 24, 2023, the Arizona Superior Court in *Potter v. Arizona House*

24   *of Reps., et al.*, No. CV2022-008626 granted the defendants' joint motion to designate

25   Plaintiff as a vexatious litigant.  (*Id.* at 249.)  In that order, the Arizona Superior Court held

26   _____

27   [9]    The Court takes judicial notice that this is the language of the Arizona Superior
     Court but not the truth of that language.

28   [10]    Again, the Court simply takes judicial notice that this is the language used by the
     Arizona Superior Court and that this is the action the Arizona Superior Court took.

that "Plaintiff Philip Potter has engaged in vexatious conduct per Arizona Revised Statutes § 12-3201 by: repeated filing of court actions without substantial justification; and repeatedly filing documents or requests for relief that have been the subject of previous rulings by the court in similar litigation." (*Id.* at 252.)  The Arizona Superior Court ordered that "Plaintiff Phillip Potter may not file any new pleading, motion or other document in this case or any other pending civil action without prior leave of the judge assigned to that case" and further ordered "that any request to file any new pleading, motion or other document in this case or any other pending civil action shall attach a copy of this order with the request." (*Id.*)  The Arizona Superior Court also "referr[ed] this matter to the Honorable Joseph Welty, Presiding Judge, Maricopa County Superior Court to consider issuing an administrative order designating Phillip Potter as a vexatious litigant." (*Id.*)  In its order, the Arizona Superior Court considered Plaintiff's litigation activity in cases "CV2021-005501, CV2021-013210, CA-CV 22-0441 (appeal from CV2021-013210), and CV2022-014146," stating that "[t]he summary of Plaintiff's claims includes many examples of frivolous motions, disregarding court orders, re-hashed positions that were rejected by the courts, and plain attempts to harass parties and/or unnecessarily expand litigation matters." (*Id.* at 250.)

    8.    In separate decisions, the Arizona Court of Appeals affirmed the superior court's dismissal orders in the *Doctor* matter (*id.* at 254-62) and in the *Arizona House of Representatives* matter (*id.* at 264-80), including holding in the latter decision that the Arizona Superior Court did not abuse its discretion in designating Plaintiff a vexatious litigant under A.R.S. § 12-3201 (*id.* at 275-79).  In the latter decision, the appellate court disagreed with Plaintiff that the vexatious litigant order "unconstitutionally infringes his First Amendment political speech rights" and found that Plaintiff's motion to dismiss under A.R.S. § 12-751(A)—which provides that "[i]n any legal action that involves a person's lawful exercise of the right [of] petition . . . the person . . . may file a motion to dismiss or quash the action under this section"—was not denied improperly.  (*Id.* at 278-79.)

    9.    The Arizona Supreme Court denied Plaintiff's petitions for review in the

*Doctor* matter (*id.* at 282-83) and the *Arizona House of Representatives* matter (*id.* at 285-86).

10. On November 2, 2023, then-Presiding Judge Welty issued Administrative Order No. 2023-159, "find[ing] that Mr. Potter has engaged in vexatious conduct by filing claims or requests for relief that have been subject to previous rulings in previous litigation; has unreasonably expanded court proceedings; and has brought court actions without 'substantial justification' as defined in A.R.S. § 12-349." (*Id.* at 324-30.)[11] Judge Welty ordered that (1) "Mr. Potter may not file any new causes of action as a pro se litigant after the date of this order without leave of the Civil Presiding Judge or his/her designee"; (2) "Mr. Potter may not file any further pleading or motion in any of his current lawsuits as a pro se litigant without first seeking leave from the judicial officer assigned to that lawsuit"; (3) "[a]ny motion for leave to file any new lawsuit, pleading or motion shall be captioned 'Application Pursuant to Court Order Seeking Leave to File,'" and "Mr. Potter must either cite this order in his application, or attach as an exhibit a copy of this order"; and (4) "[a]ny request for fee waiver or deferral may only be granted by the Civil Presiding Judge or his/her designee." (*Id.* at 325.) Judge Welty found those orders "to be the least restrictive orders that will adequately address Mr. Potter's established pattern of abuse." (*Id.*)[12]

D. **Requests Pertaining To The Presiding Judge**

Plaintiff seeks judicial notice of: (1) A.R.S. § 12-109(B)(1); (2) Ariz. R. Sup. Ct. 92; (3) an Arizona Supreme Court December 13, 2024 News Release; (4) the case record from CV2022-008626; and (5) Plaintiff's public records request to the Presiding Judge and the Presiding Judge's response. (Doc. 90.)

---

[11] Again, the Court does not take judicial notice of the truth of any of the statements contained in this Administrative Order.

[12] Ortega and the Presiding Judge also request judicial notice of Administrative Order 2023-159. (Doc. 52 at 2 [Ortega]; Doc. 67 at 9 n.1 [Presiding Judge].) Those requests are granted for the same reasons that Robson's and Meza's request for judicial notice of Administrative Order 2023-159 is granted. To the extent Plaintiff argues that he "never received, and never saw" Administrative Order 2023-159 "prior to it being referenced in Ms. Ortega's motion to dismiss" (Doc. 54-1 ¶ 8), this assertion has no bearing on the question of judicial notice—Plaintiff does not, for example, dispute the authenticity of Administrative Order 2023-159.

As for A.R.S. § 12-109 and Ariz. R. Sup. Ct. 92, the Presiding Judge responds that "judicial notice of legal authorities is unnecessary" and "while there is nothing preventing this Court from considering A.R.S. § 12-109 or Rule 92 of the Arizona Supreme Court, the Court is not required to do so by judicial notice." (Doc. 91 at 2-3, citations omitted.) As for the press release and the case record from CV2022-008626, the Presiding Judge agrees that these sources are "not subject to reasonable dispute" and are obtained "from sources whose accuracy cannot be reasonably questioned." (*Id.* at 2, citing Fed. R. Evid. 201(b).) Thus, the Presiding Judge agrees the Court may take judicial notice of them. (*Id.*) As for the public records correspondence, the Presiding Judge argues that this correspondence "is not subject to judicial notice because the matters discussed go to the heart of the controversy and are disputed." (*Id.* at 3.) Finally, the Presiding Judge argues that Plaintiff's motion "repeats previous arguments and improperly responds to prior filings" such that "Plaintiff's Motion is a surreply in disguise." (*Id.* at 4.)

In reply, Plaintiff argues that the press release and the CV2022-008626 case record contain "conceded" facts of which the Court "must" take judicial notice per Rule 201(c)(2)—namely, that the Presiding Judge's "'administrative authority' does not include 'authority over' private parties" and that "Judge Welty was never the assigned judge in [CV2022-008626] and never issued an order into that case's docket." (Doc. 92 at 2.) Plaintiff further argues that the "facts" contained in the public records correspondence are "not subject to reasonable dispute" and are relevant. (*Id.* at 3.) Plaintiff also argues that no "application" existed or was reviewed by the Presiding Judge—and therefore, he argues, per Rule 11, "Presiding Judge Gates' counsel should immediately withdraw or correct the factual contention that Presiding Judge Welty reviewed and approved the forementioned application." (*Id.* at 4 & n.2.) In a related vein, Plaintiff asks the Court "to consider *sua sponte* issuing an Order to Show Cause instructing Presiding Judge Gates' counsel . . . to explain why the Court should not sanction counsel." (*Id.* at 4 & n.3.) Plaintiff next disputes that the facts contained in A.R.S. § 12-109 and Arizona Supreme Court Rule 92 are legislative rather than adjudicative. (*Id.* at 5-6.) Next, Plaintiff argues at length regarding

the Presiding Judge's purported inability to invoke judicial and sovereign immunity and regarding why, in Plaintiff's view, Administrative Order 2023-159 was not a judicial decision.  (*Id.* at 6-8.)  Plaintiff also asserts that his "First Amendment facial challenge does not rely on" Administrative Order 2023-159.  (*Id.* at 7.)  Finally, Plaintiff argues that his motion did not operate as a surreply and that his argument that the Court cannot consider Administrative Order 2023-159 was not raised for the first time on reply.  (*Id.* at 9-10.)

As an initial matter, the Court agrees with the Presiding Judge that significant portions of Plaintiff's motion to take judicial notice operate, in effect, as an unauthorized surreply.  It is apparent that Plaintiff is seeking to use judicial notice as a vehicle to argue why the Presiding Judge's motion to dismiss should be denied.  The Court will not consider the arguments in Plaintiff's motion that operate as a surreply.

Turning to the merits, the Court declines to take judicial notice of A.R.S. § 12-109 because statutes are legislative facts that fall outside Rule 201.  The Court also declines to take judicial notice of Arizona Supreme Court Rule 92 because the "undisputed fact" that Plaintiff seeks to have noticed is not judicially noticeable.  Plaintiff asks the Court "to judicially notice the undisputed fact that nowhere in this rule does it suggest, or can it be read to indicate, that Presiding Judges may decide the rights of parties through administrative proceedings."  (Doc. 90 at 7.)  Plaintiff is thus seeking a legal determination, which is not the proper subject of judicial notice.  *CTC Glob. Corp.*, 2018 WL 4849715 at *3 ("[J]udicial notice . . . is for cold, hard, undisputable facts—not law.").

The Court will take judicial notice of the existence of the press release attached as Exhibit 3 to Plaintiff's motion; however, the Court declines to take judicial notice of the truth of its contents.  *See, e.g.*, *EVO Brands, LLC v. Al Khalifa Grp. LLC*, 657 F. Supp. 3d 1312, 1320-21 (C.D. Cal. 2023) ("Just because the document itself is susceptible to judicial notice does not mean that every assertion of fact within that document is judicially noticeable for its truth.  A court may not take judicial notice of the truth of disputed factual matters at the pleading stage.") (citations omitted).  It is apparent from Plaintiff's motion that he seeks to use this press release to show that the issuance of Administrative Order

2023-159 deeming him a vexatious litigant was not a "judicial" act but rather an administrative one. Although the Presiding Judge does not object to the Court taking judicial notice of the press release (Doc. 91 at 2), whether the issuance of Administrative Order 2023-159 was administrative or adjudicative is disputed. Accordingly, the Court will not take judicial notice of the truth of any disputed facts in the press release.

The Court will also take judicial notice of the existence of the CV2022-008626 case record and its contents. The Presiding Judge does not object to this request. (*Id.* at 2.)

Turning finally to Plaintiff's request for judicial notice of his public records request to the Presiding Judge and the Presiding Judge's response, Plaintiff's theory of relevance appears to boil down to a quibble over word choice. The Presiding Judge states in the motion to dismiss that he "review[ed] and approve[d] the application to certify Plaintiff as a vexatious litigant, as allowed by Arizona law." (Doc. 67 at 3.) This statement is a clear reference to Judge Blanchard's order designating Plaintiff as a vexatious litigant in No. CV2022-008626 and referring the matter to the Presiding Judge to have Plaintiff designated vexatious across all Arizona cases. (Doc. 51 at 249-52 ["IT IS ORDERED referring this matter to the Honorable Joseph Welty, Presiding Judge, Maricopa County Superior Court to consider issuing an administrative order designating Phillip Potter as a vexatious litigant."].) Nonetheless, Plaintiff argues that the correspondence at issue shows there was no "application" reviewed by the Presiding Judge. (Doc. 90 at 9, cleaned up ["Because § 12-3201 references no such 'application,' the Presiding Judge did not provide evidence of that application, and no application is docketed in the CV2022-008626 case record, Plaintiff submitted a public records request to inspect that 'application' document."].) At bottom, Plaintiff's request amounts to nothing more than a quibble over whether the Presiding Judge reviewed an "application" or "referral" from Judge Blanchard. This quibble over word choice does not affect the analysis of whether the Presiding Judge's issuance of Administrative Order 2023-159 was an adjudicatory/judicial or administrative act. Thus, the Court declines to take judicial notice of the correspondence. In any event, to the extent this correspondence is relevant, the Presiding Judge is correct that the matters

1  contained within that correspondence "go to the heart of the controversy and are disputed"

2  (Doc. 91 at 3), such that judicial notice of the correspondence would also be improper for

3  that reason.

4  II.    Legal Standards

5      A.    **Rule 12(b)(1)**

6      Rule 12(b)(1) of the Federal Rules of Civil Procedure provides that a defendant may

7  move to dismiss an action for "lack of subject-matter jurisdiction." "[I]n reviewing a Rule

8  12(b)(1) motion to dismiss for lack of jurisdiction, we take the allegations in the plaintiff's

9  complaint as true." *Wolfe v. Strankeman*, 392 F.3d 358, 362 (9th Cir. 2004), *overruled on*

10 *other grounds by Munoz v. Super. Ct. of L.A. Cnty.*, 91 F.4th 977, 981 (9th Cir. 2024).

11 However, "in ruling on a 12(b)(1) jurisdictional challenge, a court may look beyond the

12 complaint and consider extrinsic evidence." *Warren v. Fox Fam. Worldwide, Inc.*, 328

13 F.3d 1136, 1141 n.5 (9th Cir. 2003).  The plaintiff bears the burden of establishing that

14 subject-matter jurisdiction exists.  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S.

15 375, 377 (1994).

16     B.    **Rule 12(b)(6)**

17     Under Rule 12(b)(6), "to survive a motion to dismiss, a party must allege sufficient

18 factual matter, accepted as true, to state a claim to relief that is plausible on its face." *In re*

19 *Fitness Holdings, Int'l, LLC*, 714 F.3d 1141, 1144 (9th Cir. 2013) (internal quotation marks

20 and citation omitted).  "A claim has facial plausibility when the plaintiff pleads factual

21 content that allows the court to draw the reasonable inference that the defendant is liable

22 for the misconduct alleged."  *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

23 "[A]ll well-pleaded allegations of material fact in the complaint are accepted as true and

24 are construed in the light most favorable to the non-moving party."  *Id.* at 1144-45 (citation

25 omitted).  However, the court need not accept legal conclusions couched as factual

26 allegations.  *Iqbal*, 556 U.S. at 678-80.  Moreover, "[t]hreadbare recitals of the elements of

27 a cause of action, supported by mere conclusory statements, do not suffice."  *Id.* at 678.

28 The court also may dismiss due to "a lack of a cognizable legal theory."  *Mollett v. Netflix,*

1    *Inc.*, 795 F.3d 1062, 1065 (9th Cir. 2015) (citation omitted).

2    III.    AG Mayes's Motion To Dismiss

3    Counts One and Two of the FAC are asserted against AG Mayes.  In Count One,

4    Plaintiff raises a First Amendment facial challenge to A.R.S. § 12-3201, Arizona's

5    vexatious litigant statute.  (Doc. 14 ¶¶ 113-207.)  In Count Two, Plaintiff raises a First

6    Amendment facial challenge to A.R.S. § 13-2921, Arizona's harassment statute.  (*Id.*

7    ¶¶ 208-14.)

8    A.    **The Parties' Arguments**

9    AG Mayes moves to dismiss Counts One and Two pursuant to Rules 12(b)(1) and

10   12(b)(6).  (Doc. 38.)

11   First, AG Mayes argues that "Plaintiff lacks standing to assert his challenge to the

12   vexatious litigant statute" because although he raises a "pre-enforcement" challenge, he

13   "fails to allege a credible fear of prosecution."  (*Id.* at 6.)  AG Mayes also argues that

14   Plaintiff fails to meet the traceability and redressability requirements as to Count One.  (*Id.*

15   at 7-9.)  Specifically, AG Mayes argues that (1) "elected county attorneys[] prosecute the

16   vast majority of criminal cases in Arizona" and "in the unlikely event Plaintiff were

17   prosecuted, it would be by a county attorney"; and (2) Plaintiff's inability to file court

18   papers without prior leave of Court is "enforced by the court" and "[a]t most, through an

19   indirect chain of statutes, [Plaintiff] alleges he could be prosecuted by someone," "[b]ut

20   even that speculative belief is a far leap from tying the envisioned prosecution to AG

21   Mayes," and "AG Mayes's general supervisory power over county attorneys . . . is not

22   enough to bridge the gap."  (*Id.* at 8).

23   Second, AG Mayes argues that "Plaintiff also lacks standing to challenge the

24   harassment statute."  (*Id.* at 9.)  Specifically, AG Mayes argues that "Plaintiff lacks any

25   injury connected to this statute" because "[a]lthough Plaintiff alleges that his ex-wife was

26   able to have her address deemed confidential as a result of his litigation being deemed

27   'harassing,' a third party having their address treated as confidential is not an 'invasion of

28   a legally protected interest' belonging to *Plaintiff*."  (*Id.* at 9-10, citation omitted).  AG

1    Mayes also argues that because the Secretary of State, not AG Mayes, enforces the address

2    confidentiality program, "any injury would not be fairly traceable to AG Mayes and could

3    not be redressed by the relief sought." (*Id.* at 10.)

4         Third, AG Mayes argues that "Plaintiff's challenge to the vexatious litigant statute

5    is barred by sovereign immunity" because AG Mayes does not have a connection to the

6    law's enforcement. (*Id.* at 10-11.)

7         Fourth, AG Mayes argues that Plaintiff fails to state a claim as to Count One. (*Id.*

8    at 11-17.) Specifically, AG Mayes argues that (1) the vexatious litigant statute is "not

9    overly broad" (*id.* at 11-12); (2) "[t]he *Noerr-Pennington* doctrine does not save Plaintiff's

10   overbreadth theory" (*id.* at 12-13); (3) Plaintiff misinterprets *Ringgold-Lockhart v. Cnty.*

11   *of Los Angeles*, 761 F.3d 1057 (9th Cir. 2014) (*id.* at 13-14); (4) the vexatious litigant

12   statute "comports with procedural due process" (*id.* at 14-16); and (5) the vexatious litigant

13   statute "is not void for vagueness" (*id.* at 16-17).

14        Fifth, AG Mayes argues that Plaintiff's "void for vagueness attack" on the

15   harassment statute fails because of the purported presence of an intent requirement. (*Id.* at

16   17.)

17        In response, Plaintiff first argues that he has standing. (Doc. 49 at 1-7.) Plaintiff

18   argues that AG Mayes "concedes the first two *Driehaus* factors"—namely, (1) "an

19   intention to engage in a course of conduct arguably affected with a constitutional interest";

20   and (2) the conduct is "proscribed by a statute." (*Id.* at 2, cleaned up, quoting *Susan B.*

21   *Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014).) As for the third *Driehaus* factor,

22   Plaintiff argues that he has alleged a credible threat of enforcement because "in a statutorily

23   defined chain of causation," AG Mayes can "invoke" a violation of the vexatious litigant

24   statute to prosecute Plaintiff under Arizona's harassment statute (A.R.S. § 13-2921),

25   Arizona's statute on interfering with judicial proceedings (A.R.S. § 13-2810), and/or

26   Arizona's domestic violence statutes (A.R.S. §§ 13-3601, 3602). (Doc. 49 at 3.) Plaintiff

27   argues that enforcement is likely because the Secretary of State has already "found that

28   Plaintiff violated §13-3601 based on conduct expressly traced to" the vexatious litigant

statute (A.R.S. § 12-3201) and the harassment statute (A.R.S. § 13-2921).  (Doc. 49 at 4.)
Plaintiff argues the traceability and redressability requirements are met because "Arizona
legislators enacted an unattenuated statutory chain of causation whereby, once deemed
'vexatious', by 'operation' of A.R.S. § 12-3201 a litigant who files court papers absent
leave of the court violates § 12-3201(B) and becomes subject to (1) civil and criminal
'enforcement' per §§ 13-2810(A)(2), 13-2921, 13-3601, and 13-3602; and (2)
administrative 'enforcement' per §§ 12-3201(A) and 41-161, *et seq.*"  (Doc. 49 at 6.)
Plaintiff argues that AG Mayes "admits she can prosecute for conduct proscribed by A.R.S.
§ 12-3201(B) as § 13-2810(A)(2) and/or § 13-2921 violations which are §§ 13-3601/3602
predicates."  (Doc. 49 at 7.)

As for sovereign immunity, Plaintiff argues that AG Mayes is connected to the
enforcement scheme because she can prosecute Plaintiff through the same chain of statutes
described above.  (*Id.* at 7-8.)  Plaintiff next argues that Counts One and Two should not
be dismissed under Rule 12(b)(6).  (*Id.* at 9.)  As for Count One, Plaintiff argues that A.R.S.
§ 12-3201 "facially violates the petition clause," "facially violates the vagueness doctrine,"
and "facially violates the overbreadth doctrine."  (*Id.* at 10-15.)  Plaintiff further argues
that § 12-3201 lacks a hearing requirement, rendering it vague.  (*Id.* at 15-16.)  Plaintiff
provides little to no substantive argument regarding Count Two, other than to request
judicial notice.  (*Id.* at 16.)  Plaintiff does, however, emphasize that A.R.S. § 13-2921 was
revised in 2022 to eliminate the intent requirement.  (*Id.*)

In reply, AG Mayes focuses on the third *Driehaus* prong (Doc. 53 at 2-4) and
reiterates her arguments regarding traceability and redressability (*id.* at 4-6).  AG Mayes
also reiterates that, as to Count One, she is entitled to sovereign immunity.  (*Id.* at 6-7.)
And AG Mayes reiterates her 12(b)(6) arguments as to Counts One and Two.  (*Id.* at 7-11.)

B.    **Count One**

"[A] federal court generally may not rule on the merits of a case without first
determining that it has jurisdiction over the category of claim in suit (subject-matter
jurisdiction) and the parties (personal jurisdiction).  Without jurisdiction, the court cannot

1    proceed at all in any cause; it may not assume jurisdiction for the purpose of deciding the

2    merits of the case." *Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp.*, 549 U.S.

3    422, 430-31 (2007) (cleaned up).  Accordingly, the Court begins by determining whether

4    it has subject-matter jurisdiction over Count One as against AG Mayes.

5        "Article III standing is a necessary component of subject matter jurisdiction." *In re*

6    *Palmdale Hills Prop., LLC*, 654 F.3d 868, 873 (9th Cir. 2011).  "[T]he irreducible

7    constitutional minimum of standing contains three elements.  First, the plaintiff must have

8    suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete

9    and particularized, and (b) actual or imminent, not conjectural or hypothetical.  Second,

10   there must be a causal connection between the injury and the conduct complained of—the

11   injury has to be fairly traceable to the challenged action of the defendant, and not the result

12   of the independent action of some third party not before the court.  Third, it must be likely,

13   as opposed to merely speculative, that the injury will be redressed by a favorable decision."

14   *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (cleaned up).

15       As discussed in the order denying Plaintiff's first TRO motion (Doc. 47 at 4), to the

16   extent Plaintiff is alleging that his injury is his inability "to file court papers absent leave

17   of the court" and that he "fears[] administrative, civil, and/or criminal enforcement of

18   A.R.S. § 12-3201" (Doc. 14 ¶ 98), AG Mayes has nothing to do with this alleged injury.

19   A.R.S. § 12-3201(B) specifies that "the court," not AG Mayes, is tasked with determining

20   whether to allow a particular filing.  A.R.S. § 12-3201(B) ("A pro se litigant who is

21   designated a vexatious litigant may not file a new pleading, motion or other document

22   without prior leave of the court.").  A.R.S. § 12-3201 itself provides no method of

23   enforcement (civil or criminal) that would implicate AG Mayes.

24       Plaintiff also alleges a fear of criminal prosecution in which his future violation of

25   A.R.S. § 12-3201 would be used as the underlying predicate for criminal liability under

26   other statutes.  In the FAC, Plaintiff states as follows: "Despite the A.R.S. § 12-3201 Order,

27   including the A.R.S. § 12-3201(B) blanket provision, Plaintiff plans to file court papers

28   absent leave of the court in ongoing FC2020-09024 and CV2021-005501 litigation, and in

this suit.  For doing so, he is being threatened with, and reasonably fears, administrative, civil, and/or criminal enforcement of A.R.S. § 12-3201, *including where filing court papers in well-founded lawsuits is being unlawfully postured as violations of A.R.S. § 13-2810(A)(2) Interfering With Judicial Proceedings* and/or *A.R.S. § 13-2921 Harassment*, which enforcement authorities in turn can then cite as predicates to prosecute A.R.S. §§ 13-3601 and 13-3602."  (Doc. 14 ¶ 98, emphasis added.)  In his response to AG Mayes's motion to dismiss, Plaintiff describes this theory as a "statutorily defined chain of causation" in which "AG Mayes can 'invoke [A.R.S. § 12-3201] to prosecute per §§ 13-2921, 13-2810(A)(2), 13-3601, and/or 13-2602."  (Doc. 49 at 3.  *See also id.* at 6 ["Arizona legislators enacted an unattenuated statutory chain of causation whereby, once deemed 'vexatious', by 'operation' of A.R.S. § 12-3201 a litigant who files court papers absent leave of the court violates § 12-3201(B) and becomes subject to (1) civil and criminal 'enforcement' per §§ 13-2810(A)(2), 13-2921, 13-3601, and 13-3602; and (2) administrative 'enforcement' per §§ 12-3201(A) and 41-161, *et seq.*"].)[13]  In other words, Plaintiff argues that if he violates the vexatious litigant order (as he plans to do), he can be subject to civil/criminal liability in at least two ways:

1. If he violates § 12-3201 by filing court papers without court approval, he can be subject to prosecution under § 13-2810, which makes it a class 1 misdemeanor to interfere with judicial proceedings by, among other things "knowingly . . . [d]isobey[ing] or resist[ing] the lawful order, process or other mandate of a court."  A.R.S. § 13-2810(A)(2).  Violation of § 13-2810 can in turn be used as a predicate offense for enforcement of § 13-3601 "domestic violence."

2. If he violates § 12-3201 by filing court papers without court approval, he can be subject to prosecution under § 13-2921, which makes it a misdemeanor (and in some circumstances, a felony) to commit harassment.  Plaintiff further argues that a

---

[13]     To the extent Plaintiff argues that a future violation of § 12-3201 would subject him to administrative enforcement under § 41-161 *et seq.*, that injury is not traceable to AG Mayes.  The "address confidentiality program" that Plaintiff's ex-wife allegedly entered by invoking the § 12-3201 order is administered by the Secretary of State, not AG Mayes.

1    violation of § 13-2921 is a predicate offense for § 13-3601 "Domestic violence" /

2    § 13-3602 "Order of protection."

3    As explained in the order denying Plaintiff's first TRO motion (Doc. 47), the type

4 of claim that Plaintiff seeks to advance is known as a pre-enforcement challenge.

5 *Driehaus*, 573 U.S. at 159. Such a claim arises "when the threatened enforcement of a law

6 creates an Article III injury." *Id.* at 158. "When an individual is subject to such a threat,

7 an actual arrest, prosecution, or other enforcement action is not a prerequisite to

8 challenging the law." *Id. See also Peace Ranch, LLC v. Bonta*, 93 F.4th 482, 487 (9th Cir.

9 2024) ("Pre-enforcement injury is a special subset of injury-in-fact. . . . [T]he injury is the

10 anticipated enforcement of the challenged statute in the future. One need not violate a

11 criminal law and risk prosecution in order to challenge the law's constitutionality. This

12 principle applies equally in the civil context.") (citations omitted).

13    As noted in the order denying Plaintiff's first TRO motion, the parties have not

14 cited, nor is the Court aware of, any authority that would permit Plaintiff to invoke the pre-

15 enforcement challenge framework under these unusual and derivative circumstances, *i.e.*,

16 where Plaintiff claims to fear future prosecution under a different statute than the statute

17 whose constitutionality he seeks to challenge. To that end, the Court finds *Kearns v.*

18 *Cuomo*, 415 F. Supp. 3d 319 (W.D.N.Y. 2019), *aff'd*, 981 F.3d 200 (2d Cir. 2020),

19 instructive.

20    In *Kearns*, "the elected County Clerk for Erie County" challenged New York's

21 "Green Light Law," arguing it was "preempted by federal immigration law." *Id.* at 322-

22 23. Relying on a pre-enforcement theory, the plaintiff argued that he would "be subject to

23 potential federal criminal prosecution if he complies with the Green Light Law's

24 mandates." *Id.* at 328. The district court noted that "cases dealing with standing in the

25 context of preenforcement challenges to allegedly unconstitutional laws involve challenges

26 to the very statutes under which the plaintiff fears prosecution." *Id.* at 328-29 (listing

27 cases). The court noted that "by contrast, in this case, Plaintiff is not alleging that he would

28 be subject to criminal prosecution under the Green Light Law (nor could he plausibly do

so, because the Green Light Law is not a criminal statute).  Instead, Plaintiff contends that if he complies with the Green Light Law, he may be criminally prosecuted under 8 U.S.C. § 1324."  *Id.* at 329.  The *Kearns* plaintiff did not cite "any case in which preenforcement standing to challenge a particular statute has been recognized on the potential for prosecution under a *different* law."  *Id.*  And the district court was "not persuaded that the caselaw Plaintiff relies upon regarding preenforcement challenges based on a credible threat of prosecution is applicable here, where the law Plaintiff is challenging is different than the law under which he allegedly fears criminal prosecution."  *Id.*  At bottom, the *Kearns* court found that a plaintiff who asserts standing by alleging a fear of prosecution under a different statute than that which he is challenging "cannot satisfy the essential requirement identified by the Supreme Court . . . that the plaintiff allege an intention to engage in a course of conduct proscribed *by the challenged statute*."  *Id.* (emphasis added). Ultimately, the court concluded that "[t]o the extent Plaintiff bases his theory of injury on a credible threat of prosecution against him individually, he fails to meet his burden to establish standing."  *Id.* at 334.

Other cases since *Kearns* have rejected or criticized this sort of derivative theory of pre-enforcement standing.  *See, e.g.*, *Splonskowski v. White*, 714 F. Supp. 3d 1099, 1104 (D.N.D. 2024) ("Under [*Driehaus*], the threatened prosecution must be contained within the same statute proscribing the alleged conduct.  Splonskowski is allegedly subject to criminal prosecution under a separate statute than the ones he claims conflict with federal election law.") (citation omitted); *Mohr v. Erie Cnty. Legislature*, 2023 WL 3075956, *6 (W.D.N.Y. 2023) ("That bank-shot theory of standing—where a plaintiff challenges a law on the grounds that complying with it could lead to prosecution under some different law— has been met with some skepticism by other courts."); *Penkoski v. Bowser*, 548 F. Supp. 3d 12, 30 (D.D.C. 2021) ("[P]re-enforcement challenges are limited to where the threat of enforcement stems from the challenged law itself.").  This skepticism is supported by the language of the *Driehaus* factors themselves, which require Plaintiff to "inten[d] to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a

1   statute, and there exists a credible threat of prosecution *thereunder*."  573 U.S. at 159.

2          As in *Kearns*, Plaintiff has not identified, nor has the Court located, any authority

3   that would allow him to invoke the pre-enforcement framework where the statute he seeks

4   to challenge on constitutional grounds is not the statute under which he fears criminal

5   prosecution.[14]  Accordingly, Plaintiff lacks standing to raise a facial challenge to § 12-3201

6   based on his fear of future prosecution by AG Mayes under other statutes.[15]  This

7   determination obviates the need to reach AG Mayes's other arguments for dismissal of

8   Count One.  *Sinochem Int'l Co. Ltd.*, 549 U.S. at 430-31.[16]

9          C.    **Count Two**

10         Count Two does not raise the same standing problems as Count One because the

11  statute that is the subject of Plaintiff's pre-enforcement challenge —A.R.S. § 13-2921—is

12  the same statute under which Plaintiff claims to fear criminal prosecution.  The Court thus

13  turns to the merits of the standing analysis.

14         First is the injury-in-fact requirement, which "helps to ensure that the plaintiff has

15  a personal stake in the outcome of the controversy."  *Driehaus*, 573 U.S. at 158 (cleaned

16  up).  In a pre-enforcement challenge such as this one, "a plaintiff satisfies the injury-in-fact

17  ────────────

18  [14]    In Count Two, Plaintiff challenges the constitutionality of A.R.S. § 13-2921, which
    is one of the criminal statutes under which he claims to fear criminal prosecution as a result
19  of his plan to violate § 12-3201.  The Court therefore addresses Plaintiff's standing to
    challenge § 13-2921 under a separate standing analysis below.  The Court disagrees with
20  the conclusory statement made in AG Mayes's reply that "[b]ecause Plaintiff's challenge
    to the harassment statute is derivative of his challenge to the vexatious litigant statute, the
21  standing analysis is the same for both counts."  (Doc. 53 at 2 n.1.)  AG Mayes does not cite
    any law for this proposition, which is unpersuasive for the reasons stated in the body of
22  this order.  *See generally United States v. Ceja-Prado*, 333 F.3d 1046, 1049 (9th Cir. 2003)
    ("[F]ederal jurisdiction cannot be created by the parties through waiver or through estoppel,
23  in cases in which jurisdiction otherwise does not exist. . . .  [C]ourts have not allowed
    jurisdiction to depend on either malfeasance or well-intentioned agreement of the
    parties.").

24  [15]    As discussed in the order denying Plaintiff's first TRO motion, this outcome does
25  not undermine one of the key objectives of the pre-enforcement standing doctrine, which
    is "to ensure that no law is practically unchallengeable," because "Plaintiff already had a
26  full and fair opportunity to challenge the constitutionality of A.R.S. § 12-3201 during the
    state-court litigation that led to the issuance (and affirmance) of the vexatious litigant order
    against him."  (Doc. 47 at 6.)

27  [16]    Thus, the Court need not elaborate on its reasoning in the order denying Plaintiff's
28  first TRO motion as to why Plaintiff is "unlikely to succeed on the merits of his challenge
    to A.R.S. § 12-3201."  (Doc. 47 at 15.)

1    requirement where he alleges (1) an intention to engage in a course of conduct arguably

2    affected with a constitutional interest; (2) but proscribed by a statute; and (3) there exists a

3    credible threat of prosecution thereunder." *Id.* at 159 (cleaned up).

4         As for the first *Driehaus* factor, Plaintiff alleges that he "plans to file court papers

5    absent leave of the court in ongoing FC2020-090224 and CV2021-005501 litigation, and

6    in this suit," and "[f]or doing so, he is being threatened with, and reasonably fears . . .

7    enforcement of . . . § 13-2921 Harassment."  (Doc. 14 ¶ 98.)   These allegations are

8    sufficient to satisfy the first *Driehaus* factor, as Plaintiff's anticipated course of conduct is

9    arguably affected with a constitutional interest under the Petition Clause.

10        In contrast, Plaintiff has failed to establish that his anticipated course of conduct is

11   "proscribed by a statute" as required under the second *Driehaus* factor.  Under § 13-2921,

12   "harassment" occurs when, *inter alia*, a "person knowingly and repeatedly commits an act

13   or acts that harass another person," and the term "harass" is defined as "conduct that is

14   directed at a specific person and that would cause a reasonable person to be seriously

15   alarmed, annoyed, humiliated or mentally distressed and the conduct in fact seriously

16   alarms, annoys, humiliates or mentally distresses the person." A.R.S. § 13-2921(A), (E).

17        As an initial matter, the factual allegations in the FAC are insufficient to show that

18   Plaintiff's anticipated course of conduct would be "repeated[]" and/or "would cause a

19   reasonable person to be seriously alarmed, annoyed, humiliated or mentally distressed."

20   The FAC simply alleges that Plaintiff intends to make court filings in certain pending state-

21   court lawsuits even though he is prohibited by § 12-3201 from doing so without leave of

22   court.  (Doc. 14 ¶ 98.)  The FAC does not contain any information about the content or

23   frequency of those anticipated filings.  This approach fails to establish that a reasonable

24   person would "be seriously alarmed, annoyed, humiliated or mentally distressed" by those

25   unspecified future court filings.

26        Moreover, even if the FAC had included information about the expected content

27   and frequency of Plaintiff's anticipated court filings, it is unclear whether the act of filing

28   court papers would qualify as "conduct that is directed at a specific person," as required

under § 13-2921(E).[17]   Although the papers filed in a lawsuit may contain allegations concerning a specific person, such as the adverse party, the act of filing itself may not be "directed at" that person—instead, the filing may be "directed at" the court.  In *Hernandez v. Loarca*, 571 P.3d 371 (Ariz. Ct. App. 2025), the trial court issued an order of protection premised on a finding that the defendant (Loarca) had committed harassment of the plaintiff (Hernandez) in violation of § 13-2921 by sending an email to Hernandez's employer that accused her of plagiarism.  *Id.* at 372, 375.  The Arizona Court of Appeals reversed, holding that even though Hernandez may have "felt 'alarmed, annoyed or harassed'" by the email and "[e]ven if Loarca's conduct was intended to damage Hernandez's reputation or employment," Loarca's act of sending the email did not, as a matter of law, qualify as harassment under § 13-2921 because "his actions were . . . not 'directed at' Hernandez."  *Id.* at 374-75.  This case is roughly analogous—even if Plaintiff's unspecified future court filings may contain accusations of misconduct against specific persons, and even assuming those persons would feel alarmed, annoyed, or harassed by those accusations, it doesn't necessarily follow (per *Hernandez*) that the court filings themselves would qualify as "directed at" those persons in the manner that § 13-2921(E) requires.  And although the Arizona Court of Appeals has held that "§ 13-2921 expressly contemplates that harassment can occur through communications to third parties when that communication . . . is designed to trigger actions directed at the victim," it is also unclear— at least based on the lack of allegations in the FAC on this point—whether the act of filing documents in a court case "is designed to trigger actions directed at" the opposing party. *Raber v. Wagner*, 571 P.3d 902, 906 (Ariz. Ct. App. 2025) (noting that "previous decisions . . . have vacated protective orders on the ground that a defendant's communications were directed toward third parties rather than directly at the victims" but emphasizing that the

---

[17]    To that end, it is notable that Plaintiff's arguments regarding the applicability of § 13-2921 do not hinge on him having been deemed a vexatious litigant.  Rather, Plaintiff's position appears to be that filing court papers that cause a specific person to experience mental distress would violate § 13-2921 regardless of whether the filer had been deemed vexatious under § 12-3201(A) and regardless of whether the filing was impermissible under § 12-3201(B).

analysis is fact-specific). At bottom, Plaintiff has failed to allege, with any specificity, what actions he intends to take in the future, making it impossible to discern whether his planned conduct is proscribed by § 13-2921.

Finally, although the analysis could end there, Plaintiff has also failed to satisfy the third *Driehaus* factor. When addressing that factor, courts in the Ninth Circuit "consider (1) whether the plaintiffs have articulated a concrete plan to violate the law in question, (2) whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings, and (3) the history of past prosecution or enforcement under the challenged statute." *Arizona v. Yellen*, 34 F.4th 841, 850 (9th Cir. 2022) (cleaned up).[18] The first subfactor is not satisfied here for the reasons stated above—Plaintiff has not established that his amorphous plan to file unspecified papers in pending lawsuits even qualifies as conduct that would "violate the law in question."

The second subfactor is satisfied if "the authorities in charge of enforcing the challenged law have communicated a specific warning or threat to initiate proceedings." *Tingley v. Ferguson*, 47 F.4th 1055, 1068 (9th Cir. 2022) (cleaned up). However, the FAC does not allege that AG Mayes has threatened to prosecute Plaintiff under § 13-2921. Instead, Plaintiff merely alleges that his ex-wife, T.D., admitted during a deposition that her sole basis for applying to participate in Arizona's address protection program was "the supposed harassment [that] occurred only via court filings in meritorious litigation." (Doc. 14 ¶ 95.) According to Plaintiff, T.D.'s subsequent acceptance into this program shows that "[t]he Arizona Secretary of State has accepted that a pro se litigant who files court papers that result in the opposing party experiencing (or at least expressing) emotional

---

[18] The Court acknowledges that subsequent Ninth Circuit case law has framed the standing inquiry slightly differently, implying that the *Driehaus* test was meant to supplant the Ninth Circuit test. *See, e.g.*, *Peace Ranch*, 93 F.4th at 487; *Planned Parenthood Great Nw., Haw., Alaska, Ind., Ky. v. Labrador*, 122 F.4th 825, 836 (9th Cir. 2024). In *Yellen*, however, the Ninth Circuit applied the Ninth Circuit's test as a set of subfactors for evaluating the third *Driehaus* factor. *Yellen*, 34 F.4th at 850. The Court follows the framework as articulated in *Yellen* but notes that the outcome would be the same under the slightly different formulations articulated in other cases. (*See also* Doc. 53 at 3 [AG Mayes stating that the Ninth Circuit's "framework survived the Circuit's decision in *Peace Ranch* adopting the *Driehaus* approach; both *Peace Ranch* and the later [*Planned Parenthood*] cite *Yellen*'s use of this third-prong framework"].)

distress, has violated A.R.S. §[] 13-2921." (*Id.* ¶ 211.)  But even assuming that Plaintiff's speculation about the Arizona Secretary of State's understanding of § 13-2921 is accurate, Plaintiff overlooks that the Arizona Secretary of State is not a prosecutor and is not responsible for initiating and pursuing harassment prosecutions under § 13-2921.  Thus, nothing from this episode qualifies as a specific warning or threat by *AG Mayes* to initiate proceedings under § 13-2921.

Alternatively, even if there has been no direct warning or threat of prosecution, "the government's failure to *disavow* enforcement of the law . . . weigh[s] in favor of standing." *Tingley*, 47 F.4th at 1068.  *See also Peace Ranch*, 93 F.4th at 489-90 (third prong of *Driehaus* test "often rises or falls with the enforcing authority's willingness to disavow enforcement").  But this principle does not assist Plaintiff.  Although AG Mayes has, understandably, not categorically disavowed a future prosecution of Plaintiff for harassment or domestic violence, her filings in this lawsuit indicate that she does not believe the harassment statute applies to unauthorized court filings.  (Doc. 69 at 10, emphasis added ["Plaintiff . . . cannot shift the burden by positing that a violation of his order will be prosecuted under some other law and demanding AG Mayes disprove his claim. . . .  The Attorney General is not going to disavow enforcement of harassment or domestic violence statutes.  Instead, *those are simply not the right statutes for the situation*."].)

The third subfactor is "the history of past prosecution or enforcement under the challenged statute."   *Yellen*, 34 F.4th at 850.   "[E]vidence of past instances of enforcement," although "not dispositive," is "important in a standing inquiry." *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1155 (9th Cir. 2000).  This subfactor also undermines Plaintiff's claim to standing.  Plaintiff does not identify any case in which AG Mayes, some other Arizona prosecutor, or even some prosecutor in some other jurisdiction has brought criminal harassment charges against a defendant solely based on the act of filing papers in a pending lawsuit (or filing court papers in violation of a vexatious-litigant order).  Again, Plaintiff's only attempt to address this subfactor is his speculation regarding the Arizona

1    Secretary of State's basis for accepting his ex-wife's application to participate in the
2    address protection program.  But this is not the sort of history of past prosecution that the
3    pre-enforcement standing inquiry contemplates.

4        The Court acknowledges that when "the threatened enforcement effort implicates
5    First Amendment rights, the inquiry tilts dramatically toward a finding of standing." *LSO*,
6    205 F.3d at 1155.  Even so, Plaintiff has failed to meet his burden of establishing that he
7    has standing to pursue a pre-enforcement challenge to the constitutionality of A.R.S. § 13-
8    2921.

9        D.    **Plaintiff's Motion for Jurisdictional Discovery from AG Mayes**

10        In his motion for jurisdictional discovery, Plaintiff seeks, from AG Mayes
11    specifically, "limited jurisdictional discovery to demonstrate whether, in speaking for the
12    state, the Attorney General (1) expressly disavows enforcement of § 12-3201, and if so on
13    what grounds, including adherence to the *Noerr-Pennington* doctrine; and (2) can produce
14    an actual 'record of nonenforcement' showing § 12-3201 has been 'commonly and
15    notoriously violated' but has fallen into 'desuetude.'"  (Doc. 58 at 2.)  In response, AG
16    Mayes argues that (1) Plaintiff's "motion is untimely"; (2) "the discovery he seeks is
17    mostly irrelevant, and in any event privileged"; and (3) Plaintiff's argument operates as an
18    improper burden-shift because "Plaintiff bears the burden of showing he has standing."
19    (Doc. 69 at 4.)  In reply, Plaintiff argues that, based on AG Mayes's response, the Court
20    can "recognize that Plaintiff has jurisdictional standing to challenge § 12-3201 because, as
21    [AG Mayes] expressly states, (1) '[t]he Attorney General is not going to disavow
22    enforcement of harassment or domestic violence statutes,'; and (2) 'AG Mayes is not
23    arguing that Plaintiff lacks pre-enforcement standing because the law is old, unenforced,
24    and "has fallen into desuetude.""'  (Doc. 72 at 1, citing Doc. 69 at 10-11.)

25        Plaintiff's request to pursue jurisdictional discovery from AG Mayes fails for two
26    independent reasons.  First, as AG Mayes correctly notes in her response (Doc. 69 at 4-5),
27    the request is untimely.  *Arizona v. Mayorkas*, 600 F. Supp. 3d 994, 1015 (D. Ariz. 2022)
28    (request for jurisdictional discovery untimely where, as here, it was made after motion to

dismiss became fully briefed and after the court had already issued a ruling on a request for preliminary injunction indicating a likely lack of standing).

Second, although the analysis could end there, Plaintiff's request also fails on the merits. Jurisdictional discovery "may be appropriately granted where pertinent facts bearing on the question of jurisdiction are controverted or where a more satisfactory showing of the facts is necessary." *Boschetto v. Hansing*, 539 F.3d 1011, 1020 (9th Cir. 2008) (citation omitted). As discussed, Plaintiff's pre-enforcement challenge to § 12-3201 rests on two theories. Under the first theory, Plaintiff asserts that § 12-3201 is unconstitutional and that he fears direct enforcement of that statute by AG Mayes. But as noted, the vexatious litigant statute, by its plain terms, is not enforced by AG Mayes. Jurisdictional discovery into AG Mayes's history of enforcement of § 12-3201 itself is therefore unwarranted. Plaintiff's other theory is that he fears enforcement of other statutes by AG Mayes premised on his planned violation of § 12-3201. But as noted, this is not a proper pre-enforcement challenge in relation to § 12-3201.

Nor would the requested discovery aid the jurisdictional analysis regarding Count Two. As noted, Plaintiff's vague allegations fail to establish that his anticipated conduct would even violate § 13-2921; Plaintiff improperly seeks to base his fear of future enforcement on speculation about an entirely different (and non-prosecutorial) government official's understanding of § 13-2921; and AG Mayes's reply suggests, in any event, that she does not believe § 13-2921 is "the right statute[] for the situation" (Doc. 69 at 10).

Finally, the Court reminds Plaintiff that motions for jurisdictional discovery and/or for judicial notice—filed after motions to dismiss became fully briefed—are not opportunities to remake arguments raised in the motion-to-dismiss briefing or to raise entirely new arguments. To the extent Plaintiff's motion for jurisdictional discovery raises new arguments and/or reargues issues already addressed in the motion-to-dismiss briefing, those portions of Plaintiff's motion (and reply) need not be considered.

IV.    Robson's And Meza's Motion To Dismiss

Robson and Meza jointly move to dismiss Count Three (Plaintiff's § 1983 claim)

and Counts Four and Five (Plaintiff's state-law claims for abuse of process and aiding and abetting).  (Doc. 51.)

A.   **Plaintiff's Motion To Strike**

Before turning to the merits, the Court first addresses whether the motion to dismiss and reply should be stricken as requested by Plaintiff.  (Doc. 64.)

1.   Relevant Authorities

Local Civil Rule 7.2(m)(1) provides: "Unless made at trial, a motion to strike may be filed only if it is authorized by statute or rule, such as Federal Rules of Civil Procedure 12(f), 26(g)(2) or 37(b)(2)(A)(iii), or if it seeks to strike any part of a filing or submission on the ground that it is prohibited or not authorized by a statute, rule, or court order."

Local Civil Rule 12.1(c) provides:

No motion to dismiss for failure to state a claim or counterclaim, pursuant to Federal Rule of Civil Procedure 12(b)(6), or motion for judgment on the pleadings on a claim or counterclaim, pursuant to Federal Rule of Civil Procedure 12(c), will be considered or decided unless the moving party includes a certification that, before filing the motion, the movant notified the opposing party of the issues asserted in the motion and the parties were unable to agree that the pleading was curable in any part by a permissible amendment offered by the pleading party.  The movant may comply with this rule through personal, telephonic, or written notice of the issues that it intends to assert in a motion.  A motion that does not contain the required certification may be stricken summarily.

Federal Rule of Civil Procedure 11(b) provides:

By presenting to the court a pleading, written motion, or other paper— whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances: (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a

1  lack of information.

2      The Court's Preliminary Order requires that "before filing a Rule 12(b)(6) motion

3  to dismiss . . . the movant must confer with the opposing party to determine whether such

4  motion can be avoided" and "must attach a certificate of conferral, certifying that it notified

5  the opposing party of the issues asserted in its motion and that the parties conferred but

6  were unable to agree that the pleading was curable in any part by a permissible amendment

7  offered by the pleading party." (Doc. 13 at 4.) It further provides that "[a]ny motion

8  lacking the required certification may be summarily stricken." (*Id.*)

9              2.    The Parties' Arguments

10      Plaintiff moves, "[p]ursuant to LRCiv 7.2(m)(1)," to strike Robson's and Meza's

11  motion and reply. (Doc. 64.) Plaintiff argues that although Robson's counsel participated

12  in a meet-and-confer regarding the motion to dismiss, because "Meza never requested or

13  participated in a meet and confer session, and he never communicated any complaint

14  sufficiency issues to Plaintiff as local rules and the Court's Preliminary Order require," the

15  motion and reply (as well as the certificate of conferral) "are filings prohibited by LRCiv

16  12.1(c), Fed. R. Civ. P. 11(b), and the Preliminary Order." (*Id.* at 1, 6.) At a minimum,

17  Plaintiff argues the Court should strike part of the reply as violating Fed. R. Civ. P. 11(b)(2)

18  and (3) because Robson and Meza purportedly raise Ariz. R. Civ. P. 15(a), (d) for the first

19  time in their reply, which arguments lack "evidentiary support." (*Id.* at 7-9.)

20      In response, Robson and Meza first argue that Plaintiff's motion is "not timely" per

21  Fed. R. Civ. P. 12(f)(2), which "makes clear that motions to strike pleadings must be made

22  'either before responding to the pleading or, if a response is not allowed, within 21 days

23  after being served with the pleading.'" (Doc. 68 at 1, quoting Fed. R. Civ. P. 12(f)(2).)

24  Second, Robson and Meza argue that Plaintiff's "substantive position regarding who all

25  had to participate in the meet and confer session is inapplicable to joint motions such as"

26  their joint motion to dismiss. (*Id.* at 2.) Because Robson's counsel attended the meet-and-

27  confer and "Meza did not assert any grounds for dismissal that were not discussed in the

28  meet and confer session, there was no need for a separate meet and confer on the same

topics." (*Id.*)  Third, Robson and Meza argue that Plaintiff has used his motion to strike "to essentially file a 'Surreply,'" which "is procedurally improper." (*Id.* at 3.)

In reply, Plaintiff argues that his motion was not untimely under Rule 12(f)(2) because that rule applies to pleadings, whereas he seeks to strike a motion. (Doc. 71 at 1-2.)  Plaintiff further argues that "Defendants cite no legal authority or interpretation of procedural language to support their position" that a joint motion to dismiss does not trigger the same meet-and-confer requirement. (*Id.* at 2-3.)  Plaintiff next argues that Meza and Robson "strategically chose vague language to wordsmith" their certificate of compliance "around Meza' noncompliance" and reiterates that the certificate of conferral violates Rule 11. (*Id.* at 4.)  Plaintiff then argues that Robson's and Meza's dismissal arguments are not the same. (*Id.* at 4-6.)  Plaintiff also argues that he need not "demonstrate injury or prejudice." (*Id.* at 6.)  Plaintiff finally argues that his motion was not a surreply. (*Id.* at 7-8.)[19]

### 3.  Analysis

As an initial matter, it is unclear whether a motion to strike is the appropriate vehicle for challenging an opposing party's alleged non-compliance with a meet-and-confer requirement.  *See, e.g.*, *Perkins v. Scida*, 2025 WL 1416047, *2 (C.D. Cal. 2025) ("To the extent that Plaintiff is arguing that the Motion to Dismiss was filed in violation of the meet-and-confer requirements of Central District Local Rule 7-3, the Motion to Strike Motion to Dismiss and Opposition is not the appropriate pleading for that argument.") (citation omitted); *Karlsson*, 2020 WL 2615972 at *2 ("The motion to strike will be denied because it is an inappropriate device for opposing a motion to dismiss.").

In any event, Plaintiff's request fails on the merits.  First, the motion to dismiss did contain a conferral certificate. (Doc. 51 at 337-38.)  Plaintiff's attempt to argue that this certificate somehow violates Rule 11 is unpersuasive.  The certificate accurately states that

---

[19]     In the Conclusion to his reply, Plaintiff asks the Court to "at least strike the filings insofar as Meza is involved." (Doc. 71 at 8.)  But Plaintiff "do[es] not identify any authority suggesting that a court may 'strike' a document as it pertains to some parties but not others." *Karlsson v. Ronn Motor Grp. Inc.*, 2020 WL 2615972, *2 n.3 (D. Ariz. 2020).

"a meet and confer was held" regarding the issues in the motion to dismiss.  (*Id.*)

Second, "[g]enerally, courts do not exercise their discretion to strike motions where a party's failure to meet and confer does not prejudice their adversary."  *Clark v. Weber*, 2024 WL 1600322, *2 (C.D. Cal. 2024).  *See also Dearing v. Morristown Police Dept.*, 2025 WL 418509, *3-4 (E.D. Tenn. 2025); *Del Toro v. 360 P'ship LP*, 2021 WL 5050057, *2 (C.D. Cal. 2021).  Given that Plaintiff responded to the motion to dismiss (without raising the alleged lack of a meet-and-confer) and argued against each of the joint positions raised by Robson and Meza, the Court is persuaded by Defendants' argument that "had there been a separate meet and confer session with Meza's counsel, [Plaintiff] would [not] have in any way changed his position on any [joint] matter asserted in the [motion]."  (Doc. 68 at 2.)  Indeed, a review of the motion shows that each issue raised with respect to Meza was jointly raised with respect to Robson, such that Plaintiff would have been put on notice in the meet-and-confer with Robson's counsel of each of Meza's grounds for dismissal. Robson and Meza raise four arguments as to why Plaintiff's claims against them should be dismissed.  (Doc. 51 at 1-2.)  The first argument is that Plaintiff's claims (against both Robson and Meza) are barred by the *Noerr-Pennington* doctrine.  (*Id.* at 8-10.)  Although Plaintiff belatedly claims in his reply in support of his motion to strike that Robson's counsel "never discussed" *Noerr-Pennington* immunity with him during the meet and confer (Doc. 71 at 5), this statement appears at odds with his previous acknowledgement that Robson's counsel discussed the "litigation privilege" with him (Doc. 64 at 1-2).  It is also directly contradictory to the statement he made in his declaration attached to his response to the motion to dismiss: "Mr. Flint did explain his client's position that . . . she has immunity under the Noerr-Pennington doctrine."  (Doc. 55-1 ¶ 15.  *See also id.* ¶ 16 [Plaintiff stating that he "explained" to Robson's counsel in the meet-and-confer "that *Noerr-Pennington* immunity did not apply to her litigation conduct, but even if that brand of immunity could apply, her conduct would qualify under the 'sham litigation exception'"].)  Moreover, Plaintiff seems to misunderstand Robson's and Meza's arguments regarding the *Noerr-Pennington* doctrine when he argues that it applies

differently to Robson and Meza because Robson argues she is a private person while Meza is a government official.  (Doc. 71 at 5.)  The *Noerr-Pennington* doctrine, as discussed in greater detail below, applies equally to both defendants even assuming, as Plaintiff must allege to assert a § 1983 claim, that Robson was a state actor under a joint action theory.  *Cf. B&G Foods N. Am., Inc. v. Embry*, 29 F.4th 527, 541 (9th Cir. 2022) ("In short, *even assuming Defendants were state actors*, the *Noerr-Pennington* doctrine bars B&G's § 1983 action challenging Defendants' protected petitioning conduct.") (emphasis added).  The second argument raised in the motion to dismiss is that Plaintiff's claims against Robson and Meza are barred by claim preclusion.  (Doc. 51 at 10-12.)  Again, this argument applies equally to both Defendants.  The third argument raised is an argument that is specific to Robson.  (*Id.* at 12-14.)  Accordingly, Meza's meet-and-confer efforts regarding this argument (or lack thereof) are irrelevant.  The fourth argument is that Plaintiff fails to state a claim under his state-law claims against both Robson and Meza.  (*Id.* at 14-17.)  Once again, these arguments apply equally to Robson and Meza.  Accordingly, the Court agrees with Robson and Meza that "[b]ecause Rep. Meza did not assert any grounds for dismissal that were not discussed in the meet and confer session, there was no need for a separate meet and confer on the same topics."  (Doc. 68 at 2.)

Third, the fact that Plaintiff's motion to strike was filed nearly a month after the motion to dismiss was filed, and after the motion to dismiss became fully briefed, also undermines Plaintiff's request.  *Cf. Dearing*, 2025 WL 418509 at *3 ("In any event, Plaintiff did not raise this issue until January 2025, approximately six months after his deadline to respond to Defendants' motions.  By failing to submit a timely response to Defendants' motions, Plaintiff waived opposition to them.").  Indeed, Plaintiff's motion to strike effectively operates as an improper surreply, seeking to raise an argument (*i.e.*, failure to meet and confer) he could have raised in his response brief.

This leaves Plaintiff's argument that the Court should strike the portion of Robson's and Meza's reply brief addressing claim preclusion because that portion of the brief violates Rules 11(b)(2) and 11(b)(3).  (Doc. 64 at 7-9.)  The Court construes this as a Rule

11(c) motion for sanctions premised on an alleged violation of Rule 11(b).   Because Plaintiff's request does not comply with Rule 11(c)(2), his request is denied.[20]

### B.    The Parties' Arguments

As noted, Robson and Meza jointly move to dismiss the FAC pursuant to Rule 12(b)(6) on four grounds.   (Doc. 51.)   The Court will limit its analysis to the first ground because it is dispositive.   The first ground is that "Plaintiff's claims" against Robson and Meza "relate solely to their participation in the proceedings to designate Plaintiff as a vexatious litigant in the State Litigation" and are thus "barred by the *Noerr-Pennington* doctrine."   (*Id.* at 8.)   Robson and Meza argue that "[i]n the litigation context, the only exception to *Noerr-Pennington* immunity is the 'sham' litigation exception"—and because they were successful on their motion to have Plaintiff deemed vexatious, the sham litigation exception cannot apply.   (*Id.* at 9.)

In response, Plaintiff argues that Robson and Meza do not have *Noerr-Pennington* immunity.   (Doc. 55 at 16-17.)   Citing *Manistee Town Ctr. v. City of Glendale*, 227 F.3d 1090 (9th Cir. 2000), Plaintiff argues that "*Noerr-Pennington* immunity only extends to state actors when genuinely performing ombudsmen services for their constituents" and that "Meza was in no way engaging in political activity in support of constituents when he devised the Scheme, intentionally and systematically defrauded Medicaid, made misrepresentations to state courts, aided and abetted others' misrepresentations to state courts, and mounted attacks on Plaintiff's First Amendment rights."   (*Id.* at 16-17, cleaned up).   Plaintiff argues that, "[t]o the contrary, [Meza] and [Robson] prosecuted the § 12-3201(A) joint motion to conceal their unlawful activities," and that "*Noerr-Pennington* does not immunize legislators who perform such self-serving acts."   (*Id.* at 17.)   In the alternative, Plaintiff argues that even if *Noerr-Pennington* does apply, Robson's and Meza's petitioning "is subject to the sham litigation exception" because "[t]he supplying

---

[20]     In his reply in support of the motion to strike, Plaintiff further argues that Robson's and Meza's response to the motion to strike violates Rule 11 by stating "that a defendant need not comply with LRCiv12.1(c)."   (Doc. 71 at 4.)   The Court rejects this argument. Plaintiff cannot raise a Rule 11 argument every time he disagrees with an argument made by Defendants.

of fraudulent information" does not receive *Noerr-Pennington* immunity.  (*Id.*)

In reply, Robson and Meza argue that Plaintiff's response "largely fails to address" the *Noerr-Pennington* doctrine even though it is "dispositive." (Doc. 59 at 2.)  Robson and Meza further argue that Plaintiff fails to "make *any* argument as to how his claims against [Robson] somehow fall outside the purview of *Noerr-Pennington*"; that *Manistee* "stands for the opposite proposition" than that proposed by Plaintiff; and that the sham litigation exception does not apply because "Defendants prevailed on their vexatious litigant motion at every level." (*Id.* at 2-3.)

### C.    *Noerr-Pennington*

"Under the Noerr-Pennington doctrine, '[t]hose who petition government for redress are generally immune from antitrust liability.'" *Manistee*, 227 F.3d at 1092 (quoting *Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 56 (1993)). "The doctrine immunizes petitions directed at any branch of government, including the executive, legislative, judicial and administrative agencies." *Id.* Although originally applied in the antitrust context, the doctrine is no longer limited in that fashion, and the Ninth Circuit has "held that Noerr-Pennington immunity applies to claims under 42 U.S.C. § 1983 that are based on the petitioning of public authorities." *Id.  See also Empress LLC v. City & Cnty. of S.F.*, 419 F.3d 1052, 1056 (9th Cir. 2005) ("Although the Noerr-Pennington doctrine originally immunized individuals and entities from antitrust liability, Noerr-Pennington immunity now applies to claims under § 1983 that are based on the petitioning of public authorities."). The doctrine applies to § 1983 claims where the petitioning includes litigation activities. *B&G Foods*, 29 F.4th at 533-35. *See also Freeman v. Lasky, Haas & Cohler*, 410 F.3d 1180, 1184 (9th Cir. 2005) (the *Noerr-Pennington* doctrine applies to "[a] complaint, an answer, a counterclaim and other assorted documents and pleadings, in which plaintiffs or defendants make representations and present arguments to support their request that the court do or not do something" as well as to "'conduct incidental to' a petition . . . if the petition itself is protected"). The doctrine also provides immunity from state-law tort claims premised on protected

petitioning activity.  *Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1007 (9th Cir. 2008).  *See also Schrader Cellars, LLC v. Roach*, 129 F.4th 1115, 1125 n.12 (9th Cir. 2025) ("The *Noerr-Pennington* doctrine applies to state law tort claims.").

Courts in the Ninth Circuit follow a three-step analysis when determining whether conduct is immunized under the *Noerr-Pennington* doctrine: "(1) whether the lawsuit imposes a burden on petitioning rights; (2) whether the alleged activities constitute protected petitioning activity; and (3) whether the statute at issue may be construed to avoid that burden."  *B&G Foods*, 29 F.4th at 535 (cleaned up).  There is no immunity for "sham" petitions, an exception analyzed as part of step two.  *Id.*

Here, step one is satisfied because Plaintiff's lawsuit against Robson and Meza would burden those Defendants' petitioning rights.  Robson and Meza have a right to petition the judiciary to have a pro se litigant deemed vexatious, and that is precisely the conduct underlying Plaintiff's claims in Counts Three through Five.  In reaching its determination as to step one, the Court "do[es] not consider any alleged misconduct tied to the petitioning activities."  *Id.*

Step two asks whether Robson's and Meza's conduct constitutes "*protected* petitioning activity."  *Id.* at 535-36.  This step is composed of two subparts.  Step 2A evaluates "whether the Petition Clause extends to Defendants' conduct," and "[i]f it does," then under Step 2B, the Court must "next decide whether the sham exception to *Noerr-Pennington* applies."  *Id.*

Step 2A would clearly be satisfied as to Robson if she were considered a private citizen for purposes of Plaintiff's claims.  *Manistee*, 227 F.3d at 1093 ("If defendants were private citizens, the applicability of the Noerr–Pennington doctrine would be clear.").  Yet even assuming without deciding that she (like Meza) should be considered a state actor for purposes of those claims, the outcome would be the same.  In the § 1983 context, *Noerr-Pennington* immunity extends to "litigation activities brought by government officials to advance public goals."  *B&G Foods*, 29 F.4th at 535.  Plaintiff argues that, under *Manistee*, "*Noerr-Pennington* immunity only extends to state actors when genuinely performing

ombudsmen services for their constituents" and that "Meza was in no way engaging in 'political activity' in support of 'constituents' when he devised the Scheme, intentionally and systematically defrauded Medicaid, made misrepresentations to state courts, aided and abetted others' misrepresentations to state courts, and mounted attacks on Plaintiff's First Amendment rights." (Doc. 55 at 16-17, cleaned up.)[21]  But this argument misses the mark. The challenged conduct underlying Count Three is "Meza's and Robson's joint A.R.S. § 12-3201(A) motion and prosecution, including their efforts to uphold the resulting Order on appeal." (Doc. 14 ¶ 230.)  The challenged conduct underlying Counts Four and Five is the same.  (Id. ¶ 243 [Count 4: "Meza and Robson each engaged in a willful act in the use of a judicial process when jointly bringing the A.R.S. § 12-3201(A) motion in CV2022-008626 and prosecuting the motion and resulting Order through appeal."]; id. ¶ 264 [Count 5: "Meza and Robson each substantially assisted and encouraged each other to commit their primary torts, as evidenced by their join conduct in CV2022-008626."].)  Under Step 2A, the *Noerr-Pennington* doctrine extends to such conduct because Defendants—in litigating a public records case (CV2022-008626) under Arizona's public records law— sought to have Plaintiff deemed a vexatious litigant.  Such action advances the public goal of avoiding use of the judiciary's time and resources on baseless or harassing litigation. Plaintiff's argument speaks instead to Step 2B, which asks whether the sham exception applies.

The Ninth Circuit has "identified three circumstances in which the sham exception might apply in the litigation context": (1) "where the lawsuit is objectively baseless and the defendant's motive in bringing it was unlawful"; (2) "where the conduct involves a

---

[21]    Plaintiff also misstates the holding of *Manistee*. *Manistee* does not hold—as Plaintiff argues—that state actors *only* receive *Noerr-Pennington* immunity when they act as "ombudsmen for their constituents." (Doc. 55 at 16.)  In *Manistee*, Manistee argued that "government officials should be excluded from Noerr-Pennington immunity because government officials wield power that private petitioners do not."  227 F.3d at 1094.  In addressing that argument, the Ninth Circuit noted that petitions by government officials acting as "ombudsmen for their constituents . . . may be nearly as vital to the functioning of a modern representative democracy as petitioning that originates with private citizens." *Id.* at 1093.  Thus, *Manistee* does not set forth a rule that a state actor only receives *Noerr-Pennington* immunity when acting on behalf of constituents but rather holds that even petitioning done by a government official acting on behalf of constituents is immunized.

series of lawsuits brought pursuant to a policy of starting legal proceedings without regard to the merits and for an unlawful purpose"; and (3) "if the allegedly unlawful conduct consists of making intentional misrepresentations to the court, litigation can be deemed a sham if a party's knowing fraud upon, or its intentional misrepresentations to, the court deprive the litigation of its legitimacy." *B&G Foods*, 29 F.4th at 537-38 (citation omitted).

Under the first exception, the Court "need not reach the subjective element" if the suit was not objectively baseless. *Id.* at 538. The objective-baselessness requirement is not satisfied here because "a winning lawsuit is by definition not a sham." *Relevant Grp., LLC v. Nourmand*, 116 F.4th 917, 932 (9th Cir. 2024) (cleaned up). *See also PREI*, 508 U.S. at 60 n.5 ("A winning lawsuit is by definition a reasonable effort at petitioning for redress and therefore not a sham."). The FAC itself recognizes that the Arizona state court issued an order granting Robson's and Meza's motion to designate Plaintiff vexatious. (Doc. 14 ¶¶ 76, 79.) And the Court has judicially noticed that the Arizona Court of Appeals affirmed that decision and the Arizona Supreme Court denied review. Thus, the first sham exception does not apply.

The second exception does not appear to be at issue here, as Plaintiff has not alleged in the FAC that Robson and Meza have brought a series of lawsuits against him.

As for the third exception, the FAC alleges as part of Count Three that Robson's and Meza's "joint A.R.S. § 12-3201(A) motion and prosecution, including their efforts to uphold the resulting Order on appeal . . . constitute 'sham litigation' predicated on a litigant's 'fraud . . . misrepresentation or other misconduct', including criminal misconduct." (Doc. 14 ¶ 230 [citing *PREI*, 508 U.S. at 61; *Relevant Grp.*, 116 F.4th at 928].) And Plaintiff argues in his response to the motion to dismiss that "[t]he supplying of fraudulent information threatens the fair and impartial functioning of these agencies and does not deserve Noerr-Pennington immunity." (Doc. 55 at 17, cleaned up.) This argument fails for several reasons. First, the FAC fails to identify the alleged misrepresentations that Meza and Robson made to the superior court *in connection with their prosecution of the A.R.S. § 12-3201 motion*. The FAC alleges that Meza made

"factual misrepresentations on affidavit [which] induced the trial court to grant summary judgment in defendants' favor" (Doc. 14 ¶ 223), but those alleged misrepresentations were made in connection with the underlying public records suit, not Meza's prosecution of the vexatious litigant order. The FAC also alleges that "Meza's misconduct and malicious intent is further evident in *other* court filings where he provided knowing misrepresentations for the unlawful purpose of attempting to conceal the Scheme. Again, he falsely avowed to one court that Nonprofits' executives only paid him for his 'advice', although Plaintiff secured an affidavit from NP6's CEO in another court that she paid him for his 'services as a fundraiser'. Meza also submitted an affidavit swearing that he did not produce or maintain public records on his personal cell phone or personal email account, but evidence demonstrated that he did." (*Id.* ¶ 231.)[22] But Plaintiff's allegations that Meza made misrepresentations in *other* contexts—including in *other* cases—do not show that Meza made misrepresentations in connection with his prosecution of the vexatious litigant motion. Nor are there any allegations of alleged misrepresentations made by Robson, specifically, in connection with the prosecution of the vexatious litigant motion.

Second, even if Plaintiff had properly alleged misrepresentations made by Robson and Meza in connection with their prosecution of the vexatious litigant motion, those misrepresentations would have needed to "deprive the litigation of its legitimacy." *B&G Foods*, 29 F.4th at 538. To "overcome a 12(b)(6) motion" under the third sham exception, Plaintiff would need to "demonstrate that [Robson and Meza] so misrepresented the truth to the [Arizona Superior Court] that the entire . . . proceeding was deprived of its legitimacy." *Kottle v. Nw. Kidney Ctrs.*, 146 F.3d 1056, 1063 (9th Cir. 1998). That

[22] As a further example, in his response to the motion to dismiss, Plaintiff—in the context of his claim preclusion argument—states that "Meza's associates misrepresented a Medicaid contract's factual terms before the CV2021-014146 trial court to withhold records, but refused to admit their misrepresentation once discovered." (Doc. 55 at 9, citing Doc. 14 at 63-66.) He also states: "Meza misrepresented facts before the CV2021-013210 court when, for instance, he said he was only paid as an 'advisor' although a although a senior executive 'client' later confirmed she paid him for 'services as a fundraiser.'" (*Id.*, citing Doc. 14 at 77, 78 n.21.) Neither of these allegations address misrepresentations made by Meza to the CV2022-008626 court, never mind in connection with the prosecution of the vexatious litigant order.

standard is not satisfied here.  District courts in the Ninth Circuit have held that a proceeding is not deprived of its legitimacy "when the opposing party has the opportunity to respond to those assertions or omissions." *Ezra v. Leifer*, 2018 WL 4026975, *9 (C.D. Cal. 2018), *report and recommendation adopted*, 2018 WL 4026999 (C.D. Cal. 2018).  *See also Alers v. Bank of Am., NA*, 2014 WL 12787629, *2 (C.D. Cal. 2014), *aff'd sub. nom.*, 671 F. App'x 425 (9th Cir. 2016) (sham exception for misrepresentations did not apply because when the allegedly false statements were made, the plaintiff "*then knew* [them] to be false" and "had every opportunity, in responding" to show that they were false, and thus the alleged misrepresentations "would not have 'deprive[d] the litigation of its legitimacy'"); *Wilson v. Leigh L. Grp., P.C.*, 2020 WL 3972574, *5 (N.D. Cal. 2020) ("[A]lthough, as noted above, plaintiff alleges the defendants made fraudulent statements in their oppositions, such asserted conduct did not 'deprive the litigation of its legitimacy,' as plaintiff, in his reply brief, identified the allegedly fraudulent statements and raised the argument that defendants' oppositions were 'deceitful overall.'") (citations omitted).  Even if Robson and Meza made any misrepresentations to the Arizona Superior Court in connection with their prosecution of the vexatious litigant motion, Plaintiff—who was given an evidentiary hearing before the vexatious litigant order was issued against him— had the opportunity to respond.

Moreover, district courts have held that when misrepresentations were "accessible to all involved in the state court litigation," those "misrepresentations could not have deprived the litigation of its legitimacy." *Williams v. Jones & Jones Mgmt. Grp., Inc.*, 2015 WL 349443, *10 (C.D. Cal. 2015).   In *Williams*, the plaintiffs argued that the defendants "intentionally misrepresented the basis of Plaintiffs' state court complaint in their papers." *Id.*  The district court held that "such misrepresentations could not have deprived the litigation of its legitimacy given that the content of Plaintiffs' state court complaint was accessible to all involved in the state court litigation." *Id.*  Here, too, in the order designating Plaintiff a vexatious litigant, the Arizona Superior Court stated that it "carefully reviewed the parties' filings and the Court's minute entries and orders in this

matter, *together with the pleadings, minute entries, and orders in the several other litigation matters cited by Defendants and Plaintiff.*"  (Doc. 51 at 249, emphasis added.)  Accordingly, any alleged misrepresentations by Meza or Robson in underlying litigation would have been accessible to all and thus could not have deprived the litigation of its legitimacy.  Accordingly, even if Plaintiff were to amend the FAC to allege misrepresentations made by Meza and Robson in connection with their prosecution of the vexatious litigant motion, such allegations would be futile.

Finally, Plaintiff argues that to the extent the question of *Noerr-Pennington* immunity centers on disputed facts, his claims should not be dismissed at this stage.  (Doc. 55 at 17.)  But for the reasons stated above, the question of immunity does not turn on disputed facts.

Accordingly, Plaintiff's claims against Robson and Meza in Counts Three, Four, and Five are barred by the *Noerr-Pennington* doctrine.

### D.    **Attorneys' Fees**

Robson and Meza include a request for attorneys' fees in their motion to dismiss. (Doc. 51 at 17.)  Plaintiff does not appear to respond to this request.

This request is premature.  LRCiv 54.2(b) provides that "the party seeking an award of attorneys' fees and related non-taxable expenses must file and serve a motion . . . within fourteen (14) days of the entry of judgment in the action with respect to which the services were rendered."  No judgment against Plaintiff has yet been entered.

## V.    The Presiding Judge's Motion To Dismiss

Count One of the FAC is the only claim asserted against the Presiding Judge.  (Doc. 14 ¶¶ 113-207.)  As discussed, Count One is a First Amendment facial challenge to Arizona's vexatious litigant statute, A.R.S. § 12-3201, which seeks declaratory and injunctive relief.  (*Id.*)  Plaintiff purports to sue the Presiding Judge "in his official *administrative* capacity only."  (*Id.* ¶ 104, emphasis in original.)

### A.    **The Parties' Arguments**

The Presiding Judge moves to dismiss Count One under Rules 12(b)(1) and

12(b)(6). (Doc. 67.) First, the Presiding Judge argues that "[t]his Court lacks subject matter jurisdiction to hear this matter because there is no case or controversy between Plaintiff" and the Presiding Judge. (*Id.* at 1, 3-4.) The Presiding Judge argues there is no case or controversy because the Presiding Judge's "only action here was to review and approve the application to certify Plaintiff as a vexatious litigant, as allowed by Arizona law," and the Presiding Judge "had no part in drafting" A.R.S. § 12-3201 "nor enforces" A.R.S. § 12-3201. (*Id.* at 3.) The Presiding Judge argues that he "performed a quintessential judicial function—making a ruling based on the record before him—in his role as a judicial officer." (*Id.* at 3-4.) The Presiding Judge further argues that Plaintiff cannot "invoke the standing of others" to "prevent" the Presiding Judge "from entering vexatious litigant orders against others." (*Id.* at 4.)

Second, the Presiding Judge argues that Plaintiff's claims are "barred by the Eleventh Amendment" and that, under the Supreme Court's decision in *Whole Woman's Health v. Jackson*, 595 U.S. 30 (2021), the Presiding Judge enjoys sovereign immunity. (*Id.* at 4-5.)

Third, in the alternative, the Presiding Judge argues that Plaintiff has failed to state a claim because the Presiding Judge "has judicial immunity" and is "absolutely immune from suit for the acts he takes in his judicial capacity." (*Id.* at 7.) And the Presiding Judge argues that Plaintiff's attempt to avoid judicial immunity "by claiming that the [Presiding Judge's] action here was 'administrative,' . . . mischaracterizes the nature of the [FAC]." (*Id.* at 8.)

In response, Plaintiff argues that the Presiding Judge's motion "relies entirely on judicial immunity as grounds for Fed. R. Civ. P. 12(b)(1) and (6) dismissal." (Doc. 79 at 2.) Plaintiff argues that the Presiding Judge "performed no judicial act that could give rise to judicial immunity" because he "never served as the trial judge assigned to any case involving Plaintiff"; "did not hear or decide any controversy between the CV2022-008626 parties"; "administratively reviewed an 'application' that did not originate from the parties"; and "acted in an administrative capacity, not a judicial capacity, when issuing and

now maintaining [Administrative Order 2023-159].” (*Id.* at 2-3.)  At bottom, Plaintiff argues that the Presiding Judge's standing, sovereign immunity, and judicial immunity arguments fail because the Presiding Judge was sued in his administrative capacity. Plaintiff seeks to draw a distinction between the order issued by Juge Blanchard in CV2022-008626 and Administrative Order 2023-159, arguing that it was only Judge Blanchard, and not the Presiding Judge, who “conducted judicial proceedings and issued an appealable ruling.” (*Id.* at 6.)  Plaintiff argues that the Presiding Judge's issuance of Administrative Order 2023-159 could not have been a judicial act because it was entered while the Arizona Court of Appeals had issued a stay of Judge Blanchard's order, and “[n]o judicial act may be performed in a lower court while a case is under appellate jurisdiction.” (*Id.* at 7.)  Plaintiff also argues that the CV2022-008626 record “is devoid” of any “application,” so the issuance of Administrative Order 2023-159 could not have been a judicial act. (*Id.*)  Plaintiff further argues that no events took place in the Presiding Judge's chambers and that the parties did not otherwise “confront” the Presiding Judge. (*Id.* at 8-9.)  Plaintiff also argues that judicial immunity cannot apply because “appellate courts cannot exercise appellate jurisdiction over administrative orders.” (*Id.* at 8.)

Plaintiff further argues that he has standing because he “suffers an ongoing irreparable injury-in-fact” caused by the Presiding Judge's actions “when issuing and maintaining” Administrative Order 2023-159 and that his injury is “redressable by enjoining enforcement of that non-judicial, administrative order.” (*Id.* at 10.)  Plaintiff argues that the Presiding Judge “enforced, and continues to enforce, § 12-3201 via [Administrative Order 2023-159] and by maintaining Plaintiff's name on a vexatious litigant list” and that the Presiding Judge “has full authority to rescind [Administrative Order 2023-159] and to remove Plaintiff's name from that list.” (*Id.*)  Plaintiff also argues sovereign immunity does not apply. (*Id.* at 10-11.)  Next, Plaintiff asserts that there is no judicial immunity because under § 1983, judicial immunity protects actions taken by judges in their judicial capacity, including in actions for injunctive relief, but does not apply to prospective declaratory relief. (*Id.* at 13.)  Finally, Plaintiff reiterates his arguments as

1    to why A.R.S. § 12-3201 violates the Petition Clause.  (*Id.* at 13-16.)

2         In reply, the Presiding Judge first focuses on sovereign immunity, relying on the

3    Supreme Court's decision in *Whole Woman's Health* and the Ninth Circuit's decision in

4    *Munoz.*  (Doc. 81 at 2-4.)  The Presiding Judge then focuses on judicial immunity, arguing

5    that "[d]etermining whether a person is a vexatious litigant, and issuing an order that

6    restricts that person's ability to file additional litigation without guardrails is a judicial

7    function."  (*Id.* at 5.)  The Presiding Judge also disputes Plaintiff's argument that Arizona's

8    vexatious litigant law would be unreviewable if his challenge here were disallowed,

9    arguing that "administrative orders declaring a person a 'vexatious litigant' *are* subject to

10   appellate review in state court through a special action."  (*Id.* at 6.)  Next, the Presiding

11   Judge argues that "Plaintiff's response cannot be used as a collateral attack on the statute

12   or the state court's determination that he is a vexatious litigant."  (*Id.* at 7.)

13       B.    **The *Rooker-Feldman* Doctrine**

14        At the time Plaintiff filed the FAC, he was allegedly unaware that the Presiding

15   Judge had already entered Administrative Order 2023-159 against him.  Accordingly, the

16   FAC seeks to prevent the Presiding Judge from entering such an administrative order

17   and/or adding Plaintiff's name to the vexatious litigant list.  (Doc. 14 at 70-71 ["Plaintiff

18   requests that the Court provide the following relief: . . . Permanently enjoin[] Defendant

19   Welty from enforcing A.R.S. § 12-3201, which also precludes issuing any administrative

20   [sic] entering Plaintiff's name onto any vexatious litigant list or register."].)  However,

21   Plaintiff is now aware of the entry of Administrative Order 2023-159 (which, as discussed

22   in earlier portions of this order, is subject to judicial notice).  Accordingly, Plaintiff now

23   appears to seek relief taking the form of an order preventing the Presiding Judge from

24   maintaining and enforcing Administrative Order 2023-159.  (Doc. 79 at 10 [arguing that

25   Plaintiff's "ongoing irreparable injury-in-fact caused by [the Presiding Judge's] conduct

26   when issuing and maintaining the AO . . . is redressable by enjoining enforcement of the

27   non-judicial, administrative order"].)  Although Plaintiff's briefing is far from a model of

28   clarity (and he does not raise this issue until his reply in support of his motion to take

jurisdictional discovery from the Presiding Judge), Plaintiff argues that although the FAC sought a "negative injunction preventing administrative enforcement action," he now seeks to "pursue a 'positive injunction' (i.e., a 'mandatory injunction') requiring his name be removed from the state's vexatious litigant list and the Administrative Order 2023-159 be rescinded." (Doc. 88 at 9.)  Because the Court has taken judicial notice of Administrative Order 2023-159, it reviews the FAC and the motions to dismiss with knowledge of the order's existence, and—giving Plaintiff the benefit of the doubt—reviews the FAC and motion-to-dismiss briefing in light of Plaintiff's revised arguments for relief.[23]  In that vein, however, the Court has concerns that some of the arguments Plaintiff now makes are barred by the *Rooker-Feldman* doctrine.

"Under *Rooker-Feldman*, a federal district court does not have subject matter jurisdiction to hear a direct appeal from the final judgment of a state court order." *Noel v. Hall*, 341 F.3d 1148, 1154 (9th Cir. 2003).  "It is a forbidden de facto appeal under *Rooker-Feldman* when the plaintiff in federal district court complains of a legal wrong allegedly committed by the state court, and seeks relief from the judgment of that court." *Id.* at 1163.

Although the Presiding Judge's motion does not address the *Rooker-Feldman* doctrine, the Court has an independent obligation to determine whether it has subject-matter jurisdiction. *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999).  As discussed in the order denying Plaintiff's first TRO motion (Doc. 47 at 3 n.7), to the extent Plaintiff "seeks a declaration that [Arizona's] vexatious litigant statute is 'facially unconstitutional' and a permanent injunction barring the law's enforcement," such claims are likely "not barred by *Rooker-Feldman*." *Nunu v. Texas*, 2022 WL 820744, *2 (5th Cir. 2022).  However, several of Plaintiff's arguments appear to seek relief that would be barred by *Rooker-Feldman*.  For example, Plaintiff now contends he is entitled to "a 'positive injunction' (i.e., a 'mandatory injunction') requiring his name be removed from the state's

---

[23]    To be clear, the dismissal analysis does not ultimately turn on the timing of the administrative order's issuance or the precise form of relief sought by Plaintiff.  As discussed below, the adjudicatory nature of the issuance process means that Plaintiff's claims against the Presiding Judge, however articulated, do not present a justiciable controversy.

1    vexatious litigant list and the Administrative Order 2023-159 be rescinded."  (Doc. 88 at

2    9.)  Such relief is likely barred by *Rooker-Feldman*.  *Bianchi v. Rylaarsdam*, 334 F.3d 895,

3    900 (9th Cir. 2003) ("Here, Bianchi seeks an order compelling the state court to recall its

4    decision and reassign his case to be heard before a different panel of judges.  *Rooker-*

5    *Feldman* precludes adjudication of this claim because the only redress Bianchi seeks is an

6    'undoing' of the prior state-court judgment—a particularized challenge to an adjudication

7    against him in state court clearly barred under *Rooker-Feldman*.") (cleaned up); *Nunu*,

8    2022 WL 820744 at *1 (plaintiff's "demand that the district court 'declar[e] void' the Texas

9    courts' vexatious-litigant orders, attorney fees award, and appellate judgments affirming

10   them, is an attempt at modification of state judgments via a collateral federal suit—

11   precisely the type of action forbidden by the *Rooker-Feldman* doctrine").

12        C.    **Article III Case Or Controversy**

13        "Article III of the Constitution affords federal courts the power to resolve only

14   'actual controversies arising between adverse litigants.'"  *Whole Woman's Health*, 595

15   U.S. at 39 (citation omitted).  "Judges exist to resolve controversies about a law's meaning

16   or its conformance to the Federal and State Constitutions, not to wage battle as contestants

17   in the parties' litigation."  *Id.* at 40.  "As [the Supreme Court] has explained, 'no case or

18   controversy' exists 'between a judge who adjudicates claims under a statute and a litigant

19   who attacks the constitutionality of the statute.'"  *Id.* (quoting *Pulliam v. Allen*, 466 U.S.

20   522, 538 n.18 (1984)).  *See also Kellogg v. Nichols*, 149 F.4th 155, 161-62 (2d Cir. 2025)

21   ("Decisions from other circuits support our conclusion that there is no live case or

22   controversy between New York state court judges serving as firearms licensing officers

23   and litigants challenging the State's licensing scheme."); *Frazier v. Prince George's Cnty.,*

24   *Md.*, 140 F.4th 556, 562-63 (4th Cir. 2025) ("[W]e conclude that there is no justiciable

25   controversy between the plaintiffs and the judicial defendants because functions normally

26   performed by a judge do not create an Article III case or controversy between judges and

27   the litigants before them.") (cleaned up); *Reule v. Jackson*, 114 F.4th 360, 365 (5th Cir.

28   2024) ("[T]he requirement of a justiciable controversy is not satisfied where a judge acts

in his *adjudicatory* capacity. In contrast, if a judge acts as the enforcer or administrator of a challenged statute, a case or controversy may exist.") (citations omitted); *Lindke v. Tomlinson*, 31 F.4th 487, 492-93 (6th Cir. 2022) ("[W]e agree that no case or controversy exists between a state-court judge who has acted in an adjudicatory capacity under a state statute and a litigant who is attacking the constitutionality of that statute."); *Bauer v. Texas*, 341 F.3d 352, 359 (5th Cir. 2003) ("The requirement of a justiciable controversy is not satisfied where a judge acts in his adjudicatory capacity."); *Mendez v. Heller*, 530 F.2d 457, 458-60 (2d Cir. 1976) (affirming dismissal of suit "for want of a justiciable controversy" even where judge was sued in administrative rather than judicial capacity).

In *Wolfe*, the plaintiff sought a declaratory judgment that California's vexatious litigant statute was unconstitutional. 392 F.3d at 360. "Citing *In re the Justices of the Supreme Court of Puerto Rico*, 695 F.2d 17 (1st Cir. 1982) ('*In re Justices*'), the Superior Court Judge Defendants (Judges Garcia, Quidachay, and Chiantelli) argue[d] that there is no 'case or controversy' between them and Wolfe sufficient to support federal court jurisdiction under Article III." *Id.* at 365. The Ninth Circuit reasoned that "[i]f their argument is correct, it applies equally to Justice Strankman, who has been sued in his judicial capacity, and to Chief Justice George, to the extent he has been sued in his judicial capacity." *Id.* Quoting *In Re Justices*, the Ninth Circuit stated the general rule that "ordinarily, no 'case or controversy' exists between a judge who adjudicates claims under a statute and a litigant who attacks the constitutionality of the statute,' because when judges act as neutral adjudicators they do not have legal interests adverse to the interests of the litigants." *Id.* (quoting *In Re Justices*, 695 F.2d at 21). The Ninth Circuit noted, however, that "the First Circuit did not rest its decision in *In Re Justices* on Article III grounds" and instead "resolve[d] the case on the nonconstitutional basis that judges are 'not proper party defendants in § 1983 actions challenging the constitutionality of state statutes.'" *Id.* (quoting *In re Justices*, 695 F.2d at 22). The Ninth Circuit noted that it had previously followed that approach in *Grant v. Johnson*, 15 F.3d 146 (9th Cir. 1994). Although the Ninth Circuit in *Wolfe* and *Grant* did not resolve the issue on Article III grounds, both cases

came before the Supreme Court's decision in *Whole Woman's Health*, which holds that

"'no case or controversy' exists 'between a judge who adjudicates claims under a statute

and a litigant who attacks the constitutionality of the statute.'" 595 U.S. at 39-40. In light

of the Supreme Court's more recent decision, the Court must decide the issue here on

Article III grounds. *Cf. Evenson-Childs v. Ravalli Cnty.*, 2023 WL 2705902, *5-9 (D.

Mont. 2023), *report and recommendation adopted*, 2023 WL 2583261 (D. Mont. 2023)

(noting that, since *Grant* and *In re Justices*, "[o]ther federal courts have followed suit, and

'in doing so, have used language with broader constitutional implications,'" and ultimately

dismissing claims against district court judges who "were performing quintessentially

judicial functions" for lack of an Article III case or controversy).

As relevant here, *Wolfe*—which again, was not decided on Article III grounds—

permitted certain claims to go forward against one of the judicial defendants sued in his

administrative capacity. 392 F.3d at 367. In *Munoz*, the Ninth Circuit, relying on *Whole

Woman's Health*, overruled *Wolfe* "[t]o the extent *Wolfe* can be read to hold that the *Ex

Parte Young* exception allows injunctions against judges acting in their judicial capacity."

91 F.4th at 981. In a footnote, however, the Ninth Circuit left open the question whether

*Wolfe*'s holding "allow[ing] some claims against judicial defendants to go forward when

sued in their administrative, as opposed to judicial, capacity" is consistent with *Whole

Woman's Health. Id.* at 981 n.1. Here, Plaintiff purports to sue the Presiding Judge "in his

official *administrative* capacity only." (Doc. 14 ¶ 104, emphasis in original.) But this is a

bare "legal conclusion" and, as such, it is "not entitled to the assumption of truth." *Iqbal*,

556 U.S. at 680. Instead, it is necessary to evaluate whether the challenged actions taken

by the Presiding Judge are actually administrative or adjudicative in nature.

In *Reule*, the appellants, a "group of individuals who ha[d] been declared vexatious

litigants under a Texas statute," sought to "challenge . . . the constitutionality of that statute,

which they asserted in a lawsuit against a state court judge, a state court clerk, and a state

official responsible for publishing the online list of individuals declared vexatious

litigants." 114 F.4th at 363. The Fifth Circuit concluded that "Judge Jackson was acting

in his adjudicatory capacity, rather than as enforcer or administrator" in his role "evaluat[ing] vexatious litigants' requests for permission to file a new lawsuit." *Id.* at 366. Although the plaintiffs argued "that they intended to sue Judge Jackson in his administrative capacity, challenging only 'the performance of the ministerial task of deciding whether to permit a "vexatious litigant's" pro se filing,'" the Fifth Circuit held that "there is nothing ministerial or administrative about that duty: it is precisely the type of adjudicatory function judges perform every day, and [plaintiffs] cannot escape the rule articulated in *Whole Woman's Health* by labeling an adjudicatory process as an administrative one." *Id.* Accordingly, the court concluded that there was "no Article III case or controversy between [plaintiffs] and Judge Jackson" and "affirm[ed] the dismissal of the claims against him." *Id.* This reasoning is persuasive and forecloses Plaintiff's claim against the Presiding Judge for similar reasons.[24]

The Presiding Judge issued Administrative Order 2023-159 only after a vexatious-litigant motion was made by Robson and Meza and granted by Judge Blanchard in the underlying public records case and after Judge Blanched then made a referral to the Presiding Judge. (Doc. 51 at 324-25.) Furthermore, the Administrative Order specifies that the President Judge issued it only after "review of other matters filed in this Court, and considering all the matters presented" and after making certain "findings." (*Id.*) The act of designating a pro se litigant as vexatious is considered adjudicatory. *Cf. Wolfe*, 392 F.3d at 365 ("The role of a judge under the Vexatious Litigant Statute cannot be characterized simply. . . . For example, a judge acts as a neutral adjudicator in determining whether a plaintiff is a vexatious litigant upon a motion by a defendant, and in deciding whether to require the litigant to post a security bond.").

Several other aspects of Administrative Order 2023-159 underscore why its issuance was an adjudicatory act. "Circuits have adopted a functional approach to evaluate whether a state court judge has acted in a judicial capacity in adjudicating a state statutory

---

[24]    The Fifth Circuit noted in *Reule* that its decision does not conflict with the Ninth Circuit's decision in *Wolfe* because *Wolfe* "did not analyze the issue of standing" except as part of a *Rooker-Feldman* analysis. *Id.* at 369.

claim that is then challenged on constitutional grounds." *Kellogg*, 149 F.4th at 162. The relevant factors include: (1) "whether the judge may initiate proceedings under the statute," (2) "whether the judge who has issued the order is responsible for enforcing it"; (3) "whether the judge played a role in enacting the statute pursuant to which the order was issued"; (4) "whether the judge is adequately alleged to have a personal or institutional stake in upholding the statute"; and (5) "whether the challenged act is 'a traditionally administrative task' like 'fee collection.'" *Id.* (citations omitted). *See also Reule*, 114 F.4th at 365-66 ("Accordingly, to determine whether a case or controversy exists, courts look to the role the judge plays in the relevant statutory scheme. If the role is strictly adjudicatory, then no case or controversy exists. Relevant considerations include whether the judge initiated the proceedings that the plaintiff is challenging or was a cause of the statute being enacted and whether the challenged statutory scheme compels or allows for traditional judicial safeguards such as notice and a hearing. Judges are not proper parties to a suit challenging a state law if, in resolving disputes under the challenged statute, they act as they would in any other case in that they sit as adjudicators, finding facts and determining law in a neutral and impartial judicial fashion.") (cleaned up).

The first factor is a close call. On the one hand, A.R.S. § 12-3201 does permit the Presiding Judge to designate a pro se litigant vexatious "on the court's own motion." A.R.S. § 12-3201(A). That is one factor to consider in determining whether a judge's actions are adjudicatory. *Kellogg*, 149 F.4th at 162 ("[W]e consider factors such as whether the judge may initiate proceedings under the statute."); *Lindke*, 31 F.4th at 493 ("[T]he role of a judge under Michigan's PPO statute is adjudicative [because] the judge does not initiate the underlying action, a private party does."). And the Ninth Circuit stated in *Wolfe* that the California vexatious litigant statute "grants a judge the power to impose, *on his or her own motion*, a prefiling order prohibiting a vexatious litigant from filing new litigation without the court's permission" and "[s]uch an action *may* not be purely that of a neutral adjudicator." 392 F.3d at 365-66 (emphasis added). On the other hand, in the case of Administrative Order 2023-159, the Presiding Judge did not act on his own motion—

1    instead, he took action in response to a referral by Judge Blanchard following a motion by

2    the defendants in CV2022-008626.  (Doc. 51 at 324-25.)  What's more, Judge Blanchard's

3    referral came after an evidentiary hearing in which Plaintiff was afforded the opportunity

4    to oppose the proposed vexatious-litigant designation.  "[W]hether the challenged statutory

5    scheme . . . allows for traditional safeguards such as notice and a hearing" is a "[r]elevant

6    consideration."  *Reule*, 114 F.4th at 366-67.  On balance, this factor tips in favor of the

7    Presiding Judge's actions being considered adjudicatory.

8         As for the second factor, the only "enforcement" of A.R.S. § 12-3201 by the court

9    would be the rejection of papers filed without leave of court by a vexatious litigant—but

10   as discussed above, *Reule* instructs that the decision whether to permit a vexatious litigant's

11   filing is adjudicatory in nature.

12        As for the third factor, there is no allegation that the Presiding Judge played a role

13   in enacting A.R.S. § 12-3201.  (Doc. 67 at 3 ["The [Presiding Judge] had no part in drafting

14   the law that the Plaintiff believes violates his rights."].)

15        As for the fourth factor, there is no allegation that the Presiding Judge had any "role

16   in determining [A.R.S. § 12-3201's] criteria for" designating pro se litigants vexatious, and

17   "if those criteria were ever to change or be declared unconstitutional, judges who issued or

18   declined [vexatious litigant orders] under the statutory scheme would 'not even have an

19   institutional interest in following their prior decisions.'"  *Kellogg*, 149 F.4th at 162-63.

20        As for the fifth factor, nothing about the Presiding Judge's issuance of

21   administrative orders designating pro se litigants vexatious is "traditionally administrative"

22   or similar to "fee collection."  *Id.* at 162.  In Administrative Order 2023-159, the Presiding

23   Judge set forth his review of "Judge Blanchard's referral" and Judge Blanchard's "order

24   designating Mr. Potter a vexatious litigant in" CV2022-008626.  (Doc. 51 at 324.)  The

25   Presiding Judge also attached a list of cases he reviewed identifying "other vexatious

26   conduct by Mr. Potter in various other causes of action in this Court."  (*Id.* at 324, 327-30.)

27   To be sure, it was Judge Blanchard who initially deemed Plaintiff vexatious in CV2022-

28   008626 after an evidentiary hearing, ultimately referring the matter to the Presiding Judge

1   under the A.R.S. § 12-3201 framework.  But the Presiding Judge, agreeing with Judge

2   Blanchard, made an independent determination that "the cases filed by the plaintiff allege

3   causes of action that are unsupported by facts as alleged, argue legal positions that are not

4   founded in the law or reasonable interpretations of the law, re-argue the same positions

5   repeatedly with no regard for rulings of the Court, and promote abuse of process.  Many

6   allegations appear to be made solely for the purposes of harassing defendants."  (*Id.* at

7   325.)  The Presiding Judge also "incorporat[ed] the findings of fact and conclusions of law

8   of Judge Blanchard" as part of his own determination that Plaintiff was vexatious.  (*Id.*)

9   The Presiding Judge was acting in an adjudicatory capacity when he reviewed the findings

10  of fact and conclusions of law of Judge Blanchard following an evidentiary hearing,

11  reviewed various cases filed by Plaintiff, and made an independent determination that

12  Plaintiff was vexatious under the statute.[25]

13      Accordingly, although Plaintiff purports to sue the Presiding Judge in his

14  administrative capacity, no Article III controversy exists because the challenged actions

15  taken by the Presiding Judge were adjudicatory.  Thus, the Court lacks subject-matter

16  jurisdiction over Plaintiff's claim against the Presiding Judge.  This determination makes

17  it unnecessary to reach the Presiding Judge's remaining arguments regarding sovereign

18  immunity and judicial immunity.

19          D.    **Plaintiff's Request For Jurisdictional Discovery**

20              1.    The Parties' Arguments

21      On September 9, 2025—the same day Plaintiff filed his response to the Presiding

22  Judge's motion to dismiss—Plaintiff sent a public records request under Arizona law to

23

24  [25]    Plaintiff notes in his response to the Presiding Judge's motion that in Administrative
    Order 2023-159, the Presiding Judge found that Plaintiff "unreasonably expanded court
25  proceedings" even though that was not one of the grounds upon which Judge Blanchard
    deemed Plaintiff vexatious in the public records case.  (Doc. 79 at 1.)  Although Plaintiff
26  argues he was "denied the right to be heard on that charge" (*id.*), if anything, this shows
    that the Presiding Judge's determination was independent and based upon his own review
27  of the record—which counsels against deeming his actions administrative rather than
    adjudicatory.  As the Presiding Judge correctly argues, the Presiding Judge "performed a
28  quintessential judicial function—making a ruling based on the record before him—in his
    role as a judicial officer."  (Doc. 67 at 3-4.)

counsel for the Presiding Judge seeking "copies of all records" which (1) "The Presiding Judge created, or relied on, to 'designate' any authority to the Hon. John Blanchard to 'designate a pro se litigant a vexatious litigant'"; (2) "Contain, or reference, an 'application' from the Hon. John Blanchard to the Presiding Judge to certify Phillip Potter as a vexatious litigant through case CV20222-008626"; (3) "Contain communications the Hon. Joseph Welty made with any other person regarding the previously referenced 'application'"; and (4) "Reference, or contain communications the Hon. Joseph Welty and/or the Hon. Pamela Welty [sic] made with any other person regarding, Administrative Order 2023-159." (Doc. 84 at 10-11.) Frustrated that the Presiding Judge did not respond to this request within 30 days, Plaintiff now seeks to circumvent the public records process by seeking jurisdictional discovery from the Presiding Judge for the same categories of documents. (*Id.* at 7-8.)

In response, the Presiding Judge argues, among other things, that "no additional facts are necessary" for the Court to determine whether it has subject-matter jurisdiction over Plaintiff's claim. (Doc. 86 at 3.) In particular, the Presiding Judge argues that Administrative Order 2023-159 "is already part of the record here," and thus "[d]iscovery into the innerworkings of the court, including communications between judges, is unnecessary to determine whether [Administrative Order 2023-159] designating Plaintiff a vexatious litigant is a judicial function." (*Id.* at 3-4.)

## 2.    Analysis

The Court agrees with the Presiding Judge that jurisdictional discovery regarding Administrative Order 2023-159 is unwarranted. Nothing about the requested discovery would aid the Court's analysis because it is unnecessary to look beyond Administrative Order 2023-159 and A.R.S. § 12-3210 when determining whether an Article III controversy exists between Plaintiff and the Presiding Judge. *Cf. Yamashita v. LG Chem, Ltd.*, 62 F.4th 496, 508 (9th Cir. 2023) (affirming district court's denial of jurisdictional discovery where "[j]urisdictional discovery would be little more than a fishing expedition seeking support for jurisdictional theories one of which is farfetched").

1    Plaintiff's requests for jurisdictional discovery to assist him in possibly amending

2    his complaint to add claims for a "positive injunction," as well as his request for

3    jurisdictional discovery to assist him in adding a damages claim against the Presiding Judge

4    (Doc. 88 at 6), are also denied for several reasons.    As an initial matter, these arguments,

5    raised for the first time in a reply brief, are waived.  Regardless, Plaintiff's requests amount

6    to nothing more than a "fishing expedition for a new theory" of jurisdiction over the

7    Presiding Judge.  *Cf. CrossFit, Inc. v. Matrix Sols., LLC*, 2020 WL 6484554, *8 (S.D. Cal.

8    2020) ("[T]he Court declines to allow CrossFit the opportunity to engage in discovery as a

9    fishing expedition for a new theory of personal jurisdiction over the Fitness Trade

10    Defendants.").  To the extent Plaintiff seeks to amend his complaint to seek a "positive

11    injunction" to force the Presiding Judge to rescind Administrative Order 2023-159, such a

12    request would also be barred by the *Rooker-Feldman* doctrine.    Nor has Plaintiff

13    established an entitlement to pursue jurisdictional discovery in support of a future damages

14    claim against the Presiding Judge.

15   VI.    Ortega's Motion To Dismiss

16    Plaintiff brings only state-law claims for abuse of process (Count Four) and aiding

17    and abetting abuse of process (Count Five) against Ortega.  In her Rule 12(b)(1) motion to

18    dismiss, Ortega argues that the Court lacks supplemental jurisdiction over those claims

19    because Plaintiff "alleges no facts sufficient to show that his state law claims derive from

20    the same nucleus of operative fact as his federal-question claims or that the state and federal

21    claims—against different defendants—would be expected to be tried in the same judicial

22    proceeding." (Doc. 52 at 5.)  In the alternative, Ortega argues that "[e]ven if the Court

23    determined it had supplemental jurisdiction over the claims against Ortega, it should

24    decline to exercise it for the sake of judicial economy, comity with the Arizona courts'

25    decisions in [Plaintiff's] state court cases and with its finding him a vexatious litigant, and

26    fairness and convenience for all parties other than [Plaintiff]." (*Id.* at 6.)

27    "[I]n any civil action of which the district courts have original jurisdiction, the

28    district courts shall have supplemental jurisdiction over all other claims that are so related

1  to claims in the action within such original jurisdiction that they form part of the same case

2  or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a).

3  Moreover, "[s]uch supplemental jurisdiction shall include claims that involve the joinder

4  or intervention of additional parties." *Id.* A district court "may decline to exercise

5  supplemental jurisdiction over a claim . . . if—(1) the claim raises a novel or complex issue

6  of State law, (2) the claim substantially predominates over the claim or claims over which

7  the district court has original jurisdiction, (3) the district court has dismissed all claims over

8  which it has original jurisdiction, or (4) in exceptional circumstances, there are other

9  compelling reasons for declining jurisdiction." *Id.* § 1367(c).

10      Although Plaintiff's federal claims remained pending at the time Ortega filed her

11  motion to dismiss, they are no longer pending—as discussed above, all of Plaintiff's federal

12  claims have now been dismissed. For this reason alone, the Court declines, pursuant to

13  § 1367(c)(3), to exercise supplemental jurisdiction over Plaintiff's state-law claims against

14  Ortega. *See generally Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)

15  ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance

16  of factors to be considered under the pendent jurisdiction doctrine—judicial economy,

17  convenience, fairness, and comity—will point toward declining to exercise jurisdiction

18  over the remaining state-law claims."); *Gesell v. City of Cottonwood*, 2025 WL 928885,

19  *13 (D. Ariz. 2025) ("[T]he *Cohill* factors counsel against retaining supplemental

20  jurisdiction here. First, this case is less than a year old and no trial date has been set, so

21  declining jurisdiction will cause minimal duplication of effort. Second, it appears the

22  [Maricopa] County Superior Court is at least as convenient a forum as this Court. As to

23  the remaining factors, considerations of fairness, federalism, and comity are best served by

24  allowing the Arizona state courts to address state-law claims . . . ."). This determination

25  makes it unnecessary to resolve whether Plaintiff's state-law claims against Ortega derive

26  from the same nucleus of operative fact as his federal claims, as required under § 1367(a),

27  or whether the Court should decline to exercise supplemental jurisdiction for the other

28  reasons identified in § 1367(c). Additionally, in light of this determination, Plaintiff's

1    request to pursue jurisdictional discovery against Ortega (Doc. 58 at 2) is denied as futile.

2    VII.    Leave To Amend

3        Plaintiff's filings include an array of requests for leave to amend in the event of

4    dismissal.

5        These requests are governed by Rule 15(a) of the Federal Rules of Civil Procedure,

6    which "advises the court that leave shall be freely given when justice so requires."

7    *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003) (cleaned up).

8    "This policy is to be applied with extreme liberality." *Id.* (cleaned up).  Thus, leave to

9    amend should be granted unless "the amendment: (1) prejudices the opposing party; (2) is

10   sought in bad faith; (3) produces an undue delay in litigation; or (4) is futile."

11   *AmerisourceBergen Corp. v. Dialysist W., Inc.*, 465 F.3d 946, 951 (9th Cir. 2006).

12   Additionally, "[a] district court should not dismiss a pro se complaint without leave to

13   amend unless it is absolutely clear that the deficiencies of the complaint could not be cured

14   by amendment."  *Akhtar v. Mesa*, 698 F.3d 1202, 1212 (9th Cir. 2012) (cleaned up).

15   "[B]efore dismissing a pro se complaint the district court must provide the litigant with

16   notice of the deficiencies in his complaint in order to ensure that the litigant uses the

17   opportunity to amend effectively."  *Ferdik v. Bonzelet*, 963 F.2d 1258, 1261 (9th Cir.

18   1992), as amended (May 22, 1992).

19       Although these standards almost always counsel in favor of giving a pro se litigant

20   at least one chance at amendment, this is an unusual case in that Plaintiff's claims are not

21   (for the most part) being dismissed due to imprecision in pleading or the failure to plead

22   necessary facts with the requisite level of detail.  Plaintiff's First Amendment facial

23   challenge to A.R.S. § 12-3201 in Count One is being dismissed because it is not a

24   permissible pre-enforcement challenge (as to AG Mayes) and because it does not raise a

25   true case or controversy (as to the Presiding Judge).  Plaintiff could not cure these defects

26   by pleading additional facts in a future pleading, so leave to amend as to Count One is

27   denied on futility grounds.  Similarly, Plaintiff's claims against Robson and Meza in

28   Counts Three, Four, and Five are barred by *Noerr-Pennington* immunity, and Plaintiff

could not cure this defect by pleading additional facts in a future pleading.  Thus, leave to amend as to those claims is denied on futility grounds.

In contrast, because Count Two is being dismissed at least in part based on insufficiently detailed factual allegations, the Court will err on the side of caution and grant leave to amend as to that claim.  Finally, because Plaintiff's claims against Ortega in Counts Four and Five are only being dismissed due to the absence of a federal claim, "Plaintiff may reassert those claims if he chooses to take advantage of the limited grant of leave to amend as to Count [Two] set forth above.  In that scenario, [Ortega] may simply reassert [her] dismissal arguments as to Counts [Four and Five] in [her] response to the next iteration of Plaintiff's complaint, and if the amended Count [Two] survives dismissal, the Court will take up the merits of [Ortega's dismissal arguments as to Counts Four and Five] at that time."  *Gesell*, 2025 WL 928885 at *14.

Accordingly,

**IT IS ORDERED** that:

1.    AG Mayes's motion to dismiss (Doc. 38) is **granted**.  Count One of the FAC is dismissed against AG Mayes without leave to amend, and Count Two of the FAC is dismissed against AG Mayes with leave to amend solely to address the deficiencies identified in this order.

2.    Plaintiff's first motion to take judicial notice relevant to AG Mayes's motion to dismiss (Doc. 57) is **denied**.

3.    Plaintiff's second motion to take judicial notice relevant to AG Mayes's motion to dismiss (Doc. 85) is **granted in part and denied in part**.

4.    Robson's and Meza's motion to dismiss (Doc. 51) is **granted**.  Counts Three, Four, and Five are dismissed against Robson and Meza without leave to amend.

5.    Plaintiff's motion to strike (Doc. 64) is **denied**.

6.    Ortega's motion to dismiss (Doc. 52) is **granted**.  Counts Four and Five are dismissed against Ortega with leave to amend consistent with this order.

7.    Plaintiff's motion to take limited jurisdictional discovery (Doc. 58) is

**denied**.

8. The Presiding Judge's motion to dismiss (Doc. 67) is **granted**. Count One of the FAC is dismissed against the Presiding Judge without leave to amend.

9. Plaintiff's motion to take limited jurisdictional discovery from the Presiding Judge (Doc. 84) is **denied**.

10. Plaintiff's motion to take judicial notice regarding the Presiding Judge's motion to dismiss (Doc. 90) is **granted in part and denied in part**.

11. Within 14 days of the issuance of this order, Plaintiff may file a second amended complaint ("SAC"). The changes shall be limited to attempting to cure the deficiencies that led to the dismissal of Count Two. Plaintiff also may reassert Counts Four and Five against Ortega if he chooses to file a SAC. If Plaintiff does not file a SAC within 14 days of the issuance of this order, the Clerk shall enter judgment accordingly and terminate this action.

Dated this 6th day of January, 2026.

Dominic W. Lanza
United States District Judge