1  Phillip Potter
   2301 N. 66th Street
2  Scottsdale, Arizona 85257
   Phone: 480.459.0310
3  E-Mail: phillip.t.potter@gmail.com
4  Plaintiff
   Pro Se
5

6

7  **IN THE UNITED STATES DISTRICT COURT**

8  **FOR THE DISTRICT OF ARIZONA**

9

10

11  Phillip Potter,                          No. 2:25-cv-00663-PHX-DWL
                          Plaintiff,
12
    v.
13
                                             **SECOND AMENDED COMPLAINT**
14  Robert Meza, in his private
    capacity; Karrin Taylor Robson, in       (Jury Trial Demanded)
15  her private capacity; Alane
    Ortega; Kris Mayes, in her official
16  capacity as Arizona Attorney
    General; Joseph Welty, in his
17  official administrative capacity as
    Presiding Judge of the Maricopa
18  County Superior Court; and Does
    1-60, inclusive,
19
                          Defendants.
20

21

22      This action presents a (1) First Amendment facial challenge to A.R.S. § 12-3201;

23  (2) a 42 U.S.C. § 1983 claim arising from the deprivation of constitutional rights under

24  color of law; and (3) related intentional torts where a state legislator caught trading his

25  public office for private gain, and his associates, are liable for acts committed to conceal

26  their unlawful routing of state-administered federal funds to the legislator via nonprofits.

BACKGROUND

<u>Robert Meza Traded His Public Office for Private Gain</u>

1.      State Representative Robert Meza devised a fraudulent scheme (the "Scheme") where, under color of office[1], he corruptly secured public funds for six Medicaid-approved nonprofit behavioral health services organizations (collectively, the "Nonprofits"; individually, "NP1", "NP2", "NP3", "NP3", "NP4", "NP5", and "NP6"). The Nonprofits' complicit executives covertly paid him to perform those official acts.

2.      With intent to defraud, and through the artifice of a benevolent legislator voluntarily supporting constituents,[2] Meza solicited and secured public funds from state officials with authority to allocate those funds.  Officials that Meza defrauded include the Governor, state legislators, leaders of state agencies, and A.R.S. § 36-2906.01(A) Arizona Health Care Cost Containment System ("AHCCCS") "system contractor" executives.  His willful omission of material facts regarding his private pay arrangements effectuated the Scheme, and deceived officials into authorizing funds that went to the Nonprofits.

3.      The Scheme violated state statutes, federal codes, and government contracts proscribing bribes, kickbacks, and frauds, including Medicaid fraud.[3]

---

[1]      "No distinction exists between acts under color of office and those by virtue of office; both are 'official' acts".  *McDonald v. Thomas,* 198 Ariz. 590, ¶¶ 24-35, 12 P.3d 1194 (App.2000) "[A]n official act is 'any act done by [an] officer in his official capacity, under color and by virtue of his office.' ... . This, of course, is broad enough to cover any action taken by the [elected official] in performing the duties of his office. ... [This broad definition] creates a record the public may inspect to determine what has been done and to be informed of the contents of the official record. ... [This] prevent[s] [government] activity from slipping below public scrutiny".  *Id*.

[2]      Arizona legislators who actively support their constituents perform "official acts" in the form of "political acts" which enjoy no immunity or privilege.  *See Fann v. Kemp in and for the County of Maricopa,* 515 P. 3d 1275 (2022).

[3]      Pursuant to 42 CFR 455.2, Medicaid Fraud is defined as "an intentional deception or misrepresentation made by a person with the knowledge that the deception could result in some unauthorized benefit to himself or some other person.  It includes any act that

4.     In return for increased organizational revenues, and in pursuit of enhanced compensation derived from those revenues, the Nonprofits' complicit executives (1) knowingly received and deposited corruptly obtained public funds into the Nonprofits' corporate bank accounts; (2) actively concealed the true nature of those funds to evade internal controls and external regulations; and (3) ensured Meza received a monthly payment for sham consulting services which had no value beyond his elected office.

5.     Meza and the Nonprofits' complicit executives knowingly and willfully participated in the Scheme and acted in concert under agreement.  The primary objects of that agreement were (1) to fraudulently obtain and distribute public funds for mutual personal benefit; and (2) to maintain secrecy and prevent investigations into the Scheme.

6.     On information and belief, and evidence obtained, each Nonprofit paid Meza paid $1,000 - $3,000 per month.  Meza personally received more than $1,000,000 in total spread across 250-300 payments unlawfully sourced from public funds while the Scheme was fully operational from 2014 - 2021.

7.     To conceal the true nature of this financial activity, the complicit executives authorized and instructed Meza's payments to be made through Ameliorate, LLC.

8.     Robert Meza is, and has always been, the sole member of Ameliorate, LLC ("Ameliorate") per Arizona Corporation Commission records.

9.     From 2014 - 2021, Ameliorate possessed no external marks of a legitimate consulting business such as a website, marketing materials, social media presence, dedicated phone number, business email address, business liability insurance, or client contracts detailing statements-of-work or articulating industry accepted deliverables.

---

constitutes fraud under applicable State or Federal law." *See e.g.*, 18 U.S.C. § 371; 18 U.S.C. § 1347; 31 U.S.C. § 3729, *et seq.*; 42 U.S.C. § 1320a-7b(b).

10.     During that time period, Ameliorate functioned in truth as a corporate vehicle to unlawfully process corruptly obtained public funds as part of the Scheme.

11.     As part of the Scheme's primary revenue source, Meza solicited and secured state-administered Medicaid funds from A.R.S. § 36-2906.01(A) AHCCCS "system contractors" including Mercy Care which receives more than $4B annually to administer Medicaid health insurance plans in Maricopa County, and serves as an insurance payor.

12.     Mercy Care C-suite executive "TG" knowingly and willfully participated in the Scheme, as he was fully aware that a portion of the public funds that he authorized to benefit the Nonprofits would be passed on to Meza.  Specifically, TG facilitated state-administered Medicaid funds to be selectively provided to the Nonprofits disguised as periodic corporate grants, annual corporate event sponsorships, and ongoing enhanced rate services contracts.[4]  Other nonprofits did not receive the same considerations or benefits.

13.     The Scheme also maintained a secondary revenue source derived from corruptly obtained private funds.  The Nonprofits held fundraising events where, again through the artifice of a benevolent legislator supporting constituents, Meza operated

---

[4]     Per A.R.S. § 13-2311 Fraudulent Schemes and Practices, "[n]otwithstanding any provision of the law to the contrary, in any matter related to the business conducted by any department or agency of this state or any political subdivision thereof, any person who, pursuant to a scheme or artifice to defraud or deceive, knowingly falsifies, conceals or covers up a material fact by any trick, scheme or device or makes or uses any false writing or document knowing such writing or document contains any false, fictitious or fraudulent statement or entry is guilty of a class 5 felony."  "Scheme or artifice to defraud means to form a plan, device or trick to perpetrate a fraud upon another. ...  A fraudulent representation may be effected by deceitful statements, half-truths or the concealment of any material fact as well as by affirmative statement or acts."  *State v. Bridgeforth*, 156 Ariz. 60, 63, 750 P.2d 3, 6 (1988).  "[I]ntent to defraud is found where the defendant intends to cause a pecuniary loss or gain."  *State v. Thompson,* 194 Ariz. 295, ¶ 13, 981 P.2d 595, 598 (App. 1999).  "The intent to defraud can [also] be established by proving the defendant devised the fraudulent scheme or willfully participated in it with knowledge of its fraudulent nature".  *Bridgeforth*.

1
2
under color of office to solicit and secure corporate sponsorships from unwary registered

3
lobbyists and corporate executives seeking his political favor.  Per the Scheme, Meza

4
willfully withheld the material facts of his private pay from unwary private funders.[5, 6, 7]

5
Plaintiff Forced The Scheme To Be Revealed

6
     14.     The Scheme first came to limited public awareness on August 23, 2021

7
when NP1's CEO met with Arizona House of Representatives (the "House") members

8
and disclosed that he had been covertly paying Meza since 2015 (*see* Exhibit A).

9
     15.     The NP1 CEO disclosed because (1) Defendant Alane Ortega, who is the

10
daughter-in-law of NP1's founder, made him aware within the prior two weeks that

11
Plaintiff was on the cusp of filing a civil suit that would expose the Scheme; (2) the House

12
had received $45M in federal "P90" covid relief funds which, if the House had dispersed

13
those funds to any of the Nonprofits, would have exposed knowledgeable persons to state

14
and/or federal criminal charges; and (3) actual disclosure is a defense to fraud.

15

16
[5]    A.R.S. § 13-2310 Fraudulent Schemes and Artifices is violated whenever someone

17
"knowingly, pursuant to a scheme or artifice to defraud, obtained any benefit by means of
false pretenses, representations, promises or material omissions".  "The word benefit
means anything of value or advantage, present or prospective." *Bridgeforth*.

18
[6]    Meza routinely presented himself under color of office before and during events to

19
further the artifice of a benevolent legislator voluntarily supporting his constituents.  For
example, Meza appeared with the NP2 CEO on an April 12, 2016 podcast to promote an

20
upcoming NP2 event that a sponsor "underwrote for $25,000".  Presenting himself as
"Senator Robert Meza", but omitting the material fact of his private pay, he stated "for me

21
politically ... it affects us at the city, state, and national level ... as a policy maker I know
that I have to be strategically involved in the whole process and I'm glad I'm involved

22
right now with this [Sojourner] team ... I will help with whatever they need".  *See*

23
https://inspiredmedia360tv.com/ Podcast Episode 60; Exhibit B.
[7]    Meza also unlawfully routed election campaign funds to his private benefit via NP3

24
which received at least $9,100 originating from Meza's campaign accounts ($1,000 on
May 22, 2015; $100 on January 22, 2016; $1,000 on April 22, 2016; $2,500 on December

25
20, 2017; $1,000 on October 28, 2018; $2,500 on February 1, 2019; and $1,000 on

26
September 24, 2020).  Meza disguised the transactions as election campaign contributions
to a 501(c)(3) to be comingled with other corruptly obtained funds, and used to pay Meza.

16.     Immediately thereafter, "at the advice of House counsel", the House's Minority Leader dedicated "hundreds of staff hours" to identifying the Nonprofits paying Meza, and prevented those organizations from receiving House-administered P90 funds to be allocated as part of that year's state "budget negotiations".

17.     An honest legislative staff member contacted *The Arizona Republic* about the NP1 CEO's disclosure.  This sparked a media investigation published November 8, 2021 containing the above quoted facts.  *See* https://tinyurl.com/2s3wedcf.

18.     That article reported (1) NP1 "had been barred from seeking any funds from the House"; (2) NP1 "canceled" Meza's sham consulting contract; (3) Meza stated "[h]is job was to ... 'explore mergers and acquisitions'"; (4) Meza otherwise "declined to answer any questions about the work [he was] contracted to do"; (5) Gov. Ducey reported that he "didn't know [NP1] had hired" Meza or that Meza had "financial connections to NP1" but he did have "frequent[] discussions" with Meza about funding NP1 as a "lawmaker[]"; (6) three of the four legislators quoted were unaware that NP1 was paying Meza; and (7) Meza stated that his conduct was lawful because he "showed it on [his] financials", meaning his annual A.R.S. § 18-444 Financial Disclosure Statements.

19.     Meza's 2014 - 2021 Financial Disclosure Statements show that he wrote the words "consultant" or "strategic marketing" on those forms, with no further description.

20.     A Financial Disclosure Statement is a public record, and no public record can ever provide constructive notice of material facts.  Actual notice is required, or else material facts are considered omitted.[8]

---

[8]     *See Field v. Mans,* 516 U.S. 59, 70, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995) (Fraud exists even if the truth could be learned from public records); *Baker ex rel. Hall Brake Supply, Inc. v. Stewart Title & Trust of Phoenix, Inc.*, 197 Ariz. 535, 540, ¶ 23, 5 P.3d 249, 254 (App. 2000) ("The existence of public records is no defense to fraud.").

21.    On information and belief, and evidence obtained, the Nonprofits' complicit executives stopped paying Meza when the *Republic* article was published due to fear of criminal investigation.

22.    Before November 2021, the Scheme nearly came to light on three other occasions but was actively concealed pursuant to the Scheme agreement's second object.

a.    First, in December 2016, an unwary NP2 Board member discovered that the NP2 CEO was covertly paying Meza.

b.    NP2's Board members resigned en masse while the Board Chair initiated an internal investigation.

c.    Seeking to discredit, and attempting to intimidate and create a financial crisis for, the NP2 Chief Development Officer ("CDO") and CEO, Meza arranged for a NP2 staff Director ("TD") knowledgeable of the Scheme to anonymously email the Board Chair in January 2017, and falsely accuse them of breaching federal contract terms unrelated to the Scheme (misusing restricted funds as operating expenses).

d.    The NP2 Board Chair terminated the CDO and CEO in April 2017, in part because the paid arrangement with Meza was "not an appropriate relationship ... and [he had] asked [the CDO] to terminate" the sham contract.  In turn, the two executives filed suit for breach of employment contract on June 15, 2017 (case no. CV2017-008728).

e.    That case progressed through discovery.  The Board Chair admitted in a September 14, 2017 deposition that NP2 breached the CDO's employment contract, leading to an October 27, 2017 Motion for Summary Judgment (*see* Exhibit C).

f.    After maneuvers to cause delay, and after NP3 had "acquired" NP2 (as described below), the NP2 defendants manufactured facts to fabricate a Conversion counterclaim civilly accusing those plaintiffs of stealing donated furniture.

g.      The counterclaim was filed for the unlawful purpose of driving up plaintiffs' attorney fees and costs, and intimidating the former executives into fearing criminal prosecution.  As a result, the CDO and CEO were intimidated and eventually induced into dismissing their otherwise victorious claim on April 11, 2019.

h.      To limit public scrutiny and conceal the Scheme, Meza arranged for NP3 to "acquire" NP2 in July 2017.

i.      Meza served as a NP3 Board member at time while the NP3 CEO briefly suspended Meza's NP3 payments and spearheaded the acquisition.  Post-acquisition, the NP3 CEO selected, and still maintains, an NP2 Board of Directors consisting of himself and three NP3 executives knowledgeable of the Scheme.  The "acquisition" was, in truth, a corruptly designed and executed "mop-up operation".

j.      Second, in mid-2015, Meza recruited and cultivated a seventh nonprofit ("NP7") to participate in the Scheme, but he first needed NP7 to generate public funds sufficient to pay him through Ameliorate on a recurring basis.

k.      Prior to 2015, NP7 functioned as a modest grant-making operation whose unpaid leaders routinely lobbied the Arizona Legislature for financial allocations and discretionary funding to support research into treatment for the mentally ill.  But NP7 never brought in more than $87,632 in revenue and distributed those funds as grants.[9]

l.      To generate sufficient annual revenue, Meza approached TG in mid-2015 seeking to have Mercy Care provide that funding.  Together, the two men developed a plan to convert NP7 from a grant-making organization to a Medicaid-funded nonprofit behavioral health services organization, and open a clinic soon known as "Epicenter".

---

[9]      See NP7 IRS Form 990s at
https://projects.propublica.org/nonprofits/organizations/861030444.

m.      To effectuate that plan and to conceal its true purpose being to further the Scheme, TG (1) became the NP7 Board Chair; (2) authorized Mercy Care to provide enhanced rate clinical services contract for Epicenter; (3) authorized Mercy Care to provide corporate grants sufficient to launch Epicenter; and (4) helped Meza solicit and secure complementary public and private funding throughout the community.[10]

n.      Epicenter failed from the outset as NP7's IRS Form 990 shows the nonprofit suffered a net loss of $298,065 to operate the clinic in its first year.

o.      Yet, TG deceptively praised Epicenter in the May 2018 *Psychiatric Services* article and in other public venues knowing the clinic was not financially viable.

p.      On the cusp of NP7's collapse, and as means to conceal the Scheme, Meza again approached the other Nonprofits to "acquire" an asset that failed by his hand.

q.      In March 2018, NP4, where Meza had inserted TD into a C-suite executive position after she left NP2, agreed to acquire Epicenter upon TG's approval as NP7 Board Chair (*see* Exhibit D).  TD promoted and led the "acquisition" process.

r.      To effectuate the acquisition, in his Mercy Care role, TG had Mercy Care "forg[i]ve contract advances to Epicenter totaling $947,453"[11], effectively putting TG on both sides of the negotiating table and gifting almost $1M in Medicaid funds to corruptly complete this second "mop-up operation".

---

[10]      See article published in the May 2018 edition of *Psychiatric Services* at https://psychiatryonline.org/doi/10.1176/appi.ps.201700516.  Therein, as the only article co-author knowledgeable of the Scheme, TG noted that Epicenter funding came from various private and public sources including Mercy Care and the Arizona Attorney General's Office.  Mercy Care provided "monthly block payments of more than $100,000 to reimburse services provided to individuals covered by Medicaid" and provided enhanced rate clinical services contracts paying at "135% of standard Medicaid rate".

[11]      See NP7 2018 IRS Form 990 Schedule O, p. 26 located online at https://projects.propublica.org/nonprofits/organizations/861030444/201902409349300810/full

s.      Third, beginning in September 2019, an unwary NP6 Board member became concerned with the CEO's "specific and heightened focus on government and politics" involving Meza, and expressed those concerns in letters to the seven-member NP6 Board sent on January 29, 2020 and February 27, 2020 (*see* Exhibit E).

t.      With an unsatisfactory response from the Board (which included three members knowledgeable of the Scheme), the concerned Board member quit, instructed NP6 to "vacate[] Televerde's premises by end of day February 28, 2020", and permanently withdrew $125K in recurring annual corporate support.

u.      On May 20, 2020, NP6's Board Chair wrote an "official warning" to the CEO noting, "[u]pon attending [NP6's] Mother's Day event, we learned that it was opened by Robert Mesa (sic). ... We have repeatedly discussed Robert's involvement in [NP6] and its events and have expressed the Board's preference not to have relationship (sic) front and center.  In addition, we learned that you committed us to real estate in PHX in an office with Robert Mesa (sic). ... Finally, the Board had previously learned of a contract to pay Robert Mesa (sic) $1000 per month.  Firstly, while I have not seen the contract, you have told me it is with Robert's company and that many politicians perform services for non-profits for hire including Robert.  You had been paying Robert directly (not his company) for a portion of this contract.  When the Board discovered this and became uncomfortable for the reasons you previously stated above of not wanting to be seen politically connected to Robert, you took it upon yourself to change the check-writing to Leslie (an employee of Robert's) and current recipient of the $1000 from [NP6's] account.  Again, we only uncovered this on the Mother's Day call where Leslie stated that she was on the call 'to learn about [NP6] so when she is on the phone with constituents she can better represent us.'".  The NP6 CEO was caught actively concealing

Meza's payments from unwary Board members, and she was forced to release Meza.

     v.    As he admitted in the *Arizona Republic* article, Meza soon thereafter asked NP1's CEO to "acquire" NP6.  He made this request so that the NP6 CEO could be in a position to reinstate Meza's pay.

     w.    NP1's CEO agreed to acquire NP6 and reached terms with the compromised NP6 Board in May 2021 (*see* <u>Exhibit F</u>).  But NP1 did not finalize the acquisition when Ortega made the NP1 CEO aware of current litigation in CV2021-005501 and pending litigation in CV2021-013210.

     x.    Meza was unable to complete this third "mop up operation".  The NP1 CEO instead terminated Meza's sham consulting contract and disclosed Meza's paid arrangement to House members, triggering the November 2021 *Arizona Republic* article.

     y.    The other Nonprofits' complicit senior executives quickly released Meza from the sham consulting contracts, further confirming the covert nature of the Scheme, and that Ameliorate and the Nonprofits did not conduct legitimate business.

23.    In April 2022, the Arizona House and Arizona Senate initiated independent ethics investigations into Meza's involvement with the Nonprofits.

24.    The Arizona House Ethics Committees acknowledged on May 2, 2022 that Meza was under federal investigation and therefore tabled the complaint.

25.    The Chair of the Arizona Senate Ethics Committee stated during a May 6, 2022 ethics committee meeting, and after reviewing evidence, that there was "good cause" to believe Meza's conduct in public office was "criminal".  But the Senate likewise tabled the complaint for the same reasons as the House.

26.    Facing scandals, ethics investigations, and criminal investigations, and no longer able to supplement his legislator's $24,000 salary with income derived from the

Scheme, Meza ran for Justice of the Peace but lost that August 2022 primary election.

27.     Meza registered his name with the Arizona Secretary of State as a Lobbyist in February 2023.  He also registered Ameliorate as a Lobbyist firm in May 2023.[12]

28.     Ameliorate is, and always has been, a corporate vehicle that Meza used to generate private payment in return for influencing legislation and procuring public funds from elected officials, state agencies, and AHCCCS contractors.

TD Explained The Scheme To Plaintiff

29.     Plaintiff learned of the Scheme through TD.

30.     Between January - April 2018, TD gradually described to Plaintiff how she became involved in the Scheme, shared texts and voicemails between her and Meza referencing the Scheme, discussed the Scheme's details with her parents in Plaintiff's presence, and explained that Meza's growing pressure to maintain, grow, and secrete the Scheme had put Meza and TD in open conflict within the NP4 workplace.[13]

31.     In January 2018, TD admitted facilitating the Scheme to Plaintiff through

---

[12]     Records on file with the Arizona Secretary of State show Meza registered as a lobbyist employee (EMP ID 703900) working for a lobbying firm (LOB ID 3614168). LOB ID 3614168 corresponds to LOB NAME "Ameliorate, LLC" which lists "Robert Meza" as the only "Active Employee" with no "Inactive Employees" listed in records. Among the companies that used Meza's/Ameliorate's lobbying services, "Deloitte Consulting, LLP" identified LOB ID 3614168 "Ameliorate, LLC" as an "LFC", meaning a Lobbyist for Compensation, with a "STARTED" date of "7/18/2023" and a "TERMINATED" DATE of "1/31/2024".  Pursuant to A.R.S. § 41-1233(2), "[n]o person shall: ... Lobby the legislature for compensation within one year after the person ceases to be a member of the senate or house of representatives.".  Meza "ceased to be a member of the" House in January 2023, six months prior to the July 18, 2023 "STARTED" date lobbying on behalf of Deloitte Consulting.

[13]     TD expressed her belief to Plaintiff in February 2018 that Meza was under a financial strain to act so aggressively.  Per Maricopa County Recorder's Office records, Meza was enduring an IRS audit or investigation related to a "Small Business" at that time.  The IRS placed four federal tax liens on his personal residence, totaling $55,923.31; the last of which was recorded April 14, 2018 (Recorder No. 20180290161).

various professional roles that Meza secured for her as a financial benefit, including as a NP2 staff Director and a NP4 C-suite executive; career advancements that required her to ensure Meza's private payments would continue and remain concealed.

32.    That same month, TD admitted to Plaintiff that she sent the anonymous email to the NP2 Board Chair in January 2017 at Meza's instruction.

33.    One February 2018 evening, Plaintiff and TD found themselves at the Arcadia OHSO Distillery and Brewery Restaurant discussing her conflict with Meza when she invited TG to join them via text and call.  TG arrived with his partner after their dinner out and the parties discussed Meza over drinks.  During that time, TG stated (1) "Meza always comes to me for money and I always find ways to get it to him", referring to Meza's solicitation of Mercy Care administered funds to benefit the Nonprofits; (2) "Meza convinces politicians to send money" to the Nonprofits "but doesn't tell them the money ends up back in his pocket", referring to how Meza effectuated the Scheme through unwary government officials while withholding the material facts of his private pay; and (3) "Meza is going to end up in prison ...  I just hope I don't end up in there with him", admitting his knowledge of the Scheme and that his participation was unlawful.

34.    The conflict between Meza and TD grew through March 2018 when the CEO of NP4 officially announced her retirement.  TD claimed Meza had arranged for her to become the CEO successor as one benefit of her Scheme participation.  Realizing their relationship had soured, Meza blocked TD's promotion and demanded NP4 open the position for national recruitment when, in truth, Meza had recruited a local nonprofit executive willing to assume the position and continue paying him.

35.    On or about April 9, 2018, TD learned journalist "DP" had published an online article connecting Meza with several nonprofits, and suggesting he was corrupt.

13

36.     Intending to frighten Meza and increase her chances of becoming NP4's CEO, TD purchased a Cricket burner phone on or about April 13, 2018 and used the phone to contact DP (*see* Exhibit G). She offered to share damaging information on Meza.

37.     TD stated her goal was to cause DP to further probe Meza's involvement with nonprofits and publish articles that would cause him to fear criminal investigation in the hopes Meza would disengage from NP4, allowing her to become CEO.

38.     On April 15, 2018, Plaintiff instead encouraged TD to retain an attorney for the purpose of formally contacting Meza and instructing him to cease his open conflict with TD or otherwise face a workplace harassment suit.

39.     TD asked Plaintiff to participate in an April 19, 2018 call with her preferred attorney (*see* Exhibit H).

40.     During and after that call, TD revealed that she launched Evidence Based Medical Consulting, LLC ("EBMC") in April 2016 as her personal corporate vehicle to receive additional financial benefits derivative of the Scheme, where each of EBMC's four clients (which included NP3 and NP7) was, in truth, an individual or entity seeking Meza's legislative favor.  Meza sourced every client.  EBMC had no website, marketing materials, social media presence, dedicated phone number, business email address, business liability insurance, or client contracts detailing statements-of-work or articulating industry accepted deliverables, yet the company generated $147,125 in its first year.

41.     Plaintiff attempted to end his relationship with TD in late April 2018, but he agreed to continue when TD promised she would remove herself from the Scheme, disengage from all Nonprofits, cease contact with Meza, and find legitimate employment.

42.     In April 2018, TD assured Plaintiff that she was withdrawing from the Scheme and secured employment in June 2018 with AHCCCS contractor Equality Health.

43.     Plaintiff and TD married in October 2018.

TD Continued to Participate in the Scheme During The Marriage

44.     Based on a societal need, significant market potential, TD's graduate training, Plaintiff's experience providing psychological assessments in volume, his background in launching technology-enabled startups, and a shared desire to run a family business, Plaintiff developed and launched a startup concept ("FountainSyde") to provide rapid and scalable Autism testing and diagnostic services.

45.     By October 2019, FountainSyde, LLC was launched and operational as a corporate entity after Plaintiff had (1) created trademarked materials and developed trade secrets; (2) established corporate branding and marketing materials; (3) met with pediatricians and licensed therapists to generate a patient referral pipeline; (4) developed, tested, and launched FountainSyde's corporate website with automated scheduling, provider referral, patient intake processes, and secure health records; (5) established pricing schedules; (6) produced corporate contracts and user agreements; (7) opened a corporate bank account; (8) secured a dedicated phone line and office space at three locations; (9) generated pitch decks; and (10) secured clients.

46.     However, TD had secretly continued to serve as an NP6 Board member, to associate with Scheme participants, and to further the Scheme.  For instance, Plaintiff learned TD facilitated a November 2019 $10,000 Equality Health sponsorship for an NP6 fundraising event.  She knew a portion of those funds would be passed on to Meza.

47.      In late November 2019, TD asked Plaintiff to meet with a capital investor ("CE") that she claimed to have met earlier that same month.

48.     Also in November 2019, a professional colleague ("GB") contacted Plaintiff and asked if he would be willing to help scale an educational technology startup built

around K-12 teacher professional development.  Plaintiff agreed to consider it, conducted basic market analysis, kept the concept as a potential side project, and only made TD aware of the opportunity.

49.    Plaintiff met with CE on December 2, 2019 and pitched FountainSyde as an angel investment opportunity, but TD conveyed later that same month that CE decided to pass on the investment.

50.    On January 9, 2020, Plaintiff had become increasingly concerned with TD's questionable behavior and deceptions.  He sought to end the brief marriage amicably.

51.    TD left Plaintiff's residence calm that evening but returned two hours later agitated and threatening to lodge false domestic violence allegations.  Plaintiff immediately called Scottsdale Police.  Officers (1) arrived within ten minutes; (2) inspected the residence; (3) interviewed Plaintiff and TD; (4) determined "no crime" occurred; and (5) encouraged TD to stay the night with her parents in Chandler, AZ.

52.    TD and her mother returned unannounced the next morning with TD declaring that she spoke with Scottsdale Police and could return because Plaintiff's residence was also her residence.  Plaintiff never told TD she could not return. Regardless, TD and her mother proceeded to harass and antagonize Plaintiff until he finally called police again for assistance in the evening of January 13, 2020.

53.    A Scottsdale Police officer arrived and agreed to speak with TD and her mother to keep the peace, but TD and her mother quickly made false allegations that Plaintiff had planted video devices and was recording for some malicious purpose.  The seasoned officer challenged TD to point out the devices causing both women to recant. The officer instructed TD and her mother to stop making false criminal accusations.

54.    TD's mother vacated the residence that night and TD followed suit the next

morning.  But on January 16, 2020, TD appeared unannounced at a public plaza located at 68th Street and Thomas Road where Plaintiff already had been for an hour, and after he had already hailed a Lyft rideshare to take him to central Scottsdale.  The parties did not interact between 2:18 p.m. when TD arrived and 2:20 p.m. when Plaintiff left via Lyft.

55.     On January 24, 2020, Plaintiff reached a verbal settlement agreement with TD's first attorney to expedite the dissolution (case no. FC2020-090224), but the attorney failed to finalize the agreement with signature and stopped responding to email.

56.     On the evening of January 28, 2020, Scottsdale Police came to Plaintiff's residence, notified him that TD had secured an *ex parte* A.R.S. § 13-3602 order of protection, took Plaintiff's infant son, and explained that Plaintiff would have to challenge the order in court or else be labeled an A.R.S. § 13-3601 Domestic Violence perpetrator.

57.     Each allegation of assault and stalking described in the A.R.S. § 13-3602 petition (case no. FC2020-050752) was entirely fabricated.

58.     Plaintiff initiated his own investigation, hired counsel, and discovered:

a.     On January 9, 2020, TD's mother and father were present in front of Plaintiff's house when TD threatened to lodge false domestic violence allegations, and they called Scottsdale Police falsely accusing Plaintiff of assaulting TD in the hopes that police would arrive and arrest Plaintiff.  Scottsdale Police had dispatched a unit for that purpose.  But those officers had not yet arrived when Plaintiff made his call to the same department.  The police dispatcher dispatched a second unit, notified both units that Plaintiff was on the phone with her, and there was no assault occurring at the residence.

b.     On January 10, 2020, TD made another call to Scottsdale Police falsely accusing Plaintiff of criminally threatening her but, upon questioning and a review of text messages, that officer explained to TD that Plaintiff's conduct was "not threatening

17

in any way" per the resulting Field Incident Report.

   c. TD fired her first attorney and hired her second attorney ("MC") on January 27, 2020. MC instructed TD to file the A.R.S. § 13-3602 petition outside of the existing family law case, knowing TD had avowed three times in FC2020-090224 filings that no domestic violence occurred in the relationship.

   d. During FC2020-050752 discovery, MC initially conveyed that, *inter alia*, (1) TD's friend ("SN") would corroborate TD's assault allegations based on conversations the two women had during a noon lunch meeting that took place December 11, 2020 at Ocotillo Coffee Shop; (2) SN would corroborate the stalking allegation based on being present at the public plaza on January 16, 2020; and (3) the NP6 CEO would also corroborate the same stalking allegation based on a phone conversation that same day; and (4) TD now lived temporarily with NP6's CEO.

   e. Plaintiff learned the Ocotillo Coffee Shop had gone out of business six months prior and since reopened as a speakeasy bar that did not open until 4:00pm.

   f. Plaintiff compiled emails, texts, voicemails, store receipts, Lyft field receipts and corporate records, and witness statements confirming his physical location continuously from 6:36am through 3:15pm on January 16, 2020. The evidence proved he was at the public plaza for more than an hour prior to TD's arrival, he had hailed a Lyft prior to her unannounced arrival, and he did not interact with Plaintiff while waiting for the Lyft to pick him up less than two minutes after TD's arrival.

   g. Realizing Plaintiff intended to depose SN, TD's story changed again with MC reporting that CE was now the friend present at the public plaza on January 16, 2020, and that CE would testify as a witness to stalking, not the NP6 CEO.

   h. Finally, Plaintiff compiled texts, email messages, witness statements,

and video showing he was more than twelve miles away at a practice facility with his older son's club baseball team when he allegedly assaulted his infant son.

i.    The clearly fabricated allegations, constantly changing stories, and the NP6 CEO's involvement made Plaintiff realize TD's malicious conduct and factual misrepresentations did not just serve the unlawful purposes of attempting to gain an advantage in dissolution proceedings and harass Plaintiff, but also served the unlawful purpose of attempting to intimidate him and obstruct investigations into the Scheme.

j.    From March 2 - 6, 2020, Plaintiff's attorney contacted MC via phone calls and emails conveying evidence that proved TD's allegations were entirely fabricated and explaining to MC that his professional obligations required him to ensure the order of protection was withdrawn and not presented at the upcoming hearing to quash.

k.    MC offered to dismiss the order of protection attached to the child if Plaintiff would admit to stalking TD; malicious terms intended to intimidate Plaintiff and exploit his distress at being unjustly separated from, and not allowed to see, his young son for more than two months.  Plaintiff declined.

l.    At the April 4, 2020 hearing to quash, TD reiterated the false allegations and testified to knowingly false facts on direct examination.  Plaintiff's attorney eviscerated TD on cross-examination.

m.    On April 7, 2020, that court quashed the order of protection and awarded Plaintiff his attorney's fees and costs on May 21, 2020.

n.    TD substituted counsel again and retained Ortega on April 20, 2020.

59.    Facing an otherwise expiring claim, Plaintiff filed suit (case no. CV2021-005501) on April 5, 2021 alleging Malicious Prosecution (i.e., Wrongful Institution of Civil Proceedings and associated counts) of the order of protection.  Ortega also

19

represents TD in that civil suit which survived dismissal attempts and is set for trial.

60.    Plaintiff continued to investigate events and conduct discovery in the FC2020-090224 dissolution proceedings.  He learned:

a.    An anonymous defamatory letter was sent via U.S. mail to GB postmarked March 9, 2020 falsely accusing Plaintiff of criminal conduct, stating that he was under criminal investigation by the Arizona Attorney General and the IRS, and advising that GB should not do business with Plaintiff (*see* Exhibit I).  Plaintiff committed no crimes, and was not under investigation.  The letter, not discovered until September 2020, was another malicious attempt to intimidate Plaintiff and to damage him personally and professionally with factual misrepresentations to further the Scheme, and using methods highly similar to those TD and Meza jointly used to damage and intimidate the terminated NP2 CDO in 2017.

b.    During a November 5, 2020 deposition, TD provided knowingly false testimony, including factual misrepresentations that, *inter alia*, (1) she had not spoken with Meza since June 2018, although documents later obtained prove she and Meza were jointly involved in NP6 Board meetings and projects, and, on information and belief, Meza's personal phone records show TD and Meza spoke often beginning January 10th or 11th of 2020; (2) she did "not remember" purchasing or using the Cricket burner phone containing texts to DP; (3) Meza did not refer her to Ortega, although Meza inadvertently shared with a journalist in May 2022 that he "helped" TD to secure Ortega as counsel and "helped" Ortega with litigation thereafter; and (4) she had no personal or professional relationship with CE, but facts contained in the below paragraph refute that testimony.

c.    CE was not a capital investor that TD met in November 2019.  In June 2021, Plaintiff learned CE was the former CEO of Industrial Solutions Network, a

physical therapist health insurance network specializing in workers compensation

practice.  And she paid Meza for sham consulting services in 2013 and 2014 as part of the

Scheme while Meza served as a State Senator with the statutory ability to influence

reimbursement rates for workers compensation claims.  CE sold Industrial Solutions

Network for $7.6M in 2015.  Critically, in June 2021, CE publicly announced that she had

launched Axis for Autism, LLC, a behavioral health startup to provide rapid and scalable

Autism testing and diagnostic services – a functional copy of FountainSyde.  CE even

admitted in media interviews that she pursued the business concept after a meeting with

two psychologists.  Plaintiff and TD are those psychologists.  CE had no background in

behavioral health or in technology-enabled startups, and only could have progressed to

that point with TD's involvement and based on Plaintiff's work.[14]

        d.      Per documents responsive to Plaintiff's May 2022 A.R.S. § 39-121,

*et seq*. public records request of Governor Doug Ducey: (1) Meza corresponded with the

Governor's Director of Scheduling from his rmeza@azleg.gov government email account

---

[14]     After learning of Axis for Autism, LLC, and of CE's true relationship with Meza
and TD, Plaintiff filed case no. CV2021-013210 on August 23, 2021, the same day the
NP1 CEO disclosed Meza's pay to the House.  He filed suit after notifying Ortega of his
desire to amend CV2021-005501, or else file a second suit and move to consolidate.
Plaintiff filed CV2021-013210 as a separate suit only because Ortega objected to
consolidation on the basis that the two suits presented distinct claims.  Per Restatement
(Second) of Judgments § 26(1)(a), which Arizona follows, "Comment a provides: '[a]
main purpose of the general rule [against splitting claims] is to protect the defendant from
being harassed by repetitive actions based on the same claim.  The rule is thus not
applicable where the defendant consents, in express words or otherwise, to the splitting of
the claim.  [Defendant's] argument in [the first action] that the [Plaintiff's] claims were
distinct from [the second action's] claims is the functional equivalent of consent to
splitting the [plaintiff's] claims from the [first action's] proceedings." *Shoemake, et al. v.
Estancia De Prescott*, Nos. 1 CA-CV 14-0162, 1 CA-CV 14-0527 (Consolidated), ¶47
(Ariz. Ct. App. 2016) (mem. decision).  Hence, as a matter of law, TD and Ortega
forfeited any subsequent right to allege CV2021-013210 was filed for harassment
purposes.  CV2021-005501 has progressed through discovery and is now set for trial.

between March 6 - 15, 2018 regarding Gov. Ducey's appearance at the March 16, 2018 NP4 fundraiser. That email string included correspondence sent through Meza's legislative aide at tkrepitch@azleg.gov email account, and included other members of the Governor's Office. On March 15, 2018 Meza emailed the Director of Scheduling from his government account, "I am writing to double verify the details of the luncheon tomorrow. Please let me know if you have any questions. We would like the governor to arrive at 11:45. After the luncheon ends at 1:00, there will be a fifteen minute meeting with the governor and [the CEO of NP5], a nonprofit that has been around for about 40 years. Their demographic is foster youth in the behavioral health and medical health arenas. They are helping children, as well as their foster parents. They will be getting national recognition in the coming months, so we want the governor to hear about what they are doing. ... I will make sure that the meeting lasts only 15 minutes, to respect the governor's time."; (2) Meza directed government personnel to his (602) 421-1702 personal cell phone to conduct business; and (3) Meza invited eleven sitting Arizona Senators and House members to attend the NP4 fundraising event. See Exhibit J.

e.      Per records responsive to Plaintiff's May 2022 A.R.S. § 39-121, *et seq*. request of the Department of Corrections, Rehabilitation, and Reentry, (1) starting no later than March 2018, NP6 pursued a "Behavioral Health Program" initiative to "build [the NP6] Behavioral Center" and secure an "AHCCCS contract" as a joint initiative with NP4; and (2) NP6 internal messages from "3-11-20" listed Meza as the person already "Responsible for Outreach" to certain corporate sponsors for an NP6 fundraising event, where NP6 documents showed (a) Meza as the person responsible for contacting AHCCCS "system contractors" Mercy Care, AZ Complete Health, United Health Care, and Blue Cross and Blue Shield of Arizona for sponsorships; (b) Meza secured a $5,000

sponsorship from AHCCCS contractor Equality Health; and (c) Meza was specifically assigned to approach private corporate sponsors including the Arizona "Cardinals and Michael Bidwill", "APS/Pinnacle West", the "National Bank of Arizona", and "HBI", International which agreed to be the event's $15,000 "Title Sponsor" (*see* <u>Exhibit K</u>).

<u>Plaintiff Brought Public Records Case CV2022-014146</u>

61.    Pursuant to A.R.S. § 39-121, *et seq*., Plaintiff also requested the A.R.S. § 39-121.01(A) Director of AHCCCS and A.R.S. § 36-2906.01(A) system contractor Mercy Care provide documents regarding TG's involvement with the Nonprofits and Meza.[15]

62.    The AHCCCS Director pointed Plaintiff to the agencies' website which documented its contracts with Mercy Care, but provided no other records for inspection. The Director refused to direct Mercy Care turn over responsive records in its actual possession.  And Mercy Care refused to provide any documents.  Plaintiff filed suit (case no. CV2022-014146) seeking to compel records production.

63.    On December 8, 2022, those defendants jointly moved for summary judgment based on sworn affidavits declaring that Mercy Care and TG only allocated Mercy Care "profits" to the Nonprofits, and therefore the requested documents did not constitute public records since those "profits" belonged "exclusively to Mercy Care".

64.    That court conducted a March 17, 2023 oral argument wherein those defendants relied on the affidavit.  The court granted dismissal.  Plaintiff appealed.

65.    During appellate proceedings, Plaintiff discovered AHCCCS and Mercy Care participate in a profit-sharing agreement among thousands of pages of documents under (1) state contract YH19-001R (pp. 234-235) which describes "MCO [Mercy Care]

---

[15]    The Arizona Supreme Court confirmed that state contractors which perform government functions generate documents subject to Arizona's public records law.  *See Fann v. Kemp in and for the County of Maricopa*, 515 P. 3d 1275 (2022).

Share" and the "State Share" of profits; and (2) ACOM 311 which also details the profit-sharing agreement ("AHCCCS shall recoup/reimburse a percentage of the Contractor's profit or loss").[16]  Mercy Care's FY 2022 Audited Financial Statement also described the profit-sharing agreement ("Certain provisions of the AHCCCS ... contracts include a risk band whereby Mercy Care and the AHCCCS programs share in the profits and losses of the contract ... Mercy Care has recorded an estimate of the reconciliation revenue, or contra-revenue, within other revenue in the accompanying statements of activities and changes in net assets, based on the AHCCCS ... lines of business").[17]  The referenced *Psychiatric Services* article also confirms Mercy Care did not just allocate "profits" to Nonprofits but also provided "block grants" and "135%" enhanced rate services contracts.

66.    On October 6, 2024, Plaintiff notified those defendants, through their counsels, that he had discovered the factual misrepresentations and requested they acknowledge the profit-sharing agreement to the court.  On October 8, 2024, AHCCCS Director Carmen Heredia and Mercy Care, at TG's instruction, declined to acknowledge the profit-sharing agreement to the trial court or appellate court.

Plaintiff Brought Public Records Case CV2022-008626

67.    Plaintiff requested A.R.S. § 39-121.01(A)(1) House member Meza, the A.R.S. § 39-121.01(A)(2) House, and Robson provide documents regarding Meza's solicitation of Robson to host fundraising events for NP5 and NP6 – actions which Meza described as supporting "constituents" in a January 7, 2022  CV2021-013210 court filing – and seeking documents solely in Robson's actual possession after Meza reported that he

---

[16]    See p. 1 of ACOM 311 online at
https://www.azahcccs.gov/shared/Downloads/ACOM/PolicyFiles/300/311new/311.pdf.
[17]    See p. 8 of Mercy Care Financial Statement online at
https://www.azahcccs.gov/Resources/Downloads/ContractorAudits/2022/MercyCare0622_FS_AUDIT_FINAL.pdf.

did not actually possess documents relating to that "constituent" support.

68.    Faced with inadequate and delayed records production, Plaintiff brought suit to inspect records per A.R.S. § 39-121, *et seq.*.

69.    The House partially complied and produced records held on its government email server, which largely duplicated Gov. Ducey's disclosure.  Unique documents produced included (1) emails State Senator Lisa Otondo sent from her legislator email account lotondo@azleg.gov to "all House and Senate members" on January 11, 2018 asking legislators to "[p]lease join me and Sen. Robert Meza as we host the Board members of [NP4] for lunch on Tuesday January 16 at 11:30am – 1:00pm in Senate Dem. Caucus Rm. 2. ... Please RSVP to my assistant, Barb Wellman."; and (2) a January 10, 2017 email string Meza sent from his rmeza@azleg.gov email account to U.S. Senator Sinema's District Director requesting the Senator support NP2's $5,297,489 application for U.S. Dept. of Health and Human Services grant #HHS-2016-ACF-OHS-HP-118 (*see* Exhibit L).  Those emails did not disclose that NP2 and NP4 were paying Meza.

70.    But the House argued it was under no statutory obligation to search beyond its email servers for public records involving an A.R.S. § 39-121.01(A)(1) Officer. Plaintiff could locate no other A.R.S. § 39-121.01(A)(2) Public Body that had ever taken such a position which also appeared contrary to precedent and statutory language.

71.    Meza eventually produced two documents after the Governor's and the House's production demonstrated that, in emails sent from his legislator email address, Meza directed state officials to his personal cell phone to conduct business.  Those two un-dated documents were signed "Arizona State Senator Robert Meza", written on "Arizona State Senate" letterhead referencing "ROBERT MEZA, ARIZONA STATE SENATE, DISTRICT 30", and sent to U.S. Senator Sinema and U.S. Congressman

Stanton to their government staff at their staff's federal government email addresses. Under the artifice of a benevolent legislator, and under color of office, those two letters invited Senator Sinema and Congressman Stanton to be honored guests at a 2019 NP4 event. The letters also pointed to Meza's involvement with NP4, to public policy matters ("advocating for behavioral health issues"), to Governor Ducey's 2018 NP4 event appearance, to Meza's role organizing NP4 events, and to the "400 attendees" who regularly attended those events. See Exhibit M.[18] Meza did not disclose his private pay.

72.    On September 15, 2022, Meza signed an affidavit that he never produced or maintained public records on his personal phone (602-421-1702) or via his personal email address (mezand86@gmail.com).

a.    But on information and belief, and evidence obtained, Meza routinely solicited and secured funds from registered lobbyists and corporate executives on behalf of the Nonprofits via his personal email and his personal phone's text messaging features and loaded "apps". For example, on or about February 5, 2020, Meza sent texts to Arizona Cardinals corporate officials, under color of office, asking to meet in his

---

[18]    Senator Sinema and Congressman Stanton were unaware of Meza's private payments, meaning they were defrauded by omission into appearing. Their appearance, in turn, boosted NP4 sponsorships and ticket sales. *See State v. Henry*, 205 Ariz. 229, ¶17, 68 P.3d 455 (App. 2003) ("The definition of 'fraud' must be broad enough to cover all of the varieties made possible by boundless human ingenuity"). Unwary corporate sponsors were also defrauded by omission, as were persons who purchased individual even tickets. Event tickets cost $150, and sponsorships cost between $5,000 and $25,000 (*see* Exhibit N). As part of the Scheme, Meza facilitated at least ten Nonprofit fundraising events by soliciting and securing event sponsorships which benefitted (1) NP2 in October 2016; (2) NP3 in Spring 2015, 2016, and 2017; (3) NP4 in March 2016, 2017, 2018, and 2019; (4) NP5 in February 2020; and (5) NP6 in May 2021. On the basis that each event attracted 400 guests at $150 per ticket, and presumably 10% of those guests were aware of Meza's private payments, more than 3,500 members of the local philanthropic community were defrauded out of $525,000. Unwary corporate sponsors additionally were defrauded out of tens of thousands, if not hundreds of thousands, of dollars.

government office for the purpose of soliciting NP5 sponsorship funds.  Corporate representative Michael Bankston met Meza in Meza's office, conveyed that the team would sponsor the February 23, 2020 NP5 event, and attended that event not knowing Meza was receiving private pay due to Meza's material omissions (*see* <u>Exhibit O</u>).

        b.     Likewise, on or about October 1, 2016, Meza sent texts to corporate lobbyists under color of office for the purpose of soliciting NP2 sponsorship funds.  As a result, State Farm lobbyist Gus Miranda went to Meza's office, agreed to sponsor the NP2 fundraiser, and secured $2,500 for NP2 on October 4, 2016 not knowing Meza was receiving private pay due to material omissions: "Sen. Meza did not mention receiving any type of payment or compensation from [NP2] to me" (*see* <u>Exhibit P</u>).

73.     Robson, who was brought to suit through principles of joinder, refused to turn over documents in her actual possession but later produced seventeen (17) pages of records when confronted with Arizona appellate rulings determining private persons in actual possession of public records must produce those documents. *Fann*.

74.     Per documents Robson produced on September 9, 2022, (1) Meza sent Robson a March 10, 2020 email noting her involvement in NP5 and NP6 events served the purposes of "branding [her] name quickly in the community" to bolster her campaign to become Governor; (2) Robson hosted a February 23, 2020 fundraiser for NP5 at her personal residence, and co-hosted a May 28, 2021 fundraiser for NP6 at another person's residence; (3) sponsorships for those two events ranged from $5,000 to $25,000; and (4) NP5's Chief Administrative Officer sent Robson a $5,000 invoice from her NP5 corporate email account with "Representative Robert Meza" cc'ed on that invoice, along with an email thanking her for "support of our 2020 Tournament of Hearts"; but (5) Robson

withheld records documenting her responses to Meza's communications.[19]  *See* Exhibit Q.

75.    Meza and Robson became aware by December 1, 2022 that Plaintiff had obtained public records from cooperative state agencies factually supporting the existence of additional public records in their actual possessions and implicating the Scheme.

TORTIOUS ACTS

Meza and Robson Jointly Committed Tortious Acts

76.    Seeking to shut down further records production out of concern that Plaintiff would obtain other incriminating documents, the House, along with Meza and Robson jointly moved for that court to find Plaintiff vexatious pursuant to A.R.S. § 12-3201(A) on December 12, 2022.  In support, those defendants pointed to active litigation in FC2020-090224, CV2021-017889[20], CV2021-005501, CV2021-013210, and CV2022-014146.

77.    On January 27, 2023, NP6's CEO produced an affidavit admitting that she paid Meza "for his service as a fundraiser".[21]

---

[19]    A legislator's public records include "all ... documentary materials ... *made or received*" pursuant to A.R.S. § 41-151(2).

[20]    CV2021-017889 was a personal injury case at which time that defendant had admitted 100% fault and the only determination remaining was damages calculation. Plaintiff won that case, which was clear when the A.R.S. § 12-3201(A) motion was filed.

[21]    The NP6 CEO's admission that she paid Meza for his "services as a fundraiser", coupled with documents showing that CEO assigned Meza specific AHCCCS "systems contractors" and corporate sponsors to solicit funds for events demonstrate an agreement. Evidence shows Meza approached those assigned funders under color of office continuing to work through the artifice of a benevolent legislator supporting his constituents.  Again, constituent support is an "official act" that legislators perform.  *See Fann*.  Accordingly, under a "meeting of the minds" agreement between Meza and the NPC CEO, the NP6 CEO paid Meza in return for performing "official acts"; a proscribed *quid pro quo* agreement.  *See United States v. Householder, et a*l., No. 1:20-cr-00077, pp. 13-20 (2nd Cir., May 6, 2025) (*per curiam*) (To violate "Hobbs Act extortion ([]28 U.S.C. § 1951) and honest services fraud ([] 28 U.S.C. §§ 1343, 1346) ... the Supreme Court has told us that extortion under color of official right requires that a public official 'receive[] a payment in return for his agreement to perform specific official acts.' ... In other words, the Court has required the government to show a *quid pro quo* agreement: that the official

78.     That affidavit directly contradicted Meza's January 7, 2022 CV2021-013210 court filing where, in his private capacity, he avowed the Nonprofits were "constituents" that he supported as a legislator but they only paid him "for advice".

79.     Regardless, on February 27, 2023, the CV2022-008626 court issued an order (the "Order") finding Plaintiff statutorily vexatious per A.R.S. § 12-3201, enjoining him from filing court papers "in this case or any other pending civil action without prior leave of the judge assigned to that case", and subjecting him to an A.R.S. § 12-3201(B) blanket injunction ("A pro se litigant who is designated a vexatious litigant may not file a new pleading, motion or other document without prior leave of the court.").

80.     Meza, Robson, and the House knew when they filed the A.R.S. § 12-3201(A) motion that A.R.S. § 12-3201 was patently unconstitutional in every application but used the statute for the unlawful purposes of intimidating Plaintiff and retaliating against him for exercising his rights under the Petition Clause and the Speech Clause.

81.     Meza and Robson used A.R.S. § 12-3201 for the additional unlawful

---

received a payment (the quid) and in return agreed to take official action (the quo).  The Court's *quid pro quo* requirement also applies to honest services fraud.  ... And bribery has long proscribed an official from receiving something of value 'in return for' official action. 18 U.S.C. § 201(b)(2). ... [S]ince an agreement can be informal, unwritten, or implied, the government can prove the existence of the *quid pro quo* with circumstantial evidence.  Otherwise, anyone could frustrate the law by 'knowing winks and nods.' ... Thus, a jury can infer an agreement from what the participants 'say, mean and do.' ... In sum, Hobbs Act extortion and honest services fraud require the government to show a *quid pro quo* – that is, the official received money in exchange for a promise to take specific official action.") (Internal citations omitted).  The factual elements are sufficient to establish Meza violated 28 U.S.C. §§ 201(b)(2), 1951, and 1346.  It is of no moment whether the Nonprofits' funders knew that a portion of the funds they provided would be returned to Meza through Ameliorate.  Funders with knowledge of the Scheme were complicit while those without knowledge would have been defrauded.  If more specificity is required regarding Meza's performance of official acts, Governor Ducey expressly confirmed that Meza often approached him as a "lawmaker" seeking specific allocations and discretionary funds, such as P90 funds, made available to legislators.

purpose of concealing criminal conduct and obstructing investigations into the Scheme.

82.     Meza and Robson jointly and continuously prosecuted the A.R.S. § 12-3201(A) motion over months of trial and appellate proceedings where the December 12, 2022 motion was initially granted, the resulting injunctive Order was then stayed on appeal over defendants' objections, and the motion and Order were subsequently argued through appeal until defendants jointly filed their Answering Brief on October 10, 2023.

Ortega Committed Tortious Acts In Concert With Meza

83.     On August 25, 2021, and with full knowledge of the Scheme and of the NP1 CEO's disclosure to the House two days prior (which Meza attended), Ortega and Meza's counsel (and Meza himself, on information and belief) conferred via phone and email. During that communication, and in a series of communications dating back to April 2020, Ortega and Meza agreed (1) to intimidate Plaintiff, and (2) to pre-emptively discredit and damage him via factual misrepresentations presented in court filings; both in attempt to prevent criminal investigations into Meza and TD, and both serving as an extension of the Scheme agreement's second object.  These efforts included the concerted use of, and the overt acts of filing, A.R.S. § 12-3201(A) motions across suits.

84.     Ortega thereafter filed two unsuccessful A.R.S. § 12-3201(A) motions in CV2021-013210 on November 17, 2021 and June 23, 2022, while repeatedly referring to those motions in CV2021-005501 proceedings.  Meza then persuaded the CV2022-008626 defendants to jointly file their December 12, 2022 A.R.S. § 12-3201(A) motion.

85.     In parallel, upon learning on October 2, 2021 that TD was under FBI and DHS investigation, and in another attempt to intimidate Plaintiff and to unlawfully learn details about the federal investigations, Ortega demanded in an October 6, 2021 FC2020-090224 court filing that Plaintiff "disclose all communications with FBI Agent France and

1   Homeland Security" or face a contempt petition seeking his incarceration.[22]

2       86.    As time progressed, the Court of Appeals granted Plaintiff a new trial on

3   remand and separately granted him special action relief assigning a new judge to the

4   FC2020-090224 case.  Appellate instructions issued August 23, 2023 required discovery

5   be re-opened, including for documents production and the right to depose TD on financial

6   matters and on the "anonymous" attacks launched against Plaintiff's business interests.

7       87.    As she had done from the outset, Ortega continued to withhold statutorily

8   mandated and appellate ordered financial records production.  On court order, she

9   produced partial documents in rolling fashion between July 31, 2024 and April 10, 2025,

10  but with blanket redactions for the unlawful purpose of concealing financial information

11  that the Arizona Child Support Guidelines and court orders required her to provide, but

12  that implicated TD's and Meza's Scheme participation.

13      88.    Producing documents behind schedule and facing an August 19, 2024

14  deposition, Ortega requested a protective order on August 14, 2024.  She asked that court

15  to order "all financial information disseminated in this matter be limited to use in this

16  family Court matter and not to be disseminated to third parties for any reason without

17  order of the Court allowing such over threat of sanctions and finding of contempt."

18      89.    Government investigators were the "third parties" that concerned Ortega,

---

[22]    *See U.S. v. Liew,* 856 F.3d 585 (9th Cir. 2017) (Civil litigation becomes a criminal matter when defense tactics go beyond "a general, legal denial of guilt" and conceal prior criminal conduct);  *U.S. v. Volpendesto,* 746 F.3d 273, 286 (7th Cir. 2014) (Efforts to obtain investigative information from sources other than the investigative agency are "not efforts merely in service of curiosity, but out of desire to influence what evidence" might come before a court knowing "information collected during the investigation would, in turn, be presented to the" proceeding, and thus merit obstruction charges); *General Dynamics Corp. v. Selby Mfg. Co.*, 481 F.2d 1204, 1213 (8th Cir. 1973) (There is no "legal right to the fruits of the FBI's investigative endeavors … 'civil discovery is not intended to be a 'back door' method of accomplishing criminal discovery").

and she attempted to intimidate Plaintiff with threats of sanctions and findings of contempt should Plaintiff share any "financial information" that might evidence financial crimes although that same evidence was statutorily required to calculate child support.

90.    During the August 19, 2024 FC2020-090224 deposition, (1) Ortega improperly lodged 188 objections, the vast majority of which were talking objections and disguised instructions directing TD to evade response (e.g., "don't answer if you don't want to"); (2) she unlawfully instructed TD not to answer relevant questions going to financial matters, to EBMC's revenue, and to TD's professional history; and (3) when Plaintiff questioned TD regarding her knowledge of anonymously sent messages, Ortega unlawfully instructed TD to walk out of the deposition.  Those acts were all taken to obstruct investigations and conceal information implicating TD and Meza in the Scheme.

91.    But that court instructed TD to answer those questions at an April 14, 2025 evidentiary hearing, to which TD falsely stated she never bought or used the Cricket burner phone, *inter alia*.  Federal authorities took physical possession of that phone and, on information and belief, have confirmed that it belonged to, and was used by, TD.

92.    In preparation for inevitable documents production and deposition appearance, Ortega also instructed TD to present the A.R.S. § 12-3201 Order from CV2022-008626 to the Arizona Secretary of State on or about April 10, 2024 seeking to have the State identify Plaintiff as an A.R.S. § 13-3601 Domestic Violence perpetrator per A.R.S. § 41-161, *et seq*.[23]  The Secretary of State Office's personnel did just that.

---

[23]    A.R.S. § 41-161, *et seq*. governs the Arizona Address Confidentiality Program where A.R.S. § 41-161(5) verified victims of A.R.S. § 13-3601 criminal domestic violence can keep an address confidential upon relocation.  See A.R.S. § 41-161(2); A.R.S. § 41-162.  TD declared to an A.R.S. § 41-163(B) "application assistant" and made an A.R.S. § 41-161(C)(11) sworn statement submitted "under penalty of perjury" that Plaintiff had been convicted of committing A.R.S. § 13-3601 domestic violence.

93.     Ortega instructed TD to take those actions for the improper purposes of bolstering ongoing efforts to delay, block, and/or limit financial documents production which might prove financial crimes.

94.     To serve that unlawful purpose, on May 10, 2024, Ortega entered A.R.S. § 41-163(D) "address confidentiality program authorization cards" as exhibits attached to motions in the ongoing FC2020-090224 discovery dispute.

95.     TD confirmed during the forementioned August 19, 2024 deposition that she pursued the A.R.S. § 41-161, *et seq*. action based solely on a mention of "harassment" in the A.R.S. § 12-3201 Order – an order to which she was not party – and where the supposed harassment occurred only via court filings in meritorious litigation.

96.     Following his former attorney's prescient warnings, Plaintiff has only had very brief, publicly monitored physical or electronic contact with TD since January 2020, by design.  Ortega therefore had no factual or legal basis to instruct TD to accuse Plaintiff of being an A.R.S. § 13-3601 perpetrator via the A.R.S. § 41-161, *et seq*. action.

97.     The Arizona Secretary of State now holds official records identifying Plaintiff as an A.R.S. § 13-3601 Domestic Violence perpetrator, although Plaintiff has never committed an act of domestic violence.

98.     Despite the A.R.S. § 12-3201 Order, including the A.R.S. § 12-3201(B) blanket provision, Plaintiff plans to file court papers absent leave of the court in ongoing FC2020-090224 and CV2021-005501 litigation, and in this suit.  For doing so, he is being threatened with, and reasonably fears, administrative, civil, and/or criminal enforcement of A.R.S. § 12-3201, including where filing court papers in well-founded lawsuits is being unlawfully postured as violations of A.R.S. § 13-2810(A)(2) Interfering With Judicial Proceedings and/or A.R.S. § 13-2921 Harassment, which enforcement authorities in turn

1    can then cite as predicates to prosecute A.R.S. §§ 13-3601 and 13-3602.[24]

2                    **PARTIES, JURISDICTION, AND VENUE**

3        99.    Plaintiff Phillip Potter resides in Scottsdale, Arizona.

---

[24]    Should there be a question of whether the pleading meets the Fed. R. Civ. P. Rule 9 requirement for "particularity" of facts documenting the alleged underlying criminal fraud which motivated Meza's, Robson's, and Ortega's conduct, Plaintiff asks the Court to either (1) permit Plaintiff to conduct limited discovery to extract facts under the exclusive control of corporate entities, and amend the complaint; or (2) consider the facts and "circumstances constituting fraud" sufficient to apprise defendants of the "the time, place and nature of the alleged fraudulent activities" under either one of two "relaxed" fraud standards that the Ninth Circuit recognizes. *CMB Infrastructure Grp. IX, LP v. Cobra Energy Inv. Fin., Inc.,* 572 F. Supp. 3d 950, 969-70 (D. Nev. 2021) (citing *Wool v. Tandem Computers Inc.,* 818 F.2d 1433, 1439-40 (9th Cir. 1987)). Rule 9(b) "may be relaxed" in one of two situations, both applicable here. First, the Rule "may be relaxed as to matters within the opposing party's knowledge [especially in cases involving] corporate fraud, [where] plaintiffs will not have personal knowledge of all of the underlying facts [and may not be able to] attribute particular fraudulent conduct to each defendant." *Id*. This standard only requires plaintiffs to plead "facts on which the belief is founded and include the misrepresentations themselves with particularity and, *where possible,* the roles of the individual defendants in the misrepresentations." *Id*. The fraud alleged here involves corporate fraud conducted via Ameliorate and the Nonprofits, meaning the "relaxed" corporate-fraud standard applies. Second, Rule 9(b) is "relaxed" in "fraud by omission claims, which do not require the same level of specificity required by a normal fraud by misrepresentation claim". *See Washington v. Baenziger*, 673 F. Supp. 1478, 1482 (N.D.Cal. 1987) ("Where the fraud consists of omissions on the part of the defendants, the plaintiff may find alternative ways to plead the particular circumstances of the fraud. [F]or example, a plaintiff cannot plead either the specific time of the omission or the place, as he is not alleging an act, but a failure to act."); *see also MacDonald v. Ford Motor Co.*, 37 F. Supp. 3d 1087, 1096 (N.D. Cal. 2014) ("Because the plaintiffs are alleging a failure to act instead of an affirmative act, the Plaintiffs cannot point out the specific moment when the Defendant failed to act."). Meza and the Nonprofits' complicit executives relied extensively on material omissions of Meza's private pay when soliciting public funds from elected officials and state agencies, and when soliciting supplemental private funds from lobbyists and corporate officials. Accordingly, the "relaxed" fraud-by-omission standard also applies. Should greater particularity be deemed necessary, easily discoverable facts under the control of Ameliorate, LLC include (1) corporate bank accounts through which funds were transferred and deposited; (2) exact dates and amounts of financial transactions; (3) the terms of written contracts and oral agreements which governed those transactions; and (4) communications that resulted in the transactions.

100.    Defendant Robert Meza resides in Phoenix, Arizona.  He is a former State Senator and State House member who held legislative office from January 2003 through January 2023.  He is sued in his private capacity.

101.    Defendant Karrin Taylor Robson resides in Phoenix, Arizona.  She is a former Arizona Board of Regents member who held that position between June 2017 and February 2022, and was a candidate in the August 2022 primary election campaign to become the Governor of Arizona.  She is sued in her private capacity.

102.    Defendant Alane Ortega resides in Phoenix, Arizona.  She is TD's attorney in FC2020-090224 and CV2021-005501, and has an extensive disciplinary record.  For instance, on April 14, 2021, the Discipline Probable Cause Committee of the Supreme Court of Arizona found that "in several cases and in several forums", Ms. Orega "violated the following Rules of the Supreme Court of Arizona: Rule 42, Ariz. R. Sup. Ct., ERs, 1.2, 1.3, 3.1, 3.2, 3.4(c), and 8.4(d)", including in case cv-15-00357 before the U.S. District Court for the District of Arizona where, on December 5, 2016, the Hon. John J. Tuchi issued an order admonishing her for knowingly "furthering a [client's] falsehood".

103.    Defendant Kris Mayes is the Arizona Attorney General.  She is sued in her official capacity.  As the state's chief legal officer, Attorney General Mayes ("AG Mayes") is charged by Ariz. Const. art., 5 § 9, A.R.S. § 41-192, A.R.S. § 41-193, and other authorities with guaranteeing that state laws are uniformly and adequately enforced.  For instance, A.R.S. § 41-193(A)(2) provides that AG Mayes may "prosecute and defend any proceeding in a state court other than the supreme court in which this state or an officer of this state is a party or has an interest".  And A.R.S. § 41-193(A)(5) grants her the authority to "if deemed necessary, assist the county attorney of any county in the discharge of the county attorney's duties", providing AG Mayes the power to deputize

herself with county prosecutor criminal enforcement authorities.  She has the authority to prosecute A.R.S. § 13-2810(A)(2) which makes it criminal to "disobey[] a lawful court order", including any A.R.S. § 12-3201 order (if "lawful"), and to prosecute A.R.S. § 13-2810(A)(2) violations as an A.R.S. § 13-3601 predicate.  Likewise, Ariz. Const. art., 2 § 2.1 and A.R.S. § 13-4433(D) provide AG Mayes with civil enforcement powers over A.R.S. § 12-3201(B) violations as A.R.S. § 13-2810(A)(2) predicates for an A.R.S. § 13-3602(A) civil protective order.  A.R.S. § 13-2810 directly connects the Attorney General's civil and criminal enforcement powers with every state court order, and with every statutory basis underlying every order, including A.R.S. § 12-3201 orders, sufficient to invoke Article III jurisdiction.  *See Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 919 (9th Cir. 2004) ("[A] mere scintilla of enforcement" connection is sufficient to invoke article III jurisdiction under *Ex parte Young*).

104.    Defendant Joseph Welty is the Presiding Judge of the Maricopa County Superior Court.  He is sued in his official *administrative* capacity only.  "Enjoining a statewide official under *Young* ... is appropriate when there is a realistic possibility the official will take legal or *administrative* actions against the plaintiff's interests."  *Doe v. DeWine,* 910 F.3d 842, 848-49 (6th Cir. 2018) (emphasis added) citing *Ex parte Young,* 209 U.S. 123 (1908).  The Presiding Judge's connection to the administrative enforcement of A.R.S. § 12-3201 is grounded in Ariz. Const. art. 6 § 11 ("Presiding judges shall exercise administrative supervision over the superior court and judges thereof in their counties") and in A.R.S. § 12-3201(A) ("[T]he presiding judge of the superior court ... may designate a pro se litigant a vexatious litigant").  Judge Welty "may designate a pro se litigant a vexatious litigant" at any time without warning or recourse by issuing an unappealable administrative order adding Plaintiff to Arizona's "Vexatious Litigant

List".[25] *See Madison v. Groseth,* 230 Ariz. 8, 13, ¶ 16 n.8 (App. 2012) (Noting Arizona appellate courts does not have appellate jurisdiction over administrative orders). Presiding Judge Welty has a sufficient connection to the administrative enforcement of A.R.S. § 12-3201 to invoke Article III jurisdiction.

105.    Doe Defendants 1 through 60, inclusive, are persons sued herein under fictitious names as their true names, capacities, and sources of liability are presently unknown.  Plaintiff will amend this complaint to designate the true names, capacities, and sources of liability of these parties when the same have been ascertained.  Plaintiff is informed and believes, and on that basis alleges, that Doe Defendants 1 through 60 were agents or alter egos of Defendants, or are otherwise responsible for any acts alleged. Plaintiff is informed and believes, and on that basis alleges, that the actions of Does 1 through 60, as alleged herein, were duly ratified by named Defendants, with each Doe acting in concert per agreement or acting as the Defendant's agent, alter ego, or facilitator.

106.    The Court has jurisdiction (1) under 28 U.S.C. § 1331 because the action arises under the Constitution and laws of the United States, thus raising federal questions; (2) to decide declaratory and injunctive relief as authorized by 28 U.S.C. §§ 2201 and 2202; and (3) under 28 U.S.C. § 1343(a)(3) and 42 U.S.C. § 1983 since this action seeks to redress the deprivation, under color of the laws and statutes of the State of Arizona, of fundamental rights secured by the United States Constitution.  For the above reasons, the Court also has jurisdiction over state claims factually intertwined with federal claims.

107.    A case and a controversy exist between the parties on federal claims authorized under 42 U.S.C. § 1983 (Meza, Robson), on factually intertwined state claims (Meza, Robson, Ortega), and on federal claims for prospective relief (Mayes, Welty)

---

[25]      See https://tinyurl.com/2x4unmjx.

authorized under 28 U.S.C. §§ 2201 and 2202 based on a First Amendment facial challenge to A.R.S. § 12-3201[26] to invoke U.S. Const. art. III, § 2 jurisdiction.

108.    Venue in this judicial district is proper under 28 U.S.C. § 1391(b)(2), because the events or omissions giving rise to Plaintiff's claims occurred in this district.

## STANDING

109.    "To establish Article III standing, an injury must be 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013).

110.    AG Mayes threatens to cause Plaintiff to suffer First, Fifth, and Fourteenth Amendment fundamental rights deprivations, creating "concrete, particularized, and ... imminent" injuries, by definition. *Nebraska Press Ass'n*; *Melendres*.  "[T]he 'fairly traceable' and 'redressability' components for standing overlap and are 'two facets of a single causation requirement.'" *Washington Env't Council v. Bellon,* 732 F.3d 1131, 1146 (9th Cir. 2013). "Causation may be found even if there are multiple links in the chain connecting the defendant's unlawful conduct to the plaintiff's injury, and there's no requirement that the defendant's conduct comprise the last [or first] link in the chain". *Mendia v. Garcia,* 768 F.3d 1009, 1012 (9th Cir. 2014).  "What matters is not the 'length of the chain of causation, but rather the plausibility of the links that comprise the chain.'" *Nat'l. Audubon Soc'y., Inc. v. Davis,* 307 F.3d 835, 849 (9th Cir.2002).  As a demonstration of traceability and redressability, if the Court enjoins AG Mayes from civilly and criminally enforcing Plaintiff's non-adherence to A.R.S. § 12-3201(B) as any

---

[26]    A "plaintiffs' facial challenge [i]s not 'inextricably intertwined' with the judicial decision of the local court [if] it [i]s a general challenge to the constitutionality of" a statute. *Noel v. Hall*, 341 F.3d 1148, 1157 (9th Cir. 2003).  Therefore, this facial challenge to A.R.S. § 12-3201 is not subject to the *Rooker-Feldman* doctrine. *Id.*

form of A.R.S. §§ 13-3601 or 13-3602 predicate then Plaintiff will not suffer additional

irreparable injuries from indictment, prosecution, and incarceration, or separation from his

son. Plaintiff has standing to bring suit for prospective relief against AG Mayes.

111.    Presiding Judge Welty threatens to cause Plaintiff to suffer additional First

and Fourteenth Amendment fundamental rights deprivations under the Petition Clause –

"imminent" irreparable injuries, by definition. As a demonstration of traceability and

redressability, if the Court enjoins Presiding Judge Welty from administratively enforcing

A.R.S. § 12-3201(A), then Plaintiff will not suffer further denial of access to the courts by

being placed on the Vexatious Litigant List. Plaintiff has standing to bring suit for

prospective relief against Presiding Judge Welty.

112.    Defendants Meza, Robson, and Ortega have intentionally and directly

caused irreparable and compensable injuries which are "concrete, particularized, and

actual ...; fairly traceable to the challenged action[s]; and redressable by a favorable

ruling." Plaintiff has standing to bring suit for damages, including compensable and

punitive damages, against Defendants Meza, Robson, and Ortega.

**COUNT ONE**
**DECLARATORY AND INJUNCTIVE RELIEF**
**FIRST AMENDMENT FACIAL CHALLENGE TO A.R.S. § 12-3201**
**VIOLATION OF U.S. CONST. AMENDS. I (PETITION CLAUSE) AND XIV**
**[Mayes and Welty]**

113.    Plaintiff incorporates the allegations in all preceding paragraphs as if fully

set forth herein.

114.    The First Amendment is applicable to states via the Fourteenth Amendment.

115.    Whether due to the significant costs of litigation or other factors, pro se

litigants account for a large and growing percentage of Arizona court actions where "as

many as 70% or more of all litigants in the Family Court proceedings are self-represented,

39

the highest number among all departments in the [Maricopa County Superior] Court".[27]

116.    The Arizona Legislature passed A.R.S. § 12-3201 in 2014 purportedly to provide a statutory authority that codified and complemented courts' inherent authority to manage their dockets in the government interest of judicial efficiency.

117.    A February 10, 2025 "A.R.S. § 12-3201" keyword search shows pro se litigants have challenged an A.R.S. § 12-3201 designation in thirty-three (33) appeals.

118.    There is no telling how many A.R.S. § 12-3201 injunctions were never appealed or, worse yet, how many times attorneys threatened pro se litigants with a vexatious litigant injunction to unjustly prevent the prosecution of civil actions.

119.    Appellate courts have affirmed A.R.S. § 12-3201 plain language permits trial courts to permanently enjoin a pro se litigant from ever filing court papers of any type based solely on instances of sanctionable conduct within non-final lawsuits, even when the litigant presents as the *defendant* party.  *See Gainey Ranch Community Assoc, v. Kraft*, No. 1 CA-CV 18-0179, ¶¶ 32, 34 (Ariz. Ct. App. 2019) (mem. decision) ("[Defendant] Kraft also challenges the superior court's ruling designating him a vexatious litigant, arguing that the court failed to specify any filing made for purposes of harassment or without substantial justification. ... [The Court of Appeals affirmed because] Kraft's filings repeatedly 'rehash[ed]' issues that had already been addressed"); *Parsons v. Harris*, No. 1 CA-CV 24-0324, ¶¶ 3, 9 (Ariz. Ct. App. Dec. 10, 2024) (mem. decision) ("Parsons sued Harris for defamation.  Harris filed six motions in the ten-month period after he was served with the defamation complaint.  None of these motions had merit, ... We affirm the court's designation of [Defendant] Harris as a vexatious litigant.").

---

[27]    See https://superiorcourt.maricopa.gov/posts/press-releases/2023/informal-trial-format-assists-self-represented-litigants-in-family-cases/.

120.    There is no record showing that the facial constitutionality of A.R.S. § 12-3201 (the "Statute") has ever been challenged in state court or federal court.

121.    Plaintiff presents a First Amendment facial challenge to A.R.S. § 12-3201, which went into effect January 1, 2015, and reads in full:

> A. In a noncriminal case, at the request of a party or on the court's own motion, the presiding judge of the superior court or a judge designated by the presiding judge of the superior court may designate a pro se litigant a vexatious litigant.
> B. A pro se litigant who is designated a vexatious litigant may not file a new pleading, motion or other document without prior leave of the court.
> C. A pro se litigant is a vexatious litigant if the court finds the pro se litigant engaged in vexatious conduct.
> D. The requesting party may make an amended request at any time if the court either:
> 1. Determined that the party is not a vexatious litigant and the requesting party has new information or evidence that is relevant to the determination, even if there is not a pending case in the court.
> 2. Did not rule on the original request during the pendency of the action, even if there is not a pending case in the court.
> E. For the purposes of this section:
> 1. "Vexatious conduct" includes any of the following:
> (a) Repeated filing of court actions solely or primarily for the purpose of harassment.
> (b) Unreasonably expanding or delaying court proceedings.
> (c) Court actions brought or defended without substantial justification.
> (d) Engaging in abuse of discovery or conduct in discovery that has resulted in the imposition of sanctions against the pro se litigant.
> (e) A pattern of making unreasonable, repetitive and excessive requests for information.
> (f) Repeated filing of documents or requests for relief that have been the subject of previous rulings by the court in the same litigation.
> 2. "Without substantial justification" has the same meaning

1    prescribed in section 12-349.[28]

2

3    122.    The Statute's language is lifted almost verbatim from the state's sanctions

4    statute, A.R.S. § 12-349, which reads in pertinent part:

5        [I]n any civil action commenced or appealed in a court of
         record in this state, the court shall assess reasonable attorney
6        fees, ..., if the attorney or party does any of the following:
         1. Brings or defends a claim without substantial justification.
7        2. Brings or defends a claim solely or primarily for delay or
         harassment.
8        3. Unreasonably expands or delays the proceeding.
         4. Engages in abuse of discovery.
9

10

11    123.    The Statute violates due process, and the vagueness and overbreadth

12    doctrines.  *Grayned v. Rockford,* 408 U.S. 104, 92 S.Ct. 2294, 2298-99, 33 L.Ed.2d 222,

13    227 (1972) ("[W]e insist that laws give the person of ordinary intelligence a reasonable

14    opportunity to know what is prohibited, so that he may act accordingly.  Vague laws may

15    trap the innocent by not providing fair warning.  Second, if arbitrary and discriminatory

16    enforcement is to be prevented, laws must provide explicit standards for those who apply

17    them.  A vague law impermissibly delegates basic policy matters to policemen, judges,

18    and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of

19    arbitrary and discriminatory application.  Third, but related, where a vague statute 'abut[s]

20    upon sensitive areas of basic First Amendment freedoms,' it 'operates to inhibit the

21    exercise of [those] freedoms.'  Uncertain meanings inevitably lead citizens to 'steer far

22    wider of the unlawful zone ... than if the boundaries of the forbidden areas were clearly

23    marked.'"); *Moody v. NetChoice, LLC,* 144 S. Ct. 2383, 2397 (2024) (A state law is

24

25    overbroad if it "lacks a plainly legitimate sweep. ... [W]hen a facial suit is based on the

26    ────────────────────
      [28]    Per "section 12-349[F]", "'without substantial justification' means that the claim or
      defense is groundless and is not made in good faith".

                                        42

First Amendment, ... [the law is also void if] 'a substantial number of [its] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'").

THE STATUTE VIOLATES THE OVERBREADTH DOCTRINE

A.R.S. § 12-3201 Lacks A Plainly Legitimate Sweep Per *Noerr-Pennington*

124.    Any state statute which purports to carve out a path to enjoin litigation implicates the First Amendment right of access to courts.[29]  *Ringgold-Lockhart v. County of Los Angeles,* 761 F.3d 1057, 1061-62 (9th Cir. 2014) (Vexatious litigant injunctions implicate rights protected by the Petition Clause since such injunctions' "pre-clearance requirement imposes a substantial burden on the free-access guarantee" under the First Amendment); *see Delew v. Wagner,* 143 F.3d 1219, 1222 (9th Cir. 1998) ("[T]he right of access to the courts is a fundamental right protected by the Constitution.").

125.    Speaking to overbreadth, the U.S. Supreme Court established the "plainly legitimate sweep" for any statute that makes litigation subject to injunction.  Specifically, the litigation in question must be *both* objectively baseless *and* motivated by an improper purpose.  *Bill Johnson's Rests., Inc. v. N.L.R.B.,* 461 U.S. 731, 743-44 (1983) ("[A]n 'improperly motivated' lawsuit may not be enjoined ... unless such litigation is '[objectively] baseless.'"); *Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60-62, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993) (The Petition Clause guarantees litigation "may not be enjoined" unless the suit is *both* "objectively baseless" *and* filed for an "improper, malicious purpose"); *BE & K Constr. Co. v. N.L.R.B.,* 536 U.S. 516, 531, 122 S.Ct. 2390, 153 L.Ed.2d 499 (2002) (Litigation may be enjoined only if "both

---

[29]    Arizona courts and the Ninth Circuit treat vexatious litigant pre-filing restrictions as a species of injunction.  *Moy v. United States,* 906 F.2d 467, 470 (9th Cir. 1990); *Madison,* 230 Ariz. 8, 279 P.3d at 638-39.

objectively baseless *and* subjectively motivated by an unlawful purpose" (emphasis original); *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 934 (9th Cir. 2006) (To forfeit the Petition Clause's broad protections, "*both* objective baselessness and an improper motive" must be demonstrated) (emphasis original).

126.    Defining "plainly legitimate sweep" on the U.S. Supreme Court's "objective baselessness and improper motive" standard echoes in "the *Noerr-Pennington* doctrine [which] stands for a generic rule of statutory construction, applicable to *any* statutory interpretation that could implicate the rights protected by the Petition Clause. ... [W]e must give adequate 'breathing space' to the right of petition. ... [U]nder the breathing space principle, ... [only] 'sham litigation' [characterized by *both*] objective baselessness *and* an improper motive" must be demonstrated before becoming actionable in any form, *Id* at 931-32 (emphasis added), including via statutory injunction.

127.    At minimum, this standard – the "*Noerr-Pennington* standard" – establishes what constitutes the Statute's "plainly legitimate sweep" for enjoining a lawsuit.

128.    Pursuant to A.R.S. § 12-3201(C) and (E)(1), a "vexatious litigant" is a self-represented litigant who has engaged in "any" A.R.S. § 12-3201(E)(1)(a)-(f) "vexatious conduct".  For the Statute to possess any plainly legitimate sweep, at least one of the A.R.S. § 12-3201(E)(1)(a)-(f) provisions must meet the *Noerr-Pennington* standard and only enjoin litigation that can be properly characterized as demonstrating *both* objective baselessness *and* an improper motive.  None of those six provisions meet that standard.

129.    The Arizona Supreme Court dispositively made that determination when recently interpreting the common language between A.R.S. §§ 12-3201 and 12-349 through the lens of the Petition Claus.  *See Ariz. Republican Party v. Richer,* 257 Ariz., 210, 222, ¶ 44 (2024) (Penalizing those who bring suits "grounded in fact and law ...

inflict[s] real damage to our republic by slamming the courthouse door on citizens ... legitimately seeking to vindicate rights").[30]

130.    That court found A.R.S. § 12-3201(E)(1)(c) language referring to "without substantial justification" (i.e., "groundless and not made in good faith") does not mean "groundless and made in bad faith". *Id* at 221, ¶¶ 34-37. And "bad faith" is what characterizes litigation motivated by an "'improper purpose". *Id*. Consequently, A.R.S. § 12-3201(E)(1)(c) does not reach any improper purpose motivation as the *Noerr-Pennington* standard requires. Further, language in each A.R.S. § 12-3201(E)(1)(a), (b), and (d) "subsection provides a separate bad faith" consideration only, *Id* at ¶ 37, meaning each of those three provisions lacks an objectively baseless consideration. *Id*.

131.    In the end, the Arizona Supreme Court determined no A.R.S. § 12-3201(E)(1)(a)-(d) "subsection" can be read to codify the federal injunctive standard for *both* objective baselessness *and* an improper motive.[31]

132.    The Statute thus "lacks a plainly legitimate sweep" pursuant to the *Noerr-Pennington* standard, meaning it is overbroad.

133.    That said, enjoining a single *lawsuit* is fundamentally different from enjoining a *litigant* from forever filing *any* lawsuit absent leave of the court. The latter implicates far greater threats to the Petition Clause. Thus, a heightened standard beyond

---

[30]    *See Bragdon v. Abbott,* 524 U.S. 624, 645, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998) (When "judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language" is presumed to incorporate that same interpretation).

[31]    A.R.S. §§ 12-3201(E)(1)(e) ("A pattern of making unreasonable, repetitive and excessive requests for information") and (f) ("Repeated filing of documents or requests for relief that have been the subject of previous rulings by the court in the same litigation") include neither a "baseless litigation" nor an "improper motive" component on their face and thus fail the *Noerr-Pennington* standard.

1   *Noerr-Pennington* is required to guarantee procedural and substantive due process.  The

2   Ninth Circuit established that heightened standard in *Ringgold,* 761 F.3d at 1061-62 ("Out

3   of regard for the constitutional underpinnings of the right to court access ... [vexatious

4   litigant injunctions must] comply with certain procedural and substantive requirements").

5

6   134.    Built on the same line of precedent as *Noerr-Pennington*, *Ringgold*

7   determined that courts may find a litigant vexatious and issue a narrowly tailored

8   injunction only if there are heightened procedural and "substantive findings as to the

9   frivolous or harassing nature of the litigant's actions." *Ringgold,* 761 F.3d at 1064.

10   135.    Like *Noerr-Pennington*, the improper purpose "frivolous or harassing"

11   consideration does not come into play unless the current litigation is first determined to be

12   "objectively baseless", meaning the complaint does not arguably contain "any genuine

13   issue of material fact or law".  *See Pro. Real Est. Invs.*, 113 S.Ct. at 61.

14   136.    If that threshold criterion is met, heightened procedural requirements

15   beyond *Noerr-Pennington* trigger and court records must be reviewed for the presence of

16   numerous objectively baseless lawsuits, all of which have reached finality through the

17   exhaustion of appeal.  *See In re Powell,* 851 F.2d 427, 432 (D.C. Cir. 1988) ("[T]he

18   district court should be careful not to review pending cases … complaints that predated

19   the [motion for an] injunction were still pending at the time the injunction was imposed

20   and, as such, could not have been reviewed" for being a past baseless suit).[32]

21

22   137.    To establish that serial objectively baseless litigation is of a "harassing

23   nature", every suit in a long series of suits must found to be both objectively baseless and

24   filed for an improper purpose, thus demonstrating a heightened "pattern of harassment"

25   affecting common defendants on common claims.  *Ringgold,* 761 F.3d at 1060-64.

26

---

[32]    The Ninth Circuit recognizes *Powell* as binding authority.  See *Ringgold*.

138.    In the highly unusual alternative, serial objectively baseless litigation of a "frivolous ... nature" exists when records review demonstrates an "inordinate" number of finalized frivolous[33] suits.  *Id; see Molski v. Evergreen Dynasty Corp.,* 500 F.3d 1047 (9th Cir. 2007) (Affirming a vexatious injunction when court records revealed *Molski* had filed "hundreds" of "frivolous" suits against small business owners alleging impossible facts that he suffered the same exact injuries at the same exact time but at different geographic locations, indicating an intent to coerce defendants into unjust monetary settlements).

139.    No A.R.S. § 12-3201(E)(1)(a)-(f) provision meets the Ninth Circuit's heightened standard for vexatious litigant injunctions – the "*Ringgold* Standard" – requiring *both* serial objectively baseless litigation *and* an improper purpose in the form of either an "inordinate" number of "frivolous" suits or a demonstrated "pattern of harassment" involving common defendants and claims.

Every A.R.S. § 12-3201(E)(1) Provision Lacks A Plainly Legitimate Sweep Per *Ringgold*

140.    A.R.S. § 12-3201(E)(1)(a) defines "vexatious conduct" as "[r]epeated filing of court actions solely or primarily for the purpose of harassment".

141.    This provision only considers the "separate bad faith" improper purpose motive of harassment, *see Richer* at ¶ 37, and therefore does not first detect the presence of serial objectively baseless litigation – a threshold requirement per *Ringgold*.

142.    Plain language permitting the improper purpose of "harassment" to form the entire basis for a vexatious litigant injunction also makes A.R.S. § 12-3201(E)(1)(a) overly broad since *Ringgold* requires a heightened "pattern of harassment" demonstration.

143.    Inclusion of the phrase "or primarily" confirms A.R.S. § 12-3201(E)(1)(a) is

---

[33]    "Baseless" litigation becomes "frivolous" litigation in the absence of a "reasonable inquiry" which includes fabricating facts to bring suit. *See Moore v. Keegan Mgmt. Co. (In re Keegan Mgmt. Co., Sec. Litig.),* 78 F.3d 431, 434 (9th Cir. 1996).

overbroad since "or" presents a disjunctive standard used to express an alternative or to give a choice, and the dictionary defines "primarily" as "for the most part".[34]  A court action filed "primarily for the purpose of harassment" concedes the complaint contains at least one claim which presents a "genuine issue of material fact or law", meaning the action is not objectively "baseless", and thus can neither be enjoined nor considered in the requisite historical review for finalized serial objectively baseless litigation.  *Id.*

144.    In sum, A.R.S. § 12-3201(E)(1)(a) overbroadly permits sanctionable conduct solely in the form of non-patterned "harassment" to serve as the entire basis for a statutory vexatious litigant injunction.

145.    A.R.S. § 12-3201(E)(1)(a) lacks a plainly legitimate sweep per the *Ringgold* Standard.

146.    If the provision has any plainly legitimate sweep, then "a substantial number of [its] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep."

147.    A.R.S. § 12-3201(E)(1)(a) therefore is overbroad.

148.    A.R.S. § 12-3201(E)(1)(b) defines "vexatious conduct" as "[u]nreasonably expand[ing] or delay[ing] court proceedings".

149.    Like A.R.S. § 12-3201(E)(1)(a), A.R.S. § 12-3201(E)(1)(b) does not first determine whether the litigation in question is objectively baseless or whether there is a history of serial objectively baseless litigation, as it must per the *Ringgold* Standard.

150.    *Ringgold* also tells us that litigation "expansion" or "delay" is not a permitted improper purpose consideration for vexatious litigant injunctions; only "a pattern of harassment" or an "inordinate" number of "frivolous" lawsuits are permitted.

---

[34]      See https://www.merriam-webster.com/dictionary/primarily.

151.    The term "court proceedings" also solidifies that this particular provision casts an overbroad net since "court proceedings are not separate actions. ... [T]hey are distinct stages in the processing of the same 'action'".  *Sw. Airlines Co. v. Ariz. Dep't of Revenue,* 197 Ariz. 475, 477, ¶ 7, 4 P.3d 1018, 1020 (App.2000).

152.    The First and Fourteenth Amendments do not permit a pro se litigant to be found vexatious for unreasonably expanding or delaying "distinct stages in the processing of" a single lawsuit if that lawsuit itself is not objectively baseless and if there is not also a history of serial objectively baseless litigation.  *Ringgold.*

153.    A.R.S. § 12-3201(E)(1)(b) lacks a plainly legitimate sweep per *Ringgold.*

154.    If the provision has any plainly legitimate sweep, then "a substantial number of [its] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep."

155.    A.R.S. § 12-3201(E)(1)(b) therefore is overbroad.

156.    A.R.S. § 12-3201(E)(1)(c) defines "vexatious conduct" as "[c]ourt actions brought or defended without substantial justification" where, per A.R.S. § 12-3201(E)(2), "without substantial justification means that the claim or defense is groundless and is not made in good faith" based on cross-referencing "section 12-349".

157.    As an initial matter, A.R.S. § 12-3201(E)(1)(c) and "section 12-349" are incompatible because A.R.S. § 12-3201(E)(1)(c) applies to "court actions" (i.e., lawsuits) while "section 12-349" expressly applies to "claim[s] or defense[s]".  "Lawsuits", not any individual "claim or defense", are the only constitutional unit of analysis that can be used to evaluate for the presence of serial objectively baseless litigation.  *Ringgold.*

158.    The Arizona Legislature enacted an overbroad (and vague) statute when conflating and cross-referencing "court actions" with "claim[s] or defense[s]".

159.    Further, A.R.S. § 12-3201(E)(1)(c) "or defended" language and the section 12-349 "or defense" language both present an "or" disjunctive standard, which overbroadly allows a self-represented *defendant* to be deemed a vexatious litigant; a circumstance which common sense and the Ninth Circuit preclude given that the purpose of a vexatious litigant injunction is to protect "defendant[s] or the court" from a self-represented *plaintiff*. *Ringgold,* 761 F.3d at 1064.

160.    Moving on, the Arizona Supreme Court dispositively opined that "without substantial justification" does *not* include any "improper purpose" consideration for the presence of "bad faith", *Richer* at ¶¶ 37-40, and therefore violates the *Ringgold* Standard.

161.    A.R.S. § 12-3201(E)(1)(c) lacks a plainly legitimate sweep per *Ringgold*.

162.    If the provision has any plainly legitimate sweep, then "a substantial number of [its] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep."

163.    A.R.S. § 12-3201(E)(1)(c) therefore is overbroad.

164.    A.R.S. § 12-3201(E)(1)(d) defines "vexatious" conduct as "[e]ngaging in abuse of discovery or conduct in discovery that has resulted in the imposition of sanctions against the pro se litigant".

165.    Whether a plaintiff is engaging in, or has ever engaged in, sanctionable discovery conduct provides no information as to the whether the underlying lawsuit is objectively baseless or whether there is a history of serial objectively baseless litigation. The provision, therefore, cannot meet the *Ringgold* Standard.

166.    It should also be presumed that a litigant who reached the discovery phase presented a "well-founded lawsuit", and the First Amendment does not permit well-founded lawsuits to be enjoined for any reason. *Bill Johnson's Rests.*.

167.    A.R.S. § 12-3201(E)(1)(d) also cannot be interpreted to demonstrate any form of harassment since to do so would render A.R.S. § 12-3201(E)(1)(a) superfluous.

168.    A.R.S. § 12-3201(E)(1)(d) lacks a plainly legitimate sweep per *Ringgold*.

169.    If the provision has any plainly legitimate sweep, then "a substantial number of [its] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep."

170.    A.R.S. § 12-3201(E)(1)(d) therefore is overbroad.

171.    A.R.S. § 12-3201(E)(1)(e) defines vexatious conduct as "[a] pattern of making unreasonable, repetitive and excessive requests for information."

172.    Whether a litigant makes "excessive requests for information" provides no information as to the whether the underlying lawsuit is objectively baseless or whether there is a history of serial objectively baseless litigation.  The provision, therefore, cannot meet basic *Ringgold* requirements.

173.    A.R.S. § 12-3201(E)(1)(e) also cannot be interpreted to demonstrate any form of harassment since to do so would render A.R.S. § 12-3201(E)(1)(a) superfluous.

174.    Further, "[r]equests for information" from government officials, especially information about "cronyism and conflicts of interest" or any form of public corruption represents the epitome of the fundamental right to petition the government, as well as the fundamental right of free speech in the form of political speech.  *See Dombey v. Phx. Newspapers, Inc.,* 150 Ariz. 476, 481, 724 P.2d 562, 567 (1986) (The Arizona Supreme Court determined Arizonans' fundamental rights include the right to inquire about "the quality of the conduct of [] government, including charges of cronyism and conflicts of interest involving governmental programs [which] is at the very core of 'public concern' and is protected by the [F]irst [A]mendment.").  Consequently, statutory injunctions

cannot ever be applied to legitimate exercises of the First Amendment. *See LaFaro v. Cahill,* 203 Ariz. 482, 485, ¶ 16, 56 P.3d 56, 59 (App. 2002).

175.    Also, seeking government "information" contained in public records, including for evidentiary purposes, is a legitimate and incentivized use of the Arizona public records law and therefore cannot ever be considered to have been done for any improper purpose. *Bolm v. Custodian of Records of Tucson Police Dep't.,* 193 Ariz. 35, ¶ 11, 969 P.2d 200, 204 (App.1998) ("that litigation was pending ... when [the requesting party] made his public records request does not affect the [Public Body's] obligation to comply with the Public Records Law"); *Phoenix Newspapers, Inc. v. Keegan,* 201 Ariz. 344, 351 ¶ 33, 35 P.3d 105, 112 (App. 2001) ("The core purpose of the public records law is to allow the public access to official records and other government information so that the public may monitor the performance of government officials."); A.R.S. § 39-121.02(D) (Public records are provided free of charge when the records are sought "as evidence or as research for evidence in an action in any judicial or quasi-judicial body").

176.    In that same vein, public records litigation vindicates a public right, not a private right, and therefore is not appropriate for inclusion in the requisite record review of court records to identify the presence of serially baseless litigation or for a *Ringgold* "pattern of harassment". *Powell*, 851 F.2d at 433 (public records litigation "preclude[s] consideration of the interests of the requester"); *Bolm,* 193 Ariz. 35 at ¶ 10 ("A person's right to public records ... is not conditioned on his or her showing, or a court finding, that the documents are relevant to anything").

177.    The First and Fourteenth Amendments do not permit a pro se litigant to be found vexatious for "requesting information".

178.    A.R.S. § 12-3201(E)(1)(e) lacks a plainly legitimate sweep per *Ringgold*.

179.    If the provision has any plainly legitimate sweep, then "a substantial number of [its] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep."

180.    A.R.S. § 12-3201(E)(1)(e) therefore is overbroad.

181.    A.R.S. § 12-3201(E)(1)(f) defines "vexatious conduct" as "[r]epeated filing of documents or requests for relief that have been the subject of previous rulings by the court in the same litigation".

182.    The "same litigation" language expressly, and overbroadly, permits courts to find litigants vexatious based on sanctionable conduct that occurs within a single suit; a circumstance which *Ringgold* prohibits.

183.    The provision does not require, as it must, that the underlying lawsuit be objectively baseless, or there to be a history of serial objectively baseless litigation, before the litigant is found vexatious and all litigation is forever enjoined.

184.    A.R.S. § 12-3201(E)(1)(f) also cannot be interpreted to demonstrate any form of harassment since to do so would render A.R.S. § 12-3201(E)(1)(a) superfluous.

185.    A.R.S. § 12-3201(E)(1)(f) lacks a plainly legitimate sweep per *Ringgold*.

186.    If the provision has any plainly legitimate sweep, then "a substantial number of [its] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep."

187.    A.R.S. § 12-3201(E)(1)(f) therefore is overbroad.

A.R.S. § 12-3201(B) Is Overly Broad Per *Ringgold*

188.    Per A.R.S. § 12-3201(B), "[a] pro se litigant who is designated a vexatious litigant may not file a new pleading, motion or other document without prior leave of the court"; the epitome of an overbroad injunction designed to prevent a pro se litigant from

ever filing any motion paper or complaint in any case without leave of the court.

189.    The Ninth Circuit established long ago that a vexations litigant injunction is unconstitutionally "overbroad [if] it is designed to prevent [a plaintiff] from filing any complaint in any case without leave of court". *Moy,* 906 F.2d at 471.

190.    An A.R.S. § 12-3201(B) injunction also serves as an unconstitutional complaint "screening" in every instance and thus sweeps overbroadly per the Ninth Circuit. *See Ringgold*, 761 F.3d at 1066 (An injunctive "order is too broad [if] it provides that the court 'will approve all filings'. ... [T]he district court added a screening criteria that is not narrowly tailored to the problem before it, and is in fact unworkable. ... [C]ourts cannot properly say whether a suit is 'meritorious' from pleadings alone.").

191.    A.R.S. § 12-3201(B) also unconstitutionally enjoins all future litigation in permanent, blanket fashion. *See Id* at 1067 ("In light of the constitutional concerns such pre-filing orders implicate, ... there [must be a] []sufficiently close fit between the terms of the injunction and the problem it purports to address").

192.    A.R.S. § 12-3201(B) therefore is overly broad.

A.R.S. § 12-3201 VIOLATES PROCEDURAL DUE PROCESS

193.    As a matter of U.S. Const. amend. XIV procedural due process, a pro se litigant facing a possible vexatious injunction must be afforded a fair opportunity to be heard during an evidentiary hearing in opposition to any vexatious litigant motion. *Ringgold,* 761 F.3d at 1062-63.  But the Statute contains no hearing provision on a matter affecting First Amendment rights, and thus is unconstitutional in every application

194.    Procedural due process requires fair notice and "the opportunity to be heard at a meaningful time and in a meaningful manner." *Matthews v. Eldridge*, 424 U.S. 319, 339-343 (1976).  When "the private interest that will be affected by the official action"

arises from the First Amendment and there is "the risk of an erroneous [permanent] deprivation of such interest", *Id*, due process demands a hearing.  But the Statute has no provision requiring a hearing be conducted in opposition to an A.R.S. § 12-3201(A) motion, as it must per logic and the Ninth Circuit.  *See Ringgold,* 761 F.3d at 1062-63.  Accordingly, the Statute violates procedural due process in every application.

THE STATUTE VIOLATES THE VAGUENESS DOCTRINE

195.    A.R.S. § 12-3201 is overly vague as it does not sufficiently "provide explicit standards for those who apply them ..., abut[s] upon sensitive areas of basic First Amendment freedoms,' [and] 'operates to inhibit the exercise of [those] freedoms.'"

196.    The Statute relies on imprecise language which does not provide "explicit standards" and invites "arbitrary and discriminatory enforcement".

197.    A.R.S. §§ 12-3201(E)(1)(a), (e), and (f) reference terms "repeated"[35] and "repetitive" but do not define "explicit standards" with objective precision to determine how many times specific conduct must recur before conduct becomes prohibited as "repeated" or "repetitive", and thus subject to enforcement.

198.    A.R.S. § 12-3201(E)(1)(e) also relies on the subjective term, "excessive", which means "exceeding what is usual, proper, necessary or normal".[36]  This term does not provide "explicit standards" with objective precision and no self-represented litigant can be expected to discern at what point his conduct would be considered "excessive" and subject to penalty, especially the drastic penalty of the loss of access to the courts.

199.    A.R.S. §§ 12-3201(E)(1)(a) and (c) reference "court actions" (in the plural), but do not provide "explicit standards" with objective precision as to how many "court

---

[35]    "Repeated" means "renewed or recurring again and again".  See https://www.merriam-webster.com/dictionary/repeated.
[36]    See https://www.merriam-webster.com/dictionary/excessive.

55

actions" are required before a litigant's conduct is prohibited and subject to enforcement.

200.    A.R.S. § 12-3201(E)(1)(c) relies on the term "without substantial justification" which "is judged on an objective standard of what a professional, competent attorney would do in similar circumstances." *Richer*, 547 P.3d 356, ¶ 40.  That standard does not to "give the [self-represented] person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly" since "ordinary" persons do not possess the "intelligence" of, or the acquired knowledge gained by, the average attorney to let them know "what a professional, competent attorney would do".

201.    A.R.S. § 12-3201(E)(1)(a), (c), (e), and (f) do not provide "explicit standards for those who enforce them" and do not "give the [self-represented] person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly".  Therefore, each of those provisions is overly vague.

202.    This case also illuminates a fatal vagueness flaw across several Arizona statutes.  Specifically, "harassment" is not clearly defined, and often not defined at all.

203.    Neither A.R.S. § 12-3201(E)(1)(a) nor the provision that inspired it, A.R.S. § 12-349(A)(2), defines "harassment" which, in a legal context, should mean "[w]ords, conduct, or action . . . that, being directed at a specific person, annoys, alarms, or causes substantial emotional distress to that person and serves no legitimate purpose."  Black's Law Dictionary (12th ed. 2024).  The phrase, "and serves no legitimate purpose", functions as a crucial saving clause that prohibits litigants from strategically professing "alarm[]" or "distress" to avoid being held culpable or liable in court for their misconduct, because holding people legally accountable serves a "legitimate purpose" (vindicating legal rights) regardless of how a person emotionally responds to being brought to suit.

204.    But in everyday context, "harass" means "to annoy persistently"[37] regardless of whether that serves a "legitimate purpose" such as vindicating one's legal rights.

205.    For comparison purposes, Arizona's other statute which addresses injunctions proscribing harassment defines A.R.S. § 12-1809(T)(1)(a) "harassment" as a "[a] series of acts over any period of time that is directed at a specific person and that would cause a reasonable person to be seriously alarmed, annoyed or harassed and the conduct in fact seriously alarms, annoys or harasses the person and serves no legitimate purpose."  The "and serves no legitimate purpose" saving clause is present.  *See LaFaro*.

206.    But because A.R.S. § 12-3201(E)(1)(a) does not define harassment, persons of ordinary intelligence do not have a reasonable opportunity to know what is prohibited in judicial proceedings.  The provision invites arbitrary and discriminatory enforcement, and abuts against First Amendment freedoms implicating the Petition Clause, thus forcing Arizonans to "steer far wider of the unlawful zone" out of fear of rights deprivations.

207.    A.R.S. §§ 12-3201(E)(1)(a), (c), (e), and (f) are overly vague.

**COUNT TWO**
**DECLARATORY AND INJUNCTIVE RELIEF**
**FIRST AMENDMENT FACIAL CHALLENGE TO A.R.S. § 13-2921**
**VIOLATION OF U.S. CONST. AMENDS. I (PETITION CLAUSE) AND XIV**
**[Mayes]**

208.    Plaintiff incorporates the allegations in all preceding paragraphs as if fully set forth herein.

209.    Pursuant to A.R.S. § 13-2921(A)(1), "[a] person commits harassment if the person knowingly and repeatedly commits an act or acts that harass another person or the person knowingly commits any one of the following acts in a manner that harasses: ... Contacts or causes a communication with another person by verbal, electronic,

---

[37]    See https://www.merriam-webster.com/dictionary/harass.

mechanical, telegraphic, telephonic or written means."

210.    Per A.R.S. § 13-2921(E), "'harass' means conduct that is directed at a specific person and that would cause a reasonable person to be seriously alarmed, annoyed, humiliated or mentally distressed and the conduct in fact seriously alarms, annoys, humiliates or mentally distresses the person." The provision, however, does not contain an "and serves no legitimate purpose" saving clause. Accordingly, any repeating conduct that results in a reasonable person's "distress[]", regardless of whether that conduct serves a legitimate purpose, is a criminal violation under Arizona statutes.

211.    Reasonable persons experience distress when brought to suit. In Arizona, tens of thousands of new suits are filed each year, and it is reasonable to believe defendants experience distress as a result. Thus, the number of A.R.S. § 13-2921 violations committed when a plaintiff exercises his right to petition Arizona courts for redress of grievances and the opposing party experiences distress is substantial.

212.    The Arizona Secretary of State has accepted that a pro se litigant who files court papers that result in the opposing party experiencing (or at least expressing) emotional distress has violated A.R.S. §§ 13-2921 and 13-3602, that plaintiff violated A.R.S. §§ 13-2921 and 13-3602 when filing court papers absent leave of the court in active litigation, and that plaintiff's conduct qualifies him as an A.R.S. §§ 13-2921 and 13-3602 perpetrator.

213.    From August 2025 through November 2025, Plaintiff's former spouse filed numerous court papers and hearings in cases FC2020-090224 and CV2021-005501 pointing to Plaintiff's vexatious litigant label to argue that she was enduring harassment in well-founded litigation when Plaintiff files court papers absent leave of the court.

214.    On June 3, 2025, Attorney General Mayes declared in a written motion her

belief that Plaintiff's litigation conduct reached § 13-2921, and admitted that both she and county prosecutors could prosecute conduct proscribed under A.R.S. § 12-3201(B) as an A.R.S. § 13-2921 violation.

215.    Fully knowledgeable of the former spouse's allegations and history of malicious prosecution of A.R.S. §§ 13-3602 and 13-2921 against plaintiff, and of the Arizona's Secretary of State's findings that plaintiff violated A.R.S. §§ 13-3602 and 13-2921, on November 28, 2025, in correspondence between Plaintiff and Attorney General's counsel, the Attorney General expressly refused to disavow any form of administrative, civil, or criminal enforcement against Plaintiff for conduct proscribed under A.R.S § 12-3201(B), including as an A.R.S § 13-2921 violation or A.R.S § 13-3601 predicate.

216.    Plaintiff's intended course of conduct, and specifically his intention to file pleadings, court papers, and other documents in active litigation (FC2020-090224, CV2021-005501, and CV2021-013210) absent leave of court is arguably proscribed by A.R.S § 13-2921 under these facts and circumstances, as Plaintiff interprets the statute and as the Attorney General interprets the statute.  *See Am. Encore v. Fontes*, 152 F.4th 1097, 1118-1119 (9th Cir. 2025) (A plaintiff need "only show that their 'future conduct ... [is] 'arguably ... proscribed by [the] statute' it wishes to challenge.' And for the purposes of standing, we accept Plaintiffs' interpretation of the statute so long as it is an arguable interpretation.").

217.    Attorney General Mayes is one of several state officers and statutorily authorized private persons who "collectively" maintain a connection to the administrative, civil, and criminal enforcement of A.R.S. § 13-2921, including for supposed harassing conduct proscribed under A.R.S. § 12-3201(B).  *See Am. Encore v. Fontes*, 152 F.4th 1097, 1118-1119 (9th Cir. 2025) ("In evaluating the threat of enforcement, we look to 'the

threat posed collectively by the entire 'universe of potential complainants.'"); *Sable Commc'ns of California, Inc. v. FCC*, 827 F.2d 640, 644 (9th Cir.1987) (The Supreme Court instructs federal courts to be "particularly liberal in allowing pre-enforcement challenges to statutes imposing criminal sanctions when the challenge is based on the first amendment".).

218.    Arizona state officers read A.R.S. § 13-2921 to invoke civil and criminal penalties for petitioning the judicial branch on the basis that the opposing party voices distress, regardless of whether the petitioning serves a "legitimate purpose".

219.    On January 6, 2026, the Hon. Dominic Lanza acknowledged he "is unclear whether the act of filing court papers would qualify as 'conduct that is directed at a specific person,' as required under § 13-2921(E).".  This observation only confirms the statute's vagueness.  *See Grayned v. Rockford,* 408 U.S. 104, 92 (1972) ("[W]e insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. ... [L]aws must provide explicit standards for those who apply them.  A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application."

220.    Accordingly, A.R.S. § 13-2921 is an overly vague statute which abuts against the First Amendment, and chills or punishes fundamental rights.

## COUNT THREE
**DEPRIVATION OF CONSTITUTIONAL RIGHTS UNDER COLOR OF LAW**
**FIRST AMENDMENT RETALIATION**
**42 U.S.C. § 1983**
**VIOLATION OF U.S. CONST. AMENDS. I AND XIV**
**[Meza and Robson]**

221.    Plaintiff incorporates the allegations in all preceding paragraphs as if fully

set forth herein.

222.    "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ..., subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, ... secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress".  42 U.S. Code § 1983.  "A plaintiff may bring a Section 1983 claim alleging that public officials, acting in their official capacity, took action with the intent to retaliate against, obstruct, or chill the plaintiff's First Amendment rights."  *Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 867 (9th Cir. 2016).

223.    Meza operated under color of law as an Ariz. Const. art. 4 House member and an A.R.S. § 39-121.01(A)(1) Officer when filing and prosecuting the A.R.S. § 12-3201(A) motion through appeal, knowing the Statute was patently unconstitutional, causing Plaintiff to be subjected to the deprivation of his First Amendment right of access to the courts.  Meza's intentional acts caused irreparable and compensable injuries, making him liable for compensable and punitive damages for acting with malicious intent to retaliate, against, obstruct, and chill Plaintiff's rights under the Petition Clause.

224.    With the same intent and result, Robson also operated under color of law as a willful participant in joint activity with Meza and the House when filing and prosecuting the A.R.S. § 12-3201(A) motion through appeal.  "Private persons, jointly engaged with state officials in the prohibited action, are acting 'under color of law' for purposes of the statute.  To act 'under color' of law does not require that the accused be an officer of the State.  It is enough that he is a willful participant in joint activity with the State or its agents,".  *United States* v. *Price,* 383 U. S. 787, 794 (1966); *United Steelworkers of*

*America v. Phelps Dodge Corp.,* 865 F.2d 1539, 1540 (9th Cir.1989) ("Private parties act under color of state law if they willfully participate in joint action with state officials to deprive others of constitutional rights"). For the same reasons as Meza, Robson is liable for compensable and punitive damages.

225. "Under the First Amendment to the United States Constitution, a citizen has the right to be free from governmental action taken to retaliate against the citizen's exercise of First Amendment rights or to deter the citizen from exercising those rights in the future." *Sloman v. Tadlock,* 21 F.3d 1462, 1469-70 (9th Cir. 1994); *Hartman v. Moore*, 547 U.S. 250, 256 (2006) ("[T]he First Amendment prohibits government officials from subjecting an individual to retaliatory actions").

226. "To bring a First Amendment retaliation claim, the plaintiff must allege that (1) it engaged in constitutionally protected activity; (2) the defendant's actions would 'chill a person of ordinary firmness' from continuing to engage in the protected activity; and (3) the protected activity was a substantial motivating factor in the defendant's conduct – i.e., that there was a nexus between the defendant's actions and an intent to chill [First Amendment rights]." *Ariz. Students' Ass'n.*, 824 F.3d at 867.

227. Pursuant to *Noerr-Pennington* and the *Ringgold* Standard, Plaintiff engaged in constitutionally protected activity under the Petition Clause when he petitioned the government for redress of grievances, including when he sought to inspect public records containing government information of public concern.

228. Meza's and Robson's actions would chill a person of ordinary firmness from continuing to engage in such First Amendment protected activity. To be sure, facing a chamber of the State Legislature, a sitting House member, and a viable candidate for Governor acting in concert to jointly launch targeted attacks on one's right to petition –

and then seeing those government officials coordinate with their associates to threaten incarceration and separation from one's child based on those attacks – would chill a person of ordinary firmness from continuing to engage in that protected activity.

229.    Plaintiff's exercise of his First Amendment petition rights, and his associated speech rights, were substantial motivating factors in the defendants' conduct, which was intended to chill Plaintiff's rights.  There was a clear nexus between Meza's and Robson's actions in filing and prosecuting the A.R.S. § 12-3201(A) motion, and in their intent to chill Plaintiff's First Amendment rights.  Indeed, Plaintiff's exercise of his fundamental rights uncovered evidence of Meza's pervasive misconduct and brought Plaintiff to the cusp of additional documents production demonstrating Meza's and Robson's concerted involvement with the Scheme.  To avoid that outcome, and to thwart efforts to collect evidence in any other action, Meza and Robson jointly moved to deny Plaintiff access to the courts.  Meza and Robson had no reason to file and prosecute the A.R.S. § 12-3201(A) motion other than to chill Plaintiff's First Amendment rights given that Meza's factual misrepresentations on affidavit had already induced the trial court to grant summary judgment in defendants' favor.

230.    Plaintiff became subject to adverse action when Meza and Robson jointly filed and prosecuted an A.R.S. § 12-3201(A) motion for the improper purposes of unlawfully shutting down public records production to which Plaintiff had a statutory right to inspect, intimidating Plaintiff as a crime witness, obstructing state and federal criminal investigations into the Scheme, and falsely labeling Plaintiff vexatious in attempt to chill his First Amendment rights and deny him access to courts.  Defendants' acts had the intended effects, subjected Plaintiff to a blanket injunction, and threatened him with civil and criminal penalties, including incarceration and loss of access to his son, should

he not submit to the retaliation and abandon his fundamental right to petition.

231.    The adverse action against Plaintiff would not have been taken absent the retaliatory motive.

232.    Meza's and Robson's conduct violated clearly established statutory and constitutional rights of which a reasonable person would have known.  Plaintiff's statutory right to inspect public records was clearly established at the time of the conduct at issue, as were his constitutional rights under the First Amendment's Petition Clause and Speech Clause, including that the fundamental right to petition was procedurally and substantively protected in the face of vexatious accusations far beyond the Statute's woefully overbroad provisions pursuant to well-established U.S. Supreme Court and Ninth Circuit precedent.

233.    Meza's actions and Robson's actions "exceeded the bounds of reasonable governmental action and violated [Plaintiff's] First Amendment rights." *White v. Lee*, 227 F.3d 1214, 1231 (9th Cir. 2000).

234.    Every reasonable official, and their agents or joint operators, would have understood that what he or she was doing to violate Plaintiff's constitutional rights.

235.    First Amendment retaliation, especially on matters of considerable public concern, are prohibited under the utmost of circumstances.

236.    Meza's and Robson's joint A.R.S. § 12-3201(A) motion and prosecution, including their efforts to uphold the resulting Order on appeal, were not legitimate petitioning activity immunized by the Petition Clause or the *Noerr-Pennington* doctrine. Those concerted actions constitute "sham litigation" predicated on a litigant's "fraud ... misrepresentation, or other misconduct", including criminal misconduct.[38] *See Pro. Real*

---

[38]    The Ninth Circuit has adopted this consideration as stand-alone evidence of "sham litigation".  *See Relevant Grp., LLC v. Nourmand,* 116 F.4th 917, 928 (9th Cir. 2024) ("Our court has identified three circumstances in which the sham litigation exception

*Est. Invs.*, 113 S.Ct. at 1928 n. 6 (quotation marks omitted). "The line is crossed when [the litigant's] purpose is not to win a favorable judgment ... but to harass him, and deter others, by the process itself – regardless of outcome – of litigating". *Id* at 1935-36. Again, there was no "favorable judgment" to win in a public records lawsuit after the trial court denied additional records production, but Meza and Robson proceeded with efforts to forever deny and deprive Plaintiff of his fundamental right of access to courts.

237.    Meza's misconduct and malicious intent is further evident in other court filings where he provided knowing misrepresentations for the unlawful purpose of attempting to conceal the Scheme. Again, he falsely avowed to one court that Nonprofits' executives only paid him for his "advice", although Plaintiff secured an affidavit from NP6's CEO in another court that she paid him for his "services as a fundraiser". Meza also submitted an affidavit swearing he did not produce or maintain public records on his personal cell phone or personal email account, but evidence demonstrated that he did.

238.    "In the adjudicatory sphere, ..., information supplied by the parties is relied on as accurate for decision making and dispute resolving. The supplying of fraudulent information thus threatens the fair and impartial functioning of these agencies and does not deserve [*Noerr-Pennington*] immunity". *Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.,* 690 F.2d 1240, 1260-61 (9th Cir. 1982). "There is no first amendment protection for furnishing with predatory intent false information to an ... adjudicatory

---

might apply: first, where the lawsuit is objectively baseless and the defendant's motive in bringing it was unlawful; second, where the conduct involves a series of lawsuits 'brought pursuant to a policy of starting legal proceedings without regard to the merits' and for an unlawful purpose; and third, if the allegedly unlawful conduct 'consists of making intentional misrepresentations to the court, litigation can be deemed a sham if 'a party's knowing fraud upon, or its intentional misrepresentations to, the court deprive the litigation of its legitimacy.'") (Internal citations omitted). This "second" consideration tracks with the *Ringgold* "inordinate" number of "frivolous" lawsuits consideration.

body." *Id.*

239.    Meza's improper and malicious litigation tactics included numerous "intentional misrepresentations to, the court[s] and deprive[d] the litigation of its legitimacy.'" *Relevant Grp.,* 116 F.4th at 928.

240.    Plaintiff seeks compensatory damages due to fundamental rights deprivations, reputational harm, loss of income and wages, loss of business assets, emotional distress and fear, and pecuniary losses with damages to be jointly and severally assessed against Meza and Robson for their concerted actions.

241.    "A jury [is] permitted to assess punitive damages in an action under Section 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30 (1983). "Punitive damages by definition are not intended to compensate the injured party, but rather to punish the tortfeasor whose wrongful action was intentional or malicious, and to deter him and others from similar extreme conduct." *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 266–67 (1981).

242.    Meza and Robson were motivated by evil motives and evil intent, and demonstrated reckless or callous indifference to Plaintiff's federally protected First Amendment rights under the Petition Clause and the Speech Clause.  Those defendants should be punished for their intentional and malicious actions, and to deter them and others from similar extreme conduct.

243.    Plaintiff seeks punitive damages jointly and severally assessed against Meza and Robson.

## COUNT FOUR
### ABUSE OF PROCESS
**[Meza, Robson, and Ortega]**

244.    Plaintiff incorporates the allegations in all preceding paragraphs as if fully set forth herein.

245.    Arizona recognizes a common law claim for Abuse of Process. *Goldman v. Sahl,* 248 Ariz. 512 (App. 2020).  "[T]he elements of abuse of process are (1) a willful act in the use of [a] judicial process; (2) for an ulterior purpose not proper in the regular conduct of the proceedings." *Id at* ¶ 58.  "One who uses a legal process, whether criminal or civil, against another primarily to accomplish a purpose for which it is not designed, is subject to liability to the other for harm caused by the abuse of process." *Id* at ¶ 59.

MEZA AND ROBSON

246.    The proper purpose of a vexatious litigant injunction is to protect courts and defendants from enduring a series of "objectively baseless lawsuits" which also demonstrate "a pattern of harassment" on common claims and defendants.  *Ringgold.*

247.    Robert Meza, in his official capacity, and Karrin Taylor Robson were not party to any other lawsuit involving Plaintiff beyond CV2022-008626.  Therefore, by definition, they could not have endured any effects of a series of baseless lawsuits.  And neither Meza nor Robson could have suffered directly from a "pattern of harassment" since one lawsuit cannot establish a pattern.

248.    Further, Plaintiff never filed an objectively baseless lawsuit per *Pro. Real Est. Invs.*.  Several CV2021-013210 claims were "returned to" or abated for litigation in CV2021-005501 which is now set for trial.  Therefore, the CV2021-013210 complaint was not "objectively baseless" as it contained "genuine issues of material fact and law".  *Id.*  Further, previously concealed, but now discovered, facts show no CV2021-013210

claim, much less the entire suit, was objectively baseless.  Further still, in non-final parallel litigation, Mercy Care and the AHCCCS Director knowingly misrepresented and actively concealed facts of their profit-sharing agreement to evade public records disclosure in CV2022-014146, so that suit was not "objectively baseless" and could not contribute to any calculation of an "inordinate" number of frivolous lawsuits.  *Ringgold*.

249.    Meza and Robson each engaged in a willful act in the use of a judicial process when jointly bringing the A.R.S. § 12-3201(A) motion in CV2022-008626 and prosecuting the motion and resulting Order through appeal.

250.    Meza and Robson acted in concert, and jointly filed and prosecuted the A.R.S. § 12-3201(A) motion for the "ulterior purposes" of (1) retaliating against Plaintiff for exercising his First Amendment rights under the Petition Clause; (2) intimidating Plaintiff as a crime witness; and (3) obstructing criminal investigations into the Scheme. None of those purposes are proper in the regular conduct of judicial proceedings.  But those ulterior purposes were Meza's and Robson's primary motive.

251.    Plaintiff seeks compensatory damages due to fundamental rights deprivations, reputational harm, loss of income and wages, loss of business assets, emotional distress and fear, and pecuniary losses with those damages jointly and severally assessed against Robson and Meza.  Meza is liable in his private capacity for acts taken in his official capacity but which served his private interest.  *See Goldman,* 248 Ariz. at 519, ¶ 58 ("There is no requirement that [a defendant] be a party to the proceedings.").

252.    Meza and Robson both acted out of malice. Their concerted conduct was guided by evil minds.

253.    Meza's and Robson's wrongful conduct was motivated by ill will with intentions to serve their own interests.

254.    Meza and Robson acted in concert with evil minds to commit intentional acts that injured Plaintiff and, thus, are jointly and severally liable for punitive damages.

ORTEGA

255.    Again, "[t]here is no requirement that [a defendant] be a party to the proceedings." *Goldman*.  Ortega can be held liable for her actions and for working in concert with Meza to further the Scheme.

256.    Ortega engaged in "(1) a willful act in the use of [a] judicial process; (2) for an ulterior purpose not proper in the regular conduct of the proceedings." *Id*.

257.    The proper purpose of "discovery is to assist the search for truth by providing the parties with all the evidence possible so that the crucial facts may be presented at trial and a just decision made.'" *Wells v. Fell,* 231 Ariz. 525, 528 ¶ 13 (2013).  "[D]iscovery, is not a game." *Id*.

258.    The only proper purpose of A.R.S. § 41-161, *et seq*. is to keep addresses confidential when genuine A.R.S. § 13-3601 victims move from one location to another.

259.    Polluting proceedings with false information, evading discovery via unlawful and improper means, and intimidating crime victims with threats of incarceration are never proper purposes for judicial proceedings, including discovery proceedings.

260.    Ortega engaged in willful acts in the use of judicial processes when (1) filing A.R.S. § 12-3201(A) motions in CV2021-005501 and CV2021-013210 per agreement with Meza; (2) remaining silent during a FC2020-090224 November 2020 deposition knowing her client was presenting false testimony while having a duty, but refusing, to display candor[39] in an ongoing case; (3) demanding Plaintiff turn over

---

[39]    Ortega willfully remained silent in FC2020-090224, and therefore actively concealed the Scheme, knowing TD was presenting false testimony at a November 2020 deposition, and she willfully failed to correct the record despite maintaining an ongoing

communications he made to federal investigators and threatening him with incarceration in motion papers if he did not comply; (4) entering A.R.S. § 41-163(D) "address confidentiality program authorization cards" as exhibits in motion papers seeking to evade ordered and relevant discovery; (5) instructing TD not to answer deposition questions required on appellate remand, special action instructions, and court order; (6) instructing TD to walk out when asked relevant questions later permitted at trial; and (7) moving the FC2020-090224 court to issue a blanket order prohibiting Plaintiff from exercising his First Amendment rights under the Speech Clause and Petition Clause to speak with government officials.

261.    Ortega engaged in those willful acts for the ulterior purposes of (1) threatening Plaintiff's First Amendment rights under the Petition Clause; (2) intimidating Plaintiff as a crime witness; and (3) obstructing criminal investigations into the Scheme. None of those purposes were proper in the regular conduct of those judicial proceedings. But those ulterior purposes were Ortega's primary motive.

262.    Plaintiff seeks compensatory damages due to reputational harm, loss of income and wages, loss of business assets, emotional distress and fear, and pecuniary losses.

263.    Ortega acted out of malice.  Her conduct was guided by an evil mind.

264.    Ortega's wrongful conduct was motivated by ill will with intentions to serve her own interests and interests of other persons, including Meza.

---

professional duty to do so.  *See* Ariz. R. Sup. Ct. 42 ER 3.3; *see also U.S. v. LaPage*, 231 F3d 488, 492 (9th Cir. 2000) ("[N]o lawyer, whether prosecutor or defense counsel, civil or criminal, may knowingly present lies to a [court] and then sit idly by while opposing counsel [or party] struggles to contain this pollution"); *Wells Fargo Bank v. Arizona Laborers, Teamsters*, 201 Ariz. 474, 485, 38, ¶¶  87-98, P.3d (2002) (Silence and other forms of material omissions constitute "active concealment", and therefore constitute fraud, when there is a duty to speak the truth).

265.    Ortega committed intentional and malicious acts that injured Plaintiff and, therefore, is liable for punitive damages.

**COUNT FIVE**
**AIDING AND ABETTING ABUSE OF PROCESS**
**[Meza, Robson, and Ortega]**

266.    Plaintiff incorporates the allegations in all preceding paragraphs as if fully set forth herein.

267.    The elements of Aiding and Abetting are (1) a primary tort or violation; (2) knowledge or general awareness of the primary tort or violation; and (3) substantial assistance or encouragement of the primary tort. *Wells Fargo*, 201 Ariz. 474 at ¶ 51.

268.    Meza, Robson, and Ortega each committed the primary tort of Abuse of Process.

269.    Meza, Robson, and Ortega each had knowledge and general awareness of the other's tortious acts as they jointly engaged in that tortious activity in planned and coordinated fashion.

270.    Meza and Robson each substantially assisted and encouraged each other to commit their primary torts, as evidenced by their joint conduct in CV2022-008626.

271.    Meza and Ortega each substantially assisted and encouraged one another to commit their primary torts as evidenced by (1) Meza's and Ortega's August 2021 communications on the specific topic of filing A.R.S. § 12-3201(A) motions; (2) Ortega's two unsuccessful A.R.S. § 12-3201(A) motions filed in CV2021-013210; and (3) Meza's May 2022 inadvertent public admission that he was "helping" Ortega in litigation, including assisting her in her attempts to commit the torts and further the Scheme.

272.    Meza, Robson, and Ortega are liable for compensatory damages for causing Plaintiff's fundamental rights deprivations, reputational harm, loss of income and wages,

loss of business assets, emotional distress and fear, and pecuniary losses.

273.    Meza, Robson, and Ortega each acted out of malice.  Their conduct was guided by evil minds.

274.    Meza's, Robson's, and Ortega's wrongful actions were motivated by ill will with intentions to serve their own interests.

275.    Meza, Robson, and Ortega acted in concert to commit intentional acts that injured Plaintiff and, therefore, are jointly and severally liable for punitive damages.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that the Court provide the following relief:

A. A judgment for declaratory relief that:

    1. A.R.S. § 12-3201 is unconstitutional pursuant to the overbreadth and vagueness doctrines, and void *en toto*; and

    2. A.R.S. § 13-2921 is unconstitutional pursuant to the vagueness doctrine; and

    3. A.R.S. § 39-121, *et seq*. public records requests vindicate public rights, not private rights, implicating First Amendment protections to such an extent that the U.S. Constitution prohibits such public records litigation from being included in any consideration, or in any court records review process, for the purposes of determining a vexatious litigant injunction.

B. A judgment for preliminary and permanent injunctive relief:

    1. Enjoining Defendant Mayes from civilly or criminally enforcing A.R.S. § 12-3201(B) and any related injunctive orders, including as any type of A.R.S. §§ 13-2810, 13-2921, 13-3601, and/or 13-3602 predicate.

C. A judgment for preliminary and permanent injunctive relief:

1. Permanently enjoining Defendant Welty from administratively enforcing A.R.S. § 12-3201, which also precludes placing or maintaining any Plaintiff's name on any vexatious litigant list or register.

D. A judgment for compensatory damages against Defendants Meza, Robson, and Ortega.

E. A judgment for punitive damages against Defendants Meza, Robson, and Ortega.

F. A judgment for taxable costs and expenses to the extent permitted by law.

F. Such other relief as may appear just and appropriate.

DATED this 20th day of January 2026.

By: //s//
Phillip Potter
Plaintiff
Pro Se

VERIFICATION

I, Phillip Potter, state and swear under penalty of perjury, as follows:  I have read this Complaint, and to the best of my knowledge, information and belief, the contents of this document and the statements made therein are true and correct.

_____                           _____
Date                                                     Phillip Potter

1. Permanently enjoining Defendant Welty from administratively enforcing A.R.S. § 12-3201, which also precludes placing or maintaining any Plaintiff's name on any vexatious litigant list or register.

D. A judgment for compensatory damages against Defendants Meza, Robson, and Ortega.

E. A judgment for punitive damages against Defendants Meza, Robson, and Ortega.

F. A judgment for taxable costs and expenses to the extent permitted by law.

F. Such other relief as may appear just and appropriate.

DATED this 20th day of January 2026.

By: //s//
Phillip Potter
Plaintiff
Pro Se

VERIFICATION

I, Phillip Potter, state and swear under penalty of perjury, as follows:  I have read this Complaint, and to the best of my knowledge, information and belief, the contents of this document and the statements made therein are true and correct.

Date

Phillip Potter

73