Phillip Potter
2301 N. 66th Street
Scottsdale, Arizona 85257
Phone: 480.459.0310
E-Mail: phillip.t.potter@gmail.com
Plaintiff
Pro Se

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

Phillip Potter,

Plaintiff,

v.

Robert Meza, et al.,

Defendants.

No. 2:25-cv-00663-PHX-DWL

**PLAINTIFF'S NOTICE OF SUPPLEMENTAL AUTHORITY**

Plaintiff submits this notice of supplemental authority regarding *Imperial Sovereign Court of Montana. v. Knudsen,* No. 23-3581 (9th Cir. Mar. 13, 2026), attached hereto as Exhibit 1.  This authority supplements Plaintiff's briefs regarding dismissal, and regarding the particular issue of standing (*see* Doc. 49; Doc. 79; Doc. 115).  *Imperial Sovereign Court of Montana* supports Plaintiff's arguments that he has pre-enforcement standing (1) to bring action against Arizona Attorney General Kris Mayes and Presiding Judge Pamela Gates to challenge A.R.S. § 12-3201 for overbreadth and vagueness; and (2) to bring action against Attorney General Mayes to challenge A.R.S. § 13-2921 for vagueness.  The Ninth Circuit emphasized that when a statute's "history of enforcement is negligible or nonexistent, either [1] a 'general warning of enforcement' or a [2] 'failure to *disavow* enforcement' is sufficient to establish a credible threat of prosecution" which demonstrates standing.  *Imperial Sovereign Court of Montana v. Knudsen,* No. 23-3581, slip op. at 12 (9th Cir. Mar. 13, 2026) (emphasis original).  Consistent with the Second Circuit's holding that "[c]ourts have not placed the burden on the plaintiff to show an intent by the government to enforce the law against it but rather presumed such intent in the absence of a disavowal by the government"[1] (Doc. 49, n. 3, pp. 4-6), "the Government" as "the enforcement authority" must overcome that presumption with clear declarations "that plaintiffs will not be prosecuted if they do what they say they wish to do".  *Imperial Sovereign Court of Montana. v. Knudsen,* No. 23-3581, slip op. at 12.  For Plaintiff to lack standing, every possible enforcing member of "the Government", including authorized private party enforcers, must affirmatively declare Plaintiff will not in any way be administratively, civilly or criminally prosecuted for A.R.S. § 12-3201(B) filing court papers absent prior court approval, including for A.R.S. § 13-2921

---

[1] *See Antonyuk v. Chiumento*, 89 F.4th 271, 334 (2d Cir. 2023).

harassment based on filing court papers absent court approval.  As the Ninth Circuit "recently explained in *Matsumoto*, 'when a statute distributes enforcement authority across multiple actors, and a plaintiff brings a pre-enforcement challenge, the threat of that enforcement is properly analyzed as a collective assessment of the threat posed by *all* the potentially enforcing authorities, together." *Id* at 21-21 (emphasis original).  "And here, as in *Matsumoto*, Defendants have neither disavowed enforcement against Plaintiff[], nor "attempted to 'prevent county attorneys [or private parties, including Alane Ortega and Ms. Ortega's client] from enforcing'" A.R.S. § 12-3201(B) or A.R.S. § 13-2921.  *Id* at 22.  Also here, as the Ninth Circuit observed in *Imperial Sovereign Court of Montana*, Attorney General Mayes "is vigorously defending the constitutionality of the statute[s]." *Id*.   This new authority further asserts that when bringing a First Amendment facial challenge in the Ninth Circuit, the "vigorous[] defen[se]" of a challenged statute from any of "the potentially enforcing authorities", any general warning to enforce the statute from any of "the potentially enforcing authorities", and/or a refusal to "disavow[] enforcement" from any of "the potentially enforcing authorities", including private enforcers, is sufficient for a plaintiff to demonstrate standing to sue "*all* the potential enforcing authorities".  *Id*; *see also Isaacson v. Mayes*, 84 F.4th 1089, 1100 (9th Cir. 2023) ("The Attorney General is only one of the many enforcers of the Reason Scheme ... That at least one county attorney intends to enforce restrictive abortion laws, even when the Attorney General has disavowed and advised against enforcement, is reason enough for Plaintiffs to fear that they too will be targeted.").  As such, *Imperial Sovereign Court of Montana* supports Plaintiff's position that he has standing to sue Attorney General Mayes and Presiding Judge Gates for the purposes of challenging A.R.S. § 12-3201 and A.R.S. § 13-2921.

DATED this 27th day of March 2026.

By: //s//
Phillip Potter
Plaintiff Pro Se

# Exhibit 1

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| IMPERIAL SOVEREIGN COURT OF THE STATE OF MONTANA; ADRIA JAWORT; RACHEL CORCORAN; MONTANA BOOK COMPANY; IMAGINE BREWING COMPANY, LLC; BUMBLEBEE AERIAL FITNESS; WESTERN MONTANA COMMUNITY CENTER; GREAT FALLS LGBTQ+ CENTER; THE MYRNA LOY; MONTANA PRIDE; ROXY THEATER, | No. 23-3581 <br><br> D.C. No. 2:23-cv-00050-BMM |
| *Plaintiffs - Appellees*, | |
| v. | OPINION |
| AUSTIN KNUDSEN; ELSIE ARNTZEN, | |
| *Defendants - Appellants*, | |
| and | |
| J.P. GALLAGHER, CITY OF HELENA, | |
| *Defendants*. | |

Appeal from the United States District Court
for the District of Montana
Brian M. Morris, Chief District Judge, Presiding

Argued and Submitted June 4, 2024
Portland, Oregon

Filed March 13, 2026

Before: Johnnie B. Rawlinson, Danielle J. Forrest, and
Jennifer Sung, Circuit Judges.

Opinion by Judge Sung;
Concurrence by Judge Rawlinson

## SUMMARY[*]

### Preliminary Injunction / Standing / First Amendment

The panel affirmed the district court's preliminary injunction enjoining Defendants—the Montana Attorney General and the Montana Superintendent of Public Education—from instituting, maintaining, or prosecuting any enforcement proceedings under Montana House Bill 359 (H.B. 359), which restricts statutorily defined "drag story hours" and "sexually oriented performances."

Plaintiffs—a group of individuals, business, and nonprofits—allege that H.B. 359 violates their First

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Amendment right to freedom of speech and their Fifth Amendment right to due process.

The panel held that Plaintiffs have standing to challenge H.B. 359 because (1) at least one Plaintiff has shown injury-in-fact for each statutory provision of H.B. 359 at issue, (2) Plaintiffs have demonstrated that their injuries are fairly traceable to H.B. 359, and (3) Plaintiffs have demonstrated that their injuries would likely be redressed by a favorable decision.

Applying the preliminary injunction standard set forth in *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 20 (2008), the panel held that Plaintiffs are likely to succeed on the merits of their facial First Amendment challenge to H.B. 359's drag-story-hour provision—which provides that a school or library that receives any form of funding from the state may not allow a drag story hour on its premises during regular operating hours or at any school-sanctioned extracurricular activity—because (1) the drag-story-hour provision is a content-based restriction of purely expressive activity, and (2) the drag-story-hour restriction is not narrowly tailored to further a compelling governmental interest.

The panel also held that Plaintiffs are likely to succeed on the merits of their facial First Amendment challenge to H.B. 359's provisions restricting sexually oriented performances because (1) the sexually-oriented-performance provisions are content-based restrictions on purely expressive activity, and (2) the sexually-oriented-performance restrictions are not narrowly tailored to further a compelling governmental interest.

The panel held that the district court did not abuse its discretion in concluding that the remaining *Winter* factors weigh in favor of a preliminary injunction.

Accordingly, the panel held that the district court did not abuse its discretion in granting Plaintiffs' motion to preliminarily enjoin Defendants from instituting, maintaining, or prosecuting any enforcement proceedings under H.B. 359.

Concurring in the result, Judge Rawlinson acknowledged the limited nature of review of a preliminary injunction issued by a district court, which is to preserve the status quo rather than to decide the merits of the case. Unrestrained by the limited review, she would have opted to delve more deeply into other considerations of the legislation.

## COUNSEL

Constance Van Kley (argued) and Rylee Sommers-Flanagan, Upper Seven Law, Helena, Montana; Niki Zupanic, Zupanic Law PLLC, Helena, Montana; for Plaintiffs-Appellees.

Michael D. Russell (argued), Alwyn Lansing, Michael J. Noonan, and Thane Johnson, Assistant Attorneys General; Austin Knudsen, Montana Attorney General; Office of the Montana Attorney General, Helena, Montana; Emily Jones, Special Assistant Attorney General, Jones Law Firm PLLC, Billings, Montana; for Defendants-Appellants.

Joshua A. Block and Emerson J. Sykes, American Civil Liberties Union Foundation, New York, New York; Alex Rate, ACLU of Montana Foundation Inc., Missoula, Montana; for Amici Curiae the American Civil Liberties Union and the ACLU of Montana Foundation Inc..

Megan S. Shaw, Cohen Weiss and Simon LLP, New York, New York, for Amicus Curiae Actors' Equity Association.

## OPINION

SUNG, Circuit Judge:

Montana House Bill 359 (H.B. 359) restricts statutorily defined "drag story hours" and "sexually oriented performances." Violations of H.B. 359 are subject to criminal and civil penalties. Plaintiffs are individuals, nonprofits, theaters, and other organizations. They bring a pre-enforcement challenge to H.B. 359, contending the statute violates their First Amendment right to freedom of speech and their Fifth Amendment due process right, both facially and as applied to their speech. Defendants are Montana Attorney General Austin Knudsen and Montana Superintendent of Public Instruction Elsie Arntzen. The district court granted Plaintiffs' motion for a preliminary injunction, enjoining Defendants from instituting, maintaining, or prosecuting any enforcement proceedings under H.B. 359. Defendants timely appealed. We conclude that Plaintiffs have Article III standing to bring their claims, and the district court did not abuse its discretion by issuing the preliminary injunction. Accordingly, we affirm.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

The Montana legislature passed H.B. 359 on May 11, 2023, and the governor signed it into law on May 22, 2023, with immediate effect. H.B. 359 prohibits any school or library that receives "any form of state funding" from allowing a "sexually oriented performance or drag story hour" on its premises. *See* H.B. 359, 2023 Gen. Assemb., 68th Sess. (Mont. 2023). Both "drag story hour" and "sexually oriented performance" are statutorily defined. *Id.* H.B. 359 also prohibits statutorily defined "sexually oriented businesses" from allowing minors to enter their premises

during a sexually oriented performance. H.B. 359 § 2. And it prohibits sexually oriented performances (1) in a library that receives any form of state funding; (2) on public property when a minor is present; and (3) "in a location owned by an entity that receives any form of funding from the state." H.B. 359 §§ 3(1), 3(3)(a), 3(3)(b).

H.B. 359 prescribes significant criminal, civil, and professional penalties. The restriction on sexually oriented businesses, H.B. 359 § 2, is codified in the Montana Criminal Code and carries a minimum $1,000 criminal fine.[1] *See* H.B. 359 § 2(2); Mont. Code. Ann. § 45-8-118(2). A third offense carries a mandatory $10,000 fine and results in the revocation of an offender's business license. *See* H.B. 359 § 2(2); Mont. Code. Ann. § 45-8-118(2). Section 3, which includes the restriction on drag story hours, is codified in Title 20, the Montana Education Code. *See* Mont. Code. Ann. § 20-7-135. A person who violates a provision under that title is guilty of a misdemeanor. Mont. Code. Ann. § 20-1-207. Additionally, Section 3(4) mandates a $5,000 criminal fine for any public employee, library or school employee, or employee of an entity that receives any state funding who is convicted of violating any Section 3 restriction. H.B. 359 § 3(4). If that employee is a school employee with a certification, H.B. 359 requires the initiation of proceedings "to suspend the teacher,

---

[1] H.B. 359 is codified across multiple titles. *See* H.B. 359 § 1 (codified at Mont. Code Ann. § 45-8-117); H.B. 359 § 2 (codified at Mont. Code. Ann. § 45-8-118); H.B. 359 § 3 (codified at Mont. Code. Ann. § 20-7-135); H.B. 359 § 4 (codified at Mont. Code Ann. § 27-1-521). For consistency, we cite to H.B. 359, as the parties did in their briefs, rather than to the Montana Code.

administrator, or specialist certificate of the offender" for one year (for a first offense). *Id.*

H.B. 359 also provides a private right of action. Any minor (or their parent or legal guardian) who attends a drag story hour or sexually oriented performance can sue any "person who knowingly promotes, conducts, or participates as a performer in the performance" and collect actual damages, attorney fees and costs, and $5,000 in statutory damages. H.B. 359 § 4. The private right of action carries a ten-year statute of limitations. *Id*.

Plaintiffs are a group of individuals, businesses, and nonprofits: individual plaintiffs Adria Jawort and Rachel Corcoran and organizational plaintiffs Imperial Sovereign Court of the State of Montana, Montana Book Company, Imagine Brewing Company, Bumblebee Aerial Fitness, the Western Montana Community Center, Montana Pride, the Great Falls LGBTQ+ Community Center, the Roxy Theater, and the Myrna Loy theater. Plaintiffs filed their complaint on July 7, 2023, alleging that H.B. 359 facially violates the First Amendment because it is a content- and viewpoint-based restriction that does not satisfy strict scrutiny. They also allege that H.B. 359 facially violates the Fifth Amendment because it is unconstitutionally vague.

Plaintiffs filed a motion for a temporary restraining order and preliminary injunction on July 17, 2023, naming Attorney General Knudsen and Superintendent Arntzen as defendants.[2] Following a hearing, the district court granted a TRO on July 28, 2023. The district court held a hearing on the motion for a preliminary injunction on August 28, 2023,

---

[2] The complaint also named two additional defendants who are not parties to this appeal.

and granted a preliminary injunction in a written order on October 13, 2023.

The district court found that Plaintiffs had standing to challenge H.B. 359. Applying the standard set forth in *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 20 (2008), the district court found that Plaintiffs were likely to succeed on the merits of their First Amendment claim. The court determined that H.B. 359 was a content-based and viewpoint-based restriction on speech subject to strict scrutiny. Applying strict scrutiny, the district court concluded that H.B. 359 was not narrowly tailored to serve a compelling governmental interest. The court also found that Plaintiffs were likely to succeed on the merits of their Fifth Amendment vagueness claim because the statute included several indefinite terms and "could be interpreted to include any number of theatrical and artistic performances."

Defendants Knudsen and Arntzen timely appealed the district court's preliminary injunction. We have jurisdiction to review Defendants' interlocutory appeal of the district court's order granting a preliminary injunction. 28 U.S.C. § 1292(a)(1).

## II.  ARTICLE III STANDING

We first address whether Plaintiffs have standing to challenge H.B. 359. Plaintiffs challenge six different restrictions enacted as part of H.B. 359. Because each restriction has different elements, at least one plaintiff must have standing to challenge each restriction. *See, e.g.*, *Ctr. for Biological Diversity v. Bernhardt*, 946 F.3d 553, 560 (9th Cir. 2019); *Get Outdoors II, LLC v. City of San Diego*, 506 F.3d 886, 892 (9th Cir. 2007). But one plaintiff with standing to challenge each restriction is enough. *See Planned*

*Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 918 (9th Cir. 2004) ("Where the legal issues on appeal are fairly raised by 'one plaintiff [who] had standing to bring the suit, the court need not consider the standing of the other plaintiffs.'" (alteration in original) (citation omitted)).

To establish "the irreducible constitutional minimum of standing," Plaintiffs must demonstrate: (1) that a plaintiff has suffered an injury-in-fact, (2) that the injury is fairly traceable to a defendant's conduct, and (3) that the injury would likely be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). However, because Plaintiffs claim that H.B. 359 restricts their First Amendment right to freedom of expression, we "appl[y] the requirements of ripeness and standing less stringently." *Twitter, Inc. v. Paxton*, 56 F.4th 1170, 1173 (9th Cir. 2022) (alteration in original) (quoting *Wolfson v. Brammer*, 616 F.3d 1045, 1058 (9th Cir. 2010)). *See also Cal. Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1094 (9th Cir. 2003) ("Particularly in the First Amendment-protected speech context, the Supreme Court has dispensed with rigid standing requirements.").

## A.  Injury-in-Fact

Generally, "[t]o establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan*, 504 U.S. at 560). But courts have long "recogniz[ed] the validity of pre-enforcement challenges to statutes infringing upon constitutional rights." *Getman*, 328 F.3d at 1094. The "direct injury requirement is tempered . . . in that '[o]ne does not have to await the consummation of

threatened injury to obtain preventive relief.'" *Ariz. Right to Life Pol. Action Comm. v. Bayless*, 320 F.3d 1002, 1006 (9th Cir. 2003) (alteration in original) (quoting *Blanchette v. Conn. Gen. Ins. Corps.*, 419 U.S. 102, 143 (1974)). "Were it otherwise, 'free expression—of transcendent value to all society, and not merely to those exercising their rights— might be the loser.'" *Id.* (quoting *Dombrowski v. Pfister*, 380 U.S. 479, 486 (1965)).

Where, as here, plaintiffs bring a pre-enforcement challenge, they satisfy the injury-in-fact requirement by alleging "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)). Importantly, however, "a challenger need not 'confess that he will in fact violate th[e] law.'" *Matsumoto v. Labrador*, 122 F.4th 787, 797 (9th Cir. 2024) (quoting *Susan B. Anthony List*, 573 U.S. at 163). Further, Plaintiffs do not need to show that their intended course of conduct would definitely violate the challenged law; they need only show that it is "arguably proscribed." *Susan B. Anthony List*, 573 U.S. at 162. *See also Getman*, 328 F.3d at 1095 (holding plaintiff had standing because its intended ballot-measure advocacy "was arguably subject to" the challenged law's requirements); *Babbitt*, 442 U.S. at 302 (holding a plaintiff may bring a pre-enforcement challenge "when fear of criminal prosecution under an allegedly unconstitutional statute is not imaginary or wholly speculative").

Because courts have long recognized that some plaintiffs cannot allege an intention to engage in conduct arguably proscribed by a challenged statute because they would rather

self-censor than risk prosecution, a plaintiff has the option of establishing injury by showing that the challenged prohibition is causing them to self-censor. *See Getman*, 328 F.3d at 1095; *Ariz. Right to Life Pol. Action Comm.*, 320 F.3d at 1006 ("In an effort to avoid the chilling effect of sweeping restrictions, the Supreme Court has endorsed what might be called a 'hold your tongue and challenge now' approach rather than requiring litigants to speak first and take their chances with the consequences." (citation omitted)). Self-censorship qualifies as injury-in-fact when the plaintiff has "an actual and well-founded fear that the law will be enforced against [them]." *Getman*, 328 F.3d at 1095 (quoting *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988)). "In the free speech context, such a fear of prosecution will only inure if the plaintiff's intended speech arguably falls within the statute's reach." *Id.*

Moreover, where, as here, plaintiffs "challeng[e] a new law whose history of enforcement is negligible or nonexistent, either a 'general warning of enforcement' or a 'failure to *disavow* enforcement' is sufficient to establish a credible threat of prosecution." *Matsumoto*, 122 F.4th at 797–98 (quoting *Tingley v. Ferguson*, 47 F.4th 1055, 1068 (9th Cir. 2022)). *See also Holder v. Humanitarian L. Project*, 561 U.S. 1, 16 (2010) (emphasizing that "[t]he Government has not argued to this Court that plaintiffs will not be prosecuted if they do what they say they wish to do"). That is, plaintiffs may suffer injury-in-fact sufficient for standing even if no prosecuting authority has evinced an intent to prosecute and even in the absence of any investigation or warning of prosecution. *See Getman*, 328 F.3d at 1093–94 (explaining district court erred in holding that, under *Thomas v. Anchorage Equal Rights Commission*, 220 F.3d 1134 (9th Cir. 2000) (en banc), plaintiff lacked standing to challenge

the statute "because California never evinced an intent to prosecute [plaintiff] for its voter publications").

We turn to considering whether there is at least one plaintiff who has shown injury-in-fact for each statutory provision at issue.

### 1.   Section 2(1)

Section 2(1) prohibits a "sexually oriented business" from "allow[ing] a person under 18 years of age to enter the premises of the business during a sexually oriented performance." H.B. 359 § 2(1). Section 1(9) defines "[s]exually oriented business" as "a nightclub, bar, restaurant, or similar commercial enterprise that: (a) provides for an audience of two or more individuals: (i) live nude entertainment or live nude performances; or (ii) a sexually oriented performance; and (b) authorizes on-premises consumption of alcoholic beverages." H.B. 359 § 1(9). Section 1(10) defines a "[s]exually oriented performance" as "a performance that, regardless of whether performed for consideration, is intended to appeal to a prurient interest in sex and features: (a) the purposeful exposure, whether complete or partial, of: (i) a human genital, the pubic region, the human buttocks, or a female breast, if the breast is exposed below a point immediately above the top of the areola; or (ii) prosthetic genitalia, breasts, or buttocks; (b) stripping; or (c) sexual conduct." H.B. 359 § 1(10). Section 1(11) further defines "[s]tripping" as the "removal or simulated removal of clothing in a sexual manner for the entertainment of one or more individuals." H.B. 359 § 1(11).

Plaintiff Roxy Theater is a nonprofit theater that receives state funding from the Montana Arts Council. It authorizes on-premises alcohol consumption and hosts events for

audiences of two or more, and it "has historically displayed films and events" that it fears qualify as "'sexually oriented performances' under [H.B.] 359." The parties dispute whether some of the examples provided by the Roxy Theater qualify as sexually oriented performances. The Roxy Theater shows films rated PG-13 or R by the Motion Picture Association of America (MPAA) that include scenes involving nudity or stripping. Consistent with MPAA PG-13 and R ratings, the Roxy Theater allows minors under the age of 18 to see such films (while enforcing the requirement that minors be accompanied by a parent or guardian when applicable). The Theater fears that allowing minors to view such films (even when accompanied by a parent or guardian) would violate H.B. 359 § 2(1). Defendants, however, represent without qualification that H.B. 359's definition of "sexually oriented performance" incorporates by reference Mont. Code Ann. § 45-8-205(6)'s definition of "performance," which expressly excludes films rated PG-13 or R by the MPAA. Because Plaintiffs do not meaningfully dispute that § 45-8-205(6) narrows the statutory definition of "sexually oriented performance," we do not rely on the fact that the Roxy Theater shows PG-13 and R-rated films to determine its standing to challenge Section 2(1).

Even so, the Roxy Theater also attests that it has presented, and intends to continue presenting, films and live performances that are not rated by the MPAA but appear to qualify as sexually oriented performances for the same reasons as the MPAA-rated PG-13 and R films. For example, it has hosted a live theater event featuring comedy and dance routines, "some of which included the stripping of outer layers of clothing and the use of prosthetic breasts." This event was open to a general audience with no age restrictions. Unlike the MPAA-rated films, Defendants do

*not* specifically represent that such unrated films and live performances are exempt from the definition of sexually oriented performances. Nor do Defendants dispute the Roxy Theater's reasons for concluding that such films and live performances meet the definition of "sexually oriented performance." Consequently, we agree with Plaintiffs that these unrated films and performances are arguably proscribed by Section 2(1). Further, because H.B. 359 is too new to have a "history of enforcement," and Defendants have never disavowed enforcement of any provision of H.B. 359 against the Roxy Theater, the threat of enforcement against it is credible. *Matsumoto*, 122 F.4th at 797. Thus, the Roxy Theater has demonstrated the injury-in-fact required to bring a pre-enforcement challenge to Section 2(1).

## 2.  Section 3(1)

Under Section 3(1), "[a] library that receives any form of funding from the state may not allow a sexually oriented performance as defined in [Section 1] on its premises." H.B. 359 § 3(1). Plaintiff Imperial Court has shown that it intends to engage in a course of conduct arguably protected by the First Amendment but proscribed by Section 3(1). Imperial Court attests that it is a nonprofit organization that "produces drag shows at small businesses and public spaces" throughout Montana, including "public libraries." Imperial Court's performances "are strictly tailored based on age group, with some performances for adults only and other performances for all ages." At all-ages shows, Imperial Court performers do not "perform burlesque style drag or striptease" but instead "power lip sync[] to uplifting songs." Imperial Court has "exhaustive guidelines outlining what is and is not appropriate costuming for an all ages show." "[I]f a performer could not wear [a costume] into a kindergarten class, they cannot wear it to an all-ages show." Still, Imperial

Court fears that some of its drag shows could be deemed sexually oriented performances, as defined under H.B. 359, because they involve the "use of prosthetic cleavage." *See* H.B. 359 § 1(10)(a)(ii) (including prosthetic breasts in the statutory definition). Defendants do not dispute Imperial Court's reasons for concluding that some of its drag shows could qualify as sexually oriented performances under H.B. 359. In addition, event organizers have canceled Imperial Court's shows, refrained from advertising them, placed them on hold indefinitely, or required modifications in response to H.B. 359. Imperial Court has also shown that it has self-censored to avoid prosecution under Section 3(1). For example, it has modified the content of its performances, adopted new costume restrictions, and limited advertising of its shows.

The threat of prosecution against Imperial Court is credible. Defendants argue that Imperial Court's delineation between all-ages and adult-only performances proves it is "well within [Imperial Court's] ability to produce drag shows under [H.B. 359]." But Defendants have not disavowed enforcement of this new law against Imperial Court with respect to *any* of its performances, whether family friendly or not. Imperial Court has shown the injury-in-fact required to bring a pre-enforcement challenge to Section 3(1).

### 3.   Section 3(2)

Section 3(2) states that "[a] school or library that receives any form of funding from the state may not allow a sexually oriented performance or drag story hour, as defined in [Section 1], on its premises during regular operating hours or at any school-sanctioned extracurricular activity." H.B. 359 § 3(2). Plaintiff Adria Jawort has demonstrated that she

intends to engage in a course of conduct arguably protected by the First Amendment but proscribed by Section 3(2), and that the threat of enforcement against her is credible.

Jawort is a transgender woman and a member of the Two-spirit community. According to Jawort, "Two-spirit is a term used within some Indigenous communities to refer to tribal members who have both male and female traits" and "reflects traditional Indigenous acceptance of trans and non-binary definitions of gender." Jawort regularly lectures at libraries and other organizations for educational purposes, including on the topic of Indigenous and transgender history. Jawort was scheduled to lecture on the history of transgender and Two-spirit people in Montana at the Butte Public Library on June 2, 2023. Although Jawort does not perform in drag, and her lectures do not include any content that appeals to a prurient interest, the Butte Public Library canceled her lecture.

On the Library's Facebook page, it explained that it canceled Jawort's lecture because it feared that the lecture would violate Section 3(2): "In accordance with Governor Gianforte signing HB359 into law, our county cannot allow an event where a drag king or queen reads children's books and engages in other learning activities with minor children present. Due to this law, we have had to cancel the speaker at the Butte-Silver Bow Library that was scheduled for Friday." Defendants do not argue that Jawort's library lectures are outside the scope of H.B. 359, and they have not disavowed enforcement of H.B. 359 against her. Jawort has demonstrated the injury-in-fact required to bring a pre-enforcement challenge to Section 3(2).

#### 4.   Sections 3(3)(a) and 3(3)(b)

Sections 3(3)(a) and 3(3)(b) are closely related and both restrict statutorily defined sexually oriented performances. Section 3(3)(a) prohibits sexually oriented performances "on public property in any location where the performance is in the presence of an individual under the age of 18." H.B. 359 § 3(3)(a). Imperial Court attests that it regularly produces drag performances at "public spaces across the state," including public parks and schools. But after H.B. 359 was enacted, Imperial Court was "unable to perform any drag on public property" at the 2023 Billings Pride event.

Section 3(3)(b) prohibits sexually oriented performances "in a location owned by an entity that receives any form of funding from the state," regardless of whether a minor is present. H.B. 359 § 3(3)(b). Imperial Court attests that it regularly produces drag shows at a variety of venues that receive state funding, including public libraries, museums, schools, the Montana State Capitol building, and Zoo Montana. For the same reasons discussed above, Imperial Court has shown the requisite injury-in-fact to bring a pre-enforcement challenge to Sections 3(3)(a) and 3(3)(b).

#### 5.   Section 3(4)

Finally, Section 3(4) requires that "[a] library, a school, or library or school personnel, a public employee, or an entity described in subsection (3)(b) or an employee of the entity convicted of violating the prohibition [of drag story hours or sexually oriented performances] under this section shall be fined $5,000 and, if applicable, proceedings must be initiated to suspend the teacher, administrator, or specialist certificate of the offender under 20-4-110 for 1 year." H.B. 359 § 3(4). Plaintiff Rachel Corcoran has shown that she

intends to engage in a course of conduct arguably protected by the First Amendment but proscribed by Section 3(4).

Plaintiff Corcoran is a licensed teacher in Montana who works in the Billings Public Schools. As a teacher and instructional coach, she has "frequently used costumes and props in her classroom lessons," and she continues to "dress up as fictional and historical characters without regard to the gender or sex of the person being portrayed." Corcoran fears that Section 3(4) prohibits her, as a public school employee, from "reading to or engaging in learning activities with students while dressed up in a gendered costume," and that she "could face criminal, civil, and occupational penalties." Because Defendants do not disavow enforcement of this new statute against Corcoran, the threat of enforcement is credible. Corcoran has demonstrated the injury-in-fact required to bring a pre-enforcement challenge to Section 3(4).[3]

## 6.  Defendants' Additional Injury-in-Fact Arguments

Before we turn to the remaining elements of standing, we address Defendants' cross-cutting arguments about injury-in-fact. Defendants first argue that a "key element" of H.B.

---

[3] Defendants argue that "because Corcoran is a public employee whose alleged speech-related activities at issue occur on the job in the scope of her duties, there is no First Amendment protection for her in this context," citing *Garcetti v. Ceballos*, 547 U.S. 410, 426 (2006). While *Garcetti* may be relevant to the merits of Corcoran's claim, it has no bearing on her standing. Corcoran's intended "'course of conduct' must . . . be 'arguably affected with a constitutional interest,' but this inquiry does not require us to engage in a mini litigation of the claims. Rather, 'the Supreme Court has cautioned that standing "in no way depends on the merits."'" *Peace Ranch, LLC v. Bonta*, 93 F.4th 482, 488 (9th Cir. 2024) (first quoting *Arizona v. Yellen*, 34 F.4th 841, 849 (9th Cir. 2022); and then quoting *Warth v. Seldin*, 422 U.S. 490, 500 (1975)).

359's "sexually oriented performance" restrictions is the requirement that the performance be "intended to appeal to a prurient interest in sex," and that Plaintiffs fail to show injury because they "do not allege any intention of putting on or facilitating performances in the presence of minors that are intended to appeal to a prurient interest in sex."[4]

Defendants are correct that no Plaintiff specifically alleges that they present or participate in shows that are intended to appeal to a prurient interest in sex. That omission, however, does not mean Plaintiffs have failed to show that their conduct is arguably proscribed by H.B. 359. The Supreme Court's standing analysis in *Babbitt* is instructive. In *Babbitt*, plaintiffs brought a pre-enforcement challenge to a statute that made boycotting an "agricultural product by the use of dishonest, untruthful and deceptive publicity" an unfair labor practice. 442 U.S. at 301 (internal quotation marks omitted). Plaintiffs had "actively engaged in consumer publicity campaigns in the past" and alleged "an intention to continue" those campaigns in the future—but they did not "plan to propagate untruths." *Id.* By alleging that they did not plan to be untruthful, the *Babbitt* plaintiffs effectively denied that their speech would satisfy an element of the challenged restriction. But the *Babbitt* Court concluded that the plaintiffs' fear of prosecution was not "imaginary or wholly speculative" and determined that they had Article III standing. *Id.* at 302.

Here, as in *Babbitt*, Plaintiffs' fear of prosecution is not imaginary or wholly speculative, even though they do not intend to appeal to a prurient interest in sex. For one, because

---

[4] Because H.B. 359's definition of "drag story hour" does not require an intent to appeal to a prurient interest, this argument does not affect Plaintiff Jawort's standing to challenge Section 3(2).

H.B. 359's definition of "sexually oriented" does not include a comparable intent requirement, § 1(8), and Defendants concede that the definition of "sexually oriented" affects the definition of "sexually oriented performance," some performances arguably would qualify as sexually oriented performances despite the absence of any intent to appeal to a prurient interest. *See infra* Section V.B.2. Further, H.B. 359 does not specify whose—if anyone's—intent matters. *See* H.B. 359 § 1(10). Thus, for example, the Roxy Theater could show a film without intending to appeal to a prurient interest in sex but could be charged with violating Section 2(1) if a factfinder determined that the filmmaker intended to appeal to a prurient interest in sex. Alternatively, the Roxy Theater could be liable if a factfinder determined that the film, viewed objectively, was intended to appeal to a prurient interest in sex. These interpretations of H.B. 359 are plausible enough that Plaintiffs' fear of prosecution is not imaginary or wholly speculative. Indeed, even though none of the Plaintiffs intend to appeal to a prurient interest in sex, Defendants have never disavowed enforcement against any of them.

Next, Defendants generally argue that Plaintiffs have not shown a credible threat of prosecution because they allege they have engaged in conduct proscribed by H.B. 359, but there has been "no interference by the State Defendants." As discussed above, the absence of an enforcement action does not defeat standing where coverage is arguable and there has been no disavowal of enforcement. If Defendants are arguing that Plaintiffs must show that Defendants *in particular* have interfered with Plaintiffs' expressive activities, Defendants are incorrect. As we recently explained in *Matsumoto*, "when a statute distributes enforcement authority across multiple actors, and a plaintiff

brings a pre-enforcement challenge, the threat of that enforcement is properly analyzed as a collective assessment of the threat posed by *all* the potentially enforcing authorities, together." 122 F.4th at 798 (discussing *Susan B. Anthony List*, 573 U.S. at 164). And here, as in *Matsumoto*, Defendants have neither disavowed enforcement against Plaintiffs, nor "attempted to 'prevent county attorneys from enforcing the statute.' Quite the opposite—[Montana] is vigorously defending the constitutionality of the statute." *Id*. (quoting *Isaacson v. Mayes*, 84 F.4th 1089, 1100 (9th Cir. 2023)). Plaintiffs have therefore shown a credible threat of future enforcement, which "is all that is needed to show imminent injury to a constitutional interest in a pre-enforcement challenge." *Id.*

## B. Traceability and Redressability

"The next inquiry in the standing sequence is whether [Plaintiffs'] injuries are fairly traceable to the challenged [Montana law] and whether those injuries are likely to be redressed by a favorable decision." *Id.* at 799; *see also Lujan*, 504 U.S. at 560. To show traceability, "there must be a causal connection between the injury and the conduct complained of." *Lujan*, 504 U.S. at 560. "An injury is fairly traceable to a challenged action as long as the links in the proffered chain of causation are not hypothetical or tenuous and remain plausible." *Matsumoto*, 122 F.4th at 799 (quoting *Ass'n of Irritated Residents v. EPA*, 10 F.4th 937, 943 (9th Cir. 2021)).

Plaintiffs have demonstrated that their injuries are fairly traceable to H.B. 359. "The statute supplies all the trace needed." *Id.* at 799. The legislature passed a bill that authorizes civil and criminal penalties for expression arguably protected by the First Amendment. Montana law

authorizes the Attorney General and the Superintendent of Public Instruction, among others, to enforce H.B. 359's penalties. "At bottom, [Plaintiffs] reasonably assert that the course of conduct they wish to engage in would put them at risk of prosecution under [H.B. 359]. [Montana], for its part, does not disabuse them of that notion." *Id.* at 801.

Defendants argue that Plaintiffs' injuries are not traceable to the named defendants, Attorney General Knudsen and Superintendent Arntzen, in particular. We disagree. "[O]ur precedent makes clear that [an] Attorney General's authority to assist county prosecutors in the enforcement of penal statutes . . . 'demonstrates the requisite causal connection for standing purposes.'" *Planned Parenthood Great Nw., Haw., Alaska, Ind., Ky. v. Labrador*, 122 F.4th 825, 839 (9th Cir. 2024) (quoting *Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 920 (9th Cir. 2004)). Here, Attorney General Knudsen has that authority—and more.

Montana law authorizes Attorney General Knudsen to assist or act as a county attorney in any case "in which the state has an interest." Mont. Code. Ann. § 2-15-501(6). Montana law also authorizes the Attorney General to direct any of the state's 56 county prosecutors to bring a criminal or civil action for violations of H.B. 359. *See* Mont. Code Ann. § 2-15-501(5) (conferring upon the attorney general "supervisory powers over county attorneys" and "the power to order and direct county attorneys in all matters pertaining to the duties of their office"). Indeed, Section 2-15-501(5) expressly gives the Attorney General the power to direct county prosecutors in a binding fashion. *See id.* ("The county attorney shall, when ordered or directed by the attorney general, promptly institute and diligently prosecute in the proper court and in the name of the state of Montana any

criminal or civil action or special proceeding."). Further, under Montana law, "the Attorney General determines when to prosecute or to defend cases in which the State has an interest. Thus, if a challenge is brought to a state statute, the Attorney General has discretion to decide whether or not to defend its constitutionality." *W. Tradition P'ship, Inc. v. Att'y Gen. of State*, 291 P.3d 545, 550 (Mont. 2012). As this case shows, Attorney General Knudsen is vigorously defending H.B. 359.

Superintendent Arntzen has authority to enforce Section 3(4) of H.B. 359. Under Section 3(4), if a public school employee is convicted of violating any prohibition under Section 3, "proceedings must be initiated to suspend the teacher, administrator, or specialist certificate of the offender under [Mont. Code Ann.] § 20-4-110 for 1 year." H.B. 359 § 3(4). Section 20-4-110 details the process by which the Board of Public Education can suspend, revoke, or deny a certificate. The statute authorizes the Board to initiate suspension and revocation proceedings upon the request of the Superintendent of Public Instruction or the trustees of a school district. *See* Mont. Code Ann. § 20-4-110(2). Because Section 3(4) requires that suspension proceedings be initiated against any public school employee convicted of violating Section 3, and the Superintendent of Public Instruction is authorized to initiate those proceedings, Plaintiff Corcoran's injury is fairly traceable to Defendant Arntzen.

Finally, "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Lujan*, 504 U.S. at 561 (quoting *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 38, 43 (1976)). "[A] plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury

to himself. He need not show that a favorable decision will relieve his *every* injury." *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982). Here, the preliminary injunction prevents Defendants from directing, pursuing, or initiating enforcement actions against Plaintiffs. This is sufficient to show redressability. "[I]f a court decision can provide a 'small incremental step' to reduce the risk of harm to the plaintiffs 'to some extent,' that is enough to show causation as well as redressability." *Matsumoto*, 122 F.4th at 801–02 (quoting *Massachusetts v. EPA*, 549 U.S. 497, 524–26 (2007)). Defendants argue that Plaintiffs have not shown redressability because Montana's 56 county attorneys "remain free to prosecute under HB359." They are incorrect. "[O]ur courts adhere to the simple principle that, absent an express statutory provision to the contrary, a plaintiff need not sue every defendant that may cause her harm." *Id.* at 802. "Partial amelioration of a harm . . . suffices for redressability." *Id.* at 801.

We conclude that Plaintiffs have standing to challenge H.B. 359.

## III.   REVIEW OF PRELIMINARY INJUNCTION

"We review a district court's decision to grant or deny a preliminary injunction for abuse of discretion. We review the district court's legal conclusions de novo, and the district court's findings of fact for clear error. When reviewing under this standard, we will not reverse the district court's decision 'simply because [we] would have arrived at a different result if [we] had applied the law to the facts of the case.'" *Doe v. Harris*, 772 F.3d 563, 570 (9th Cir. 2014) (alterations in original) (citation omitted) (quoting *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1115 (9th Cir. 2011), *overruled in part on other grounds by*, *Bd. of Trs.*

*of Glazing Health & Welfare Tr. v. Chambers*, 941 F.3d 1195, 1199 (9th Cir. 2019) (en banc)).

"The standard for issuing a preliminary injunction is well established." *Id.* "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. When evaluating a preliminary injunction "in the First Amendment context, the moving party bears the initial burden of making a colorable claim that its First Amendment rights have been infringed, or are threatened with infringement, at which point the burden shifts to the government to justify the restriction." *Thalheimer*, 645 F.3d at 1116.

## IV.   LEGAL FRAMEWORK FOR ASSESSING PLAINTIFFS' CONTENT-BASED CLAIMS

Because H.B. 359 contains distinct definitions for "drag story hours" and "sexually oriented performances" and imposes some restrictions only on sexually oriented performances, some individualized analysis of the restrictions is required. Before turning to those restriction-specific analyses, we discuss the framework of legal standards that we must apply, and we address the parties' disputes about those standards.

### A. Application of Tiered Scrutiny to Facial Content-Based Claims[5]

Defendants first argue that the district court erred in applying "tiered scrutiny" to H.B. 359 because Plaintiffs bring a facial overbreadth claim. It is unclear whether Defendants argue that the district court applied the wrong standard for an overbreadth claim, or that the district court applied the wrong standard for facial claims (as opposed to as-applied claims). Regardless, Defendants are incorrect on both points. To explain why, we begin by identifying each of the facial claims raised in Plaintiffs' complaint and the applicable standards. Then, we address Defendants' arguments.

First, Plaintiffs claim that H.B. 359 is facially invalid because it restricts protected speech based on content or viewpoint, in violation of the First Amendment. "Content-based laws . . . target speech based on its communicative content." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). They "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Id.*; *see also United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813 (2000) (holding that "a content-based speech restriction . . . can stand only if it satisfies strict scrutiny"). Discrimination based on viewpoint is "an egregious form of content discrimination." *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).

---

[5] Plaintiffs' complaint includes three as-applied claims that are not at issue in this appeal because they were not addressed by the district court in its preliminary injunction order.

Second, Plaintiffs claim that H.B. 359 is facially invalid because it is an overbroad speech restriction. "In the First Amendment context, . . . a law may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *United States v. Stevens*, 559 U.S. 460, 473 (2010) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n.6 (2008)).[6]

Third, Plaintiffs claim that H.B. 359 is facially invalid because it is unconstitutionally vague. A statute is "impermissibly vague" on its face if "it fails to establish standards for the police and public that are sufficient to guard against the arbitrary deprivation of liberty interests." *City of Chicago v. Morales*, 527 U.S. 41, 52 (1999). A vague statute violates the Fifth Amendment because it "may fail to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits" or "may authorize and even encourage arbitrary and discriminatory enforcement" due to its nebulous terms. *Id.* at 56. A statute may be facially void for vagueness "even if [it] does not reach a substantial amount of constitutionally protected conduct." *Id.* at 52. A vagueness challenge is properly brought under the Fifth Amendment, not the First. *United States v. Williams*, 553 U.S. 285, 304 (2008) ("Vagueness doctrine is an outgrowth not of the First Amendment, but of the Due Process Clause

---

[6] The First Amendment facial overbreadth doctrine allows litigants to depart from traditional rules of standing. A litigant has standing to challenge a statute as facially overbroad even if the statute could be "lawfully applied" to his conduct. *See United States v. Hansen*, 599 U.S. 762, 769 (2023). Courts "have justified this doctrine on the ground that it provides breathing room for free expression." *Id.*

of the Fifth Amendment.").[7] But when a "law interferes with the right of free speech or of association," we apply "a more stringent [Fifth Amendment] vagueness test." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982).

We turn to Defendants' argument that "the district court incorrectly applied a tiered scrutiny analysis to plaintiffs' overbreadth claim." This is not an accurate reading of the district court's order. The district court applied a tiered scrutiny analysis to Plaintiffs' claim that H.B. 359 is facially invalid because it restricts speech based on content and viewpoint. *See Imperial Sovereign Ct. v. Knudsen*, 699 F. Supp. 3d 1018, 1038 (2023) ("H.B. 359 imposes a content-based restriction. Strict scrutiny applies." (citation omitted)); *id.* ("H.B. 359's facially viewpoint-based regulation subjects it to strict scrutiny."). The district court correctly concluded that courts apply a tiered scrutiny analysis to a claim that a law is content or viewpoint based.

Although Plaintiffs' content-based claim and overbreadth claim are legally distinct, Defendants insist that the district court should have applied the standard for a First Amendment overbreadth challenge to both claims.[8] As best

---

[7] Although vagueness is a Fifth Amendment claim, we still may consider a speech restriction's vagueness when analyzing a First Amendment claim. *See, e.g.*, *Reno v. ACLU*, 521 U.S. 844, 864, 871–74 (1997) (discussing statute's vagueness "because of its relevance to the First Amendment overbreadth inquiry," "without reaching the Fifth Amendment issue"); *see also* discussion *infra* Section V.B.2.

[8] To address a possible basis for Defendants' confusion, we note that, while "overbreadth" is a particular type of First Amendment claim, courts also use the term "overbreadth" when applying tiered scrutiny,

as we can tell, Defendants argue that the district court erred by using a tiered scrutiny analysis because Plaintiffs bring a facial challenge instead of an as-applied claim. That argument is legally incorrect. To explain why, it is important to pinpoint where Defendants' arguments go astray.

Defendants begin by correctly citing the standard we generally apply to facial claims outside the First Amendment context. Generally, "a plaintiff cannot succeed on a facial challenge unless he establish[es] that no set of circumstances exists under which the [law] would be valid, or he shows that the law lacks a plainly legitimate sweep." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024) (alterations in original) (citations and internal quotation marks omitted). Defendants then correctly note that we lower that standard in the First Amendment context, so a facial challenge can succeed if the plaintiff shows that a substantial number of the law's applications are unconstitutional, judged in relation to its plainly legitimate sweep. *Stevens*, 559 U.S. at 473. And Defendants correctly note that this lower standard is the standard we apply when analyzing a First Amendment facial overbreadth claim. But Defendants then appear to argue that these cases mean that the district court erred by applying strict scrutiny to Plaintiffs' facial *content-based*

including in the context of First Amendment content-based claims. For example, when determining whether a restriction is narrowly tailored to a governmental interest, we typically consider whether the restriction is overinclusive or underinclusive, and we may use "overbreadth" as a synonym for "overinclusiveness." *See, e.g.*, *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 805 (2011) (concluding legislation restricting sale of violent video games was "seriously underinclusive" "[a]s a means of protecting children from portrayals of violence," and "seriously overinclusive" "as a means of assisting concerned parents," and that "the overbreadth in achieving one goal is not cured by the underbreadth in achieving the other").

claim.[9] This is the point at which Defendants' argument goes in the wrong direction.

It is well established that plaintiffs may bring a facial First Amendment challenge on the ground that a statute is content or viewpoint based. *See, e.g.*, *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 799 (2011) (holding that a California statute restricting the sale of violent video games to children was a facially invalid content-based speech restriction); *Playboy*, 529 U.S. at 807, 834 n.3 (holding that a signal bleed provision in the Telecommunications Act of 1996 was a facially invalid content-based speech restriction); *R.A.V. v. City of St. Paul*, 505 U.S. 377, 380–01 (1992) (holding that a city cross-burning ordinance was a facially invalid content-based speech restriction).

It is also well established that if a plaintiff shows that a statute is content based and the government fails to show that the restriction satisfies strict scrutiny, the plaintiff prevails on their facial challenge. *See, e.g.*, *Brown*, 564 U.S. at 799 (When a law "imposes a restriction on the content of protected speech, it is invalid unless [the government] can demonstrate that it passes strict scrutiny."); *R.A.V.*, 505 U.S. at 395 ("[T]he danger of censorship presented by a facially content-based statute requires that that weapon be employed only where it is *necessary* to serve the asserted [compelling] interest." (second alteration in original) (citation and internal quotation marks omitted)). Thus, if a court concludes that a

---

[9] In their reply brief, Defendants appear to concede that Plaintiffs' complaint includes both a facial challenge to H.B. 359 on the ground that it is content and viewpoint based, and a facial overbreadth claim. To the extent that Defendants argue Plaintiffs cannot facially challenge a statute on both content-based and overbreadth grounds, they are incorrect. Plaintiffs may bring facial challenges on both grounds and often do. *See, e.g.*, *Stevens*, 559 U.S. at 467.

content-based speech restriction fails strict scrutiny, the analysis ends. The law is facially invalid and cannot be enforced against anyone. *See, e.g.*, *Brown*, 564 U.S. at 799 (concluding, in a facial challenge, that a statute was a content-based speech restriction that failed strict scrutiny and affirming district court's order declaring the statute unconstitutional and permanently enjoining its enforcement, without applying overbreadth analysis); *Playboy*, 529 U.S. at 813 (same); *see also Iancu v. Brunetti*, 588 U.S. 388, 398–99 (2019) (rejecting government's argument that the Court should apply the First Amendment overbreadth standard and uphold a viewpoint-discriminatory statute against a facial attack because "this Court has never applied that kind of analysis to a viewpoint-discriminatory law").

We recognize that in *Moody*, the Supreme Court explained that to avoid "short circuit[ing] the democratic process," it has "made facial challenges hard to win, . . . even when a facial suit is based on the First Amendment." 603 U.S. at 723 (quoting *Wash. State Grange*, 552 U.S. at 451). After the Court reiterated the general standard for a facial challenge and the lower standard for a First Amendment overbreadth challenge, the Court held that the lower courts in the underlying cases erred by not applying the facial overbreadth standard and instead "treat[ing] these cases more like as-applied claims than like facial ones." *Id.* at 724. *Moody*, however, did not displace the longstanding and myriad precedents setting forth the tiered scrutiny analysis we apply to a facial claim challenging a law on the ground that it is an unconstitutional content-based restriction on speech. *See, e.g.*, *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 477–85 (2025) (applying tiered-scrutiny analysis to facial content-based claim after *Moody*).

### B.  Determining the Applicable Level of Scrutiny

"When the [g]overnment restricts speech, the [g]overnment bears the burden of proving the constitutionality of its actions." *Playboy*, 529 U.S. at 816. The standard for the government's burden—the level of scrutiny—depends on various threshold determinations. Here, Plaintiffs contend that H.B. 359 restricts purely expressive activity based on its content and therefore strict scrutiny applies. Defendants argue that H.B. 359 is a content-neutral regulation of expressive conduct and therefore only intermediate scrutiny applies.[10] Thus, in this case, there are two threshold issues in dispute: first, whether the restriction regulates purely expressive activity or expressive conduct, and second, whether the restriction is content based or content neutral.[11]

### 1.  Purely Expressive Activity or Conduct with an Expressive Component

"The First Amendment literally forbids the abridgment only of 'speech,' but we have long recognized that its

---

[10] Although Defendants primarily argue that tiered scrutiny is inapplicable to Plaintiffs' claims, they alternatively argue that we should apply intermediate scrutiny. Further, although Defendants argue that H.B. 359 regulates only conduct, they concede it is at least expressive conduct. Although rational basis review or the equivalent, *see, e.g.*, *Zauderer v. Off. of Disciplinary Couns. of Sup. Ct. of Ohio*, 471 U.S. 626, 651 (1985), may apply in the First Amendment context, there is no basis for concluding it applies in this case, and Defendants do not argue that it does.

[11] The type of forum (public, limited public, or non-public) is another threshold consideration that can affect the applicable level of scrutiny in the First Amendment context. *See, e.g.*, *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 802 (1985). In this case, however, neither party argues that a forum analysis is required.

protection does not end at the spoken or written word." *Texas v. Johnson*, 491 U.S. 397, 404 (1989). "All manner of speech—from pictures, films, paintings, drawings, and engravings, to oral utterance and the printed word—qualify for the First Amendment's protections." *303 Creative LLC v. Elenis*, 600 U.S. 570, 587 (2023) (citations and internal quotation marks omitted). "[T]he Supreme Court and our court have recognized various forms of entertainment and visual expression as purely expressive activities, including music without words, dance, topless dancing, movies, parades with or without banners or written messages, and both paintings and their sale." *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1060 (9th Cir. 2010) (internal citations omitted). *See also id.* (holding that the tattoo, the tattooing process, and the business of tattooing are all purely expressive activities). Operating a beauty pageant and staging a play are both purely expressive activities. *Green v. Miss U.S.A., LLC*, 52 F.4th 773, 777, 780–82 (9th Cir. 2022). In the First Amendment context, "purely expressive activit[ies]" are a form of "speech" and are "entitled to full First Amendment protection." *Anderson*, 621 F.3d at 1059.

The Supreme Court has also long recognized that the First Amendment extends protection to "expressive conduct," that is, a message "delivered by conduct" that is not purely expressive activity but which is "intended to be communicative."[12] *United States v. Swisher*, 811 F.3d 299, 310–11 (9th Cir. 2016) (en banc) (quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 294 (1984)); *see also*

---

[12] Courts sometimes refer to expressive conduct as "symbolic speech." *See, e.g.*, *Virginia v. Black*, 538 U.S. 343, 358 (2003) ("The First Amendment affords protection to symbolic or expressive conduct as well as to actual speech."); *Swisher*, 811 F.3d at 311 (discussing "symbolic speech").

*Anderson*, 621 F.3d at 1059 (explaining that expressive conduct is "conduct that can be used to express an idea but does not necessarily do so"). "[C]onduct intending to express an idea is constitutionally protected only if it is 'sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments.'" *Anderson*, 621 F.3d at 1058 (quoting *Spence v. Washington*, 418 U.S. 405, 409 (1974)). Examples of expressive conduct include burning the American flag, *Johnson*, 491 U.S. at 406, burning a draft card, *United States v. O'Brien*, 391 U.S. 367, 376–77 (1968), affixing a peace sign to the American flag, *Spence*, 418 U.S. at 406, and wearing a military medal, *Swisher*, 811 F.3d at 314.

When a generally applicable conduct regulation incidentally burdens expressive conduct, we typically apply the four-part test announced in *O'Brien*, 391 U.S. at 377, "a less stringent test than those established for regulations of pure speech" or "purely expressive activit[ies]." *Anderson*, 621 F.3d at 1059. The government "may not, however, proscribe particular conduct *because* it has expressive elements." *Johnson*, 491 U.S. at 406. The Court has therefore "limited the applicability of *O'Brien*'s relatively lenient standard to those cases in which 'the governmental interest is unrelated to the suppression of free expression.'" *Id.* at 407 (quoting *O'Brien*, 391 U.S. at 377). That is, "[t]he *O'Brien* framework governs First Amendment claims when evaluating government regulations that have 'only an incidental effect on protected speech.'" *Green*, 52 F.4th at 790 (quoting *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 659 (2000)).

When a law is "directed at the communicative nature of conduct," it "must, like a law directed at speech itself, be justified by the substantial showing of need that the First

Amendment requires." *Johnson*, 491 U.S. at 406 (citation and internal quotation marks omitted). In *Johnson*, the Court applied the "most exacting scrutiny" to Texas's flag-burning law and concluded that the law was unconstitutional as applied to political expression. *Id.* at 412 (quoting *Boos v. Barry*, 485 U.S. 312, 321 (1988)).[13]

### 2.  Content Based or Content Neutral

A content-based speech restriction is "presumptively invalid." *R.A.V.*, 505 U.S. at 382. "[I]t can stand only if it satisfies strict scrutiny." *Playboy*, 529 U.S. at 813. That is, "[i]f a statute regulates speech based on its content, it must be narrowly tailored to promote a compelling [g]overnment interest. If a less restrictive alternative would serve the [g]overnment's purpose, the legislature must use that alternative." *Id.* (citation omitted). By contrast, a content-neutral regulation of the time, place, and manner of speech is subject to the test set forth in *Clark*, 468 U.S. at 293, which "is little, if any, different from the [*O'Brien* test]." *Id.* at 298.

"Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed*, 576 U.S. at 163. To determine whether a speech restriction is content based, we first must consider whether it "'on its face' draws distinctions based on the message a speaker conveys." *Reed*,

---

[13] "Most exacting scrutiny" is the same test as "strict scrutiny." *Compare Boos*, 485 U.S. at 321 (holding that to satisfy "most exacting scrutiny," the government must "show that the 'regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end'" (citing *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45 (1983))), *with Playboy*, 529 U.S. at 813 (holding that a statute "must be narrowly tailored to promote a compelling Government interest" to satisfy strict scrutiny).

576 U.S. at 163 (quoting *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011)). "Some facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose. Both are distinctions drawn based on the message a speaker conveys, and, therefore, are subject to strict scrutiny." *Id.* at 163–64. "[A] speech regulation targeted at specific subject matter is content based even if it does not discriminate among viewpoints within that subject matter. For example, a law banning the use of sound trucks for political speech—and only political speech—would be a content-based regulation, even if it imposed no limits on the political viewpoints that could be expressed." *Id.* at 169 (citation omitted). Additionally, "[b]ecause speech restrictions based on the identity of the speaker are all too often simply a means to control content, we have insisted that laws favoring some speakers over others demand strict scrutiny when the legislature's speaker preference reflects a content preference." *Id.* at 170 (citations and internal quotation marks omitted); *see also Sorrell*, 564 U.S. at 565 (applying strict scrutiny to content- and speaker-based restriction). "A law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech." *Reed*, 576 U.S. at 165 (quoting *Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 429 (1993)).

The general rule that a facially content-based speech restriction is subject to strict scrutiny has two exceptions. The first is the secondary-effects doctrine, which has been applied to uphold zoning restrictions aimed at specific types of businesses, such as adult theaters. *See, e.g.*, *City of Renton*

*v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986); *Young v. Am. Mini Theaters, Inc.*, 427 U.S. 50 (1976). The zoning laws at issue in these cases were content neutral because they were aimed at the secondary effects of the businesses, not the content of their expression. *Renton*, 475 U.S. at 47–48. The Supreme Court has made clear that the secondary-effects doctrine is a narrow exception that is generally limited to zoning regulations. *See Reno v. ACLU*, 521 U.S. 844, 867–68 (1997) (rejecting government argument that a statute targeting online speech was a form of "cyberzoning"); *Playboy*, 529 U.S. at 815 (discussing *Renton*).

The second exception was most clearly articulated by the Supreme Court in *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 69 (2022). There, the Court explained that a speech regulation that applies only to speech of certain content is content based, but a regulation that merely requires some evaluation of speech content to determine whether a content-neutral regulation applies is content neutral. *Compare Reed*, 576 U.S. at 159–61 (holding that a sign code was content based because it distinguished between ideological, political, and temporary directional signs), *with Reagan Nat'l Advert.*, 596 U.S. at 69 (holding that a regulation was content neutral because it "require[d] an examination of speech only in service of drawing neutral, location-based lines"). *See also Project Veritas v. Schmidt*, 125 F.4th 929, 950 (9th Cir. 2025) (en banc) (holding that statute restricting unannounced recording was content neutral); *Porter v. Martinez*, 68 F.4th 429, 443 (9th Cir. 2023) (concluding that vehicle code restriction on honking was content neutral).

To determine whether a speech restriction is content based or content neutral, we also must consider its justification and purpose, because even laws that are

"facially content neutral[] will be considered content-based regulations of speech" if they "cannot be 'justified without reference to the content of the regulated speech,' or . . . were adopted by the government 'because of disagreement with the message [the speech] conveys.'" *Reed*, 576 U.S. at 164 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). "Those laws, like those that are content based on their face, must also satisfy strict scrutiny." *Id.* "Because strict scrutiny applies either when a law is content based on its face or when the purpose and justification for the law are content based, a court must evaluate each question before it concludes that the law is content neutral and thus subject to a lower level of scrutiny." *Id.* at 166.

## C.  Restrictions of Speech Deemed "Indecent" but not "Obscene"

Defendants do not argue that H.B. 359 targets obscenity. Nor do Defendants argue that H.B. 359 can be narrowly construed to restrict only obscenity.[14] Rather, Defendants maintain that the Montana Legislature enacted H.B. 359 because it determined that drag story hours and sexually oriented performances are "indecent and inappropriate for minors." And in Defendants' view, H.B. 359 withstands constitutional scrutiny because "a State may regulate what may be indecent to minors," even where "not legally obscene." In making this argument, Defendants rely primarily on two related and sometimes overlapping lines of First Amendment cases: (1) cases involving statutes that

---

[14] Montana already has criminal statutes that prohibit obscenity, both as to adults and as to minors. *See* Mont. Code. Ann. §§ 45-8-201 (criminalizing the offense of obscenity and incorporating the *Miller* definition), 45-8-206 (criminalizing the public display or dissemination of obscene material to minors).

used the term "indecent" to define the scope of restricted speech, *see, e.g.*, *FCC v. Pacifica*, 438 U.S. 726 (1978), and (2) cases involving a statute that used other terms to define the scope of restricted speech and a claim by defendants that the restricted speech was "indecent" or "unsuitable" for minors, *see, e.g.*, *Erznoznik v. City of Jacksonville*, 422 U.S. 205 (1975). For ease, we refer to these cases collectively as "indecent-speech cases."

Although Defendants do not argue that H.B. 359 is an "obscenity" restriction, to understand the Supreme Court's indecent-speech cases, we must read them in the context of the Court's jurisprudence regarding obscenity and other categories of "unprotected speech." As the Court explained in *Brown*, "[a]s a general matter, government has no power to restrict expression because of its message, its ideas, its subject matter, or its content. . . . [But] [f]rom 1791 to the present, the First Amendment has permitted restrictions upon the content of speech in a few limited areas." 564 U.S. at 790–91 (2011) (citations and internal quotation marks omitted). "These limited areas" of unprotected speech include obscenity, *Roth v. United States*, 354 U.S. 476, 483 (1957); incitement, *Brandenburg v. Ohio*, 395 U.S. 444, 447–49 (1969) (per curiam); and fighting words, *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942). "Prevention and punishment" of these "well-defined and narrowly limited classes of speech . . . have never been thought to raise any Constitutional problem." *Brown*, 564 U.S. at 791 (quoting *Chaplinsky*, 315 U.S. at 571–72). However, statutes aimed at restricting unprotected speech must be drawn carefully to reach only unprotected speech. *See Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 239, 247–48, 256 (2002) (holding unconstitutional a statutory provision that would ban "sexually explicit images that appear to depict minors

but were produced without using any real children" as covering materials that did not meet *Miller*'s obscenity standard, such as films with themes of teenage sexual activity).[15] Further, "new categories of unprotected speech may not be added to the list by a legislature that concludes certain speech is too harmful to be tolerated." *Brown*, 564 U.S. at 791 (citing *United States v. Stevens*, 559 U.S. 460 (2010)).

The Supreme Court first set the standard for obscenity in *Roth v. United States*, 354 U.S. 476 (1957), and later revised it in *Miller v. California*, 413 U.S. 15 (1973). Under *Miller*, the standard for determining whether speech qualifies as "obscenity" is: "(a) whether the average person, applying contemporary community standards would find that the work, taken as a whole, appeals to the prurient interest; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value." *Miller*, 413 U.S. at 24 (citations and internal quotation marks omitted).

In *Ginsberg v. State of New York*, which followed *Roth* but preceded *Miller*, the Court set forth an obscenity standard as to minors that was a variation of the adult obscenity standard enunciated in *Roth*. 390 U.S. 629, 635

---

[15] A statute that expressly proscribes only unprotected speech "is not necessarily subject to strict scrutiny," even though it is "content based." *Swisher*, 811 F.3d at 313. But a statutory proscription that restricts both protected and unprotected speech based on content generally is subject to strict scrutiny. *See, e.g.*, *Erznoznik*, 422 U.S. at 209–10. And a statute that selectively prohibits a subset of an unprotected speech category based on content may also be subject to strict scrutiny. *See R.A.V.*, 505 U.S. at 381.

(1968). In *Erznoznik*, the Court noted that it had not had occasion to decide the effect of *Miller* on the "*Ginsberg* formulation" but explained that "it is clear . . . that under any test of obscenity as to minors not all nudity would be proscribed. Rather, to be obscene 'such expression must be, in some significant way, erotic.'" 422 U.S. at 214 n.10 (quoting *Cohen v. California*, 403 U.S. 15, 20 (1971)).

In *Free Speech Coalition, Inc. v. Paxton*, the Court clarified the effect of *Miller* on the *Ginsberg* formulation of obscenity for minors. 606 U.S. at 472–74. At issue in *Free Speech Coalition* was a First Amendment challenge to a Texas statute that required websites with more than one-third content qualifying as "sexual material harmful to minors" to verify their users' age, to prevent minors from accessing certain sexually explicit content. *Id.* at 466–67 (quoting Tex. Civ. Prac. & Rem. Code Ann. § 129B.002(a)). The statute defined restricted content as "material that: (1) 'is designed to appeal to or pander to the prurient interest' when taken 'as a whole and with respect to minors'; (2) describes, displays, or depicts 'in a manner patently offensive with respect to minors' various sex acts and portions of the human anatomy, including depictions of 'sexual intercourse, masturbation, sodomy, bestiality, oral copulation, flagellation, [and] excretory functions'; and (3) 'lacks serious literary, artistic, political, or scientific value for minors.'" *Id.* at 467 (alteration in original) (citing Tex. Civ. Prac. & Rem. Code Ann. § 129B.001(6)). The Court concluded that the statute restricted *only* obscenity for minors because the statute's definition of restricted content conformed to the *Miller-Ginsberg* obscenity for minors standard, which "broaden[s] *Miller*'s 'definition of obscenity' to cover that which is

obscene from a child's perspective." *Id.* at 474 (quoting *Ginsberg*, 390 U.S. at 638).[16]

As noted above, Montana already prohibits the display or dissemination of material that is obscene for minors under a different statute, Mont. Code Ann. § 45-8-206, and Defendants do not contend that H.B. 359 restricts only obscenity for minors. Although the briefing in this case was complete before *Free Speech Coalition* was decided, that case makes only more clear that Defendants could not defend H.B. 359 on that ground, because neither of the statute's categories of restricted speech (drag story hours and sexually oriented performances) conform to the *Miller-Ginsberg* obscenity for minors standard. *See Free Speech Coal.*, 606 U.S. at 472–74 (describing three-part obscenity test for minors).

We turn next to the Court's indecent-speech cases. Although there are a fair number of such cases, the Court has never expressly defined "indecent speech." Yet, the Court has repeatedly emphasized that legislatures are not free to

---

[16] The Court also clarified that the category of "obscene to minors" constitutes partially protected speech, not wholly unprotected speech like "obscenity." *Free Speech Coal.*, 606 U.S. at 492. Content that qualifies as "obscene for minors" but does not qualify as "obscenity" is "protected" for adults: adults have a First Amendment right to access such speech. *Id.* at 492–93. Content that is obscene to minors is "unprotected" only for minors, meaning that minors (but only minors) do not have a First Amendment right to access such speech. *Id.* Finally, the Court considered what level of scrutiny to apply to the Texas statute. *Id.* at 477–78. The Court reasoned that rational basis review did not apply because the age-verification requirement burdened adults' First Amendment rights. *Id.* at 478. But because the burden was only "incidental," intermediate scrutiny (like the *O'Brien* test) applied rather than strict scrutiny. *Id.* at 482–85. The Court held the age-verification requirement survived intermediate scrutiny. *Id.* at 499.

label any speech "indecent" and restrict it on that basis. As explained in *Brown*, a legislature's "legitimate power to protect children from harm . . . does not include a free-floating power to restrict the ideas to which children may be exposed." 564 U.S. at 794. "Much that we encounter offends our esthetic, if not our political and moral, sensibilities. Nevertheless, the Constitution does not permit government to decide which types of otherwise protected speech are sufficiently offensive to require protection for the unwilling listener or viewer." *Erznoznik*, 422 U.S. at 210; *see also Reno*, 521 U.S. at 871–74 (holding that a criminal statute restricting "indecent" speech without defining the term "indecent" was too ambiguous and not narrowly tailored).

If "indecent speech" cannot mean anything the government decides is inappropriate for children, what can it mean? When the Court has considered "indecent speech" restrictions, it generally has used the term "indecent" to refer to speech that is similar in kind to obscene speech (i.e., sexually explicit) but does not qualify as obscene speech. *See, e.g.*, *Playboy*, 529 U.S. at 808–11, 814 (using the term "indecent" to describe cable television programming that was "sexually explicit" but not "obscene"); *Reno*, 521 U.S. at 873 (where statute restricted "indecent" and "patently offensive" speech without defining "indecent," assuming that the terms were "synonymous"); *Denver Area Educ. Telecomms. Consortium, Inc. v. FCC*, 518 U.S. 727, 737, 752 (1996) (plurality opinion) (noting that a regulation permitting cable operators to prohibit "indecent" programming tracked some, but not all, of the *Miller* obscenity test); *Sable Commc'ns of Cal. v. FCC*, 492 U.S. 115, 126 (1989) (using the term "indecent" to describe "dial-a-porn" that was sexually explicit but "not obscene"); *FCC v. Pacifica Found.*, 438 U.S. 726, 740 (1978) (observing, in

the context of radio broadcasting, that obscenity requires a prurient appeal while indecency does not). In *Pacifica*, the FCC regulation at issue defined indecent language as "language that describes, in terms patently offensive as measured by contemporary community standards for the broadcast medium, sexual or excretory activities and organs at times of the day when there is a reasonable risk that children may be in the audience," and the case involved speech "that concededly [wa]s not obscene." *Id.* at 732, 735.[17] In *Bethel School District No. 403 v. Fraser*, the Court held that a school district was permitted to discipline a student for "offensively lewd and indecent speech." 478 U.S. 675, 685 (1986). The Court distinguished *Tinker v. Des Moines Independent School District*, 393 U.S. 503 (1969), which held that a school regulation prohibiting students from wearing armbands violated their freedom of speech, because the speech at issue in *Bethel* was "sexually explicit." *Id.*

The Supreme Court has also suggested that the meanings of both "indecent speech" and "obscene speech" are limited to the historical understandings of those categories, i.e., that both are limited to sexually explicit content. In *Winters v.*

---

[17] *Pacifica* involved an as-applied challenge to the FCC's determination that a particular radio broadcast was actionably "indecent" under 18 U.S.C. § 1464 (1976), not a facial challenge to the statutory restriction. *See generally* 438 U.S. 726. Although Section IV.B. of the *Pacifica* opinion discussed "whether the First Amendment denies government any power to restrict the public broadcast of indecent language in any circumstances," that section was not joined by a majority of the Court. *See id.* at 729, 744. Further, in *Pacifica* and subsequent cases, the Court has emphasized that its holding was narrow and depended on many case-specific factors, including the role of the FCC, the nature of the adjudicatory proceeding, the fact that the FCC's order was non-punitive, and the medium of radio broadcasting. *See id.* at 748–51; *Playboy*, 529 U.S. at 815; *Reno*, 521 U.S. at 866–67; *Sable*, 492 U.S. at 127–28.

*New York*, the Court rejected the government's view that violent speech is a form of "indecent or obscene" speech. 333 U.S. 507, 512–19 (1948). In doing so, the Court noted that the violent speech reached by New York's statute contained "no indecency or obscenity in any sense heretofore known to the law." *Id.* at 519. The Court reaffirmed that view in *Brown*. 564 U.S. at 793 ("Our opinion in *Winters* . . . made clear that violence is not part of the obscenity that the Constitution permits to be regulated."). *See also Video Software Dealers Ass'n v. Schwarzenegger*, 556 F.3d 950, 967 (9th Cir. 2009) (declining to "read *Ginsberg* as reaching beyond the context of restrictions on sexually-explicit materials or as creating an entirely new category of expression—speech as to minors—excepted from First Amendment protections"), *aff'd*, *Brown*, 564 U.S. 786. In *Free Speech Coalition*, the Court also repeatedly indicated that the partially protected category of "obscene to minors" reaches only "sexually explicit" content. 606 U.S. at 465, 478 (describing statute that restricts content that is obscene for minors as prohibiting the distribution of "sexually explicit content to children"); *id.* at 473–74 (same). Reading these cases together, we conclude that, in the First Amendment context, the term "indecent speech" generally refers to sexually explicit content that is similar in kind to obscenity, but does not qualify as obscenity.

Because "obscenity for minors" is not protected speech for minors, a restriction that limits only minors' access to this content is not subject to strict scrutiny. *See id.* at 492; *cf. id.* at 478 (a restriction aimed at limiting only minors' access to obscenity for minors that incidentally burdens adult access is subject to intermediate scrutiny). But sexually explicit speech that is "indecent but not obscene" is fully protected by the First Amendment. *See Playboy*, 529 U.S. at 813–14;

*Sable*, 492 U.S. at 126 ("[S]exual expression that is indecent but not obscene is protected by the First Amendment."); *Reno*, 521 U.S. at 871–74.

When the government restricts sexually explicit speech that is not obscene *because* it considers the content "indecent" for young viewers, the restriction is "content based." *See Playboy*, 529 U.S. at 811. The statute challenged in *Playboy* required cable television operators to completely block "channels primarily dedicated to 'sexually explicit adult programming or other programming that is indecent'" or to limit transmission of such channels "to hours when children are unlikely to be viewing," in order "to shield children from hearing or seeing images resulting from signal bleed." *Id.* at 806, 811. Because "[t]he overriding justification for the regulation [wa]s concern for the effect of the subject matter on young viewers," the regulation was "content based." *Id.* at 811. As the Court explained: "[The statute] is not justified without reference to the content of the regulated speech. It focuses *only* on the content of the speech and the direct impact that speech has on its listeners. This is the essence of content-based regulation." *Id.* at 811–12 (citations and internal quotation marks omitted).

Further, a content-based restriction of sexually explicit speech that is indecent but not obscene is subject to strict scrutiny. *See id.* at 814. Because the restricted programming in *Playboy* was "indecent" but "not obscene," it was "protected speech; and the question [wa]s what standard the Government must meet in order to restrict it." *Id*. The Court responded: "As we consider a content based regulation, the answer should be clear: The standard is strict scrutiny. This case involves speech alone; and even where speech is indecent and enters the home, the objective of shielding children does not suffice to support a blanket ban if the

protection can be accomplished by a less restrictive alternative." *Id. See also Sable*, 492 U.S. at 126 ("We have recognized that there is a compelling interest in protecting the physical and psychological well-being of minors. This interest extends to shielding minors from the influence of literature that is not obscene by adult standards. The [g]overnment may serve this legitimate interest, but to withstand constitutional scrutiny, it must do so by narrowly drawn regulations designed to serve those interests without unnecessarily interfering with First Amendment freedoms. It is not enough to show that the [g]overnment's ends are compelling; the means must be carefully tailored to achieve those ends." (citations and internal quotation marks omitted)).

When determining whether an indecent speech restriction withstands strict scrutiny, the Court has carefully considered the extent to which the targeted speech invades the home, and the extent to which an unwilling viewer or listener can simply avoid it without government restriction. The Court summarized this principle in *Erznoznik*: "[W]hen the government, acting as censor, undertakes selectively to shield the public from some kinds of speech on the ground that they are more offensive than others, the First Amendment strictly limits its power. Such selective restrictions have been upheld only when the speaker intrudes on the privacy of the home, or the degree of captivity makes it impractical for the unwilling viewer or auditor to avoid exposure." 422 U.S. at 209 (citations omitted); *see also Cohen*, 403 U.S. at 21 ("The ability of government, consonant with the Constitution, to shut off discourse solely to protect others from hearing it is . . . dependent upon a showing that substantial privacy interests are being invaded in an essentially intolerable manner.").

Since *Erznoznik*, the Court has continued to emphasize these contextual factors when determining the constitutional validity of an indecent speech restriction. *See Playboy*, 529 U.S. at 813–15; *Reno*, 521 U.S. at 868–69 (distinguishing the internet from broadcast media and noting that "special justifications for regulation of the broadcast media . . . are not present in cyberspace"); *Sable*, 492 U.S. at 128 ("Placing a telephone call is not the same as turning on a radio and being taken by surprise by an indecent message. Unlike an unexpected outburst on a radio broadcast, the message received by one who places a call to a dial-a-porn service is not so invasive or surprising that it prevents an unwilling listener from avoiding exposure to it."); *Pacifica*, 438 U.S. at 750 (emphasizing that "context is all-important" and that "differences between radio, television, and perhaps closed-circuit transmissions, may also be relevant" in determining the lawfulness of an FCC indecency sanction); *Denver Area*, 518 U.S. at 757–78 (majority opinion) (concluding that provision requiring leased channel operators to "segregate and block" "patently offensive" or indecent programming violated the First Amendment in part because a less restrictive alternative would allow "parents to 'lock out' those programs or channels that they did not want their children to see").

In *Playboy*, the Court reaffirmed the First Amendment principle that when the aim of a law is to protect the sensibilities of listeners, the onus is generally on the listener to avert his eyes. 529 U.S. at 813 (first citing *Cohen*, 403 U.S. at 21; and then citing *Erznoznik*, 422 U.S. at 210–11). The Court also underscored that the invasiveness of the medium by which speech is conveyed is an important factor to consider when applying strict scrutiny. *Id.* at 813–15. For example, it noted that both cable television and broadcast

media "present[] unique problems" because they are "transmitted to some homes where they are not wanted and where parents often are not present to give immediate guidance," which "may justify restrictions that would be unacceptable in other contexts." *Id.* But the Court ultimately distinguished cable television from broadcast television because the former was less invasive than the latter. *Id.* at 815. When concluding that the signal bleed provision did not withstand strict scrutiny, it explained that the case turned on "a key difference between cable television and the broadcasting media": cable systems' ability "to block unwanted channels on a household-by-household basis." *Id.*

With this legal framework in mind, we turn to assessing H.B. 359's restrictions.

## V. PLAINTIFFS' CONTENT-BASED CLAIMS

### A. Drag Story Hours

Under H.B. 359 § 3(2), "[a] school or library that receives any form of funding from the state may not allow a . . . drag story hour, as defined in [Section 1], on its premises during regular operating hours or at any school-sanctioned extracurricular activity."

#### 1. The drag-story-hour provision is a content-based restriction of purely expressive activity.

Plaintiffs argue that the drag-story-hour provision is a "content-based restriction on protected speech and expression" subject to strict scrutiny. Defendants argue that drag story hours are conduct, not inherently expressive speech, and that H.B. 359's drag-story-hour provision is a content-neutral restriction on the secondary effects of drag story hours subject only to intermediate scrutiny. For the reasons explained below, we conclude that drag story hours

are purely expressive activity and that the drag-story-hour provision is a content-based restriction subject to strict scrutiny.

H.B. 359 defines a "drag story hour" as "an event hosted by a drag queen or drag king who reads children's books and engages in other learning activities with minor children present." H.B. 359 § 1(3). H.B. 359 defines a "drag king" as "a male or female performer who adopts a flamboyant or parodic male persona with glamorous or exaggerated costumes and makeup," and a "drag queen" as "a male or female performer who adopts a flamboyant or parodic feminine persona with glamorous or exaggerated costumes and makeup." H.B. 359 §§ 1(1), (2).

A drag story hour is purely expressive activity. Reading a book out loud is purely expressive activity. *See Brown*, 564 U.S. at 790 (holding that video games, "[l]ike the protected books, plays, and movies that preceded them . . . communicate ideas—and even social messages—through many familiar literary devices"). Performing or expressing a particular persona is indistinguishable from performing a character in a play or film or competing in a beauty pageant, all of which is undoubtedly purely expressive activity. *See Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 557 (1975) (live drama is protected under the First Amendment and is not subject to different standards than other forms of expression); *Green*, 52 F.4th at 780–83, 783 n.10 ("[B]eauty pageants combine speech with live performances such as music and dancing to express a message" and pageant competitors are "performers" who "deliver . . . a message to an audience."). Performing a male or feminine persona that expresses a view about masculinity or femininity is also expressive activity. *See Green*, 52 F.4th at 803 ("[A] pageant consisting of speeches, costumes, and elaborate ceremonies

in furtherance of its ideal vision of femininity certainly qualifies" as "expressive activity") (VanDyke, J., concurring). Applying these precedents, we have no trouble concluding that drag story hours, as defined by H.B. 359, are purely expressive activity, not conduct.

H.B. 359's restriction of drag story hours is content based on its face. *See* H.B. 359 § 3(2). First, it applies only to people reading a particular type of content—children's books. Second, it restricts who can read the children's books—only certain speakers (drag kings and queens) are prohibited from conveying a message by reading books out loud. Third, Section 3(2) draws a line between prohibited and permitted speakers based on the content of their expression: the statute prohibits only speakers who express "flamboyant or parodic" male or feminine personas with "glamorous or exaggerated costumes and makeup." H.B. 359 §§ 1(1), 1(2). An individual who expresses a modest or serious male or female persona—or any other type of persona—may host a story hour. Because H.B. 359's facial speaker preference reflects a content preference, it is content based on its face and subject to strict scrutiny. *See Playboy,* 529 U.S. at 813; *Sorrell*, 564 U.S. at 564.

Further, the drag-story-hour restriction cannot be justified without reference to the content of the targeted expression. Defendants repeatedly emphasize that the Legislature restricted drag story hours because it considers them "indecent" for children. When "[t]he overriding justification for the regulation is concern for the effect of the subject matter on young viewers," the restriction is content based. *Playboy*, 529 U.S. at 811 (citation and internal quotation marks omitted). *See also Reno*, 521 U.S. at 868 (explaining that when the purpose of a restriction is to "protect children from the primary effects of 'indecent' and

'patently offensive' speech," the restriction is "content-based" and subject to "the most stringent review of its provisions" (first citing *Boos*, 485 U.S. at 321; and then citing *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 134 (1992))).

Defendants incorrectly assert that this is a secondary-effects case. Defendants do not cite any evidence that H.B. 359 was aimed at any secondary effects, "such as crime and deteriorating property values," caused by drag story hours. *See Reno*, 521 U.S. at 867 (discussing secondary effects zoning cases). Rather, the legislative history shows that the Legislature was concerned about the effect that seeing and hearing drag story hours had on children in the audience. *See Prohibit Minors from Attending Drag Shows: Hearing on H.B. 359 Before the S. Judiciary Comm.*, 2023 Leg., 68th Sess. (Mont. 2023) (statement of bill sponsor, Rep. Braxton Mitchell) ("This bill is to protect children from hypersexualized events that are meant for adults, not children.").

Defendants concede that the Legislature enacted the drag-story-hour restriction because it had "heard many concerns about the effects of 'sexually oriented performances' and 'drag story hours' on children," but contend that those effects are "secondary," not "primary." Defendants are incorrect. When the government restricts speech because of concerns about its effects on the audience, it is targeting the *primary* effects of the speech. *See Playboy*, 529 U.S. at 815 ("We have made clear that the lesser scrutiny afforded regulations targeting the secondary effects of crime or declining property values has no application to content-based regulations targeting the primary effects of protected speech."); *Forsyth Cnty.*, 505 U.S. at 134 ("Listeners' reaction to speech is not a content-neutral basis for

regulation."); *Reno*, 521 U.S. at 868. In *Reno*, the government similarly argued that the Communications Decency Act (CDA) was a form of "cyberzoning" aimed at the secondary effects of speech. 521 U.S. at 867–68. The Supreme Court squarely rejected this argument, explaining that "the purpose of the CDA is to protect children from the primary effects of 'indecent' and 'patently offensive' speech, rather than any 'secondary' effect of such speech." *Id.* at 868. Further, because the CDA was aimed at the primary effects of indecent speech, the Court concluded it was a content-based restriction subject to strict scrutiny, not a content-neutral time, place, and manner restriction subject to intermediate scrutiny. *Id.*

Defendants also argue that the drag-story-hour provision restricts only the kind of clothes and costumes story-hour hosts can wear, and that wearing clothes or dressing in a particular style is at most expressive conduct, not purely expressive activity. Therefore, Defendants contend, the drag-story-hour provision is a conduct regulation subject only to the *O'Brien* test. We disagree. We must consider the activity regulated by the drag-story-hour provision as a whole. We do not separate "[t]he process of expression through a medium" from "the expression itself." *Anderson*, 621 F.3d at 1062. By its express terms, H.B. 359 regulates a particular type of event—a drag story hour, in which an individual wears a costume to express a persona and reads stories as that persona. When determining which level of scrutiny to apply, we do not separate the conduct element (wearing clothes) from the expressive elements (conveying a persona and reading a story) and then consider only the conduct element. *See Animal Legal Def. Fund v. Wasden*, 878 F.3d 1184, 1203 (9th Cir. 2018) (declining to separate "the creation of [a] video" from the recording itself where

the challenged statute restricted recordings at agricultural production facilities); *Project Veritas*, 125 F.4th at 945–46 (declining to separate the conduct of recording from the expressive activity of making newsworthy audio recordings in an as-applied challenge); *Green*, 52 F.4th at 780 (noting that the "interdependent dynamic between medium and message is well-established and well-protected in our caselaw").

Even when we assume that H.B. 359's drag-story-hour restriction merely limits the clothing that story-hour hosts may wear and that wearing clothing is expressive conduct, we still conclude that H.B. 359 regulates speech based on its content. A content-neutral clothing regulation prohibits certain forms of clothing without reference to the message expressed by the clothing. For example, a regulation that requires a person to wear shoes or prohibits public nudity is content neutral. *See, e.g.*, *City of Erie v. Pap's A.M.*, 529 U.S. 277, 282 (2000). But a regulation that restricts clothing because of the message it expresses is content based. *See Swisher*, 811 F.3d at 314. *Swisher* concerned a defendant's First Amendment challenge to his conviction for wearing unauthorized military medals in violation of the Stolen Valor Act, 18 U.S.C. § 704(a). *Id.* at 305–06. We concluded that wearing a medal is expressive conduct because "[w]earing a medal, like wearing a black armband or burning an American flag, conveys a message by conduct that is intended to be communicative and that, in context, would reasonably be understood by the viewer to be communicative." *Id.* at 314 (citation and internal quotation marks omitted). We then concluded that the challenged restriction was aimed at the expressive aspect of the conduct of wearing a medal. *Id.* (concluding that § 704(a) "suppresses expression out of concern for its likely

communicative impact" (quoting *United States v. Eichman*, 496 U.S. 310, 317 (1990))). Consequently, we held that § 704(a) was a content-based restriction and that "the tests applicable to content-neutral regulations (the time, place, or manner test, and the *O'Brien* test) [were] not applicable." *Id.*[18]

Here, even assuming the drag-story-hour restriction merely prohibits story-hour hosts from wearing certain clothing, it nonetheless restricts expressive conduct because it prohibits only "glamorous or exaggerated costumes" that express "flamboyant or parodic" "male" or "feminine" personas. H.B. 359 §§ 1(1), (2). The expression of certain masculine or feminine personas through clothing is protected speech under the First Amendment. *See Green*, 52 F.4th at 780, 782 n.8 (noting that pageant contestants express "their message [about ideal womanhood] through certain decisions such as 'their choice of gown and swimsuit'"). Because a restriction of expressive conduct that is aimed at the expressive aspect of the conduct is content based, characterizing the drag-story-hour restriction as an expressive-conduct restriction does not change our conclusion: it remains a content-based restriction subject to strict scrutiny.

---

[18] After holding that the *O'Brien* test was inapplicable to a "content-based regulation of false symbolic speech," we looked to the standards applied by the Supreme Court in *United States v. Alvarez*, 567 U.S. 709, which involved a similar provision. Because the Supreme Court there was divided over whether "most exacting scrutiny" or a form of intermediate scrutiny applied to content-based regulations of false speech, we determined that § 704(a) was unconstitutional under either standard. *See Swisher*, 811 F.3d at 317 n.13; *Alvarez*, 567 U.S. at 724 (plurality opinion), 730 (Breyer, J., concurring).

Finally, Defendants argue that the drag-story-hour restriction only regulates school and library employees' and administrators' conduct of allowing drag story hours to occur. This is not an accurate characterization of the provision. Because H.B. 359 expressly provides a private right of action against *anyone* who participates in a prohibited drag story hour, it also reaches the expressive activity of the drag-story-hour hosts. H.B. 359 § 4(1). But even if H.B. 359 were only directly enforceable against library and school employees, it would still restrict access to speech based on content and therefore, it would still be subject to strict scrutiny.[19] *See, e.g.*, *Playboy*, 529 U.S. at 811–15 (concluding law that required cable operators to restrict access to sexually explicit channels was a content-based restriction subject to strict scrutiny).

### 2.  The drag-story-hour restriction is not narrowly tailored to further a compelling governmental interest.

"Because [HB 359] imposes a restriction on the content of protected speech, it is invalid unless [Defendants] can demonstrate that it passes strict scrutiny—that is, unless it is justified by a compelling government interest and is narrowly drawn to serve that interest." *Brown*, 564 U.S. at 799. "The [s]tate must specifically identify an actual problem in need of solving, and the curtailment of free speech must be actually necessary to the solution. That is a demanding standard. It is rare that a regulation restricting

---

[19] Plaintiffs also argue that the drag-story-hour provision discriminates based on viewpoint. Because we conclude that Plaintiffs are likely to succeed in showing that the provision is a content-based restriction that does not satisfy strict scrutiny, we do not need to assess whether the provision is also viewpoint based. *See INS v. Bagamasbad*, 429 U.S. 24, 25 (1976). We therefore decline to reach this alternative argument.

speech because of its content will ever be permissible." *Id.* (citations and internal quotation marks omitted).

Defendants assert two governmental interests. Although Defendants do not concede that H.B. 359 regulates speech and thus assert only governmental interests in regulating "conduct," for the purpose of this analysis, we assume Defendants would assert the same interests as they apply to speech. Viewed in this light, Defendants first contend that Montana has a compelling interest in protecting the well-being of minors by preventing their exposure to speech that is "indecent and potentially harmful to minors." Second, Defendants assert that Montana has an interest in "prevent[ing] [public funds] from being used to support or subsidize the presentation of [speech] that is indecent and potentially harmful to minors." We address each asserted interest in turn.

### a. Preventing minors from being exposed to indecent speech

To the extent Defendants claim that the state has a legitimate and compelling governmental interest in restricting minors' access to any protected speech that the government deems "indecent"—regardless of whether the content is sexually explicit and regardless of whether the minors' parents agree with the government's views regarding the propriety of the content—Defendants go too far. Defendants primarily rely on *Sable*, where the Supreme Court agreed that "the Government has a legitimate interest in protecting children from exposure to indecent dial-a-porn messages" and stated: "We have recognized that there is a compelling interest in protecting the physical and psychological well-being of minors. This interest extends to shielding minors from the influence of literature that is not

obscene by adult standards." 492 U.S. at 126 (first citing *Ginsberg*, 390 U.S. at 639–640; and then citing *New York v. Ferber*, 458 U.S. 747, 756–757 (1982)). In *Sable*, however, the restricted speech was "sexually explicit," and the Court's references to *Ginsberg* and *Ferber* indicate that, when the Court approved of the government's interest in protecting children from "potentially harmful" speech "that is not obscene by adult standards," it had in mind content that is obscene for minors, or at least sexually explicit and akin to obscenity. *See id.* at 122–23, 126. Following *Sable*, the Supreme Court has confirmed that the legitimate interest recognized in *Sable* should be viewed in context. *See Reno*, 521 U.S. at 875 ("*Sable* thus made clear that the mere fact that a statutory regulation of speech was enacted for the important purpose of protecting children *from exposure to sexually explicit material* does not foreclose inquiry into its validity." (emphasis added)).[20] *See also Brown*, 564 U.S. at 792–96, 799 (distinguishing cases regarding restrictions of sexually explicit "indecency or obscenity" and holding restriction of violent video games was not narrowly tailored to compelling government interest in protecting minors because government could not "show a direct causal link between violent video games and harm to minors").

Moreover, even when considering restrictions that applied only to sexually explicit speech, the Supreme Court has strongly suggested that the government does *not* have a broad and undifferentiated interest in shielding *all* minors from any non-obscene protected speech that the government deems "indecent," regardless of their parents' views. In

---

[20] In *Reno*, the plaintiffs-appellees did "not dispute that the Government generally has a compelling interest in protecting minors from 'indecent' and 'patently offensive' speech." *Id.* at 863 n.30.

*Reno*, the Court explained that it "need neither accept nor reject the Government's submission that the First Amendment does not forbid a blanket prohibition on all 'indecent' and 'patently offensive' messages communicated to a 17-year-old—no matter how much value the message may contain and regardless of parental approval," because it was "at least clear that the strength of the Government's interest in protecting minors [wa]s not equally strong throughout the coverage of this broad statute." 521 U.S. at 878. *See also Playboy*, 529 U.S. at 811 (noting at the outset that "the [g]overnment disclaim[ed] any interest in preventing children from seeing or hearing [the targeted sexually explicit programming] with the consent of their parents"); *Brown*, 564 U.S. at 795 n.3 (expressing strong disapproval of laws that "do not enforce *parental* authority over children's speech and religion," but instead "impose *governmental* authority, subject only to a parental veto").

Thus, while we recognize that Montana has a compelling interest in shielding minors from sexually explicit speech that is "indecent" but not obscene (for minors or adults), we do not agree that this compelling interest extends to any speech deemed "indecent" by the government, regardless of whether that speech is sexually explicit. Further, while we recognize that the legitimacy of the government's interest in shielding minors from sexually explicit indecent speech may depend on their parents' views, we do not need to resolve the questions left open by the Court in *Reno*. Instead, we may assume that Montana has a broad interest in shielding minors from sexually explicit speech that is indecent but not obscene, while recognizing that the strength of the state's interest "is not equally strong" throughout H.B.359's coverage, and that "[t]he breadth of this content-based restriction of speech imposes an especially heavy burden on

the Government to explain why a less restrictive provision would not be as effective." *Id.* at 879.

We turn to explaining why the drag-story-hour restriction is not narrowly tailored to that governmental interest.

First and foremost, the drag-story-hour restriction does not actually restrict sexually explicit speech that could be deemed "indecent speech" under the Court's indecent-speech cases and the historical understanding of that term. H.B. 359 restricts the story-hour expression of flamboyant or parodic male and female personas by the use of "glamorous or exaggerated costumes and makeup." Defendants urge us to interpret these terms using dictionary definitions. "Flamboyant" means that something is "marked by or given to strikingly elaborate or colorful display or behavior."[21] A "parody" is a work that imitates a style "for comic effect or in ridicule" or, alternatively, as "a feeble or ridiculous imitation." [22] "Glamorous" means "full of glamour" or "excitingly attractive."[23] "Exaggerated" means

---

[21] *Flamboyant*, Merriam-Webster, https://www.merriam-webster.com/dictionary/flamboyant [https://perma.cc/8QGR-9AQV] (last visited Mar. 5, 2026).

[22] *Parodic*, Merriam-Webster, https://www.merriam-webster.com/dictionary/parodic [https://perma.cc/W88Q-4PMN] (last Mar. 5, 2026).

[23] *Glamorous*, Merriam-Webster, https://www.merriam-webster.com/dictionary/glamorous [https://perma.cc/6AVY-NYGU] (last visited Mar. 5, 2026).

"excessively or inappropriately heightened, inflated, or overstated" or "enlarged or increased beyond the normal."**24**

Defendants assert that the expression of such personas is "indecent." But the state does not have free license to label expression "indecent" and restrict it in the name of protecting children. *See supra* Section IV.C. "Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them." *Erznoznik*, 422 U.S. at 213–14. The readings, personas, and costumes restricted by the drag-story-hour provision have no apparent relationship to the historical understanding of "indecent speech." *See supra* Section IV.C. For example, the provision does not bar sexually explicit content, nudity (full or partial), or even revealing clothing. Defendants provide no evidence of a historic understanding that flamboyant or parodic expressions of male or female personas, or glamorous or exaggerated costumes and makeup, are "indecent" generally, or for children specifically. In *Brown*, the Supreme Court explained that there was no "longstanding tradition in this country of specially restricting children's access to depictions of violence" and held that this militated against the state's argument that it could restrict children's access to violent video games. 564 U.S. at 795–96. As in *Brown*, Defendants fail to show that the flamboyant or parodic expression of a gendered persona falls within the historical ambit of speech that may be restricted with respect to minors.

---

24 *Exaggerated*, Merriam-Webster, https://www.merriam-webster.com/dictionary/exaggerated [https://perma.cc/KKJ3-QYRS] (last visited Mar. 5, 2026).

To the contrary, the drag-story-hour restriction plainly reaches speech that is widely accepted as appropriate even for young children under historic and contemporary standards. Many characters from children's movies rated G by the MPAA would meet H.B. 359's definition of a "drag king" or a "drag queen." Cinderella, Elsa from *Frozen*, and many other Disney princesses could be described as adopting flamboyant feminine personas when they dress up in glamorous ballgowns and bejeweled tiaras. *See generally Cinderella* (Disney 1950); *Frozen* (Disney 2013); *Snow White and the Seven Dwarfs* (Disney 1937). Many Disney villains, such as Cruella de Vil from *101 Dalmatians* and the Evil Queen from *Snow White and the Seven Dwarfs*, could be described as expressing both flamboyant and parodic feminine personas with both glamorous and exaggerated costumes. *See generally 101 Dalmatians* (Disney 1961); *101 Dalmatians* (Disney 1996); *Snow White and the Seven Dwarfs* (Disney 1937). In *Beauty and the Beast*, Gaston expresses a flamboyant and parodic male persona, wearing masculine clothing that reveals bulging muscles while declaring that he has "biceps to spare." *See generally Beauty and the Beast* (Disney 1991). The G-rated Disney movie *Mulan* centers on a girl who is derided for not being feminine enough, adopts a male persona by wearing a soldier's uniform, and becomes a war hero. *See generally Mulan* (Disney 1998). This movie also features a scene in which other soldiers parody feminine personas by wearing fancy dresses and exaggerated make-up. *See id.* Defendants assert that such characters are not covered by H.B. 359's drag king and drag queen definitions but do not explain why, considering the plain meaning of the statutory text. Rather, Defendants simply ignore the statutory definitions and claim

that "any person of ordinary intelligence knows what drag is and knows it when they see it."

Defendants appear to be arguing that popular characters from G-rated children's movies will not be covered by the statutory definitions of "drag king" and "drag queen" because those characters do not meet the common understanding of a drag king or queen. The problem with this argument is that the Montana Legislature chose to specifically define "drag king" and "drag queen" in HB 359. And "[w]hen 'a statute includes an explicit definition' of a term, 'we must follow that definition, even if it varies from a term's ordinary meaning.'" *Van Buren v. United States*, 593 U.S. 374, 387 (2021) (quoting *Tanzin v. Tanvir*, 592 U.S. 43, 47 (2020)).

Thus, even accepting Defendants' assertion that drag queens and kings "typically wear flamboyant or parodic attire, or glamorous and exaggerated costumes, while engendering the opposite sex," that common understanding does not control. The statutory definitions expressly cover any person who performs a "flamboyant or parodic" "feminine" or "male" persona and wears "glamorous and exaggerated costumes or makeup"—regardless of whether they are engendering the opposite sex. H.B. 359 §§ 1(1), 1(2). If, as Defendants seem to suggest, the Montana Legislature intended to cover only people who meet the statutory definition of drag queen or drag king *and* engender the opposite sex, then the express scope of the drag-story-hour restriction is broader than its intended scope, it is not narrowly tailored to the asserted interest, and it fails strict scrutiny.

Even if we could disregard the text of H.B. 359's drag king and drag queen definitions and narrow their scope to

the asserted "common understanding" of "drag," that narrowing construction would not cure the constitutional deficiencies. Rather, it would only make it more clear that the restriction is content based, prohibiting the expression of disfavored views about gender, including expression that "caricature[s] or challenge[s] gender stereotypes."[25]

Defendants also assert that the drag-story-hour restriction merely prevents children from accessing "sexualized content" or content that "sexualizes children." But the drag-story-hour provision does not actually restrict "sexualized content" or content that "sexualizes children." The statute defines "drag story hour" as "an event hosted by a drag queen or drag king who reads children's books and engages in other learning activities with minor children present." H.B. 359 § 1(3). Nothing in that definition restricts the reading of "sexualized content" or content that "sexualizes children." Likewise, nothing in H.B. 359's definitions of drag queen and king restricts sexualized costumes or personas.

The drag-story-hour restriction is plainly over- and underinclusive when judged against this asserted justification. Because it covers expression that is *not* sexualized, it is overinclusive. Dolly Parton, through her

---

[25] In support of this argument, Defendants cite the Merriam-Webster definition of drag, as well as definitions provided by the National Center for Transgender Equality and the website Outcoast. Merriam-Webster defines "drag" as "entertainment in which performers caricature or challenge gender stereotypes (as by dressing in clothing that is stereotypical of another gender, by using exaggeratedly gendered mannerisms, or by combining elements of stereotypically male and female dress) and often wear elaborate or outrageous costumes." *Drag*, Merriam-Webster, https://www.merriam-webster.com/dictionary/drag [https://perma.cc/2ZPL-T56A] (last visited Mar. 5, 2026).

Imagination Library, has committed to giving a free age-appropriate book to every child under the age of five in Montana.[26] But under H.B. 359, she could not visit a library in Montana to read one of those books to children if she wore glamorous clothing and makeup consistent with her famously flamboyant feminine persona. The drag-story-hour restriction is also underinclusive. It places no restrictions on the content of books read during story hour. Thus, a person who is not a "drag king" or "drag queen" could host a story hour and apparently read any content they choose, including sexually explicit material, to young children without violating H.B. 359. Further, the drag-story-hour restriction does not actually prohibit story-hour hosts from dressing in a sexually explicit manner. As discussed, it only bars the host from performing a flamboyant or parodic male or feminine persona using glamorous or exaggerated costumes or makeup. A person dressed in any other manner—including a person wearing highly revealing or sexually explicit clothing—is not restricted from hosting a story hour. Such gross "[u]nderinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Brown*, 564 U.S. at 802.

Second, the drag-story-hour restriction is not narrowly tailored to the asserted interest of protecting minors from indecent speech because it disregards minors' own speech rights and completely overrides parental authority. In *Reno*, the Court held that the statute at issue—which was "enacted

---

[26] *Montana Kicks Off Statewide Expansion of Dolly Parton's Imagination Library*, Imagination Libr. (June 2, 2023), https://imaginationlibrary.com/montana-kicks-off-statewide-expansion-of-dolly-partons-imagination-library/ [https://perma.cc/6ZKN-XTFG] (last visited Mar. 5, 2026).

to protect minors from 'indecent' and 'patently offensive' communications on the Internet"—was not narrowly tailored because "neither the parents' consent—nor even their participation—in the communication would avoid application of the statute." 521 U.S. at 849, 865. Similarly, in *Brown*, the Court rejected California's argument that a statute that prohibited minors from purchasing violent video games aided "parental authority" by "ensur[ing] that parents can decide what games are appropriate" for their minor children. 564 U.S. at 802. The Supreme Court reiterated that "[m]inors are entitled to a significant measure of First Amendment protection, and only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to them." *Id.* at 794 (quoting *Erznoznik*, 422 U.S. at 212–13). Then, while acknowledging that "parents have traditionally had the power to control what their children hear and say," *id.* at 795 n.3, the Court explained that it "doubt[ed] that punishing third parties for conveying protected speech to children *just in case* their parents disapprove of that speech is a proper governmental means of aiding parental authority." *Id.* at 802–03. And, "[w]hile some of the legislation's effect may indeed be in support of what some parents of the restricted children actually want, its entire effect is only in support of what the State thinks parents *ought* to want. This is not the narrow tailoring to 'assisting parents' that restriction of First Amendment rights requires." *Id.* at 804.

Here, as in *Brown* and *Reno*, the drag-story-hour restriction cannot withstand strict scrutiny because there are a number of alternatives that would be both less restrictive of speech and more respectful of parental authority, such as requiring covered schools and libraries to give parents notice of a drag story hour and an opportunity to opt out, as many

routinely do with other events. *See Mahmoud v. Taylor*, 145 S. Ct. 2332, 2362–63 (2025) (holding school board's refusal to provide parents with notice and opportunity to "opt out" from "LGBTQ+-inclusive" story times was not narrowly tailored to compelling interest where board "continue[d] to permit opt outs in a variety of other circumstances" and "[s]everal States across the country permit broad opt outs from discrete aspects of the public school curriculum without widespread consequences"). Defendants assert that "a parent should not be forced to opt-out their child to a school day" or a "trip to the library." There are two problems with this assertion. First, the drag-story-hour restriction does not even allow parents to "opt in" to a drag story hour. Second, Defendants bear the heavy burden of proving that the less restrictive alternative of allowing parents to opt out from a drag story hour would not be as effective, and they have not done so. *See Reno*, 521 U.S. at 878–89.

Third, the drag-story-hour restriction is not narrowly tailored to the asserted governmental interest in shielding children from "indecent" speech because it employs a blunt and draconian instrument to further that interest: heavy civil and criminal sanctions. Courts have often considered whether a statute imposes criminal penalties when assessing whether it is narrowly tailored. *See, e.g.*, *Sable*, 492 U.S. at 128 (rejecting as "quite unpersuasive" the argument that a criminal "ban on indecent commercial telephone communications is justified because nothing less could prevent children from gaining access to such messages"); *Reno*, 521 U.S. at 872 ("The severity of criminal sanctions may well cause speakers to remain silent rather than communicate even arguably unlawful words, ideas, and images."). In *Pacifica*, the Court upheld the FCC's determination that a particular radio broadcast was

actionably indecent. 438 U.S. at 733–34, 741, 751. Even though the Court held that broadcast radio allows content to invade the home and reach minor listeners without parental consent, the Court was careful "to emphasize the narrowness of [its] holding": It upheld the FCC's order because the agency had engaged in a case-specific, contextual adjudication, and it imposed no criminal penalties. *Id.* at 750. Indeed, the Court noted that the FCC was not statutorily authorized to impose criminal penalties. *Id.* at 747 n.25 ("Even the strongest civil penalty at the Commission's command does not include criminal prosecution."). In *Reno*, by contrast, the Court concluded that the CDA, a criminal statute, was not narrowly tailored and underscored that the "increased deterrent effect" of criminal sanctions "poses greater First Amendment concerns than those implicated by . . . civil regulation." 521 U.S. at 872. Defendants bear the burden of showing that a less burdensome alternative to the criminal and civil penalties authorized by H.B. 359 would be ineffective, and they have not made that showing here.

Finally, Defendants argue that the drag-story-hour restriction is narrowly tailored because it applies only at schools or libraries during regular operating hours or school-sanctioned extracurricular activities. But those time-and-place limits do not negate the problems discussed above. If Defendants are trying to argue that the drag-story-hour provision is a time, place, and manner restriction subject only to intermediate scrutiny, that argument fails because the restriction is not content neutral. *Ward*, 491 U.S. at 791–92. And unlike the special context of broadcast media, which is "invasive" to the home and therefore subject to "special justifications for regulation," the drag-story-hour provision restricts live book readings that are limited to the physical confines of libraries and schools. *Reno*, 521 U.S. at 868

(quoting *Sable*, 492 U.S. at 128). In this context, the government bears a heavy burden to show that its restriction is narrowly tailored because "the burden normally falls upon the viewer to 'avoid further bombardment of (his) sensibilities simply by averting (his) eyes'"—or averting his child's eyes. *Erznoznik*, 422 U.S. at 210–11 (quoting *Cohen*, 403 U.S. at 21); *see also supra* Section IV.C. The government has not met that burden.

To the extent Defendants assert a compelling interest in protecting the physical and psychological well-being of minors by shielding them from speech that is not sexually explicit "indecent" speech, as that term has been understood historically, the state must show "a direct causal link" between the restricted speech—here, drag story hours—and harm to children. *Brown*, 564 U.S. at 799 (analyzing restriction of violent speech); *see also Alvarez*, 567 U.S. at 725 ("There must be a direct causal link between the restriction imposed and the injury to be prevented.").

The standard for demonstrating a direct causal link is a demanding one. In *Brown*, California sought to support its restriction on violent video games by citing social-science studies and expert testimony "purport[ing] to show a connection between violent video games and harmful effects on children." 564 U.S. at 800. The Court did not find this evidence compelling. *Id.* It firmly rejected California's argument that "the legislature c[ould] make a predictive judgment that such a link exists, based on competing psychological studies." *Id.* at 799. Because the state "bears the risk of uncertainty," the Court held that "ambiguous proof will not suffice." *Id.* at 799–800. The Court determined that the studies "show at best some correlation between exposure to violent entertainment and miniscule real-world effects" and concluded that this correlation was insufficient.

*Id.* at 800. Without unambiguous evidence of a causal link, the Court rejected California's assertion that violent video games harmed minors. *Id.* at 799–801.

Here, there is *no* evidence of a causal link between drag story hours and harm to the physical and psychological well-being of children. To show that drag story hours harm children, Defendants rely only on testimony from proponents of H.B. 359 at a legislative hearing on the bill. Twenty-eight proponents testified in favor of H.B. 359, including five organizations. [27] The bill's proponents provided anecdotal descriptions of drag performances and expressed their personal opinions that such performances are harmful to children. *See generally Prohibit Minors from Attending Drag Shows: Hearing on H.B. 359 Before the S. Judiciary Comm.*, 2023 Leg., 68th Sess. (Mont. 2023). None of the proponents cited *any* study that would qualify as causation evidence under the *Brown* standard, and no one who testified was a qualified medical or psychological expert. [28] The district court found that one proponent advanced a claim of harm that was demonstrably false. Comparing Defendants' evidence with the evidence the Supreme Court rejected in *Brown*, it is clear that Defendants have fallen far short of meeting their burden to show a causal link between drag story hours and minors' well-being. The anecdotal opinion testimony of bill proponents is neither unambiguous nor "compelling" evidence of causation. *Brown*, 564 U.S. at 800. Because Defendants have failed to

---

[27] Eighty-seven opponents testified against the bill, including seventeen organizations, two of which were medical providers.

[28] While some proponents identified themselves as members of the medical profession, they did not testify as experts or cite medical or scientific studies to support their testimony.

show a causal link between the restriction they seek to impose and the injury they seek to prevent, they have not met their burden with respect to their asserted interest in protecting minors' physical and psychological well-being.

### b. State subsidy interest

Defendants assert that the drag-story-hour restriction furthers the government's interest in not subsidizing "conduct" it considers "indecent and potentially harmful to minors." Relying on *Rust v. Sullivan*, 500 U.S. 173 (1991), Defendants argue that Montana has a legitimate interest in not subsidizing conduct it considers indecent and potentially harmful to minors, and they assert that H.B. 359 "simply den[ies] state subsidies for the covered conduct." Defendants' reliance on the *Rust* line of cases is misplaced.

In *Rust*, the challenged federal law applied only to clinics that voluntarily accepted Title X grant funding for particular projects and prohibited the clinics from engaging in abortion advocacy only when they were carrying out Title X-funded projects. *Rust*, 500 U.S. at 179. The clinics remained free to engage in abortion advocacy through programs "separate and independent from the project that receives Title X funds." *Id.* at 196. As the Supreme Court has explained, *Rust* and its progeny stand for the narrow proposition that the government can "selectively fund certain programs to address an issue of public concern, without funding alternative ways of addressing the same problem," and in doing so, it may set "conditions that define the limits of the government spending program." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214–15, 217 (2013).

The government may not, however, "seek to leverage funding to regulate speech outside the contours of the program itself." *Id.* at 214–15. For example, in *Agency for*

*International Development*, the Court held that a law requiring organizations that receive federal funding to explicitly oppose prostitution and sex trafficking violated the First Amendment because it "compel[ed] . . . the affirmation of a belief that by its nature cannot be confined within the scope of the Government program." *Id.* at 208, 221. For another example, in *F.C.C. v. League of Women Voters of California*, the challenged statute forbade broadcast stations that received a grant from the Corporation for Public Broadcasting (CPB) from engaging in editorializing, and the Government (much like Defendants here) argued "that by prohibiting noncommercial educational stations that receive CPB grants from editorializing, Congress has, in the proper exercise of its spending power, simply determined that it 'will not subsidize public broadcasting station editorials.'" 468 U.S. 364, 399 (1984). The Court rejected that argument because "a noncommercial educational station that receives only 1% of its overall income from CPB grants is barred absolutely from all editorializing," "such a station is not able to segregate its activities according to the source of its funding," "[t]he station has no way of limiting the use of its federal funds to all noneditorializing activities, and, more importantly, it is barred from using even wholly private funds to finance its editorial activity." *Id.* at 400. Consequently, the Government's interest in not subsidizing the targeted speech was "not served in a sufficiently limited manner" to justify the substantial abridgement of the First Amendment freedom of speech. *Id.* at 402.

Here, as in *Agency for International Development* and *League of Women Voters*, Montana is trying to leverage government funding to regulate speech far beyond the confines of any government-funded program. Indeed, the drag-story-hour restriction is not tied to any particular state-

funded program. A school or library that receives "any form of funding from the state," in any amount, is prohibited from allowing a drag story hour to occur on its premises during its regular operating hours or any school-sanctioned extracurricular activity. H.B. 359 § 3(2). Here, as in *League of Women Voters*, the school or library has no way of limiting the use of government funds and it is barred from using even wholly private funds to finance a drag story hour. Consequently, the drag-story-hour restriction is not narrowly tailored to the state's interest in denying state subsidies for the targeted expression.

### B. Sexually Oriented Performances

We turn next to the H.B. 359 provisions that restrict "sexually oriented performance[s]," namely, Section 2 and all subsections of Section 3. The same statutory definition of "sexually oriented performance" applies to all these restrictions: Under H.B. 359 § 1(10), a "sexually oriented performance" is "a performance that, regardless of whether performed for consideration, is intended to appeal to a prurient interest in sex and features: (a) the purposeful exposure, whether complete or partial, of: (i) a human genital, the pubic region, the human buttocks, or a female breast, if the breast is exposed below a point immediately above the top of the areola; or (ii) prosthetic genitalia, breasts, or buttocks; (b) stripping; or (c) sexual conduct." H.B. 359 § 1(11) defines "stripping" as the "removal or simulated removal of clothing in a sexual manner for the entertainment of one or more individuals."

H.B. 359 § 1(8) also defines "sexually oriented" as "any simulation of sexual activity, stripping, salacious dancing, any lewd or lascivious depiction or description of human genitals or of sexual conduct as defined in 45-5-625." H.B.

359 § 1(8). The cross-referenced definition in Mont. Code. Ann. § 45-5-625 defines "sexual conduct" as "(i) actual or simulated: (A) sexual intercourse, whether between persons of the same or opposite sex, as defined in 1-1-201; (B) penetration of the vagina or rectum by any object, except when done as part of a recognized medical procedure; (C) bestiality; (D) masturbation; (E) sadomasochistic abuse; (F) lewd exhibition of the genitals, breasts, pubic or rectal area, or other intimate parts of any person; or (G) defecation or urination for the purpose of the sexual stimulation of the viewer; or (ii) depiction of a child in the nude or in a state of partial undress with the purpose to abuse, humiliate, harass, or degrade the child or to arouse or gratify the person's own sexual response or desire or the sexual response or desire of any person." Mont. Code. Ann. § 45-5-625(5)(b). The cross-referenced code section also defines "simulated" as "any depicting of the genitals or pubic or rectal area that gives the appearance of sexual conduct or incipient sexual conduct." Mont. Code. Ann. § 45-5-625(5)(c).

Defendants represent that H.B. 359 also incorporates the existing statutory definition of "performance," which includes movies but excludes those that are MPAA-rated G, PG, PG-13, or R. *See* Mont. Code. Ann. § 45-8-205(6) (defining "performance" as "any motion picture, film, or videotape (except a motion picture or videotape rated G, PG, PG-13, or R by the [MPAA]); phonograph record; compact disk; tape recording; preview; trailer; play; show; skit; dance; or other exhibition played or performed before an audience of one or more, with or without consideration"). Defendants further represent that H.B. 359 incorporates the existing statutory definition of "prurient interest in sex," which is defined as "a shameful or morbid interest in sex or excretion." Mont. Code Ann. § 45-8-205(8).

H.B. 359 § 1(9) defines a "sexually oriented business" as "a nightclub, bar, restaurant, or similar commercial enterprise that: (a) provides for an audience of two or more individuals: (i) live nude entertainment or live nude performances; or (ii) a sexually oriented performance; and (b) authorizes on-premises consumption of alcoholic beverages."

### 1. The sexually-oriented-performance provisions are content-based restrictions on purely expressive activity.

As above, whether we apply intermediate or strict scrutiny turns on two disputed issues: (1) whether a "sexually oriented performance," as defined by H.B. 359, is purely expressive activity or expressive conduct, and (2) whether the "sexually oriented performance" restrictions are content based or content neutral.

As defined by H.B. 359, sexually oriented performances are purely expressive activities. Montana's statutory definition of "performance" encompasses various purely expressive activities, including skits, dances, and plays "performed before an audience of one or more." Mont. Code. Ann. § 45-8-205(6). Performances in front of an audience are purely expressive activities. *See, e.g.*, *Berger v. City of Seattle*, 569 F.3d 1029, 1034–35 (9th Cir. 2009) (street performances are expressive activity); *Ward*, 491 U.S. at 790–01 (musical performances and speeches at a public bandshell are expressive activity); *Green*, 52 F.4th at 780 ("theatrical productions that 'frequently mix[] speech with live action or conduct'" are expressive activities (quoting *Conrad*, 420 U.S. at 558) (alteration in original)). "Performance" also includes "any motion picture, film, or videotape," which are also "speech" under the First

Amendment. *See Project Veritas*, 125 F.4th at 942–43, 945–46.

Defendants argue that the sexually-oriented-performance provisions regulate conduct, not expression, because they restrict only performances that are intended to appeal to a prurient interest in sex and feature an activity that could be characterized as merely expressive conduct, such as exposure of a body part. Defendants' approach to determining whether the restricted activity is speech or conduct is incorrect. We do not disaggregate the restricted activity and then focus only on the conduct components. *See supra* Section V.A.1; *Anderson*, 621 F.3d at 1062; *Wasden*, 878 F.3d at 1203; *Project Veritas*, 125 F.4th at 945–46. Rather, we look at the restricted activity as a whole. *See Erznoznik*, 422 U.S. at 211 n.7 (applying the *Miller* obscenity test and concluding that "[s]cenes of nudity in a movie, like pictures of nude persons in a book, must be considered as part of the whole work"). Viewed as a whole, sexually oriented performances, as broadly defined by H.B. 359, are speech, not conduct.

Further, sexually oriented speech is still speech. *See Playboy*, 529 U.S. 803. In *Playboy*, the challenged law required cable television operators to scramble or limit the transmission of channels "primarily dedicated to sexually-oriented programming." *Id.* at 806. The Court held that this programming was "protected speech" and that the challenged law was "a content-based speech restriction" subject to strict scrutiny. *Id.* at 811–13. The sexually oriented performances restricted by H.B. 359 are not meaningfully distinguishable from the sexually explicit programming at issue in *Playboy*.

Our conclusion is confirmed by comparing H.B. 359's sexually-oriented-performance restrictions to laws that are correctly characterized as regulations of conduct, not speech. For example, in *City of Erie*, the Supreme Court held that a public nudity law was a generally applicable conduct regulation because it "does not target nudity that contains an erotic message; rather, it bans all public nudity, regardless of whether that nudity is accompanied by expressive activity." 529 U.S. at 290, *see also Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 565–66 (1991). Because the public nudity law was aimed generally at the conduct of being nude and prohibited nudity regardless of whether it was part of a performance, the burden on expression was incidental. *See City of Erie*, 529 U.S. at 301 (explaining the public nudity ordinance "regulates conduct, and any incidental impact on the expressive element of nude dancing is *de minimis*"). Unlike the public nudity law at issue in *City of Erie*, H.B. 359's sexually-oriented-performance provisions do not generally restrict sexually explicit conduct in public, whether part of a "performance" or not. Rather, H.B. 359's restrictions are aimed only at "performances." Because H.B. 359's restriction on expression is direct, not merely incidental, it is not a generally applicable conduct regulation subject to the *O'Brien* test.

The sexually-oriented-performance restrictions are also content based. Here, as in *Playboy*, it is undisputed that the overriding justification for H.B. 359's sexually-oriented-performance restrictions is "concern for the effect of the subject matter on young viewers." *Playboy*, 529 U.S. at 811.

This is the essence of a content-based speech restriction. *See id.* at 811–12.**[29]**

Defendants nonetheless argue that the sexually-oriented-performance restrictions are content neutral because they are aimed at the secondary effects of the disfavored speech. But, as explained above, Defendants misunderstand the secondary-effects doctrine. The stated purpose of these restrictions is to prevent minors from viewing performances the government considers "indecent," and the effects of a performance on its viewers are its "primary" effects, not "secondary." *Reno*, 521 U.S. at 868.

Because the sexually-oriented-performance restrictions regulate protected expressive activity based on content, strict scrutiny applies, and the burden shifts to Defendants to show that the restrictions are narrowly tailored to further a compelling interest.

### 2. The sexually-oriented-performance restrictions are not narrowly tailored to further the asserted state interests.

Defendants assert that the sexually-oriented-performance restrictions further the same governmental interests as the drag-story-hour restriction. *See supra* Section V.A.2. And here, as above, we begin by assuming that the state has a legitimate and compelling interest in protecting the physical and psychological well-being of minors by shielding them from sexually explicit speech that is indecent

---

[29] As discussed above, sexually explicit content that is not obscene for minors or adults remains fully protected by the First Amendment, and Defendants do not argue that H.B. 359 limits "sexually oriented performances" to content that qualifies as unprotected "obscenity for minors." *See supra* Section IV.C.

but not obscene (for minors or adults), and we consider whether Defendants have met their heavy burden to show that the sexually-oriented-performance restrictions are narrowly tailored to that interest.

Plaintiffs contend that H.B. 359 defines "sexually oriented performance" so broadly that it reaches content that is not sexually explicit. Defendants respond by noting that H.B. 359 covers only performances that are "intended to appeal to a prurient interest in sex," H.B. 359 § 1(10), which is statutorily defined as a "shameful or morbid interest in sex or excretion," Mont. Code Ann. § 45-8-205(8). We do not need to resolve this interpretive dispute because, even assuming that H.B. 359's definition of "sexually oriented performance" reaches only sexually explicit content, the restrictions still do not survive strict scrutiny.

*Reno* provides substantial guidance. Recall that in *Reno*, the plaintiffs facially challenged two provisions of the Communications Decency Act as violative of the First Amendment, the "indecent transmission" provision and the "patently offensive display" provision, which essentially prohibited the transmission of "indecent" or "patently offensive" materials to any recipient under 18 years of age through the internet. 521 U.S. at 858–59. The CDA did not define "indecent," *id.* at 865, but it defined "patently offensive" communication as that which "in context, depicts or describes, in terms patently offensive as measured by contemporary community standards, sexual or excretory activities or organs," *id.* at 860, and the Court assumed that "indecent" and "patently offensive" were synonymous, *id.* at 873. The Court concluded that the challenged provisions were "content-based" restrictions of protected speech "subject to the most stringent review," *id.* at 868, and it ultimately held that the provisions were facially invalid

because they were not narrowly tailored to the government's interest in protecting minors, *id.* at 878–79. The Court identified several ways in which the CDA was broader than the restriction approved in *Ginsberg* and the order upheld in *Pacifica*, *id.* at 864-67, as well as several additional reasons for concluding that the CDA's restrictions were not narrowly tailored, *id.* at 868–82. Much of what the Court said about the CDA is equally applicable here.

First, the statute upheld in *Ginsberg* did not bar parents from buying their children magazines that could be considered obscene for minors, whereas the CDA had no exception for parental consent. *Id.* at 865–66 (noting that "neither the parents' consent—nor even their participation— in the communication would avoid the application of the [CDA]"). Like the CDA, H.B. 359's restrictions apply regardless of parental approval. *See* H.B. 359 §§ 2, 3; Mont. Code. Ann. §§ 45-8-118, 20-1-207. Additionally, in *Reno*, the Court noted there were alternatives to the CDA's prohibitions on transmissions to minors that were both less restrictive of speech rights and more respectful of parental authority, such as "requiring that indecent material be 'tagged' in a way that facilitates parental control of material coming into their homes." 521 U.S. at 879. The same is true in this case: For example, instead of prohibiting a business from permitting a minor to enter its premises during a sexually oriented performance regardless of parental consent, as H.B. 359 § 2 does, the state could require that the minor be accompanied by a parent or guardian. *See also supra* Section V.A.2.a (discussing notice and opt-out alternative).

Second, the *Ginsberg* statute "applied only to commercial transactions, whereas the CDA contain[ed] no such limitation." *Reno*, 521 U.S. at 865 (citation omitted). In

explaining that "[t]he breadth of the CDA's coverage [was] wholly unprecedented," the Court noted, "[u]nlike the regulations upheld in *Ginsberg* and *Pacifica*, the scope of the CDA is not limited to commercial speech or commercial entities. Its open-ended prohibitions embrace all nonprofit entities and individuals posting indecent messages or displaying them on their own computers in the presence of minors." *Id.* at 877. Like the CDA, H.B. 359's scope is not limited to commercial transactions, commercial speech, or commercial entities; rather, the Section 3 restrictions apply equally to nonprofit entities and individuals. *See* H.B. 359 § 3.

Third, the *Ginsberg* statute "cabined its definition of material that is harmful to minors with the requirement that it be 'utterly without redeeming social importance for minors.'" *Reno*, 521 U.S. at 865 (citation omitted). In contrast, the CDA failed "to provide . . . any definition of the term 'indecent' as used in § 223(a)(1) and, importantly, omit[ted] any requirement that the 'patently offensive' material covered by § 223(d) lack serious literary, artistic, political, or scientific value." *Id.* The CDA's lack of an exception for materials with serious literary, artistic, political, or scientific value, a prong of the *Miller* obscenity test, led the Court to conclude that its restrictions were not narrowly tailored. *See id.* at 873–74 (observing that the "societal value" requirement "allows appellate courts to impose some limitations and regularity on the definition by setting, as a matter of law, a national floor for socially redeeming value," and concluding that "the CDA lacks the precision that the First Amendment requires when a statute regulates the content of speech"). Like the CDA, H.B. 359 makes no exception for performances with serious literary, artistic, political, or scientific value. *See* H.B. 359 § 1.

Fourth, the statute upheld in *Ginsberg* defined a minor as a person under the age of 17, whereas the CDA defined a minor as an individual under 18. *Reno*, 521 U.S. at 864–65. *See also id.* at 865–66, 878 (explaining that, because the *Ginsberg* statute defined "minor" as under age 17 instead of 18, it was narrower than the CDA in an "important respect"). Like the CDA, H.B. 359 applies to all minors under the age of 18. *See* H.B. 359 §§ 2(1), 3(3)(a).

Fifth, the FCC order upheld in *Pacifica* "was not punitive," *Reno*, 521 U.S. at 867, whereas "the CDA [was] a criminal statute." *Id.* at 872 ("In addition to the opprobrium and stigma of a criminal conviction, the CDA threaten[ed] violators with penalties including up to two years in prison for each act of violation."). The Court in *Reno* viewed the availability of criminal sanctions under the CDA to be a "significant" distinction, *id.* at 867: For example, the Court repeatedly cited the CDA's criminal penalties as a reason for concluding that the CDA's restrictions were not "narrowly tailored," *id.* at 870–72. *See also id.* at 867 (noting the Court in *Pacifica* "expressly refused to decide . . . whether the indecent broadcast would justify a criminal prosecution" (citation and internal quotation marks omitted)); *id.* at 878 (noting that "[u]nder the CDA, a parent allowing her 17-year-old to use the family computer to obtain information on the Internet that she, in her parental judgment, deems appropriate could face a lengthy prison term"); *id.* at 882 (rejecting defense of CDA in part because "the risk of criminal sanctions 'hovers over each content provider, like the proverbial sword of Damocles'" (citation omitted)). Much like the CDA, H.B. 359 imposes criminal sanctions that, in addition to the "opprobrium" of a criminal conviction, *id.* at 872, include imprisonment for up to 30 days plus a criminal fine of $5,000, for a first offense. *See*

H.B. 359 § 3; Mont. Code Ann. §§ 20-7-135, 20-1-207. H.B. 359 also imposes significant civil liabilities, including actual damages, statutory damages of $5,000, and, when applicable, loss of business and professional licenses. *See* H.B. 359 §§ 2–4; Mont. Code Ann. §§ 45-8-118, 20-7-135, 27-1-521.

Sixth, the FCC's order in *Pacifica* "applied to a medium," radio broadcasting, "which as a matter of history had received the most limited First Amendment protection, in large part because warnings could not adequately protect the listener from unexpected program content," whereas the CDA applied to a medium, the internet, which "ha[d] no comparable history." *Reno*, 521 U.S. at 867 (citation and internal quotation marks omitted). *See also id.* at 868 (noting that the "invasive" nature of broadcast media provides a "special justification[] for regulation" (quoting *Sable*, 492 U.S. at 128)). Like the CDA, H.B. 359 restricts speech in a medium that is less invasive than broadcast radio. Indeed, H.B. 359 restricts a medium that is even less invasive than internet communications: H.B. 359 restricts performances only in spaces outside the home: nightclubs, bars, and theaters that serve alcohol; schools and libraries; any public property where a minor is present; and in any location owned by an entity that receives any form of state funding. *See* H.B. §§ 1(9), 2(1), 3.

Seventh, the Court in *Reno* found that there were "many ambiguities concerning the scope of [the CDA's] coverage," and that "[t]his uncertainty undermine[d] the likelihood that the CDA [had] been carefully tailored to the congressional goal of protecting minors from potentially harmful materials." 521 U.S. at 870–71. The Court further explained that "[t]he vagueness of the CDA [was] a matter of special concern for two reasons." *Id.* at 871. Because the CDA was

a "content-based regulation of speech," it would have an "obvious chilling effect on free speech." *Id.* at 871–72. And, because the CDA was a criminal statute, "[t]he severity of criminal sanctions may well cause speakers to remain silent rather than communicate even arguably unlawful words, ideas, and images." *Id.* at 872. Considering these features together with "the vague contours of the coverage of the statute," the Court concluded that the CDA "unquestionably silences some speakers whose messages would be entitled to constitutional protection," and that this "burden on protected speech cannot be justified if it could be avoided by a more carefully drafted statute." *Id.* at 874. Like the CDA, H.B. 359 imposes criminal penalties and has an ambiguous scope of coverage, as discussed further below.

Finally, the Court in *Reno* concluded that the CDA was not narrowly tailored to the government's interest in "deny[ing] minors access to potentially harmful speech," because "the CDA effectively suppresse[d] a large amount of speech that adults have a constitutional right to receive and to address to one another." 521 U.S. at 874–76. Like the CDA, H.B. 359's sexually-oriented-performance restrictions are not narrowly tailored to the government's interest in denying minors access to potentially harmful speech because they, too, effectively suppress a large amount of expression that adults have a constitutional right to engage in and view. Indeed, two of H.B. 359's provisions prohibit sexually oriented performances even if no minor is present. *See* H.B. 359 § 3(1), (3)(b).

Plaintiffs also argue that the "sexually oriented performance" definition is vague and that this vagueness contributes to the restrictions' lack of narrow tailoring. "Regardless of whether [a statute] is so vague that it violates the Fifth Amendment," we may consider ambiguities in its

scope when determining whether it is narrowly tailored enough to survive strict scrutiny. *Reno*, 521 U.S. at 870. Plaintiffs primarily argue that the sexually-oriented-performance restrictions are ambiguous because the relationship between H.B. 359's definition of "sexually oriented" and its definition of "sexually oriented performance" is unclear. [30] H.B. 359 defines "sexually oriented performance" as "a performance that, regardless of whether performed for consideration, is intended to appeal to a prurient interest in sex" and features the purposeful exposure (complete or partial) of various body parts, including certain "prosthetic" body parts; stripping; or sexual conduct. *See* H.B. 359 § 1(10)(a)-(c). H.B. 359 defines "sexually oriented" as "any simulation" of an overlapping but different list of activities, including "salacious dancing." H.B. 359 § 1(8). Because "sexually oriented" is an adjective that modifies "performance," but H.B. 359 defines "sexually oriented" as a noun (any simulation of various activities), it is difficult to reconcile these definitions. Further, because "sexually oriented" does not include any requirement of intent to appeal to a prurient interest in sex, it is unclear whether a performance that qualifies as "sexually oriented" under Section 1(8) also qualifies as a "sexually oriented performance" under Section 1(10), regardless of whether it is intended to appeal to a prurient interest in sex.

Defendants agree with Plaintiffs that the "sexually oriented" definition affects the "sexually oriented performance" definition, but Defendants provide no

---

[30] Although Plaintiffs contend that H.B. 359's restrictions are ambiguous in multiple respects, because addressing all the asserted ambiguities is unnecessary to our decision, we decline to do so at this preliminary stage.

guidance about how to reconcile the definitions. Rather, they only conclusorily assert that "'sexually oriented performance' is clearly defined." Because Defendants provide no guidance, we agree with Plaintiffs that ambiguities in the definitions of "sexually oriented performance" and "sexually oriented" contribute to the lack of narrow tailoring.

Further, even assuming that a performance does not qualify as a "sexually oriented performance" unless the "prurient interest" element is met, the scope of the restriction remains unclear. H.B. 359 does not state that the entire performance must be intended to appeal to a prurient interest. Because H.B. 359 is silent on this issue, the definition of "sexually oriented performance" could reach performances that include one scene that is intended to appeal to a prurient interest in sex. Further, H.B. 359 does not tell us whether the intent standard is objective, subjective, or both. If the standard is objective, then the subjective intent of anyone involved in the performance is irrelevant. If the standard is subjective, H.B. 359 does not specify whose intent matters. Is it the author of a play or movie? A performer? The director? The owner of the venue at which the performance takes place?

We recognize that the first element of the *Miller* "obscenity" standard also refers to "prurient interest," 413 U.S. at 24, and that the Supreme Court has held that the obscenity standard is not unconstitutionally vague, *Ward v. Illinois*, 431 U.S. 767 (1977). But that does not mean H.B. 359's definition of sexually oriented performance is not unconstitutionally vague. *See Reno*, 521 U.S. at 873 (rejecting government's argument that, because the CDA's "'patently offensive standard' . . . is one part of the three-prong *Miller* test, . . . [the CDA] cannot be

unconstitutionally vague"). The "prurient interest" prong of the obscenity standard is only one of three required prongs. *See Miller*, 413 U.S. at 24. As the Court explained in *Reno*, each of *Miller*'s prongs "critically limits the uncertain sweep of the obscenity definition." 521 U.S. at 873. Further, the second requirement—that the material "lack serious literary, artistic, political, or scientific value"—"is particularly important because, unlike the 'patently offensive' and 'prurient interest' criteria, it is not judged by contemporary community standards." *Id.* (internal quotation marks omitted). "This 'societal value' requirement," absent in H.B. 359, "allows appellate courts to impose some limitations and regularity on the definition by setting, as a matter of law, a national floor for socially redeeming value." *Id.*

Further, *Miller*'s "prurient interest" prong contains two limiting factors that H.B. 359's definition of "sexually oriented performance" omits. Content does not satisfy *Miller*'s prurient-interest prong unless the work "as a whole" appeals to the prurient interest—and does so from the perspective of "the average person, applying contemporary community standards." *Id.*; *cf.* H.B. 359 § 1(10) (defining "sexually oriented performance"). The Supreme Court incorporated the use of community standards in formulating the *Miller* test because "they furnish a valuable First Amendment safeguard." *Ashcroft v. ACLU*, 535 U.S. 564, 575 (2002). "[T]he primary concern . . . is to be certain that . . . [material] will be judged by its impact on an average person, rather than a particularly susceptible or sensitive person—or indeed a totally insensitive one." *Miller*, 413 U.S. at 33 (internal quotation marks omitted); *see also Hamling v. United States*, 418 U.S. 87, 107 (1974) (emphasizing that the principal purpose of the community standards criterion "is to assure that the material is judged

neither on the basis of each juror's personal opinion, nor by its effect on a particularly sensitive or insensitive person or group"). Because H.B. 359 omits several critical limitations that are part of the *Miller* obscenity test, H.B. 359's inclusion of a "prurient interest" intent requirement does not, in itself, adequately clarify or narrow the scope of the sexually-oriented-performance restrictions.

As noted in our discussion of Article III standing, Plaintiffs also argue that the sexually-oriented-performance restrictions are not narrowly tailored because they restrict some movies that are rated PG-13 by the MPAA. *See supra* Section II.A.1. For example, Plaintiffs contend that the PG-13 film *Asteroid City* qualifies as a "sexually oriented performance" because one scene depicts the actress Scarlett Johansson taking off her clothes and getting into a bathtub, and that arguably qualifies as "stripping" under H.B. 359 § 1(11). Defendants do not dispute that the content of this scene would place *Asteroid City* within the definition of "sexually oriented performance." Rather, Defendants argue that the film would be exempt from the sexually-oriented-performance restrictions because the statutory definition of "performance" excludes all movies rated G, PG, PG-13, or R by the MPAA. *See* Mont. Code Ann. § 45-8-205(6). While this exemption may mean that movie theaters that show only PG-13 or R-rated movies are safe from prosecution under H.B. 359, the exemption supports Plaintiffs' argument that the statute is over- and underinclusive and therefore not narrowly tailored. A live theater show with a scene similar to the scene from *Asteroid City* would be prohibited as a "sexually oriented performance" under H.B. 359 because the MPAA does not rate theater shows. If such content is indecent for minors, then the exemption for PG-13 rated movies       makes       the       sexually-oriented-performance

restrictions underinclusive. If the content is appropriate for minors, then the statute's coverage of the theater show means the restrictions are not narrowly tailored to the asserted interest in shielding minors from indecent speech.

Defendants argue that the sexually-oriented-performance restrictions are narrowly tailored because they "only apply if a minor is present or at a state-funded school or library during regular operating hours." Defendants' assertion, however, is incorrect as a matter of fact. H.B. 359 § 3(3)(b) expressly prohibits sexually oriented performances "in a location owned by an entity that receives any form of funding from the state," regardless of the time of day or whether a minor is present. And in any event, the limitations cited by Defendants do not cure the problems discussed above.

In sum, even assuming that the state has a legitimate interest in shielding children from sexually explicit speech that is indecent but not obscene (for minors or adults), and that all "sexually oriented performances" are sexually explicit, "indecent" speech, H.B. 359's sexually-oriented-performance restrictions are not narrowly tailored to the asserted state interest and therefore fail strict scrutiny.[31]

\*  \*  \*

H.B. 359's drag-story-hour and sexually-oriented-performance provisions restrict protected speech based on content. As such, they are subject to strict scrutiny. Defendants have not met their heavy burden to show that H.B. 359 is narrowly tailored to further a compelling

---

[31] The sexually-oriented-performance restrictions are not narrowly tailored to the state's asserted interest in declining to subsidize certain speech for the same reasons discussed above. *See supra* Section V.A.2.b.

governmental interest.[32] Therefore, Plaintiffs are likely to succeed on the merits of their facial First Amendment claim.[33]

## VI.  OTHER *WINTER* FACTORS

The district court did not abuse its discretion in concluding that the remaining *Winter* factors weigh in favor of a preliminary injunction. Once "a party has established likelihood of success on the merits of a constitutional

---

[32] Defendants argue that the district court erred "in not considering whether a limiting construction was possible before declaring HB 359 overbroad." The first problem with this argument is that the district court expressly declined Defendants' invitation to apply a First Amendment overbreadth analysis to H.B. 359. Instead, the district court properly analyzed the statute as a content-based speech restriction and applied strict scrutiny. Although the district court addressed what it dubbed a "vagueness/overbreadth facial challenge," that was a Fifth Amendment vagueness analysis, not a First Amendment analysis. The second problem with this argument is that while Defendants correctly note that, "before invalidating a state statute on its face, a federal court must determine whether the statute is readily susceptible to a narrowing construction by the state courts," *Cal. Tchrs. Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1147 (9th Cir. 2001) (internal quotation marks omitted), "we are 'without power to adopt a narrowing construction of a state statute unless such a construction is reasonable and readily apparent,'" *Stenberg v. Carhart*, 530 U.S. 914, 944 (2000) (quoting *Boos*, 485 U.S. at 330). Here, Defendants do not identify any readily apparent limiting construction that the district court failed to consider. We decline to speculate as to what, if any, narrowing construction should be applied in the first instance.

[33] The district court also granted preliminary injunctive relief on two alternative grounds: it found that H.B. 359 is a viewpoint-based speech restriction and that it is void for vagueness under the Fifth Amendment. Because it is unnecessary to reach these alternative grounds in order to decide this appeal, we decline to do so. *See All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1139 (9th Cir. 2011).

claim—particularly one involving a fundamental right—the remaining *Winter* factors favor enjoining the likely unconstitutional law." *Junior Sports Mags. Inc. v. Bonta*, 80 F.4th 1109, 1120 (9th Cir. 2023). The second *Winter* factor is irreparable harm: "A 'colorable First Amendment claim' is 'irreparable injury sufficient to merit the grant of relief.'" *Doe*, 772 F.3d at 583 (quoting *Warsoldier v. Woodford*, 418 F.3d 989, 1001 (9th Cir. 2005)). The remaining factors—the balance of equities and the public interest—merge when the government is a party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). "[T]he balance of equities favors [Plaintiffs], whose First Amendment rights are being chilled. This is especially so because the Act under scrutiny imposes criminal sanctions." *Doe*, 772 F.3d at 583. And, because "it is always in the public interest to prevent the violation of a party's constitutional rights," this factor likewise favors Plaintiffs. *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023) (citation and internal quotation marks omitted).

## VII.  CONCLUSION

The district court did not abuse its discretion in granting Plaintiffs' motion to preliminarily enjoin Defendants from instituting, maintaining, or prosecuting any enforcement proceedings under H.B. 359. The district court's order is **AFFIRMED.**

Rawlinson, Circuit Judge, concurring in the result:

I concur in the result because I acknowledge and respect the limited nature of our review of a preliminary injunction issued by a district court.  *See Does 1-5 v. Chandler*, 83 F.3d 1150, 1152 (9th Cir. 1996) ("A district court's order regarding preliminary injunctive relief is subject to limited review. . . ."); *see also Doe v. Kelly*, 878 F.3d 710, 719 (9th Cir. 2017) (discussing that when reviewing a preliminary injunction:  "If the district court identifies the correct legal standard, it will not be reversed simply because the appellate court would have arrived at a different result if it had applied the law to the facts of the case.") (citation and internal quotation marks omitted).  The reason for this required restraint is obvious—a preliminary injunction is intended to maintain the status quo rather than to decide the merits of the case.  *See Benisek v. Lamone*, 585 U.S. 155, 161 (2018) ("[T]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held. . . .") (citation and internal quotation marks omitted); *see also Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1024 (9th Cir. 2016) ("The purpose of a preliminary injunction is to preserve the status quo ante litem pending a determination of the action on the merits.  Status quo ante litem refers to the last uncontested status which preceded the pending controversy.") (citations and internal quotation marks omitted).

Unrestrained by our limited review, I would have opted to delve more deeply into the portions of the legislation designed to shield children from vulgarities.  The United States Supreme Court has expressed sensitivity toward the protection of children in this context.  In *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675 (1986), the Supreme Court

decided a case involving a high school student who delivered a nominating speech for a classmate who was running for office. *See id.* at 677. The Supreme Court noted that "many . . . 14-year-olds" were present when the speech was delivered. *See id.* During the speech, the student "referred to his candidate in terms of an elaborate, graphic, and explicit sexual metaphor." *Id.* at 677-78. The student was subsequently disciplined for violating a disciplinary rule that prohibited "the use of obscene, profane language or gestures." *Id.* at 678. The hearing officer who heard the student's review of the discipline imposed concluded that the speech presented by the student was "indecent, lewd, and offensive to the modesty and decency of most of the students and faculty in attendance." *Id.* at 678-79. The student brought an action in federal court alleging violation of his First Amendment right to freedom of speech. *See id.* at 679. The district court held that the school violated the student's First Amendment right to free speech. The district court also determined that the school's rule was "unconstitutionally vague and overbroad." *Id.* On appeal, this court affirmed the district court's decision. *See id.* We "rejected the School District's argument that it had an interest in protecting an essentially captive audience of minors from lewd and indecent language." *Id.* at 680. After granting certiorari, the Supreme Court reversed this court's decision. *See id.*

The Supreme Court made clear in its opinion that the fact that children were in the audience mattered greatly to its analysis. The Supreme Court noted that speech that might be protected when uttered before adults would not be similarly protected when uttered before children. *See id.* at 682 ("It does not follow . . . that simply because the use of an offensive form of expression may not be prohibited to adults, . . . the same latitude must be permitted to

children . . .").  The Supreme Court noted that the speech "could well be seriously damaging to its less mature audience, many of whom were only 14 years old."  *Id.* at 683.    The Supreme Court also referenced its prior acknowledgment that a school board "has the authority to remove books that are vulgar."  *Id.* at 684.  The Supreme Court remarked on the "interest in protecting minors from exposure to vulgar and offensive spoken language."  *Id.*  To illustrate this point, the Supreme Court discussed its decision in *FCC v. Pacifica Foundation*, 438 U.S. 726 (1978).  In that case, the Supreme Court "dealt with the power of the Federal Communications Commission to regulate a radio broadcast described as indecent but not obscene."   *Id.* (internal quotation marks omitted).    The Court described the broadcast as including "certain words [that] depicted sexual and excretory activities in a patently offensive manner," with the words being "broadcast at a time when children were undoubtedly in the audience."   *Id.* at 684-85 (internal quotation marks omitted).  The Supreme Court observed that a plurality of the Court in that case "reject[ed] the radio station's assertion of a First Amendment right to broadcast vulgarity."   *Id.* at 685.    The Court essentially equated vulgarity with obscenity.  *See id.* ("These words offend for the same reasons that obscenity offends. . . .")  Following this discussion, the Supreme Court concluded that the school district in *Bethel School District* "acted entirely within its permissible authority in imposing sanctions upon [the student] in response to his offensively lewd and indecent speech."  *Id.*

Although *Bethel School District* primarily addressed regulation of speech in a school setting, the Court's reference to the case involving a radio broadcast outside the school setting signals the Court's broader concern with "vulgar[]"

speech made when "children [are] undoubtedly in the audience." *Id.* Viewed in this context, portions of the challenged legislation could have well been salvaged.

I would also have pursued more assiduously a narrowing construction of the legislation. *See, e.g., California Teachers Ass'n. v. State Bd. of Educ.*, 271 F.3d 1141, 1147 (9th Cir. 2001), *as amended.* ("[B]efore invalidating a state statute on its face, a federal court must determine whether the statute is readily susceptible to a narrowing construction by the state courts.") (citations and internal quotation marks omitted); *see also Human Life of Wash., Inc. v. Brumsickle*, 624 F.3d 990, 1009 (9th Cir. 2010) (noting that "[t]o avoid [an] unconstitutional result, the *Buckley*[1] court adopted the lower court's narrowing construction of the definition of political committees") (citation and internal quotation marks omitted); *California Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1098 (9th Cir. 2003) (considering the "narrowing construction of the statute" by the California Court of Appeal, and concluding that the narrowed definition of a provision in the statute saved the statute from "overreach[ing]"); *American Bankers Ass'n. v. Lockyer*, 541 F.3d 1214, 1217 (9th Cir. 2008) (discussing that the "appeal turns on whether *narrowing* section 4053(b)(1) to exclude the regulation of consumer report information would effectuate the intent of the California Legislature and whether the Legislature would have preferred the narrowed statute to no statute at all") (emphasis in the original).

Even if the parties have not requested or suggested a narrowing construction, we have an obligation, in my view, to consider whether the language of legislation can be narrowed to avoid a finding of unconstitutionality. *See*

---

[1] *Buckley v. Valeo*, 424 U.S. 1 (1976).

*California Teachers Ass'n*, 271 F.3d at 1147.  A potential narrowing interpretation that comes readily to mind is a requirement of parental consent for those performances that could be described as "vulgar."  *Bethel Sch. Dist.*, 478 U.S. at 685. *Cf. United States v. Am. Library Ass'n, Inc.*, 539 U.S. 194, 199, 213-14 (2003) (upholding against a First Amendment challenge a statute requiring public libraries receiving federal assistance for providing Internet access to install filtering software to "prevent minors from obtaining access to material that is harmful to them.")   A similar rationale could support a parental consent condition.